March 26, 2003

FILED
OFFICE
D 1:45

Assist to Outside Agency.

At approximately 2:30pm I, Sgt. Riordan, while in the dispatch area read a CJIS message regarding a bank robbery that had occurred earlier in the day in No. Andover. The description of the individual involved, including clothing, had similarities to a M.C. student, (Brett Godette),I had seen earlier in the day and was familiar with. The individual was wearing a "dew-rag", baggy clothing, baggy grey sweatshirt with front zipper and what I perceived to be workout clothing. I ran the listed plate included in the CJIS message through our in house decal program and came up with a match to another M.C. student. I informed Lt. Wlodyka of this and asked him to inform Chief Mayrose as soon as possible and that I would be notifying N.A.P.D. I informed Officer Rogers of this as he had also seen the individual in question earlier in the day and agreed that there were similarities in the description of the individual as well as the clothing being worn.

Two M.C. mobile units were given the plate information and conducted a campus wide search for same. This search produced negative results. Chief Stanley, Lt. Gallagher, Inspectors Cronin and Heffernan of the N.A.P.D. responded to the campus and met with Chief Mayrose, Officer Rogers and myself. Officer Salois, N.A.P.D., also responded in a marked unit and stood-by in same. They were shown, per Chief Mayrose's instructions, photos of both individuals. These photos were compared to surveillance photos from the incident and again similarities were noted.

Officer Anderson was dispatched to pickup Inspector Heffernan and Officer Rogers. They proceeded in a M.C. marked unit to the Monican dorm. They responded to the on campus resident of the individual in question to check on his whereabouts. All three officers went to the approximate location of the individual's residence. All three stood in the area while dispatch placed a telephone call to the room. The call went unanswered and began to go to Audix (voice mail) and was terminated. Officer Rogers, in plainclothes stayed in the foyer area to watch for the individual while Officer Anderson and Inspector Heffernan returned to the marked cruiser parked in front of Monican. Officer Rogers radioed that the individual was walking through the lobby of the building heading in the direction of the exit. Officer Anderson and Inspector Heffernan responded immediately from their location. They made contact with the individual in the lobby area. Inspector Heffernan told the individual that she wanted to talk to him and to walk over to the wall and to put his hands up on the wall. Inspector Heffernan told him that he was not under arrest but that she just wanted to talk to him and was handcuffing him for our safety. Chief Stanley, Lt. Gallagher, Inspector Cronin and I arrived shortly after hearing Officer Rogers transmission. Officer Anderson and I exited the foyer area and stood-by at the entrance to the dorm. Chief Mayrose arrived shortly after.

Inspectors Heffernan and Cronin escorted the individual to his room. Chief Stanley, Lt. Gallagher, Chief Mayrose and I followed behind. Inspectors Heffernan and Cronin along with the individual entered his room. All other parties present including

Officer Salois, who had arrived at the location, remained in the hallway. We were joined there by Sgt. Pattullo, Inspectors Wallace, Heseltine and Keefe of the A.P.D. Detective Division.

Comparisons of the surveillance photos with the individual were made by most parties present and again similarities were noted. The interview was completed and the individual exited his room and left the area. All investigating personnel cleared at this time.

Officer Rogers, during the process, attempted to contact the individual's instructor to verify his whereabouts during the time of the incident. Officer Rogers received a return call from the instructor sometime later. The instructor did in fact verify his attendance in her class from approximately 11:00am 'til approximately 11:45am. I immediately notified Inspector Cronin of this. As previously requested, by Inspector Cronin, M.C.C.P. checked all campus parking lots looking for the previously referenced M.V. The registered owner was scheduled for a class here at 6:00pm that evening. This check resulted in negative results.

This is a summary of events as they occurred to the best of my knowledge.

Sgt. Michael E.

Riordan

M.C.C.P.



```
**** CJIS DISPLAY FOR LMC901  ON 01/05/05  10:52 EST
*** RECORD NOT FOUND       MSG ID = 02.3081
 KEYS USED = REF/           NIC/           LOJACK REPLY CODE/
             LIC/  9095ZB  LIS/    LIT/PC  VIN/
             NAM/                           DOB/       RAC/  SEX/
             SOC/           OLN/            WAR/

ALARS,NCIC
                        CJIS 009184   01/05/2005 1052   S0751/6512.
UN.
   1N01VPQ0002619
MA005389E

NO NCIC WANT LIC/9095ZB.>-<
                        CJIS 009184   01/05/2005 1052   S1512/6512.
                    MASSACHUSETTS REGISTRY OF MOTOR VEHICLES    01/05/05 1052
                        REGISTRATION / TITLE  INQUIRY
STATUS: SWAP/                                   STATUS DATE:06/06/2003
REG#: 9095ZB   TYPE: PAN.  PLATE-COLOR: R    VIN#:
                                  DR   PASS   CYL  WT:0000000.   MDL#
EFF DT: 07/18/2002  EXP DT: 05/04  ORI-ISS-DT:07/18/2002   BUS:
                    ----------------OWNERS----------------
1:IANNELLI        ,STEVEN      M      2:                ,
LIC1: S16136302      DOB 08/19/1980     LIC2:               DOB 00/00/0000
CORP/CO NAME:
MAIL ADD:93 WEBSTER ST        ,           E. BOSTON      ,MA 02128-2708
RES  ADD:                     ,                          ,   00000-0000
                    ----------------TITLE ----------------
TITLE#        ,   STATUS,DATE:      ,00/00/0000.    PURCH DT:00/00/0000
TITLE-DT:00/00/0000                           PREV-TITLE-ST:
INS-CO: 153.  NAME: ARBELLA MUTUAL INS
                    ----------------LESSEE----------------
LESSEE NAME 1:
LESSEE NAME 2:
LESSEE ADDR:
LESSEE LIC# 1:                    LESSEE STATE1:
LESSEE LIC# 2:                    LESSEE STATE2:
LESSEE-CORP:
Stkr#-dt:   - 01/12/1985   Insp rslt:
```

S 124385  03/26/03 1313 AGB.

JIS ADMINISTRATIVE BROADCAST FOR AGB 032603 1312 EST
            FROM LNOH01    MS6N0 0263

XT
M:   NORTH ANDOVER POLICE DEPARTMENT
O.   SURROUNDING TOWNS AND COMMUNITIES
E:   ARMED BANK ROBBERY
URED ON 03/26/03 AT ABOUT 11:38 OUR SOVEREIGN BANK, 149 MAIN ST,
TH ANDOVER, WAS ROBBED BY A HISPANIC MALE, 20'S, 5'09" WEARING A
TE HAT WITH A DO-RAG UNDERNEATH  GRAY SHIRT ZIP UP SHIRT WITH DARK
EVES, "RW" ON CHEST.  ALSO LOOKING FOR MA REG 9096ZB ON A 2003
SUBISHI ECLIPSE HATCH GRAY.  TWO MALES WEARING WHITE BASEBALL CAPS IN
NT SEAT AND ONE MALE IN BACKSEAT WEARING A BLUE BASEBALL CAP.
***GUN WAS SHOW****** CONTACT NORTH ANDOVER POLICE, 978-683-3168.


                AUTH:  LT JOHN CARNEY     OPER:  DONNA SAVASTANO


IS 137301   03/26/2003 1348   S1512/G512.
= = = = = = = = MATCHING RECENT QUERIES = = = = = = = = = =

Y   MALDEN PD - MOBILE        OEA: MAL   STA: 1091   TEL: 781-397-7171
C: 2440YX   MA PC VIN:                       DATE: 031303 TIME: 0621
M: CRONIN-                                   RSN:



**STUDENT** ID

**Godette**

**Brett S**

ISSUED: __/__/____

EXPIRES: 05/31/2004

D.O.B.: 03/19/1982



Under 21 Until

6























TELL 03/26/2003 11:34:15



TELL 03/26/2003 11:34:43









## Page 1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS
C.A. NO.: 05-11354JLT

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

BRETT S. GODETTE,
            PLAINTIFF

        vs.

RICHARD STANLEY, DIANE HEFFERNAN,
DANIEL CRONIN, PAUL CALLAGHER,
WILLIAM WALLACE, DONALD ATTULLO,
CHARLES HESELTINE and PATRICK KEEFE,
Individually and as Police Officers
of Their Respective Municipalities,
LT. RIORDON, TOWN OF NORTH ANDVOER,
TOWN OF ANDOVER, and MERRIMACK
COLLEGE,
            DEFENDANTS

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

DEPOSITION OF BRETT S. GODETTE, a

witness called on behalf of the Defendants,

pursuant to Massachussetts Rules of Civil

Procedure, before Meredith A. Fairbanks, a

Notary Public and Shorthand Reporter in and for

the Commonwealth of Massachusetts, at the

offices of Merrick, Louison & Costello, 67

Batterymarch Street, Boston, Massachusetts

02110, on Thursday, October 19, 2006, commencing

at 9:31 a.m.

## Page 2

1  Appearances:
2
    Paul J. Klehm
3   Krasnoo Klehm, LLP
    23 Main Street
4   Terrace Level, Suite One
    Andover, MA 01810
5   (978)475-9955
    For the Plaintiff;
6
    Regina M. Ryan
7   Merrick, Louison & Costello, LLP
    67 Batterymarch Street
8   Boston, MA 02110
    (617)439-0305
9   For the Defendants.
10
    Allison C. Ayer
11  Nelson, Kinder, Mosseau & Saturley, PC
    99 Middle Street
12  Manchester, NH 03101
    (603)647-1800
13  for the Defendant Merrimack College.
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1           EXAMINATION INDEX
2
    Brett Godette
3     DIRECT BY MS. RYAN . . . . .Page 4
      CROSS BY MR. KLEHM . . . . .Page 151
4     CROSS BY MS. AYER . . . . . .Page 153
5           EXHIBIT INDEX
6
    1   Four Individual Statements...Page 139
7
    2   Photographs on Four Pages...Page 143
8
    3   Diagram...Page 173
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1           Brett Godette, a witness
2  called on behalf of the Defendant, having been
3  properly identified and sworn under oath,
4  testified as follows:
5               * * *
6           DIRECT EXAMINATION
7  BY MS. RYAN:
8     Q.  Good morning, Mr. Godette.  As I told
9  you, my name is Regina Ryan and I represent the
10 Andover police and the North Andover police and
11 all of the individual police officers from those
12 two departments that have been named in the
13 lawsuit that you have brought and I'm going to
14 be asking you a series of questions today
15 pertaining to your claim and the allegations
16 that you've made against those officers.
17          If at any point during this deposition
18 you want to take a break, I see you have an
19 injury with your crutches here today, I'd be
20 happy to accommodate you in any way.  Okay?
21    A.  I appreciate that.
22    Q.  I'm sorry?
23    A.  I appreciate that.
24    Q.  Okay.  And if I ask you a question,

Page 9

1    Q.  And where did you reside prior to
2   that?
3    A.  Irvington, New Jersey.
4    Q.  And for how long did you reside in
5   Irvington?
6    A.  Two.
7    Q.  And where did you reside prior to
8   that?
9    A.  South Bronx.
10   Q.  South Bronx, New York?
11   A.  Yes.  With my mother.
12   Q.  How long did you reside there?
13   A.  Zero to two.  I was born in Norfolk,
14  Virginia.
15   Q.  Okay.
16   A.  My mother went to Norfolk, Virginia
17  when she was pregnant with me.  She didn't have
18  anybody to take care of her, so she went down
19  there to get taken care of by some friends and
20  gave birth to me and then immediately I was back
21  in the Bronx.
22   Q.  And you stayed there until you were
23  two, approximately?
24   A.  I can't remember, but that's what my

Page 10

1   mother told me.
2    Q.  And then you went to Irvington,
3   Keasbey and then you went to Las Vegas and then
4   you came back to New Jersey; is that correct?
5    A.  Yes.
6    Q.  And then you went to Merrimack
7   College?
8    A.  Yes.
9    Q.  Did you graduate in four years?
10   A.  Yes.
11   Q.  And did you play basketball for
12  Merrimack?
13   A.  Yes.
14   Q.  And when you went to Las Vegas for the
15  year, was that for school purposes or did you
16  move there for other reasons?
17   A.  When I went to Las Vegas as a
18  freshman?
19   Q.  Yes.
20   A.  My mother moved from New Jersey to Las
21  Vegas.        .
22   Q.  And were you raised by your mother?
23   A.  Yes.  Even when I wasn't living with
24  my mother, I was being raised by my mother.

Page 11

1    Q.  And at what point when you were
2   growing up did you not live with your mother,
3   but you were raised by your mother?
4    A.  When I left Las Vegas.
5    Q.  And you returned to East Brunswick?
6    A.  New Jersey, yes.  I didn't return to
7   East Brunswick directly.
8    Q.  Okay.
9    A.  I returned, initially returned, to
10  live with friends of the family.  Situation
11  wasn't quite working out and I initially told
12  the coach over at the high school that I was
13  playing for that I might need to go back home
14  with my mother.
15          Because I left Las Vegas primarily
16  because the fast-paced -- the environment just
17  wasn't very conducive for education.  The school
18  system out there is either 50 or, at the time,
19  it was either 50 or 51 -- 49 in the nation.  My
20  mother, she was upset that she took me out there
21  to go to school there.
22   Q.  So you came back to New Jersey.  You
23  lived with some friends.  You enrolled in
24  school; correct?  And then at some point you

Page 12

1   stopped residing with those family friends?
2    A.  Yes.
3    Q.  And where did you go?
4    A.  I resided with my high school coach.
5    Q.  And that was the high school coach of
6   the East Brunswick basketball team?
7    A.  No.  St. Peters High School.
8    Q.  Is that a private school?
9    A.  Yes.  Catholic school in New
10  Brunswick, New Jersey.
11   Q.  How long did you reside with your
12  coach?
13   A.  Until I graduated high school.
14   Q.  Did you graduate from St. Peters?
15   A.  No, I did not.
16   Q.  Why did you leave St. Peters?
17   A.  I was asked to leave St. Peters.
18   Q.  Why were you asked to leave
19  St. Peters?
20   A.  I had one too many detentions, two too
21  many detentions.  Shirt untucked.
22   Q.  So you were asked to leave St. Peters,
23  so then you enrolled in the public school of
24  East Brunswick; is that correct?

2  (Pages 5 to 8)

Page 5

1   I'm going to assume that you understood the
2   question that I asked of you.  So if you provide
3   a response to it, I'll assume that you
4   understood the question.  If you don't
5   understand a question that I ask of you, just
6   ask me to repeat it or rephrase it and I'll be
7   happy to that.
8       A.  Oh, okay.
9       Q.  The other thing is, I need you to give
10  me verbal responses to each question that I ask
11  of you.  So you can't nod your head or say
12  "uh-huh."  I actually need verbal answers
13  because she's taking down all your testimony
14  here today and she needs to have words to put
15  into the transcript.
16      A.  Yes.
17          MS. RYAN:  And we'll have usual
18  stipulations.  It's in federal court.  And an
19  objection by one is an objection by all.
20          MR. KLEHM:  Read and sign 30
21  days.  Waive notary.
22          MS. RYAN:  Great.
23  BY MS. RYAN:
24      Q.  Could you please state your name?

Page 6

1       A.  Brett Godette.  Middle name Stefone.
2       Q.  Can you spell that?
3       A.  B-R-E-T-T.
4       Q.  You can keep going.  I'll just take
5   notes throughout the deposition, but she's
6   making the book.  So my notes are kind of just
7   scatter-brained anyways, so just don't worry
8   about me.  You just provide your responses.
9           MR. KLEHM:  I think it was the
10  "Stefone" she wanted you to spell.
11      A.  S-T-E-F-O-N-E.
12      Q.  And your date of birth, sir?
13      A.  3/19/82.
14      Q.  And your Social Security number?
15          MR. KLEHM:  I'll provide it in a
16  letter to you, but not in the transcript, if
17  that's acceptable.
18          MS. RYAN:  That's acceptable.
19      Q.  Where do you presently reside?
20      A.  Presently, I just moved to New Jersey,
21  back to New Jersey.  I was residing in Maryland.
22      Q.  Now, maybe we can just back up a
23  little.  You went to Merrimack College; is that
24  correct?

Page 7

1       A.  Yes.
2       Q.  Did you graduate from Merrimack?
3       A.  Yes.
4       Q.  What year did you graduate?
5       A.  2004.
6       Q.  Now, prior to enrolling at Merrimack
7   College, where did you, we'll say, grow up?
8       A.  I grew up in New Jersey, primarily,
9   Las Vegas --
10      Q.  Why don't we --
11      A.  California.
12      Q.  -- back up a little.
13      A.  Okay.
14      Q.  Did you graduate from high school?
15      A.  Yes.
16      Q.  What high school?
17      A.  East Brunswick High School.
18      Q.  In New Jersey?
19      A.  Yes.
20      Q.  Did you complete all four years of
21  high school in East Brunswick?
22      A.  No.
23      Q.  Where else did you reside or what
24  other schools did you attend?

Page 8

1       A.  I went to Palo Verde High School.
2       Q.  Where is that --
3       A.  P-A-L-L-V-E-R-D-E.
4       Q.  Where is that?
5       A.  That's Las Vegas, Nevada.
6       Q.  What years of high school did you
7   attend Palo Verde High School?
8       A.  My freshman year of high school, which
9   was -- I do not recall the year.
10      Q.  That's understandable.  And for how
11  long did you reside in Las Vegas?
12      A.  Nine months.
13      Q.  And where did you --
14      A.  For the school year.
15      Q.  Where did you reside prior to Las
16  Vegas?
17      A.  New Jersey.
18      Q.  In East Brunswick?
19      A.  No.
20      Q.  What part of New Jersey?
21      A.  A town called Keasbey, K-E-A-S-B-E-Y.
22      Q.  And for how long did you live in
23  Keasbey, New Jersey?
24      A.  From about seven to 13, six to 13.

4  (Pages 13 to 16)

Page 13

1      A.  Yes. I enrolled into East Brunswick
2   because that's where Bob Green, who was my
3   coach, resided in East Brunswick.
4      Q.  So he --
5      A.  So he resigned -- he resigned from --
6   after this occurred, he resigned from
7   St. Peters.
8      Q.  And was he a teacher and the
9   basketball coach or just the basketball coach?
10     A.  No, he was just the basketball coach.
11     Q.  Did he resign as a result of you being
12  asked to leave St. Peters?
13     A.  I never asked him.
14     Q.  And then you continued to live with
15  Mr. Green? Was it Mr. Green?
16     A.  Mr. Green.
17     Q.  Until you went to Merrimack College;
18  is that correct?
19     A.  Mr. Green, Patricia Green, which is
20  his wife, and his two daughters, Shannon and
21  Jenny, who I see as, like, little sisters.
22     Q.  And your mother continued to live in
23  Las Vegas while you went through high school;
24  is that correct?

Page 14

1      A.  Yes.
2      Q.  And is she still in Las Vegas?
3      A.  No.
4      Q.  Okay. So then you went to Merrimack
5   College; correct?
6      A.  (Witness shakes head.)
7      Q.  You have to say "yes."
8      A.  Yes.
9      Q.  Everyone does it. Don't worry about
10  it. And then you graduate from Merrimack in
11  2003?
12     A.  Four.
13     Q.  2004. And then where do you go?
14     A.  From there, I went to live with Coach
15  Green for the summer.
16     Q.  In East Brunswick?
17     A.  In East Brunswick.
18     Q.  New Jersey?
19     A.  Right.
20     Q.  Okay.
21     A.  Just to, after college, kind of get
22  myself together. Really didn't have a plan.
23     Q.  And then what happened?
24     A.  And then my mother moved to -- she was

Page 15

1   in Maryland. She moved to Maryland, so went to
2   live with my mom for a little bit and kind of,
3   you know, rekindle eight -- I hadn't lived with
4   her for eight years. You know, this situation
5   happened to me. She really wanted to kind of be
6   close to me. Situation that we're discussing.
7      Q.  What situation?
8      A.  The situation that happened to me.
9      Q.  The incident involving the police?
10     A.  Yes.
11     Q.  Okay. As a result of that incident --
12     A.  Yes, she was worried for me.
13     Q.  So she moved from Las Vegas to
14  Maryland?
15     A.  Not because. She moved --
16         MR. KLEHM: Objection. Go
17  ahead. You can answer.
18     Q.  Right. If he objects, you can still
19  answer.
20     A.  Okay. What was the question?
21     Q.  Did she move from Las Vegas to
22  Maryland because of the incident involving --
23     A.  No.
24     Q.  -- the police?

Page 16

1      A.  She got a position with Kaiser
2   Permanente. My mom is a RN.
3      Q.  Okay. Do you remember when she --
4      A.  So this happened to be close and I was
5   visiting from New Jersey initially and, on one
6   of my visits, she just, she told me she's really
7   worried for me. Just, that's all. I mean,
8   that's what she said.
9      Q.  Do you remember when your mother moved
10  from Las Vegas to Maryland?
11     A.  I don't recall.
12     Q.  Were you at Merrimack?
13     A.  I'm not sure. I spoke to my mom
14  rather infrequently while in college.
15     Q.  When this incident occurred on March
16  26, 2003, did you contact your mother?
17     A.  Yes.
18     Q.  How soon after?
19     A.  I attempted to contact her the same
20  day.
21     Q.  And what happened?
22     A.  I couldn't get through.
23     Q.  And so when did you ultimately speak
24  to her?

Page 17

1   A.  Ultimately spoke to her within, within
2   a few days.  Like a day or two.
3       Q.  Would you have called her on a cell
4   phone or a dorm phone?
5       A.  I don't recall.
6       Q.  Did you have a cell phone?
7       A.  I do not believe I had a cell phone at
8   that time.  No, I didn't have a cell phone at
9   that time.
10      Q.  Did you have a phone in your room at
11  college?
12      A.  I did have a dorm room phone, but it
13  only allowed you to call --
14      Q.  Locally?
15      A.  -- on campus.  I believe I may have
16  used my coach's phone.  My coach let me use his
17  phone to call my mom.
18      Q.  Who was your coach?
19      A.  Bert Hammel.
20          MR. KLEHM:  Can we go off for
21  just one second.
22          (There was a discussion off the
23          record.)
24  BY MS. RYAN:

Page 18

1       Q.  Curt Hammel?  I'm sorry, who is your
2   coach?
3       A.  Bert.
4       Q.  Bert Hammel?
5       A.  Mm-hmmm.
6           MR. KLEHM:  Is that a "yes?"
7           THE WITNESS:  Yes.
8       Q.  Now, backing up, so you're not sure if
9   your mother moved from Las Vegas to Maryland
10  while you were in college; correct?
11      A.  Not quite sure when it was.  It was
12  either -- you know what?  She moved -- she lived
13  in Florida.  She lived in Florida for six months
14  from Vegas and I don't know, like, I don't know
15  which six months or which eight months she was
16  in Florida, but she went from Vegas to Florida
17  to Maryland.
18          But during that Florida period, I
19  didn't, I didn't -- I wasn't so much in contact
20  with her.  I was more or less focused on school,
21  basketball.
22      Q.  So while you were in college, she
23  moved from Las Vegas to Florida; is that
24  correct?

Page 19

1       A.  Yes.
2       Q.  And then, at some point after that,
3   she moved to Maryland; is that correct?
4       A.  Yes.
5       Q.  Now, you testified that after you
6   graduated from Merrimack College in 2004 you
7   went to East Brunswick, New Jersey and you lived
8   with Coach Green for a period of time; is that
9   correct?
10      A.  Yes.
11      Q.  And do you know how long of a period
12  you lived with Coach Green?
13      A.  Sophomore, junior, senior year.  Three
14  years.
15      Q.  No.  When you graduate from Merrimack
16  --
17      A.  Oh, after graduating?
18      Q.  My question is:  After you graduated
19  from Merrimack in 2004, you went to live with
20  Coach Green; is that correct?
21      A.  Mm-hmmm.  Yes.
22      Q.  And for how long did you live with him
23  at that point?
24      A.  About five months.

Page 20

1       Q.  And then where did you live?
2       A.  In Maryland with my mother.
3       Q.  What part of Maryland was that?
4       A.  Rockville, Maryland.
5       Q.  Did anyone else live with you and your
6   mother?
7       A.  My little brother.
8       Q.  What's your mother's name and what's
9   your little brother's name?
10      A.  My brother's name is Brian.  My
11  mother's name is Linda.
12      Q.  And what's their last names?
13      A.  My brother's last name is Bykowski,
14  B-Y-K-O-W-S-K-I, which is his father, which was
15  my stepfather growing up.  And my mother's last
16  name, she goes by G-Bykowski.  G, dash,
17  Bykowski.  Because I have my mother's maiden
18  name.
19      Q.  And how long did you reside with your
20  mother and your brother in Rockville, Maryland?
21      A.  Until -- until about ten months ago.
22      Q.  So you would have lived with her until
23  2005; is that correct?  Sometime in 2005?
24      A.  Yes.  Until about November of 2005.

6  (Pages 21 to 24)

Page 21

1    Q.  And then where did you go?
2    A.  At that point, I had no place to go.
3    Q.  And why did you --
4    A.  I was homeless for a while.
5    Q.  And why did you leave Maryland?
6    A.  I left Maryland because one of my best
7  friends, the person with whom I lived with, the
8  person with whom I lived with when I first came
9  back to New Jersey, the family that I lived
10  with --
11    Q.  The Greens?
12    A.  No.  These are the Channers.
13    Q.  Okay.  You know what?  I'm just going
14  to ask you not to read my notes.  I know you're
15  not -- I know you're making sure I'm writing
16  everything.
17    A.  I apologize.
18        MS. RYAN:  No.  We can even take
19  this off the record.
20        (There was a discussion off the
21        record.)
22  BY MS. RYAN:
23    Q.  You graduated from Merrimack.  You
24  lived with the Greens for a period of time;

Page 22

1  correct?  For eight months, I believe you
2  testified to.
3    A.  Yes.  No, eight months?  No.  After
4  graduating from Merrimack?
5    Q.  Correct.
6    A.  It was about five months.
7    Q.  So that would have been, say, from May
8  until about October; is that right?
9    A.  Yes.
10    Q.  2004?
11    A.  Four or five months.
12    Q.  Who are the Channers?
13    A.  The Channers, the Channers are the
14  family of my best friend since I was -- since I
15  moved to Keasbey, which was around seven, eight.
16    Q.  Who is your best friend?
17    A.  Jermaine Channer.  That's why I moved
18  back to New Jersey.
19    Q.  When?
20    A.  He is why I moved back to New Jersey
21  most recently.
22    Q.  So just let me -- bear with me for one
23  minute.  You graduated from Merrimack in May of
24  2004.  You went and lived with the Greens until

Page 23

1  approximately October of 2004.  And we
2  understand that these dates may not be exactly
3  correct, but you're giving me your best
4  estimate; is that correct?
5    A.  Oh, yes.  Yes.
6    Q.  Then in October of 2004 you moved to
7  Rockville, Maryland to live with your mother;
8  is that correct?
9    A.  Yes.
10    Q.  And you lived with your mother until
11  November of 2005; correct?  So you would have
12  lived with your mother for about 13 months?
13    A.  Fourteen months or so, on and off.  On
14  and off.
15    Q.  Where were you going on the off?
16    A.  On the off, staying with friends.  My
17  mom, she really, she --
18        MR. KLEHM:  I think you've
19  answered her question.
20    A.  I don't like to talk about it.
21    Q.  Were you having problems when you were
22  living with your mom with your relationship with
23  your mother?
24    A.  In my mother's opinion.

Page 24

1    Q.  Ultimately, you move out of Rockville,
2  Maryland in November of 2005; is that correct?
3    A.  Yes.
4    Q.  And where do you go?
5    A.  I had no place to go.
6    Q.  Did she ask you to leave?
7    A.  Yes.
8    Q.  And why did she ask you to leave?
9    A.  She felt I needed to get some help.
10    Q.  And what did she think you needed help
11  with?
12    A.  Expressing myself.  She said I was
13  depressed.
14    Q.  Anything else?
15    A.  That's about it.
16    Q.  Okay.  So in November of 2005, you
17  move out of your mother's house in Rockville,
18  Maryland and for a period of time you were
19  homeless; is that correct?
20    A.  Yes.
21    Q.  And where were you homeless?
22    A.  Where?
23    Q.  Yes.  If that question makes sense.
24        MR. KLEHM:  Just object to the

Page 25

1  form. Go ahead.
2      A. For a period of time, I was from
3  friend to friend and, most recently, most
4  recently, I resided at my place of employment.
5      Q. And what's your place of employment?
6      A. I worked for Verizon.
7      Q. When did you reside with the Channers?
8      A. Well, which time? Jermaine Channer
9  most recently or...
10     Q. It was my understanding that you moved
11 out of your mother's because of Jermaine
12 Channer?
13     A. Oh, no. Most recently? Or are you
14 discussing from Vegas, from when I was in Las
15 Vegas? I don't understand the question.
16     Q. Did you live with the Channers after
17 Vegas?
18     A. When I moved? Yes.
19     Q. That was the family that it didn't
20 work out, and then you moved in with Coach
21 Green?
22     A. Yes. Because Jermaine Channer,
23 Jermaine Channer got kicked out by his mother
24 and I was residing there without him even being

Page 26

1  there.
2      Q. Okay. And now you left your mother's
3  in Rockville, Maryland; correct?
4      A. Yes.
5      Q. And after that, at any point, did you
6  reside with Jermaine Channer since November of
7  2005?
8      A. No.
9      Q. Okay.
10     A. Up until now. Until present. I'm
11 staying with him right now.
12     Q. When did you start saying with
13 Jermaine Channer?
14     A. Say about two months ago. Two, three
15 months ago.
16     Q. And where are you and Jermaine Channer
17 residing?
18     A. As -- Brick, New Jersey.
19     Q. Asbrick?
20     A. No. Brick, New Jersey. It's right
21 next to a town called Asbury Park. I confuse
22 them sometimes.
23     Q. Do you have an apartment?
24     A. He has an apartment with his newborn,

Page 27

1  which is my goddaughter, and the mother of his
2  child.
3      Q. And so it's you, Jermaine, the newborn
4  baby and the baby's mother; is that correct?
5      A. (Witness shakes head.)
6      Q. All residing in an apartment?
7      A. (Witness shakes head.)
8      Q. I'm just asking if that's a "yes." I
9  see you nodding your head.
10     A. I have a question.
11     Q. Do you want to confer with counsel?
12         MR. KLEHM: Sure. Under the
13 circumstances, do you mind stepping out?
14         MS. RYAN: Oh, sure.
15         (A break was taken.)
16 BY MS. RYAN:
17     Q. So at the present time, you're
18 residing in Brick, New Jersey with Jermaine
19 Channer, his newborn baby, the baby's mother;
20 is that correct?
21     A. Yes.
22     Q. But you hold Rockville, Maryland as
23 your legal address; is that correct?
24     A. Yes. Like, my driver's license is a

Page 28

1  New Jersey driver's license with a Maryland
2  address.
3      Q. Okay. So if you had to put a primary
4  residence down, you'd put down Rockville,
5  Maryland; is that correct?
6      A. Right. Because my mail is still going
7  to my mother's.
8      Q. And before you testified that you were
9  living at your place of employment?
10     A. Yes.
11     Q. What did you mean by that?
12     A. I worked for a company called Ober
13 Wireless. It's a Verizon indirect distributor,
14 cell phones. I was living in the store.
15     Q. Were there apartments in the store for
16 you to live in or were you just sleeping there?
17     A. Sleeping there, waking up and
18 working.
19     Q. Were you the manager of that store?
20     A. I was the only person who worked at
21 that store primarily unless they gave me a day
22 off.
23     Q. Did they know you were living there?
24     A. Yes.

8   (Pages 29 to 32)

Page 29

1    Q.  And did they object to that?
2    A.  No.
3         MS. AYER:  I'm sorry.  I didn't
4    hear the answer.
5         THE WITNESS:  No.
6         MS. AYER:  Okay.
7    Q.  Now, prior --
8         Strike that.  From October 2005,
9    or November of 2005, when you left Rockville,
10   Maryland until two months ago when you moved in
11   with the Channers -- are you following me?
12   A.  Can you restate that?
13   Q.  Sure.  In November of 2005, you left
14   Rockville, Maryland; correct?
15   A.  Yes.
16   Q.  Were you homeless up until the time
17   you moved in with the Channers two months ago?
18   A.  I had friends and I had a girlfriend
19   who would help me out, but I didn't really feel
20   comfortable staying there.  You know, so I was
21   really from place to place.  That's the best way
22   to put it.
23   Q.  Do you intend to stay at the Channer's
24   for an extended period of time?

Page 30

1    A.  I intend to stay there until I get on
2    my feet.
3    Q.  Have you been back to Rockville,
4    Maryland since you left in November of 2005?
5    A.  Yes.
6    Q.  And has your relationship with your
7    mother improved since you moved out in November
8    of 2005?
9    A.  Yes.
10   Q.  Had you sought any treatment for your
11   depression since you left in 2005?
12   A.  I mean, my mother is a nurse.  I just
13   talk to my mom.  No, nothing as far as I haven't
14   been -- I haven't been given a condition.
15   Q.  I'm sorry?
16   A.  I mean, you said treatment.  Treatment
17   for -- I don't know what you mean.
18   Q.  You said November of 2005 you moved
19   out of your mother's home because she said that
20   you needed help expressing yourself and she felt
21   that you were depressed; is that correct?
22   A.  Oh, okay.  Yes.
23   Q.  Since then, had you --
24   A.  No.

Page 31

1    Q.  -- sought any treatment for the
2    depression?
3    A.  No, I didn't.  I kind of want to take
4    heed to my mother's advice because I believe in
5    what my mother says, but at that time I didn't
6    have insurance or, you know, my main priority
7    was just feeding myself at that time and
8    shelter.
9    Q.  When you worked at Ober Wireless?
10   A.  Yes.
11   Q.  Did you have insurance?
12   A.  No.
13   Q.  Now, have you told me, to the best of
14   your ability here today, all the places that you
15   have resided at since you were born?
16   A.  Yes.
17   Q.  Now, if we can just walk through your
18   employment history, are you presently employed?
19   A.  No.
20   Q.  When was the last time you were
21   employed?
22   A.  Ober Wireless.
23   Q.  And for how long were you employed by
24   Ober Wireless?

Page 32

1    A.  Two months.  Two and a half months.
2    Q.  And when was that?
3    A.  About July 15th to September 1st.  Or,
4    actually, middle of August.
5    Q.  Okay.  And what was your salary?
6    A.  My salary was 600 every two weeks.
7    Q.  And who was your supervisor there?
8    A.  I'm not quite sure.
9    Q.  And what was the position that you
10   held for Ober Wireless?
11   A.  Ober Wire -- I held -- not quite sure.
12   Q.  Okay.  And what was the reason that
13   you left?
14   A.  Primary reason why I left was what
15   happened with Jermaine.
16   Q.  Were you terminated from your
17   position?
18   A.  Not quite sure.
19   Q.  What happened with Jermaine that
20   caused you to leave?
21   A.  He was shot last year.
22   Q.  When was that?
23   A.  I'm not quite sure the exact date.
24   Q.  When you say last year, do you mean in

Page 33

1   2005?
2       A.   He just says last year to me.  I mean,
3   I try -- I'm trying to get his mind away from
4   stuff, from that, like, so I don't really ask
5   him too much details.  Just...
6       Q.   So it's your understanding that
7   Jermaine was shot approximately a year ago; is
8   that correct?
9       A.   Yes.
10      Q.   And that was the reason why you left
11  Ober Wireless; is that correct?
12      A.   When I found out -- that was the first
13  time I had talked to him since I lived with him
14  six years prior.  He didn't know what was really
15  going on in my life.  He was filling me in.
16      Q.   And you ultimately learned that he had
17  been shot?
18      A.   Yes.
19      Q.   What did you do as a result of that?
20      A.   As a result of that, I really
21  contemplated my priorities and, you know.
22      Q.   And what did you do?
23      A.   I may never see him again, so kind of
24  wanted to be close to him for a while,

Page 34

1   especially while I'm -- you know, he understood
2   my situation with how I was living and he asked
3   me to come live with him.
4       Q.   And where was Ober Wireless located?
5       A.   Ober Wireless is located -- they had
6   three locations: Clarksburg, Maryland;
7   Fredrick, Maryland; and Germantown, Maryland.
8   Mr. Ken Ober owns the three stores.  He bought
9   franchise from Verizon.
10      Q.   Which one were you working in?
11      A.   Clarksburg.
12      Q.   So approximately two months ago you
13  were living in Maryland; is that correct?
14      A.   Yes.  Two -- two, three months ago,
15  yes.
16      Q.   And how did you get the job at Ober
17  Wireless?
18      A.   Through Marcus Whittaker.
19      Q.   Who is Marcus Whittaker?
20      A.   This is who I lived with at Bob
21  Green's house in high school.  He played for
22  Fairleigh Dickinson University.
23      Q.   And did he know Mr. Ober?
24      A.   Yes.  He was working there before me.

Page 35

1   So I had been discussing the position with Ober
2   Wireless for a couple of months, but they're a
3   start-up company.  There were only four
4   employees, so they were -- they knew I had a
5   business-to-business background and once their
6   company got brewing as a -- on the retail end,
7   they wanted to bring me in to do
8   business-to-business.  But I was training more
9   or less in the retail environment.  That's how
10  they had me training.  The store I was in was
11  rather slow.
12      Q.   And did you just abandon your job
13  after you spoke with Jermaine Channer?
14      A.   No.
15      Q.   Because you said that you left your
16  job because of Jermaine.
17          MR. KLEHM:  Objection.
18      Q.   Is that correct?
19          MR. KLEHM:  Objection.
20      A.   Can I answer?
21      Q.   Yes.
22      A.   That's why I went back to New Jersey.
23  I didn't really have a place to stay, so my
24  employment was also my shelter, was also my --

Page 36

1   any source of income.  And when he extended his
2   arms to me, I thought about it for a month,
3   month or so.  I told him, you know, let me get
4   myself together, see what's best for me to get
5   on my feet, and made that decision.
6       Q.   Did you give two-weeks notice to Ober
7   Wireless?
8       A.   We had an agreement where it didn't
9   require any notice.
10      Q.   Did you tell them you were leaving?
11      A.   I -- that's why I stated that I'm not
12  quite sure if I was terminated or if I left.
13  When I went to a fellow employee to ask where
14  the boss was, he fired -- they fired me.
15      Q.   So you were terminated from Ober
16  Wireless?
17      A.   I'm not sure if it's considered
18  terminated because the person who fired me was
19  also another retail sales person, so it was --
20  that's what I mean.  I don't know.  He told me
21  to leave and he took the keys of the store and,
22  at that point, you know, I had no place to stay
23  for the night, so I went to New Jersey.
24      Q.   Did he say any other reason why he

10  (Pages 37 to 40)

Page 37

1  took the keys?
2     A.  No.
3     Q.  And where were the main headquarters
4  for Ober Wireless?
5     A.  It really isn't a -- I don't know
6  where the main headquarters is.  There's just
7  three locations; Clarksburg, Fredrick,
8  Germantown.
9     Q.  And the president is Ken Ober?
10    A.  President and owner.
11    Q.  O-B-E-R?
12    A.  O-B-E-R.
13    Q.  Where were you employed prior to Ober
14 Wireless?
15    A.  Well, during this whole time period of
16 Maryland, I was a seasonal employee, so I would
17 get -- and to this day I still receive calls
18 from Montgomery County Recreation Department.
19 So routinely, on weekends, after-school
20 programs, things of that nature, I would be
21 asked to do hours.
22    Q.  So for the period of 13 to 14 months
23 when you lived in Maryland with your mother, you
24 were considered a seasonal employee for

Page 38

1  Montgomery County in the rec. department; is
2  that correct?
3     A.  I believe I first started working for
4  Montgomery County -- it took me about three
5  months to get that job when I got down there.
6  January.
7     Q.  So that would have been in January '05
8  you started working for Montgomery County?
9     A.  As a seasonal employee, yes.
10    Q.  And that would be on weekends and
11 after school; is that correct?
12    A.  Times varied.
13    Q.  And who was your supervisor there?
14    A.  Numerous supervisors.
15    Q.  Who was your immediate supervisor, if
16 you had one?
17    A.  Patrick Sullivan.
18    Q.  And what was the nature of your
19 employment there?
20    A.  Sports recreation department.
21    Q.  Would you assist with the children
22 doing sports activities?
23    A.  Oh, that was another department.
24 Eventually, other departments decided to start

Page 39

1  using me for their departments as well.
2     Q.  What were your wages that you were
3  earning there?
4     A.  Depending on the program, the
5  situation, anywhere from ten to $12 per hour.
6     Q.  How many hours a week would you
7  generally work?
8     A.  They varied.  It can be anywhere from
9  20 to zero.
10    Q.  But the most, generally, you would
11 work would be 20 hours a week; is that correct?
12    A.  It's more like a seasonal, part-time
13 position.
14    Q.  When was the last time you worked for
15 Montgomery County?
16    A.  Sunday, this past.
17    Q.  When was the time before that?
18    A.  Sunday prior to that.
19    Q.  So you'll drive from New Jersey --
20    A.  New Jersey.
21    Q.  -- to Maryland in order to work for
22 the rec. department; is that correct?
23    A.  Yes.
24    Q.  And do you generally do that every

Page 40

1  Sunday?
2     A.  Well, what happened was, when
3  everything was taken care of with Ober Wireless,
4  I had already stated to Brad Roos -
5        MS. AYER:  Can you spell "Roos?"
6        THE WITNESS:  R-O-O-S.
7     A.  -- that I would help him with his
8  Sunday soccer, adult soccer league.  I
9  supervised the fields.  I already committed to
10 that, so I already committed to it, so I'm
11 finishing it until the season ends.  So I'm
12 driving from New Jersey every weekend to
13 Maryland just to work that day.
14    Q.  Where were you employed prior to
15 Montgomery County Recreation Department?
16    A.  Ober Wireless.  I mean, what do you
17 mean?  I had Ober Wireless and Montgomery County
18 at the same time.
19    Q.  Okay.  And the employment before that?
20    A.  The employment prior to that was with
21 Nextel.
22    Q.  When did you work for Nextel?
23    A.  December of '05 until November of '06.
24       MS. AYER:  We're in October of

Page 41

```
 1   '06.
 2       A.  I mean, not -- I apologize.  I
 3   apologize.  I know I worked with them for 11
 4   months.
 5       Q.  Where did you reside during that --
 6   stop reading my notes.
 7       A.  Oh, gosh.  Oh, gosh.
 8       Q.  Where did you reside when you worked
 9   for Nextel?
10       A.  When I worked for Nextel, I resided --
11   this is when I was on and off with my mother.
12       Q.  So it was that period when you were
13   living in Maryland?
14       A.  Yes.
15           MS. RYAN:  Can we just break for
16   one second?
17           (A break was taken.)
18   BY MS. RYAN:
19       Q.  Where was the Nextel office that you
20   worked at located?
21       A.  It was located -- I worked for two
22   different locations; one in Silver Spring,
23   Maryland and one in Rockville, Maryland.
24       Q.  At the same time?
```

Page 42

```
 1       A.  Wherever they needed me to run the
 2   store.
 3       Q.  And you'd work in the store?
 4       A.  Yes.
 5       Q.  And were you a sales rep.?
 6       A.  Yes.
 7       Q.  And what were your wages?
 8       A.  Well, I worked two separate positions,
 9   so my wages changed with the two different
10   positions.
11       Q.  And you worked for Nextel for 11
12   months; is that correct?
13       A.  Yes.
14       Q.  And who was your supervisor?
15       A.  Tory Seagers.
16       Q.  How do you spell "Seagers?"
17       A.  I always messed up his name.  I'm not
18   sure.
19       Q.  And the reason why you left Nextel?
20       A.  I'm sorry.  I'm sorry.  I'm just
21   trying to make sure you spelled it right.
22       Q.  I know you're not doing it on
23   purpose.  I'll just keep reminding you.
24       A.  Okay.  What was the question?
```

Page 43

```
 1       Q.  The reason why you left Nextel?
 2       A.  The reason why I left Nextel, they --
 3   basically felt I was being taken advantage of.
 4       Q.  You felt that?
 5       A.  Yes.
 6       Q.  And why did you feel you were being
 7   taken advantage of?
 8       A.  Well, I started there as an outside
 9   sales rep.  Primarily, the reason why I
10   purchased my vehicle was so I can continue
11   working there, which kind of put me somewhat in
12   a burden financially, and then I also moved --
13   they then asked me to work an inside retail
14   position, but continue to do outside sales
15   rep. work.  So that's why I stopped, I stopped
16   working there.
17       Q.  Did you quit or were you terminated?
18       A.  It was rather mutual.
19       Q.  Okay.  Did you --
20       A.  But.
21       Q.  -- give two-weeks notice?
22           MR. KLEHM:  Did you finish your
23   answer?  You said "but."
24           MS. RYAN:  Oh, I didn't hear the
```

Page 44

```
 1   "but."  Sorry.
 2           MR. KLEHM:  Brett, did you finish
 3   your answer?  You said "but" to her.
 4           THE WITNESS:  No.
 5   BY MS. RYAN:
 6       Q.  My question to you was:  Did you quit
 7   or were you terminated?  And I believe your
 8   answer was it was somewhat mutual and then I
 9   think counsel thought I interrupted you.
10       A.  Well, which time are you discussing?
11       Q.  Did you work for Nextel more than
12   once?
13       A.  There was an off-period of working for
14   them for one month in that 11-month period and
15   the owner of the place called me and asked me to
16   come back and work for him as an inside sales
17   rep.
18       Q.  When was that?
19       A.  When he called me?  Is that your
20   question?  When did he call me to come back?
21       Q.  When did you do that one-month
22   employment period?
23       A.  That one month when I wasn't employed
24   by them anymore when I left Nextel?  I don't
```

Page 45

1   understand your question.
2       Q.  Let me back up.  Have you ever been
3   terminated by Nextel?
4       A.  Yes.
5       Q.  When was that?
6       A.  After the 11 months.  When the 11
7   months was up.
8       Q.  And what was the reason you were
9   terminated?
10      A.  I have no idea.
11      Q.  They never gave you a reason why they
12  terminated you?
13      A.  Yes.  It's inconclusive.
14      Q.  After you were terminated, is it your
15  testimony that you were then called back by a
16  supervisor to work there again?
17      A.  I was called back to work there again
18  after I left the outside sales position, and I
19  was called back to work an inside sales
20  position.  Once I worked the inside sales
21  position for maybe a month, a month and a half,
22  when I realized they were asking me to do the
23  same -- they were asking me to do the same
24  duties of an outside sales rep., but at a much

Page 46

1   less salary.
2           And I tried to discuss that with the
3   owner and he disagreed and that's where we
4   strayed and we had to have a mediation meeting
5   with the unemployment offices and that's when I
6   went on unemployment.
7       Q.  And what was your supervisor's name
8   that -- was that Tory Seagers that you had the
9   disagreement with?
10      A.  No.
11      Q.  Who was the one that you had the
12  disagreement with?
13      A.  My disagreement was nothing personal
14  with them.  My disagreement was with salary.
15      Q.  I know.  My question was:  What was
16  the person's name?
17      A.  Oh, Leon Nasar.  He owns the company.
18      Q.  N-A-S-S-A-R?
19      A.  N-A-S-A-R.
20      Q.  And then you sought unemployment
21  wages; is that correct?
22      A.  Yes.
23      Q.  In Maryland?
24      A.  Yes.

Page 47

1       Q.  And do you continue to collect those
2   benefits?
3       A.  No.
4       Q.  For how long did you collect
5   unemployment in Maryland?
6       A.  I believe it was maybe six months.
7       Q.  Since you graduated from Merrimack
8   College, have you held any other positions
9   besides Nextel, Ober Wireless and Montgomery
10  County Recreation Department?
11      A.  I -- yes, I did, actually.
12      Q.  And what was that employment?
13      A.  I was a tutor.
14      Q.  And where were you a tutor?
15      A.  I tutored for a company called Tutor
16  Find.
17      Q.  Tutor?
18      A.  Tutorfind.com.
19      Q.  When was that?
20      A.  Not quite sure when I first began
21  working for them, but it's around the same time
22  period as when I began working for Montgomery
23  County.  So that would be January -- is that
24  '05?  That was January of '05.

Page 48

1       Q.  And for how long did you work for
2   Tutor Find?
3       A.  I still do.
4       Q.  And where is Tutor Find located?
5       A.  I'm not quite sure their location.
6   They're like a cyber company.
7       Q.  And what's the nature of your
8   employment with Tutor Find?
9       A.  They call you with students who can
10  use help with subjects.  They ask if you would
11  like to work with this student.
12      Q.  How much do you get paid for that?
13      A.  It varies all depending on the family.
14      Q.  And do you have a computer?
15      A.  No, I do not.
16      Q.  So how do you communicate with Tutor
17  Find?
18      A.  Public library or I just check my
19  emails when I can.
20      Q.  And do you still own your car?
21      A.  Or if my friends have computers.
22      Q.  Do you still own your car?
23      A.  Yes.
24      Q.  What kind of car is that?

Page 49

1    A.  A Mitsubishi.
2    Q.  And what year is that?
3    A.  2002.
4    Q.  Any other employment besides Tutor
5  Find, Nextel, Ober Wireless and Montgomery
6  County since you graduated from Merrimack
7  College?
8    A.  No.  I believe that's all.
9    Q.  Do you file tax returns?
10   A.  Yes.
11   Q.  Every year?
12   A.  Yes.
13   Q.  And are you presently married?
14   A.  No.
15   Q.  Do you have any children?
16   A.  No.
17   Q.  Have you ever been married?
18   A.  No.
19   Q.  Have you taken any courses or classes
20  since you graduated from Merrimack College?
21   A.  No.
22   Q.  Have you attended any other colleges
23  besides Merrimack College?
24   A.  Can you explain the question?

Page 50

1    Q.  Have you attended any other colleges
2  besides Merrimack?
3        MR. KLEHM:  Objection.  Go ahead.
4    A.  As far as to participate in a
5  basketball workout or to -- you mean attended,
6  like, for school?
7    Q.  Yes.
8    A.  No.
9    Q.  Aside from St. Peters and, is it East
10  Brunswick High School and the high school in Las
11  Vegas, did you attend any other high schools?
12   A.  No.  Three schools.
13   Q.  Have you ever been asked to leave any
14  other schools aside from St. Peters?
15   A.  No.
16   Q.  And is St. Peters located in East
17  Brunswick?
18   A.  No.
19   Q.  Where is it located?
20   A.  New Brunswick.
21   Q.  New Jersey?
22   A.  Yes.
23   Q.  And who was paying your tuition at New
24  Brunswick -- I mean, at St. Peters?

Page 51

1    A.  I'm not sure.
2    Q.  What's your father's name?
3    A.  I don't know my father.
4    Q.  Have you ever met your father?
5    A.  I never met my father.
6    Q.  And you were raised -- you testified
7  earlier about that you had a stepfather; is that
8  correct?
9    A.  Yes.
10   Q.  And his name was?
11   A.  Richard.
12   Q.  Last name?
13   A.  Bykowski.
14   Q.  And your mother married him?
15   A.  They were married.
16   Q.  Are they still married?
17   A.  No.
18   Q.  Do you keep in touch with Richard
19  Bykowski?
20   A.  No.
21   Q.  Any other siblings besides your
22  brother?
23   A.  No.
24   Q.  Have you ever been convicted of a

Page 52

1  crime?
2    A.  No.
3    Q.  Have you -- and I'm not referring to
4  any incidents that serve as the basis of this
5  complaint when I ask you these questions.  Have
6  you ever been PC'd, brought in for protective
7  custody by a police department?
8    A.  I don't understand what that means.
9    Q.  Okay.  Have you ever been arrested?
10       MS. RYAN:  Let's take a break.
11       (A break was taken from
12       10:29 a.m. to 10:38 a.m.)
13  BY MS. RYAN:
14   Q.  Okay.  I just asked you if you had
15  been convicted of a crime.  You said no.  Have
16  you ever been arrested?
17   A.  Yes.
18   Q.  And when was that?
19   A.  I've been arrested a couple times.
20  I'm not sure the amount of times.
21   Q.  To the best of your memory, go through
22  each time you were arrested for me.
23   A.  I was arrested for -- I didn't --
24  well, while I was in Maryland, I had lost my

Page 53

1  license, the actual copy of my license, and I
2  wasn't -- I also, in the process of all this
3  moving, I lost my birth certificate. I lost my
4  Social Security card.
5         So in order for me to obtain another
6  copy of my license, I had to go back to New
7  Jersey with those documents. They no longer
8  allow you to call and have them mailed due to,
9  you know, the times of today. So I was pulled
10 over, didn't have proper documentation. They
11 couldn't find my license, so I was arrested for
12 that.
13    Q. So you were arrested for driving
14 without a license?
15    A. Yes.
16    Q. Anything else at the time of that
17 arrest?
18    A. There were other, other things, but I
19 don't recall what they were.
20    Q. And where did this take place?
21    A. That was on the way to work or on the
22 way to -- I was on the way to an interview and
23 it happened in Silver Spring.
24    Q. Maryland?

Page 54

1     A. Yes.
2     Q. And where were you going for your
3  interview?
4     A. I'm not quite sure. I didn't make it.
5     Q. What was the result of the arrest for
6  driving without a license?
7     A. Not guilty of -- or no prosecute.
8  That's what it said on the paperwork I received.
9     Q. Did you have to pay a fine?
10    A. I paid -- I had to pay a fine, but I'm
11 not sure for which, for which ticket.
12    Q. Do you remember --
13    A. Because many of them were dismissed or
14 no prosecute.
15    Q. When --
16    A. I had to pay a fine for failure to
17 display license, I believe.
18    Q. As a result of being charged with
19 driving without a license?
20    A. I believe.
21    Q. And now, what year did this occur in,
22 approximately?
23    A. I'm not quite sure. I'm sorry.
24    Q. 2005?

Page 55

1     A. Yes.
2     Q. Now, were you taken to the police
3  station?
4     A. Yes.
5     Q. And were you handcuffed?
6     A. Yes.
7     Q. Photographed?
8     A. No.
9     Q. Was your car towed?
10    A. Yes.
11    Q. Was anyone with you at the time of the
12 arrest?
13    A. No.
14    Q. Now, when was the time prior to that
15 that you were arrested?
16    A. I was arrested after that -- what was
17 the question again? I'm sorry.
18    Q. Okay. That was one arrest that you
19 remember. What was another arrest that you
20 remember?
21    A. I was arrested in July which just
22 passed.
23    Q. Okay. July '06. Where were you
24 arrested?

Page 56

1     A. In Fredrick, Maryland.
2     Q. What were you arrested for?
3     A. I was arrested for position of CDS
4     Q. What's CDS?
5     A. I believe it's marijuana.
6     Q. And were you handcuffed?
7     A. Yes.
8     Q. Photographed?
9     A. Yes.
10    Q. Transported in a cruiser?
11    A. Yes.
12    Q. Were you alone or were you with anyone
13 else?
14    A. I was with someone else.
15    Q. Who were you with?
16    A. Marcus Whittaker.
17    Q. And how long -- were you placed in a
18 cell?
19    A. Yes.
20    Q. For how long?
21    A. Maybe an hour.
22    Q. Were you bailed out?
23    A. No.
24    Q. On personal recognizance?

Page 57

1    A. Yes.
2    Q. And is that matter still pending?
3    A. No.
4    Q. What happened to that matter?
5    A. PBJ.
6    Q. Do you know what that stands for?
7    A. PBJ? I think it was "probation before
8    judgment."
9    Q. And do you have to pay a fine?
10   A. Yes, I had to pay a fine.
11   Q. How much?
12   A. $150.
13   Q. What about Marcus Whittaker? Did he
14   get the same --
15   A. Yes.
16       MR. KLEHM: Wait. Can we --
17       MS. RYAN: I know.
18   Q. Was Marcus Whittaker also given a PBJ
19   and asked to pay a fine of $150?
20   A. Yes.
21       MR. KLEHM: Thanks.
22   Q. Did it go to trial?
23   A. No.
24   Q. Where were you or what were you doing

Page 58

1    when you got arrested?
2    A. Sleeping.
3    Q. Did they come in your -- where were
4    you sleeping?
5    A. Sleeping in my vehicle.
6    Q. Is this when you were employed by Ober
7    Wireless?
8    A. Yes.
9    Q. Did that have anything to do with your
10   termination?
11   A. No.
12   Q. Aside from those two times, have you
13   been arrested on any other occasion?
14   A. Not that I recall.
15   Q. Were you ever arrested as a juvenile?
16       MR. KLEHM: Objection. You can
17   answer.
18   A. Not that I recall.
19   Q. Did anyone else ever have custody
20   aside from your mother?
21   A. Yes.
22   Q. Who was that?
23   A. Bob Green and Patricia Green.
24   Q. And your mother legally gave them

Page 59

1    custody of you?
2    A. To allow them to make decisions for my
3    well-being.
4    Q. And that's when you were in high
5    school; correct?
6    A. Yes.
7    Q. Did any state ever have custody of
8    you?
9    A. No.
10   Q. So it's your best testimony today that
11   you've been arrested two times in your life; is
12   that correct?
13   A. Yes.
14   Q. And are you presently on probation as
15   a result of the marijuana charges?
16   A. Yes.
17   Q. And for how long are you on probation?
18   A. One year.
19   Q. Have you ever had a restraining order
20   taken out against you?
21   A. Yes.
22   Q. And by whom?
23   A. My ex-girlfriend.
24   Q. And who is that?

Page 60

1    A. Jennifer Magnanimi.
2    Q. Do you know how to spell it?
3    A. M-A-G-N-A-N-I-M-I.
4    Q. Where did she reside?
5    A. I don't know when she resided -- where
6    she resided at that time.
7    Q. When you received the restraining
8    order, where did you reside?
9    A. I was -- I'm not sure if I was at my
10   mother's house or if I was homeless at that
11   time.
12   Q. What court issued the restraining
13   order?
14   A. Rockville, the same court that I used
15   to place the restraining order on her.
16   Q. So Rockville, Maryland?
17   A. Yes.
18   Q. And is the restraining order still in
19   effect?
20   A. I'm not sure.
21   Q. Anyone else ever seek to have a
22   restraining order taken out against you?
23   A. No.
24   Q. Have you ever been a party to a civil

16 (Pages 61 to 64)

Page 61

1  lawsuit aside from the lawsuit that we're here
2  for today?
3      A. No.
4      Q. You've never sued anyone else?
5      A. No.
6      Q. Has anyone else ever sued you?
7      A. No.
8      Q. Aside from the unemployment wages that
9  you received, have you ever received any other
10 federal or state funding?
11     A. No.
12     Q. Have you ever gone by any other names
13 aside from Brett Godette?
14     A. No, not unless you consider a stage
15 name.
16     Q. What's your stage name?
17     A. Dejavu, D-E-J-A-V-U.
18     Q. And what's your stage name for?
19     A. We do -- I do music. I have a dream
20 aspire music.
21     Q. I'm sorry?
22     A. I have a dream to aspire to music.
23     Q. Do you play any musical instruments?
24     A. I produce music, but I don't use

Page 62

1  keyboards or instruments. It's synthetic
2  instruments, drum pads.
3      Q. And are you in a band?
4      A. Yes.
5      Q. And do you perform?
6      A. Yes. We performed at Merrimack
7  College.
8      Q. Now, directing your attention back to
9  March 26, 2003, which serves as the date as the
10 basis for the complaint that you filed against
11 my client, were you in fact a student at
12 Merrimack College at that time?
13     A. Can you restate the question?
14     Q. On March 26, 2003, were you a student
15 at Merrimack College?
16     A. Yes.
17     Q. What year were you in?
18     A. Junior.
19     Q. Where was your dorm? What room --
20        Strike that. What dorm did you
21 reside in?
22     A. Monican.
23     Q. And did you have a roommate?
24     A. Yes.

Page 63

1      Q. Who was your roommate?
2      A. Chuck Dukus.
3      Q. Was he your roommate for four years at
4  Merrimack?
5      A. No.
6      Q. And is it fair to say that you were on
7  the basketball team at Merrimack?
8      A. Yes.
9      Q. And were you on a full scholarship?
10     A. Yes.
11     Q. Now, at some point on March 26, 2003,
12 do you have a memory of being interviewed by
13 police?
14     A. Interviewed?
15     Q. Yes.
16     A. I wouldn't --
17     Q. Do you have a memory of being
18 questioned by police officers on March 26, 2003?
19     A. Yes.
20     Q. Now, if you reflect back on that day,
21 do you remember what the weather was like that
22 day?
23     A. No.
24     Q. Do you remember if the basketball

Page 64

1  season was still in progress?
2      A. We were out of season.
3      Q. The season was completed?
4      A. Yes. We were in post-season training.
5      Q. And was that playoffs?
6      A. No. It was just stay in shape. I
7  mean, we primarily work out every day.
8      Q. What was your major at Merrimack?
9      A. Business.
10     Q. Do you remember what you did when you
11 first woke up on March 26, 2003?
12     A. When I first woke up? I don't
13 remember what I did when I first woke up.
14 Probably brushed my teeth.
15     Q. Do you remember anything about March
16 26, 2003?
17     A. I remember a lot.
18     Q. Why don't you tell me what you
19 remember?
20     A. I remember -- I remember working out
21 in the morning.
22     Q. What time would that have been?
23     A. Approximately seven, 7:30.
24     Q. Would you have worked out on campus?

Page 65

1    A.  In the gym with the team, as a team.
2    Q.  Go ahead.
3    A.  Okay.  Then we -- I believe I went to
4    breakfast with Light Foot or Light Foot met me
5    over there in the breakfast hall or the dining
6    hall.
7    Q.  Who is Light Foot?
8    A.  Light Foot Taylor.
9    Q.  Is that his real name?
10   A.  Yes.  He's also a Merrimack basketball
11   player.  Currently still plays.
12   Q.  So you met him for breakfast; is that
13   your testimony?
14   A.  Yes.  I'm not sure if we walked
15   together or I met him there.
16   Q.  Okay.  What else do you remember about
17   this day?
18   A.  I remained in the study hall eating on
19   and off while -- I mean, not study hall.  In the
20   cafeteria studying, eating on and off with other
21   students who came in and left for their class
22   until my examination.
23   Q.  You can keep going.
24   A.  Oh, I didn't -- okay.  Then I went to

Page 66

1    take an exam.  Left the exam.  Went to my next
2    class, which was a marketing class that I had.
3    Left that class.  Went to the resident life
4    office in order to reschedule an appointment
5    that I had because of some issues that were
6    going on with Chuck Dukus, my roommate.
7    Rescheduled that in order to attend a mandatory
8    lift, weightlifting workout.
9         Went back to my dorm room to go get my
10   items, stuff that I needed.  May have just
11   relaxed for like a half hour.  Went back.  Left
12   to go back to the gym.  As I left the gym, I was
13   confronted by a lot of police officers.
14   Q.  Let me stop you there.  You said you
15   went to go back to -- did you go to the gym?
16   A.  I was there in the morning for the
17   morning workout.
18   Q.  When you were confronted by police
19   officers, were you at the gym or were you on
20   your way to the gym?
21   A.  I was leaving Monican to go back to
22   the gym from this morning.
23   Q.  Now, you testified a few minutes ago
24   that you went to Monican and you relaxed for a

Page 67

1    half hour; is that correct?
2              MR. KLEHM:  Objection.
3    Q.  You can answer.
4    A.  I relaxed for a short amount of time
5    just to gather myself before I went to work out.
6    Q.  And where was that?
7    A.  In my room.
8    Q.  Do you remember your room number?
9    A.  No.
10   Q.  And was your roommate there?
11   A.  No.
12   Q.  Were you alone in your room?
13   A.  Yes.
14   Q.   when you left to go to the gym, were
15   you alone?
16   A.  Yes.
17   Q.  And you testified earlier that you had
18   to go to the resident life hall because of an
19   issue with your roommate Dukus, Chuck Dukus; is
20   that correct?
21   A.  Yes.
22   Q.  What was the issue with Chuck Dukus?
23   A.  Well, the issue -- I had initially had
24   the room to myself and Chuck Dukus was having

Page 68

1    some problems with his roommates that he was
2    living with before living with me, so they
3    placed him in my room.
4              When I initially saw one of the
5    resident life officials on campus -- just saw,
6    not in a physical meeting about the issue -- I
7    asked her, I said, you know, Can I -- I wanted
8    to talk to her about some things and that's why
9    I was having the resident life meeting.
10   Q.  Were you having problems with Chuck
11   Dukus?
12   A.  Yes.
13   Q.  What were the problems?
14   A.  He was base -- he was saying my
15   girlfriend at the time was over too often.  He
16   left -- he was very messy.  I was very neat.  We
17   actually had a partition in the room, like
18   actually had a partition in the room and just,
19   you know, to get to my side of the room I had to
20   walk through his room, so I was...
21   Q.  Did the resident life eventually work
22   out the problems that you had with Chuck Dukus?
23   A.  Yes.  He moved out of my room, I think
24   it was on the 28th, two days after the incident.

Page 69

1    Q.  And why was that?
2    A.  I'm not quite sure.
3    Q.  And who was your girlfriend at the
4  time?
5    A.  Jennifer Magnanimi.
6    Q.  Do you still keep in touch with
7  Jennifer Magnanimi?
8    A.  No.  I have a restraining order on
9  her.
10   Q.  Why do you have a restraining order on
11 her?
12   A.  She, along with another female, came
13 by my job at Nextel in Silver Spring and I was
14 assaulted in front of customers and also my car
15 was assaulted.  And this was -- and I hadn't
16 spoken to her, you know, probably for about a
17 good going on a year at that time.
18   Q.  And what court did you get the
19 restraining order against her?
20   A.  Rockville.  She filed a restraining
21 order on me after I filed a restraining order on
22 her.
23   Q.  So you have two restraining orders
24 against you?

Page 70

1          MR. KLEHM:  Objection.
2    A.  No.
3    Q.  Is that the one that we just talked
4  about?
5    A.  Yes, ma'am.
6    Q.  Okay.  And why did you and Jennifer
7  break up?
8    A.  Well, we broke up -- she initially
9  told me she wanted to continue with school.  She
10 was going to -- she was really focused on
11 continuing her education, but it became apparent
12 that that wasn't true.  That was primarily -- I
13 just didn't see her going in the same direction
14 I was trying to go.  She started hanging out
15 with a different kind of crowd.
16   Q.  Did she graduate from Merrimack?
17   A.  No.
18   Q.  Do you know where she resides today?
19   A.  No.
20   Q.  Do you know what state she resides in?
21   A.  No.
22   Q.  Now, how did you prepare for this
23 deposition today, aside from conversations that
24 you had with your counsel?  I don't want to hear

Page 71

1  about those, but did you do anything else to
2  prepare?
3    A.  I just ironed my clothes.  Got
4  dressed.
5    Q.  Did you review any documents?
6    A.  Not really.
7    Q.  Did you speak to any potential
8  witnesses?
9    A.  I don't know who -- I really don't
10 know all of the -- who all the potential
11 witnesses are.
12   Q.  Well, my question was:  Did you speak
13 with any potential witnesses?  Did you speak
14 with anyone about this case prior to coming here
15 today?
16   A.  Oh, yes.
17   Q.  Who?
18   A.  Spoke with Joe Gallow, who is my
19 teammate.  I mean, I went by the college
20 yesterday to get some tape documents, videotapes
21 of me playing basketball.
22   Q.  Okay.
23   A.  Since I was in the area, stopped by
24 the coaches' offices, the athletic facility.

Page 72

1  Joe Gallow, who was my college teammate, is now
2  the assistant coach at Merrimack College, so I
3  went to his office.  We've always been good
4  friends.
5          Went by his office.  Asked him for
6  some tapes.  He asked me what was going on.
7  That's when I talked about what's going on with
8  me.  He was asking how it was and stuff.
9    Q.  What did you say and what did he say?
10   A.  I don't really recall.
11   Q.  You don't recall what the conversation
12 was yesterday?
13   A.  What we said?
14   Q.  Yes.
15   A.  I mean, that's kind of private between
16 me and him as a friend.
17   Q.  I recognize that, but if you have a
18 memory of that conversation, I'm asking you to
19 disclose it here today.
20         MR. KLEHM:  Yes, she's right.
21 You have to tell what the conversation was.
22   A.  I mean, we talked about -- we talked
23 about another teammate of ours who supposedly
24 now is getting married to our other teammate's

Page 73

1  ex-girlfriend.
2     Q.  Let me just -- my question to you is:
3  Do you remember the conversation that you had
4  with him about this case?  I had asked you, did
5  you discuss with anyone?
6     A.  Oh, yes.  All I discussed with this
7  case was my eligibility.  He's like, "Oh, you're
8  still looking to play?"
9         And I said, "Yes, I'm still looking to
10  play.  I've been training."  Because he saw me
11  with a busted ankle, so he, you know, was asking
12  me how I was doing with that and, Oh, yeah,
13  we -- Yeah, you got that year left?  He said,
14  "You got that year left from when you were
15  injured as a junior."  That's what we discussed
16  on the case.
17     Q.  Did you tell him that you were suing
18  the college and the two towns?
19     A.  Well, he already knew.
20     Q.  You had previously told him?
21     A.  I had previous -- when this all
22  initially happened, the same day I sat with
23  Coach Hammel, my head coach, and I told him
24  everything that happened.

Page 74

1     Q.  But did you tell Joe Gallow at any
2  point in time that you were suing the college
3  and the towns?
4     A.  He asked me, "Aren't you suing the
5  town or the college?  Aren't you in a lawsuit?"
6         I said, "Yeah, I'm still involved in
7  that."
8     Q.  Anything else about the lawsuit?
9     A.  I mean, no.
10     Q.  And now, you just testified about
11  eligibility and you're trying to get another
12  year; is that correct?
13     A.  Yes.
14     Q.  What does that have to do with the
15  lawsuit?
16     A.  What does that have to do with the
17  lawsuit?
18     Q.  Right.
19     A.  I'm still an employee of Merrimack
20  College.  I need to be released by Merrimack
21  College in order to seek my year at another
22  institution.
23     Q.  And are you working to do that now?
24     A.  Well, my conversation with Joe ended

Page 75

1  with, "Burt wants to talk to you.  He's in his
2  office.  Why don't you stop in and say hello to
3  him?"
4     Q.  Did you talk to Burt?
5     A.  Yes.
6     Q.  What did Burt tell you?
7     A.  Well, about the case or how I'm doing
8  or -- I mean, we talk about so many things.  We
9  probably talked for a good 40 minutes that I had
10  spoke to him.
11     Q.  About the case?
12     A.  About the case?  I didn't want to --
13         MR. KLEHM:  No, tell them what
14  you said, what he said.
15     A.  What he said or what I said?  What are
16  you asking me again?
17     Q.  Both.  I want to hear the
18  conversation.
19     A.  Conversation was I hope I'm, you know,
20  I hope my lawsuit and everything isn't
21  complicating your job.  He asked me about,
22  "You're still seeking that year of eligibility
23  that you have?"  I said yes.  You know, he saw
24  my ankle, so he obviously knows I'm still

Page 76

1  training.  I'm still playing.  I'm still
2  active.  I said yes.
3         He said, "That year is timeless."
4  He's like, "You can use that year whenever."  He
5  was like, "And you need a release, right?"
6         And I was like, "I need to get that
7  release."
8         He was like, "I'll try to help you
9  with that as much as I can."  That was basically
10  the conversation, I mean, about this.  It was
11  very short.
12     Q.  And I believe you said the initial
13  conversation was, Are you still suing
14  Merrimack?  Was that your testimony?
15     A.  He asked me --
16     Q.  How did you respond?
17     A.  -- "Are you involved with the lawsuit
18  still?"  Yes.
19     Q.  Anything further?
20     A.  No.
21     Q.  Any other witnesses or potential
22  witnesses that you had a conversation with prior
23  to coming here today?
24     A.  Potential witnesses?  Again, I don't

20 (Pages 77 to 80)

| Page 77 | Page 79 |
|---|---|

**Page 77**

1  know who the potential witnesses are.
2          MR. KLEHM: Can we go off for a
3  second?
4          MS. RYAN: Yes.
5          (There was a discussion off the
6          record.)
7      A.  Yes.  I saw my -- obviously, I saw a
8  lot of my teammates and I saw Light Foot Taylor
9  in the gym and he also came up to me and asked
10 me what was going on with your lawsuit, the
11 lawsuit I'm hearing about.
12 BY MS. RYAN:
13     Q.  And what did you tell him, and what
14 did he tell you?
15     A.  I told him, "I can't really discuss
16 that with you."
17     Q.  And what did he say he was hearing
18 about the lawsuit, if anything?
19     A.  Oh, he didn't say anything.
20     Q.  Anyone else that you discussed this
21 lawsuit with prior to coming here today?
22     A.  Kenny Jones, another basketball
23 player, asked the same question as Light Foot
24 Taylor.  Same response.

**Page 78**

1      Q.  Anybody else?
2      A.  Who else?  Who else?  Who was there?
3  Tom Sipsey, another athlete on the team.  He
4  asked the same question.
5      Q.  Did you give the same response?
6      A.  Same response.
7      Q.  Have you told me, to the best of your
8  ability here today, anyone that you talked to
9  prior to coming to the deposition here today?
10         MR. KLEHM: Objection to the
11 form, but you can answer.
12     A.  Yes.  To the best of my ability, yes.
13     Q.  Now, directing your attention to when
14 you testified that you were walking out of the
15 Monican Hall and you were confronted by police.
16 Can you describe for me the first police officer
17 that you saw when you were walking out of
18 Monican Hall?
19     A.  I can't describe.  I was really just
20 shocked.
21     Q.  Okay.
22     A.  Startled.
23     Q.  And where were you in Monican Hall?
24     A.  I wasn't in Monican Hall. I had just

**Page 79**

1  walked out of Monican, the Monican dormitory,
2  and I couldn't tell you the precise step, but I
3  was somewhere near the steps area, parking lot
4  area.
5      Q.  So you were outside of the Monican
6  Hall dormitory; is that correct?
7      A.  Yes.
8      Q.  And you were approached by how many
9  police officers?
10     A.  I didn't count.  I did not count.
11     Q.  And do you remember -- what's the next
12 thing you remember occurring?
13     A.  I just remember being given a bunch of
14 directions.
15     Q.  What were those directions?
16     A.  Don't move.  You know, freeze.  Hands
17 up.
18     Q.  What did you do in response to those
19 directions?
20     A.  I raised -- I raised my arms up and
21 down because I was confused what they were
22 telling me to do.
23     Q.  But you don't remember how many police
24 officers were telling you this; correct?  And

**Page 80**

1  you don't remember what they looked like in
2  appearance; is that correct?
3      A.  No, I don't remember what they looked
4  like in appearance.
5      Q.  And you don't remember how many there
6  were; is that correct?
7      A.  No.
8      Q.  And were these individuals in police
9  uniforms?
10     A.  No.
11     Q.  Okay.  So how did you know that they
12 were police officers?
13     A.  They had badges, like, hanging.
14     Q.  Did they identify themselves as police
15 officers?
16     A.  To be honest, I'm not sure.
17     Q.  Did you remember what the badge said?
18         MR. KLEHM: Objection. Go ahead.
19     A.  No, I don't remember.
20     Q.  And how long did you remain outside in
21 front of the Monican Hall dormitory?
22     A.  It felt like -- it felt like hours,
23 but in literal time, it was probably, I mean, I
24 would have to say 20 minutes, 25 minutes.

Page 81

1    Q.  To the best of your memory, what
2  occurred during that 20-minute period?
3    A.  I was told -- I was just told that
4  they wanted to go into my dorm room.  I stated I
5  didn't want anyone going in my dorm room.  I was
6  told, "If you have nothing to hide, you'll let
7  us in your dorm room."  At this point, I was
8  really embarrassed, so, you know, to minimize my
9  embarrassment, I said, "Fine, we can go to the
10  dorm room."
11         At this time, I'm -- at some point
12  during this process my pants were pulled down
13  because I had on, I believe it was -- it was
14  either some sweats or some nylon, nylon, like,
15  basketball pants.  They were basketball pants.
16  I was embarrassed, totally embarrassed when my
17  pants came down.  An officer went inside my
18  pants to, I believe to see what was in my pocket
19  because he was juggling my pocket, whoever it
20  was.
21         Because I had my face to the, to the
22  wall, but there were numerous officers behind
23  me.  Someone put a hand in my pocket, juggled
24  it, said, "It's in his pocket."  That's what I

Page 82

1  heard.  I heard from behind me, "It's in his
2  pocket."
3         Then someone reached in my pocket,
4  pulled out the keys, which they were keys to the
5  dorm room.  I just had a big set of keys
6  probably because of all, you know, the places
7  I've grown up.  I have keys -- at that time, I
8  had a lot of keys.
9         Then they were placed back in my
10  pocket.  They were going through my -- at the
11  same time, someone was going through my bag, but
12  the bag was -- my hands were behind my back
13  cuffed, so the bag got stuck in my cuffs.  But
14  they were going in my bag where I had my shorts,
15  items for the gym.
16    Q.  Anything else you remember about being
17  outside in front of the Monican Hall during that
18  20-minute period?
19    A.  That's all I remember.  That's all I
20  remember right now.
21    Q.  Okay.  Now, you testified a few
22  moments ago that you had, am I right, you had
23  sweatpants on?
24         MR. KLEHM:  Objection.

Page 83

1    A.  I had nylon or sweatpants, nylon
2  sweats.  Some kind of athletic wear.
3    Q.  And did you have anything on
4  underneath those?
5    A.  Boxer shorts.
6    Q.  And you said that someone pulled down
7  your pants?
8    A.  Yes.  By going inside my pants, they
9  were very loose and I was cuffed so I couldn't
10  pull them up, so they fell to my knees.
11    Q.  So your pants fell?
12    A.  Yes.
13    Q.  And you said that it was by someone
14  going inside your pants.  Is that when they were
15  going in to pull out the keys?
16    A.  They went on the inside, not in my
17  pocket, but inside of my pants, and pulled the
18  pocket inside out.
19    Q.  Okay.  And where was the pocket
20  located?
21    A.  It was my left pocket.
22    Q.  And can you describe the individual
23  that did this?
24    A.  I don't know whose hand it was.

Page 84

1    Q.  Do you remember anything about this
2  person?
3    A.  Which person?
4    Q.  That took the keys out of your pocket.
5    A.  I don't know whose hand it was.  I was
6  answering questions at the same time.  I was
7  doing multiple things.
8    Q.  Can you give a physical description of
9  any of the officers that confronted you outside
10  of the Monican Hall?
11    A.  There was one female.  I know there
12  were no -- there may have been -- I don't know
13  if one officer was maybe Spanish, but other than
14  that, you know, all Caucasian officers.
15    Q.  And you, in fact, had keys in your
16  pocket; is that correct?
17    A.  Yes.
18    Q.  And they were in your left pocket; is
19  that correct?
20    A.  Yes.
21    Q.  Now, it's not your testimony that one
22  of these officers went up to you and pulled down
23  your pants; is that correct?
24    A.  No.

22 (Pages 85 to 88)

Page 85

1    Q.  I'm sorry. Is it correct that the
2    officer didn't just walk up to you and pull down
3    your pants; is that correct?
4        A.  Correct. Did not walk up to me and
5    pull down my pants.
6        Q.  It was in the course of trying to
7    retrieve the keys out of your pocket that your
8    loose pants fell down to your knees; is that
9    correct?
10      A.  Yes.
11      Q.  And can you remember anything about
12   the officer that went through your bag?
13      A.  I believe -- I believe that was the
14   female officer who went through my bag.
15      Q.  Do you remember what else was in your
16   bag?
17      A.  No, I don't recall.
18      Q.  Do you remember any communications
19   about what was in your bag?
20      A.  No.
21      Q.  Is it to the best of your memory that
22   it just really was your workout clothes?
23      A.  Yes.
24      Q.  Do you remember who put the handcuffs

Page 86

1    on you?
2        A.  No.
3        Q.  And you were handcuffed behind your
4    back; is that correct?
5        A.  Yes.
6        Q.  Do you remember any other things that
7    were stated during this period of 20 minutes, or
8    approximately 20 minutes?
9        A.  I mean, I was numerously called a
10   liar. I was asked about my day, to give recount
11   where I was.
12      Q.  And this was all outside, right?
13      A.  Yes.
14      Q.  And who asked you that? Do you
15   remember?
16      A.  Numerous -- I believe it was a couple
17   different officers, but it was mainly one male
18   officer.
19      Q.  Do you remember if there were any
20   Merrimack police officers --
21      A.  Yes.
22      Q.  -- that were involved with the
23   incident in front of Monican Hall?
24      A.  Yes, I believe I saw some.

Page 87

1    Q.  Were they in uniform?
2        A.  I'm not sure.
3        Q.  Had you known these individuals?
4        A.  Yes. I mean, you see -- you see
5    different -- yeah, you see everyone at Merrimack
6    knows everyone.
7        Q.  So during your three years at
8    Merrimack, you had recognized some of the
9    individuals that were --
10      A.  Yes.
11      Q.  -- with you out in front of Monican
12   Hall as Merrimack police officers; is that
13   correct?
14      A.  Yes.
15      Q.  Do you remember anything that any of
16   those officers said or did?
17      A.  I do not recall.
18      Q.  So one of the officers -- it's fair to
19   say you don't have a specific memory of one
20   officer saying one thing or another officer
21   saying another thing; is that correct?
22      A.  Well, the main was a heavyset
23   gentleman that did most of the talking.
24      Q.  Do you remember anything he said

Page 88

1    specifically?
2        A.  He just said with his finger in my
3    face, "We have your face on surveillance
4    videotape. We know you did it." But for a
5    period of time, I responded by saying, "Did
6    what?" I didn't understand what he was talking
7    about. And he was getting more aggressive,
8    rather upset with me. Whereas I told him, you
9    know, "I had basketball practice this morning,"
10   he stated, "Basketball's out of season. You're
11   lying."
12      Q.  So you remember that one officer
13   saying those things to you; is that correct?
14      A.  Yes.
15      Q.  But then is it correct in saying that
16   the other things you remember, you're not sure
17   which officer said what?
18      A.  As far as when I was given initial
19   directives as far as...
20      Q.  For the entire time that you were out
21   in front of the Monican Hall?
22      A.  Yeah, I don't remember anyone else
23   intimidating me, like, you know -- he was the
24   only one, like, really intimidating me at that

Page 89

1  time.
2     Q.  And did anyone ever tell you that
3  there had been an armed robbery in North
4  Andover?
5     A.  Yes.
6     Q.  How did that -- when did you first
7  become aware of that?
8     A.  I first became aware of that in the,
9  in the same area.
10    Q.  When you first walked out of the
11 Monican Hall?
12    A.  When I was first cuffed in front of
13 the dormitory.
14    Q.  What was said to you?
15    A.  First, I was called a liar and I
16 repeated to say what I was saying.
17    Q.  What's that?  Just say everything so
18 the record can be clear.
19    A.  First I was called a liar as far as,
20 you know, they asked me about my whole day.  The
21 recount that I gave you earlier as far as what I
22 did that day, that's the same -- that's what I
23 did that day, so I told the officer that and...
24    Q.  My question is:  When was it first

Page 90

1  disclosed to you that there was an armed robbery
2  in North Andover?
3     A.  It was outside.
4     Q.  When you were initially approached,
5  did an officer approach you and say --
6     A.  I don't know which officer came out
7  and approached me and said there was an armed
8  bank robbery.  I'm not sure which one that was.
9  It could have been the one intimidating me, but
10 I was still -- I was getting bombarded with
11 questions from different officers, and they were
12 the same questions.  So I was answering two
13 different people at the same time.
14    Q.  And was this the first you had learned
15 that there was an armed robbery in North
16 Andover?
17    A.  Yes.
18    Q.  Do you remember anything else that was
19 said out in front of the Monican Hall during
20 that 20-minute period?
21    A.  That's the best of my ability that I
22 know.
23    Q.  What's the next thing you remember
24 that occurred?

Page 91

1     A.  I was then led through the dormitory
2  handcuffed.
3     Q.  By whom?
4     A.  Whoever placed the handcuffs on me
5  initially.  I don't know who it was.
6     Q.  Was it the heavyset gentleman that was
7  pointing his finger in your face?
8     A.  I'm not sure.
9     Q.  How many officers escorted you through
10 the dorm to your room?
11    A.  I'm not sure.  I couldn't see behind
12 me.  I was just walking forward.  I was keeping
13 my head down because I was embarrassed.  So I
14 just would see a lot of the dorm doors were open
15 and, you know, kids were sticking out and
16 they're like, "Hey, Brett, what's going on?"
17    Q.  So what's the next thing you remember
18 occurring?
19    A.  We got to my dorm room.  They asked me
20 to unlock the door with my keys that were in my
21 pocket, but I couldn't get the keys out of my
22 pocket.  So I don't know who this person was.  I
23 think he may have worked for Merrimack, but I'm
24 not sure.  But he went in my pocket and got the

Page 92

1  keys.  I'm not sure.  And I opened the door for
2  them.
3     Q.  Were you unhandcuffed at that time?
4     A.  No.  I did more like that
5  (indicating).
6     Q.  What's the next thing you remember
7  occurring?
8     A.  I was then cuffed to the desk.
9     Q.  By whom?
10    A.  I do not remember.  Someone uncuffed
11 me and cuffed me to the desk.  I sat down in the
12 chair of my desk of my room.
13    Q.  At this point, had you ever observed
14 an officer in uniform, police uniform, or were
15 they all in plain clothes?
16    A.  They were mostly in plain clothes.
17    Q.  My question, was anyone in --
18    A.  Not in my room.
19    Q.  Let me ask the question.  Was anyone
20 in a uniform?
21    A.  I'm not sure.
22    Q.  So now, you're handcuffed to your desk
23 seated in your chair; is that correct?
24    A.  Yes.

24 (Pages 93 to 96)

Page 93

1   Q.  How many police officers are in the
2   room with you?
3       A.  I'd say about four to five.
4       Q.  Was the individual that you recognized
5   from Merrimack that you said took the keys out
6   of your pocket, was he in the room at that time?
7           MS. AYER:  Objection.  Just...
8       Q.  You can answer.
9       A.  I'm not sure.
10      Q.  Do you have a memory of the physical
11  description of any of the four to five
12  individuals that were in your room at that time?
13      A.  I know -- I know the female officer
14  was there.
15      Q.  And what about --
16      A.  The only reason I know that is because
17  she was the only female officer there.
18      Q.  What about the heavyset gentleman?
19      A.  Heavyset gentleman was there.
20      Q.  And there were approximately two to
21  three others; is that correct?
22      A.  I believe, yes.
23      Q.  Did you recognize any of them as being
24  Merrimack College police officers?

Page 94

1       A.  Not sure.  I mean, yes -- I'm not sure
2   if -- honest, I wasn't really thinking about
3   that at the time.
4       Q.  Tell me what occurred in your room.
5       A.  Well, I was then -- while I was cuffed
6   to the desk, they rammed -- ransacked my room.
7       Q.  Was your roommate there?
8       A.  No.
9       Q.  And this is the four to five officers
10  ransacked your room; is that correct?
11      A.  Yes.  They only ransacked my side of
12  the room.  Because we had a partition up.
13      Q.  And did you tell them what your side
14  was?
15      A.  Yes.
16      Q.  And do you recall any conversations or
17  communications that occurred during that period
18  of time?
19      A.  Yes.
20      Q.  What was that?
21      A.  They asked where my white doo-rag
22  was.  I showed them where my white doo-rag was.
23  I had a drawer full of doo-rags.
24      Q.  Anything else that you remember?

Page 95

1       A.  I remember being just cuffed to the
2   desk while they conducted their police matters.
3       Q.  And for how long did this occur?
4       A.  Like 30 to 45 minutes.
5       Q.  And you said that you had a drawer
6   full of doo-rags.  Did you direct them to that
7   drawer?
8       A.  Yes.  I said, "It's over there."
9       Q.  At that time in 2003, would you
10  frequently wear doo-rags?
11      A.  Yes.
12      Q.  Can you just describe for me what a
13  doo-rag is?
14      A.  A doo-rag is -- it sets your hair.
15      Q.  Okay.  It's fair to say it's a thin,
16  nylon type --
17      A.  Yes.
18      Q.  -- textured material?
19      A.  Yes.
20      Q.  Was there any further communication
21  about the doo-rag?
22      A.  They just asked where my white doo-rag
23  was, and I said where the white doo-rag was.
24      Q.  And you did, in fact, own one at that

Page 96

1   time; correct?
2       A.  Yes.
3       Q.  And where was it?
4       A.  In a drawer with my other doo-rags.
5       Q.  You didn't have one separately hanging
6   from, like, a light fixture?
7       A.  I may have.
8       Q.  And anything else that you remember
9   that occurred in the room during that 30- to
10  45-minute period?
11      A.  Just police search.  Police conducted
12  a search.
13      Q.  And you don't remember anything else
14  that they were saying amongst themselves?
15      A.  No.
16      Q.  Now, what's the next thing you
17  remember occurring after that 30- to 45-minute
18  period?
19      A.  After the 30- to 45-minute period?
20  Well, I was left -- after the 30- to 45-minute
21  search, I was left cuffed to the desk with one
22  officer.
23      Q.  And who was that?
24      A.  Ummm...

Page 97

1    Q.  Was it the female?
2    A.  It was not a female officer.  It was a
3  male officer and I don't recall a face.
4    Q.  Was it the heavyset male officer?
5    A.  It was not the heavyset male officer.
6    Q.  Do you remember if it was a Merrimack
7  College police officer?
8    A.  I'm not sure.
9    Q.  And was it an officer in a police
10  uniform?
11    A.  No.  It was a detective.
12    Q.  Do you remember from which department?
13    A.  No.
14    Q.  And during this time period, this 30-
15  to 45-minute time period, were students coming
16  in and out of your room?
17    A.  No.  There were officers -- I can tell
18  there were officers outside my door somewhat.
19    Q.  How did you know that?
20    A.  That I can hear.
21    Q.  Was your dorm room door opened or
22  closed?
23    A.  There were more officers outside my
24  room than inside my room.

Page 98

1    Q.  Was your dorm room opened or closed?
2    A.  Open.
3    Q.  All the way?
4    A.  Yes.
5    Q.  Could you see the officers outside in
6  the hall?
7    A.  I did see some, like, elbows, like,
8  right by my door.  Yes, I saw officers outside
9  my door.
10    Q.  How many officers did you see outside
11  your door?
12    A.  I didn't -- I only saw, like, one
13  elbow.
14    Q.  So how did you know that there were
15  more officers outside your room than inside your
16  room?
17    A.  You can hear them talking, the
18  walkie-talkies.  Just the commotion.  It just
19  sounded like a lot of people, a lot of officers.
20    Q.  But you never actually got up and
21  walked out and looked out in the hall to see
22  what was going on; is that correct?
23    A.  Right.
24    Q.  And when you walked in your room and

Page 99

1  there was this partition, were you to the right
2  or to the left of the partition?
3    A.  This is my room -- this is the room.
4  You walk in here.
5    Q.  So it's a rectangular room; is that
6  correct?
7    A.  No.  It's a square room.  A dorm
8  room.  But I had to totally walk through Chuck's
9  room to get to my side.  It was partitioned like
10  this (indicating).
11    Q.  So it was partitioned horizontally, so
12  Chuck had the front of the room and you had the
13  back of the room?
14    A.  Right.  I had to walk totally through
15  his room to get to mine.
16    Q.  So you were handcuffed to the desk in
17  the back part of the room; is that correct?
18    A.  Yes.
19    Q.  Did you hear what any of the officers
20  outside the room said?
21    A.  Sounded a lot like what happened
22  outside.  Just a lot of police talking.  I can
23  hear it around me.  The police officers in my
24  room were somewhat quiet, so I can hear what was

Page 100

1  going on outside.
2    Q.  And do you remember anything that was
3  said outside?
4    A.  No.  I just heard walkie-talkies and
5  police noises.
6    Q.  At any point up until the conclusion
7  of this 30- to 45-minute search of your room did
8  you ever recognize any police officers as being
9  Merrimack police officers, Andover police
10  officers, or North Andover police officers?
11    A.  There was one gentleman that I said I
12  thought might have been a Merrimack police
13  officer.  I thought I may have seen him before,
14  but I wasn't sure.
15    Q.  And aside from him, anyone else that
16  you recognized?
17    A.  No.
18    Q.  Now, you testified earlier that as you
19  were walking down the hall to your room, as you
20  were being escorted down, kids were poking their
21  heads out of the room and saying, "Hey, Brett,
22  what's going on?"  Is that correct?
23    A.  Yes.  To that effect, yes.
24    Q.  Can you identify for me any of the

Page 101

1  kids that poked their heads out?
2     A.  A lot of these kids I don't even know
3  the names of. I just know by face.
4     Q.  Okay. Now, at the conclusion of that
5  30- to 45-minute search of your room, what
6  occurred?
7     A.  At the conclusion of the search, the
8  officers that were in my room left and the quiet
9  outside died down, so I'm assuming everyone
10 left. I was left in the room with one officer
11 who just sat there for approximately 30 to --
12 I'd say another 30 to 45 minutes or so.
13    Q.  And were you still handcuffed?
14    A.  Still handcuffed to the desk. He
15 would periodically get up to browse around the
16 room, but he never said anything to me.
17    Q.  And then what occurred?
18    A.  Then the female officer came back into
19 the room and uncuffed me.
20    Q.  Anything else you remember?
21    A.  She showed me some surveillance
22 pictures because I asked her, "Let me see the
23 pictures of who I'm supposed to be."
24    Q.  And can you describe her demeanor at

Page 102

1  this time?
2     A.  Her demeanor was very -- somewhat
3  sympathetic. Somewhat.
4     Q.  And what did she say?
5     A.  Ummm...
6     Q.  When she unhandcuffed you, did she
7  tell you that --
8     A.  She didn't say anything. She didn't
9  say anything to -- she didn't verbally give me
10 any sympathy. She more or less, you know,
11 handed me the pictures nicely. Because I was
12 being, at that time, I was being rather rude.
13    Q.  Did she say, You're no longer a
14 suspect, or did she say --
15    A.  I was just uncuffed.
16    Q.  And then you asked her to see
17 pictures, right? What prompted you to do that?
18          MR. KLEHM: Objection.
19    A.  I was told there was a surveillance
20 videotape downstairs when I was first arrested
21 and handcuffed, so I asked, "May I see the
22 pictures of who I'm supposed to be?"
23    Q.  And what did she say?
24    A.  She showed me the pictures.

Page 103

1     Q.  And what did you say?
2     A.  I said, I don't quite know the curse
3  words I said, but I did -- like I said, I was
4  rude.
5     Q.  Can you explain --
6     A.  I threw the pictures and asked that
7  everybody leave my room. They left my room. I
8  closed the door and I just sat down. I just sat
9  down on my bed and just was thinking, What just
10 happened?
11    Q.  So this female officer comes in. She
12 unhandcuffs you and shows you the photographs of
13 the surveillance camera; is that correct?
14    A.  (Witness shakes head.)
15    Q.  And then you swear and threw the
16 pictures and they left?
17    A.  Mm-hmmm.
18    Q.  Is that a "yes?"
19    A.  Oh, yes.
20    Q.  Do you remember anything else that
21 occurred when this officer returned?
22    A.  That she just stated, I mean, she
23 stated, "We've confirmed your whereabouts." To
24 that effect.

Page 104

1     Q.  So then you knew that you were no
2  longer a suspect; is that correct?
3     A.  Yes.
4     Q.  And how long did that take, this last
5  period of time when the female officer returned,
6  uncuffed you, showed the pictures to you --
7     A.  Less than five minutes.
8     Q.  What's the next thing you remember
9  occurring?
10    A.  I then gathered my stuff for the
11 workout that I was trying to go to, but I was
12 already late by a hour, so I wanted to go over
13 to tell my coach why I was late because I've
14 never really been late for anything. And he
15 just asked me, you know, "What happened? What's
16 going on?" He had overheard. I told him what
17 had happened.
18    Q.  And then did you, at that time, work
19 out with the team?
20    A.  No.
21    Q.  Was the workout over?
22    A.  The workout was over. I just went
23 back to my room.
24    Q.  Did anyone ever tell you that they

Page 105

1  witnessed the incident involving the police?
2      A.  Yes.
3      Q.  And who was that?
4      A.  Again, I don't know the names.  A lot
5  of people knew me on the college, but I didn't
6  know them.
7      Q.  Did anyone ever tell you they
8  witnessed it?
9      A.  Yeah.  They're like, "I saw what
10 happened, man.  What happened?  What's going
11 on?"  And I was just like, "Nothing."
12     Q.  And you don't know the names of any of
13 these people; is that correct?
14     A.  I don't remember their names.
15     Q.  Do you remember anything else about
16 that day that you haven't already told me here
17 today?
18     A.  No.
19     Q.  Did you miss any classes that day?
20     A.  No.
21     Q.  You had completed them in the morning?
22     A.  Yes.
23     Q.  And do you remember what you did that
24 night?

Page 106

1      A.  I went to the cafeteria.  I just
2  went -- then went back to my room and just went
3  to sleep.
4      Q.  Do you remember what time the whole
5  incident ended at?  Was it around dinner time
6  that you would have gone to the cafeteria?
7      A.  The time which incident ended?  Like,
8  when I was uncuffed and --
9      Q.  When you were freed.
10     A.  I'd say that was around 3:30.  Three,
11 four.  Three or four.
12     Q.  Then you ultimately went to dinner at
13 some point and then returned and went to bed; is
14 that correct?
15     A.  I went then at 4:30-ish.  After it
16 happened to me, I went to talk to my coach.
17 Then from there I'm not sure if I went back to
18 my dorm or the cafeteria first, but I either
19 went to my dorm to the cafeteria or straight to
20 the cafeteria to the dorm, ate and just went to
21 my room, ate by myself.
22     Q.  Now, you testified earlier, I believe,
23 I just want to clarify, that they asked -- the
24 police officers when you were in front of the

Page 107

1  Monican Hall asked if they could search your
2  room; correct?
3      A.  Yes.
4      Q.  And how did you respond?
5      A.  I said no.
6      Q.  And then what happened?
7      A.  An officer said, "If you have nothing
8  to hide, you'll let us in your room.  You better
9  tell the truth."  You know, it was a bunch of
10 just...
11     Q.  And then what, ultimately, how did you
12 respond?
13     A.  Ultimately, I then said okay.
14     Q.  Now, do you remember if you changed
15 your clothes from the morning until the time
16 that you were getting ready to go to the gym?
17     A.  I did not change my clothes.
18     Q.  So you had the same outfit on all
19 day; is that correct?
20     A.  Well, I might have put on a fleece.
21 I'm not sure if I had -- no, I believe I had the
22 fleece on the whole day.
23     Q.  So you had these like --
24     A.  Merrimack College basketball fleece.

Page 108

1  That's what I was wearing.  College basketball
2  fleece.
3      Q.  What color was that?
4      A.  Gray.  It zipped up.  It had
5  "Merrimack College" right here and a basketball
6  here (indicating).
7      Q.  And what did you have on underneath
8  that?
9      A.  I don't remember.
10     Q.  And you had your doo-rag on?
11     A.  I had my doo-rag off.
12         MR. KLEHM:  Objection.
13     Q.  At any point that day did you have a
14 doo-rag on?
15     A.  Yes.
16     Q.  When was that?
17     A.  During the morning when I first
18 awoke.  Because I usually wear it when I go to
19 sleep.
20     Q.  And did you wear it to class that day?
21     A.  No.
22     Q.  So you never left your dorm with the
23 doo-rag on that day; is that correct?
24     A.  I always -- huh?

Page 109

1    Q.  You never left your dorm room with the
2  doo-rag on that day; is that correct?
3    A.  I did leave my dorm room with the
4  doo-rag on.
5    Q.  When was that?
6    A.  In the morning.  When I went to work
7  out in the morning.
8    Q.  At approximately seven o'clock in the
9  morning?
10   A.  Early in the morning.
11   Q.  At that time, did you have a different
12 outfit on than what you had on in mid-morning?
13   A.  No.  I had the same pants on and I
14 believe I did -- I had the same fleece on.
15   Q.  And then you'd go and change, do your
16 workout, get back into your clothes and then go
17 to your class; is that correct?
18   A.  Yes.  Because in the locker room, I
19 probably had more clothes in the locker room
20 than I did in my room.
21   Q.  Okay.
22   A.  So -- and I had way too many clothes.
23 Actually, Coach Hammel had to ask me to remove
24 clothes from the locker room.

Page 110

1         MS. RYAN:  Do you want to take,
2  like, a quick little break?
3         MR. KLEHM:  Yes.  That's fine.
4         (A break was taken from
5         11:44 a.m. to 12:00 p.m.)
6  BY MS. RYAN:
7    Q.  Now, you testified that after the
8  incident you went to see your coach, then you
9  ultimately had some dinner and then you went to
10 bed for the night; is that correct?
11   A.  Yes.
12   Q.  Do you remember afterwards anything
13 else after the fact?  I know in your complaint
14 that you state that you had -- you went out with
15 Richard Santagati, the president of Merrimack
16 College.  Do you remember doing that?
17   A.  That wasn't that day.
18   Q.  Do you remember anything else about
19 this incident that occurred prior to going out
20 with President Santagati?
21   A.  I don't understand your question.
22   Q.  Do you remember meeting with anyone
23 else?  Do you remember discussing it with anyone
24 else?  Do you remember anything else regarding

Page 111

1  this incident prior to having -- was it lunch or
2  dinner?
3    A.  I mean, I went to the cafeteria and,
4  you know, being an athlete, you're like a --
5  you're a public figure, so -- and, you know,
6  cafeteria is full of the whole college, so some
7  people were asking me what happened.  You know,
8  I pretty much was saying, "I don't know."
9    Q.  Why were you saying that?
10   A.  Because I don't know why I was, you
11 know, I don't know why I was believed to have
12 looked like the person in the pictures.
13   Q.  Did you tell these people that you
14 were thought to have been a suspect in an armed
15 robbery and then released?
16   A.  No.  I was just -- I was saying, "I
17 don't know."  Basically, you know, it's none of
18 their business and, also, I really didn't know.
19   Q.  Anything else that you remember
20 occurring?
21   A.  What did you say, prior to?
22   Q.  Your dinner or lunch with
23 Mr. Santagati.  Lunch.
24   A.  I don't recall anything.  That was the

Page 112

1  next -- that wasn't the same day.
2    Q.  And in your complaint you allege that
3  it was on March 27th.  Do you have any reason to
4  believe that that wouldn't have been correct?
5    A.  No.
6    Q.  So that was a substantial time later;
7  is that correct?
8         MR. KLEHM:  Objection.
9    Q.  It was 23 days later, right?
10 Twenty-four days?
11        MR. KLEHM:  Objection.
12   Q.  I'm sorry.  One day, wasn't it?
13   A.  Yes, it was one day.  You confused me
14 right there.  I'm sorry.
15   Q.  Was it the next day?
16   A.  Yes, it was the next day.
17   Q.  So the next day you had lunch with the
18 president of Merrimack College; is that correct?
19   A.  Yes.
20   Q.  How did that get initiated?  Did he
21 contact you?  Did you contact him?
22   A.  I was just going about my regular day,
23 going to lunch.  He approached me in the lunch
24 line at the cafeteria and said, "Do you mind

Page 113

1  sitting down, chatting? I want to talk to
2  you." Something like that.
3      Q. So where did you have lunch, in the
4  cafeteria?
5      A. Yes. The Merrimack cafeteria.
6      Q. Did you know him to be the president
7  before he approached you?
8      A. Oh, yes. Of course.
9      Q. And can you describe the conversation
10 that you had with him?
11     A. He stated, you know, "I'm sorry about
12 what happened. Whoever is at fault for this
13 will be disciplined. Whatever we can do to help
14 you. We had, you know, we had nothing to do
15 with the situation. It was an outside
16 operation."
17         Pretty much that was the gist of the
18 conversation. It wasn't long. I was very -- I
19 was -- at that time, I was just anti-social in
20 general, but, then again, this is the president
21 of the college you play for, so I was, you know,
22 showing respect.
23     Q. So when you were at Merrimack, would
24 you describe yourself as being anti-social?

Page 114

1      A. Yes. I stayed in my room pretty much
2  my whole four years. I didn't really go out on
3  campus at all, really. Very, very, very
4  rarely. And then in my -- in my senior year of
5  college, I basically lived off-campus.
6      Q. Who did you live with off-campus?
7      A. My girlfriend at the time.
8      Q. Who was that?
9      A. Jennifer Magnanimi.
10     Q. And so you wouldn't make it a practice
11 to go to parties on campus?
12     A. No.
13     Q. And would you socialize with your
14 teammates?
15     A. Oh, yes. I would socialize -- I would
16 socialize with my teammates and that's pretty
17 much it.
18     Q. And why was that?
19     A. Honestly, I felt those are the only
20 people there I would trust to hang out with
21 and...
22     Q. Why did you feel they were the only
23 ones you could trust?
24     A. Honestly, because I understood the

Page 115

1  fact that I -- when I signed to go to Merrimack,
2  you know, I was going to be one of very few
3  minorities and, I mean, I come from an area --
4  I've been involved in situations in the past
5  where, you know, things like this have occurred
6  to me. So I more keep to my -- I'm a
7  keep-to-myself person. You know, I try to avoid
8  trouble.
9      Q. So were you unhappy when you were at
10 Merrimack?
11         MR. KLEHM: Objection. Do you
12 want to say when?
13     Q. At any time were you unhappy --
14         Strike that. You just testified
15 that you understood you were going to be one of
16 very few minorities at Merrimack; is that true?
17     A. Yes. But I was -- I wasn't raised to
18 view color. My brother is half white. I don't
19 know my father but a name. I'm -- but I'm
20 aware. I'm aware of my surroundings always.
21     Q. What do you mean by that?
22     A. I mean, while at Merrimack, I'd seen
23 things happen to other students of color.
24 That's all.

Page 116

1      Q. What have you seen?
2      A. There was an incident with two
3  football players and the hockey team and the two
4  football players eventually got expelled.
5      Q. Were the football players minorities?
6      A. Yes.
7      Q. And were the hockey players?
8      A. I don't believe they ever had a
9  minority hockey player. I'm not sure.
10     Q. So the ones that were involved weren't
11 minorities; is that correct?
12     A. Huh?
13     Q. The ones that were involved in an
14 incident between football players and hockey
15 players were not minorities, the hockey players?
16     A. I wasn't present. Like I said, I
17 stayed in my room. But I was friends with the
18 two football players.
19     Q. Did you think it was racially
20 motivated?
21     A. Going off of what they stated, yes.
22     Q. Any other incidences that you believe
23 were racially motivated with regard to students
24 at Merrimack College?

**DUNN & GOUDREAU**

Page 117

1    A.  That's about it.
2    Q.  Did the incident involving the
3    football players and hockey players involve
4    outside players or was it handled, if you know,
5    by the Merrimack police or Merrimack
6    administration?
7    A.  I'm not sure.  Again, I didn't get
8    that involved in it.  I'm just going off what
9    they said.
10   Q.  Now, you testified a few moments ago,
11   you said that things like this have occurred to
12   you in the past.  What are you referring to?
13   A.  While I attended Palo Verde High
14   School as a freshman in Las Vegas -- this is
15   part of the reason my mother wanted me to, you
16   know, go back to New Jersey, place where I was
17   comfortable -- a situation very similar to this
18   happened to me in school, during school.
19   Q.  Can you explain to me --
20   A.  What happened was I was on the
21   basketball team.  One of my teammates, I'm not
22   sure which teammate it was, had an altercation
23   with -- all right.  I have to bring you back to
24   explain.

Page 118

1         Palo Verde High School, at that time,
2    it was its first year.  All it had was
3    freshmans.  There were no sophomores, juniors,
4    or seniors.  So we were borrowing Bonanza High
5    School's -- we were sharing a high school with
6    another high school.  That was part of the
7    reason my mother was like, I've never heard of
8    anything like that.
9         So Palo Verde was sharing Bonanza High
10   School.  Bonanza High School and some of the
11   guys I played basketball with had -- it would
12   just cause friction.  And these were -- caused
13   friction.  I didn't get involved in that.
14   Again, I don't really get involved in that kind
15   of stuff.
16        But I guess there was an altercation
17   sometime around lunch between one of our
18   basketball players and one of the Bonanza, one
19   of their sports athletes.  I don't know what
20   team.  But as I'm coming out of the lunch, as
21   I'm coming out of lunch, handcuffed, pinned,
22   asked about, you know, "Do you have a gun?  We
23   heard that there's going to be a rumble or
24   something."

Page 119

1         I'm like, "What are you talking
2    about?"  Because I wasn't even around my
3    teammates.  I pretty much -- I think that day I
4    actually ate lunch with my girlfriend at the
5    time or something.  I don't know.  But I wasn't
6    around them.  I had no idea what was going on.
7    And it occurred again, but...
8    Q.  Any other similar incidences or
9    episodes in your life?
10   A.  That was -- that's the only other time
11   something like this...
12   Q.  Now, you testified that you were
13   handcuffed, pinned and asked about a gun.  Who
14   handcuffed you, pinned you and asked you about a
15   gun?
16   A.  Las Vegas Police Department.
17   Q.  Were you arrested?
18   A.  I'm not sure what -- I believe I was
19   arrested.  I was handcuffed.
20   Q.  Were you taken to a police station?
21   A.  No.
22   Q.  Were you booked or photographed?
23   A.  No.  I believe I was taken to the
24   principal's office.

Page 120

1    Q.  Were you suspended or disciplined by
2    the school?
3    A.  No.
4    Q.  Were you exonerated?
5    A.  Yes.
6    Q.  And did you ever come to learn how you
7    were identified as the suspect?
8    A.  No.
9    Q.  Did you bring a lawsuit against them?
10   A.  No.
11   Q.  Were you ever compensated in any way
12   by the school or by the Las Vegas police?
13   A.  No.
14   Q.  And did you leave the school shortly
15   after that incident?
16   A.  Shortly?  Well, that was -- I left at
17   the end of the school year to go to St. Peters
18   in New Jersey.
19   Q.  So you completed the school year?
20   A.  Yes.
21   Q.  In Palo Verde?
22   A.  Yes.
23   Q.  And then left?
24   A.  Yes.

| Page 121 | Page 123 |
|---|---|
| 1   Q. Was that one of the reasons why you<br>2   left Palo Verde?<br>3   A. Yes.<br>4   Q. Do you remember anything else about<br>5   the conversation that you had with the president<br>6   of Merrimack aside from what you already<br>7   testified to here today?<br>8   A. I'm not quite sure what I've already<br>9   stated. I mean, no, that's about it.<br>10   Q. Were you ever offered anything in<br>11   terms of compensation by the president of<br>12   Merrimack College as a result of what occurred?<br>13       MS. AYER: Objection.<br>14       MR. KLEHM: Let's go off for a<br>15   second.<br>16       (There was a discussion off the<br>17       record.)<br>18   A. Compensation?<br>19   BY MS. RYAN:<br>20   Q. Correct.<br>21   A. I was told we're fully --<br>22       MR. KLEHM: Well, wait a minute.<br>23   Hold on a second. I think I need to talk to<br>24   him. | 1   Santagati, do you remember anything else that<br>2   occurred? Did you have anymore communications<br>3   with anyone from the college or from the police<br>4   or your coaches regarding this incident?<br>5   A. After I had my conversation with Coach<br>6   Hammel, probably about couple days after that, I<br>7   don't know the exact date, he said, "I think you<br>8   should talk to somebody." And he told me I<br>9   should go talk to a therapist or psychologist<br>10   over at the school.<br>11   Q. Do you know why he told you to do<br>12   that?<br>13   A. No, I don't.<br>14   Q. Did you, in fact, do that?<br>15   A. Yes, I did.<br>16   Q. Do you remember what you told the<br>17   counselor?<br>18       MR. KLEHM: I'm going to object<br>19   on the grounds of patient-therapist privilege.<br>20       MS. RYAN: Well, is he seeking<br>21   damages?<br>22       MR. KLEHM: He is. If you look<br>23   at Sorrenson vs. H&R Block, which is our case,<br>24   which is a District Court of Massachusetts case, |
| Page 122 | Page 124 |
| 1       MS. RYAN: Well, I want to hear a<br>2   conversation that he had with the president.<br>3   It's not -- as long as it's nothing that you<br>4   learned from your attorney.<br>5       MR. KLEHM: Right. Can I just<br>6   talk to him for a second? You can answer as to<br>7   conversation you had with the president.<br>8       MS. AYER: The president on the<br>9   day after. On that day.<br>10       MS. RYAN: That day, right.<br>11   Well, or that school year.<br>12       MR. KLEHM: Right.<br>13   A. What I was going to say was he said,<br>14   "We're fully behind you." That's what I was<br>15   going to say.<br>16   BY MS. RYAN:<br>17   Q. Now, were you allowed to live<br>18   off-campus as a student at Merrimack?<br>19   A. I believe so, yes. I mean, there was<br>20   commuters.<br>21   Q. And to play on the basketball team?<br>22   A. Yes. I still had a dorm room at the<br>23   time.<br>24   Q. Now, after your meeting with President | 1   if it's a garden-variety emotional distress<br>2   claim, you don't have to -- you don't have to<br>3   give the information that's contained, otherwise<br>4   governed by a psychotherapist patient-privilege.<br>5   If we're claiming a psychic injury, which we're<br>6   not, I don't have to reveal it. So he's not<br>7   going to.<br>8       MS. RYAN: So what is the extent<br>9   of your damages that you're alleging in this<br>10   case?<br>11       MR. KLEHM: You want me to put<br>12   this on the record?<br>13       MS. RYAN: Yes, if you're going<br>14   to instruct him not to answer the question that<br>15   I'm asking.<br>16       MR. KLEHM: It's an emotional<br>17   distress case and there's other damages as<br>18   well. You can ask him any questions you want<br>19   about the damages he's suffered. But as to what<br>20   he had told that particular person, it's<br>21   governed by that privilege.<br>22       MS. RYAN: Now, I made it on the<br>23   record in front of the court that I wanted those<br>24   records and it was represented to me that those |

Page 125

1  records had been destroyed and that's the reason
2  why they were not being produced. It was never
3  disclosed to me that you were making those
4  records confidential or --
5          MR. KLEHM: Oh, no. You're
6  misunderstanding. I didn't say anything about
7  -- we never object to the production -- well, I
8  shouldn't say never, but we don't object to the
9  production of records. These happen not to
10  exist. But the contents of the communications
11  between them is governed by the privilege, so
12  you can't get it through him.
13          MS. RYAN: I disagree and we can
14  bring it up with the court, but are you
15  instructing him not to answer?
16          MR. KLEHM: Yes, I am.
17  BY MS. RYAN:
18      Q.  So who was the counselor that you met
19  with?
20      A.  I don't recall her name.
21      Q.  How many times did you meet with her?
22      A.  Once.
23      Q.  Where did you meet with her?
24      A.  In her office.

Page 126

1      Q.  At the college or was she from an
2  outside agency?
3      A.  At the college.
4      Q.  Did she prescribe you any medications?
5      A.  No.
6      Q.  Did she prescribe you any course of
7  treatment?
8      A.  No.
9      Q.  Did you schedule a second appointment
10  with her?
11      A.  No.
12      Q.  Have you sought any other counseling
13  as a result of any of the incidents that serve
14  as the base of your complaint against my
15  clients?
16      A.  No.
17      Q.  Any medical treatment?
18      A.  I would if I had insurance. But no, I
19  haven't.
20      Q.  When you were in college you had
21  medical insurance, right?
22      A.  Yes.
23      Q.  So when you were in college, if you --
24      A.  I did? Yes, I did.

Page 127

1      Q.  And you never sought any medical
2  treatment as a result of any injuries that you
3  sustained in this correct; is that correct?
4      A.  No.
5      Q.  You didn't go to the emergency room;
6  is that correct?
7      A.  Correct.
8      Q.  And now it's your testimony here today
9  that after college you would have sought medical
10  attention for damages you sustained in this case
11  if you had medical insurance?
12      A.  Yes. After my mother, you know, we
13  had a very -- we had like a heart-to-heart and
14  my mother knows me best. She always will.
15  Always has. She thinks that I need to seek some
16  medical attention.
17      Q.  What medical attention does she think
18  you need to seek?
19      A.  She just says, "You need to talk to
20  somebody."
21      Q.  And you haven't done that; is that
22  correct?
23      A.  No.
24      Q.  And since you graduated from college,

Page 128

1  have you ever had medical insurance?
2      A.  No. Maybe for a brief period when my
3  mother first signed with Kaiser Permanente,
4  which is a insurance company, but I think I got
5  too old or I was too old to be on it. They said
6  no. Something like that. Because I asked my
7  mother for insurance. She was trying to get me
8  insurance.
9      Q.  But you believe you had it for a brief
10  time?
11      A.  I may have. I'm not sure.
12      Q.  Did you seek any counseling or
13  treatment during that period?
14      A.  No.
15      Q.  You never had insurance with Nextel?
16      A.  No.
17      Q.  Did you have the option of having it?
18      A.  I'm not sure.
19      Q.  What about with Ober Wireless?
20      A.  No.
21      Q.  Did you have the option of having it?
22      A.  No.
23      Q.  Were you ever prescribed any
24  medications by anyone as a result of any

Page 129

1  injuries that you allege you sustained as a
2  result of this incident?
3       A.  No.
4       Q.  And you don't have any copies of the
5  records for the treatment that you had with the
6  counselor on campus; is that correct?
7       A.  Excuse me?
8       Q.  Did you keep a copy of any of the
9  records that you had from the meeting that you
10 had with your counselor on campus?
11            MR. KLEHM: Objection. Go ahead.
12      A.  No. Only records -- I went back to my
13 coach's office and told him I talked to her like
14 he had asked me to and that was it.
15      Q.  And at any point did you keep a diary
16 of the events that transpired?
17      A.  A diary? No. I more or less write
18 poetry.
19      Q.  Did you write any poems about the
20 incident that occurred?
21      A.  I didn't write -- no, I didn't write
22 any poems about the incident that occurred, no.
23      Q.  Do you have medical insurance now?
24      A.  No.

Page 130

1       Q.  I see here today you have an injury to
2  your leg; is that correct?
3       A.  Yes.
4       Q.  Did you seek medical attention for
5  that?
6       A.  Initially, I wasn't going to, but my
7  mother went ahead and paid for whatever the
8  costs were for this.
9       Q.  And what, did you go to the emergency
10 room?
11      A.  A walk-in clinic.
12      Q.  What's your diagnosis?
13      A.  No fracture. They just did x-rays.
14 But I am going to the hospital on Friday,
15 tomorrow, before I leave just to get it
16 rechecked out because they said I should have it
17 checked out in two weeks again to check the
18 ligaments.
19      Q.  What hospital will you be going to?
20      A.  Probably Lawrence General.
21      Q.  And who is paying for that course of
22 treatment?
23      A.  I've been told just to have them call
24 my attorneys if there's a problem.

Page 131

1       Q.  For this leg?
2       A.  Yes.
3       Q.  And who did you tell that to?
4       A.  Who did I tell what to?
5       Q.  To call your attorneys?
6       A.  Oh, I haven't done it yet. On Friday,
7  that's what I've been told to do when I go to
8  have it looked at.
9       Q.  But your mother has paid for your
10 medical treatment to date?
11      A.  Thus far.
12            MR. KLEHM: Can we go off for a
13 minute? I can explain it really quickly.
14            MS. RYAN: Don't worry about it.
15 That's okay.
16      Q.  Who are you staying with while you're
17 here for this deposition?
18      A.  I am staying with friends.
19      Q.  Who?
20      A.  Matthew and Nate. But I'm staying in
21 different places. I may stay at a different
22 place tonight. Koran -- I may stay at one of my
23 teammate's places, Koran Rivers. It's kind of up
24 in the air right now.

Page 132

1       Q.  Where do Matt and Nate live?
2       A.  Lawrence.
3       Q.  How do you know them?
4       A.  I know them through music. Came to
5  some of my games. Their cousin was my barber
6  while I was attending Merrimack, so that's how I
7  know them.
8       Q.  Have you had any other medical
9  treatment in the past three years aside from the
10 injury to your leg?
11      A.  Three years. I'm not quite sure what
12 injuries occurred, but I have had injuries. I
13 have had surgery.
14      Q.  When was the last time you had
15 surgery?
16      A.  I had surgery on my shoulder.
17      Q.  When was that?
18      A.  That was after my freshman year.
19      Q.  Any medical treatment after you left
20 Merrimack?
21      A.  No. I mean, really couldn't afford it
22 if I had to. No, nothing.
23      Q.  Ever had any counseling aside from the
24 one counseling session that you had at Merrimack

Page 133

1  College in your whole life?
2      A. Have I ever been counseled? Say that
3  again.
4      Q. Have you ever sought any treatment
5  with a counselor, being a psychiatrist,
6  psychologist, a social worker, at any point in
7  your life aside from the one you've already
8  testified to here today?
9      A. No, not that I recall. Well, when I
10 was at East Brunswick High School, I don't know
11 if it counts, but my guidance counselor used to
12 sit and talk with me about, like, my plans for
13 college and stuff.
14     Q. Anything else you can think of?
15     A. That's it.
16     Q. Now, is it your testimony that you
17 believe that this incident that serves as the
18 basis of the complaint today was racially
19 motivated?
20     A. I mean, yes.
21     Q. And what evidence do you have to
22 support your position that this was motivated by
23 race?
24     A. I mean, just the whole doo-rag

Page 134

1  incident just really didn't rest easy with me.
2  Like, what did that have to do with anything?
3  Like, I wear a doo-rag. You know, and then the
4  prior things that occurred on campus that I
5  already discussed.
6      Q. The one incident with the hockey
7  players and the football players?
8      A. Yes. And then there was another
9  incident with -- there was other incidents, too,
10 like, that my teammates had.
11     Q. With the Merrimack police or with an
12 outside police agency?
13     A. With other students and the police.
14     Q. Outside police agencies?
15     A. I'm not really sure what happened in
16 their case, but that would be Light Foot Taylor
17 and those guys. They had an incident.
18     Q. What was the incident with Light Foot
19 Taylor?
20     A. Light Foot Taylor and Kenny Jones,
21 they're current athletes. That's who I stopped
22 in to see yesterday. Kenny Jones hurt his
23 back. Light Foot just had surgery on his leg,
24 so I wanted to, you know, I had to stop by and

Page 135

1  say hello, see how they were doing. And but
2  those guys were involved in a incident where,
3  from what they tell me, they were called the "N"
4  word by other students.
5      Q. Did that involve the police?
6      A. And then when the police came, I
7  believe they were arrested and the other people
8  weren't.
9      Q. Do you know who they were arrested by?
10     A. No, I'm not sure.
11     Q. Do you know when this occurred?
12     A. No, I'm not sure.
13     Q. Was it after your incident?
14     A. Yes. Was it? Yes.
15     Q. And do you know if it's still pending?
16     A. I'm not sure.
17     Q. You said that when I asked you why you
18 believe that this incident was racially
19 motivated, you said the doo-rag didn't rest well
20 with you and then you said because of prior
21 incidences including the incident involving
22 Light Foot Tailor and Kenny Jones.
23        Anything else that you're aware of
24 that supports your assertion that this incident

Page 136

1  involving the police was racially motivated?
2      A. I have nothing that comes to mind.
3  Something may come to mind later.
4      Q. Is your leg bothering you?
5      A. Yes. We can finish.
6      Q.    Do you want to walk around for a few
7  minutes? Does that help it?
8      A. Yes, it does. It's just that the
9  circulation needs to switch.
10        MS. RYAN: Why don't you walk
11 around for a little bit and then we can come
12 right back in.
13        (A break was taken from
14        12:30 p.m. to 12:34 p.m.)
15 BY MS. RYAN:
16     Q. Now, I'm just going to -- your counsel
17 has produced the names of some people that he
18 believes might have information that would be
19 relevant to this case, so I'm just going to go
20 through the names and ask you if you know what
21 information these individuals could have that
22 could be relevant to this lawsuit, okay?
23 Patrick Foley. Who is Patrick Foley?
24     A. (Witness shakes head.)

Page 137

1    Q.  You don't know who Patrick Foley is?
2    A.  (Witness shakes head.)
3    Q.  Gina Bertelli?
4    A.  That was -- that was my classmate.
5    Q.  And what do you think Gina Bertelli
6  would know about this incident?
7    A.  Well, she sat with me during the -- in
8  the cafeteria, so she knows I was in the
9  cafeteria.
10    Q.  So she was with you the morning of the
11  incident?
12    A.  Yes.
13    Q.  She didn't see you at any time with
14  the police, did she?
15    A.  No.
16    Q.  So she'd be able to testify to your
17  whereabouts at the time of the armed robbery,
18  say?
19    A.  At the time of my day, I don't
20  believe -- I don't think that was the same
21  time. I'm now aware of the time, so...
22    Q.  What about Nick Gerteisen?  Do you
23  know who I'm talking about?
24    A.  I forgot the name.  I don't know.

Page 138

1    Q.  Chrisovalanti Papantonakis?  Let me
2  show you this name so you can see if that will
3  refresh your memory?
4    A.  I'm sorry.  No.
5    Q.  Light Foot Taylor.  You've testified
6  about Light Foot today?
7    A.  Oh, yes.
8    Q.  Are you aware of anything else that
9  Light Foot would be able to testify to in this
10  matter?
11    A.  No.  Probably nothing other than I've
12  said.
13    Q.  Your counsel has also produced two
14  statements to us -- three statements.  One is
15  from a Patrick Foley, one is from a Gina
16  Bertelli, one is from Nick Gerteisen and another
17  one is from Chrisovalanti Papantonakis,
18  whatever.  I'm just going to show you these and
19  ask you if you've seen these documents before?
20    A.  All right.
21    Q.  Have you seen those before?  Do you
22  know?
23    A.  I don't remember.
24    Q.  You can take your time and read

Page 139

1  through them, but I just wanted to know if you
2  had ever seen them before?
3    A.  I mean, no.  I don't remember.
4    Q.  You don't remember asking these
5  individuals to write these statements for you;
6  is that correct?
7    A.  I don't remember what they wrote.  I
8  just got them.
9    Q.  You did?  Okay.  That's all I want to
10  know.
11    A.  Oh.
12    Q.  So you did ask these individuals to
13  write statements about what they saw?
14    A.  Yes.
15        MS. RYAN:  I'm going to have this
16  marked as Exhibit 1 and then I'll make a copy
17  for everyone.  It's a four-page document marked
18  as Exhibit 1.
19        (The stenographer marked the
20        document Exhibit No. 1 for identification.)
21    Q.  Do you remember the conversation that
22  you had with any of these individuals when they
23  gave you those statements?
24    A.  No.

Page 140

1    Q.  And you, at some point, had just
2  learned that these individuals had witnessed
3  something about the incident of March 26th; is
4  that correct?
5        MR. KLEHM:  Objection.  Go ahead.
6    A.  What was the question again?
7    Q.  Sure.  You, at some point, learned
8  that these individuals might have knowledge
9  about the incident involving the police; is that
10  correct?  Is that why you asked them for their
11  statement?
12    A.  Yes.  I mean, they asked me what was
13  going on and then they would tell me, Oh, I saw
14  this or I saw that, and I would say, "Write it
15  down."
16    Q.  Did they write this all down on one
17  computer in front of you?
18    A.  I didn't see them write it down.
19    Q.  So they wrote this down and then gave
20  it to you?
21    A.  Yes.
22    Q.  Do you remember when you had them do
23  this?
24    A.  (Witness shakes head.)

36 (Pages 141 to 144)

## Page 141

1    Q.  Was it while you were a student at
2  Merrimack?
3    A.  Yes.
4    Q.  Why did you ask them to write down
5  what they had seen?
6    A.  I was trying to find out what happened
7  to me.  You know, because, primarily, at this
8  point, I really don't know what the -- who was
9  the reason this happened to me.  That's why.
10    Q.  Now, on these letters, we'll call
11  them, most of them say "To whom it may
12  concern."  Did you instruct them to write "To
13  whom it may concern?"
14    A.  No.
15    Q.  And most of them say -- are dated
16  either March 26 or they make reference to today,
17  referring to March 26.  Do you remember having
18  conversations with these people on March 26?
19    A.  I don't remember the conversations
20  with them.  I was more or less trying to
21  eliminate conversation with anybody that day.  I
22  would just say, "Write it down then for me.  I
23  don't know what happened."
24    Q.  Do you remember if they brought their

## Page 142

1  statements to your room that night?
2    A.  I don't recall when they gave them to
3  me.  Periodically, probably, when they saw me on
4  campus.  You know.
5    Q.  I'm just going to show you a series of
6  photographs and ask you if these are the
7  photographs that were shown to you by the police
8  on March 26, 2003.  And I'm showing you a
9  four-page document.
10    A.  I was shown four photographs, and I
11  don't know which four.
12    Q.  You were shown original photographs as
13  opposed to photocopies; is that correct?
14    A.  Yes.
15    Q.  And did they resemble what's in front
16  of you today?
17    A.  Yes.
18    Q.  And in any of those can you see the
19  face of the individual?
20        MR. KLEHM:  Objection.  Go ahead.
21    A.  No.
22    Q.  And in the one that was shown to you,
23  could you see the face of the individual?
24    A.  No.

## Page 143

1    Q.  Okay.  And when you testified earlier
2  that you threw the pictures and swore, why did
3  you do that?  Did you think it didn't look like
4  you?
5        MS. AYER:  Objection.
6    Q.  You can answer.
7    A.  Yes.  I still think it doesn't look
8  like me.
9        MS. RYAN:  Can we have this
10  marked as Exhibit 2.  And it's a four-page
11  document.
12        (The stenographer marked the
13        document Exhibit No. 2 for identification.)
14    Q.  Now, are you familiar with an
15  individual by the name of Steven Bertelli?
16    A.  No.
17    Q.  Did you know an individual by the name
18  of John or Steven Ionelli?
19    A.  No.
20    Q.  Did anyone ever mention anything to
21  you about a getaway car?
22    A.  I'm not sure.  I'm not sure about
23  that.  Matter of fact, I do remember the name
24  Steven Ionelli.

## Page 144

1    Q.  How do you remember that name?
2    A.  One of the officers said -- showed me
3  a picture.  That's it.  Showed me a picture of
4  my campus ID and showed me a picture of that
5  name that you're talking about, but I didn't
6  know the person.
7    Q.  Did they ask you if you knew that
8  person?
9    A.  Huh?  Excuse me?
10    Q.  Did they ask you if you knew that
11  person?
12    A.  Yes.  They told me that I knew that
13  person.  They didn't ask me if I knew the
14  person.
15    Q.  When did the officers do this?
16    A.  Outside of the Monican dormitory when
17  I was first grabbed.
18    Q.  Did you know anyone at Merrimack that
19  drove a Mitsubishi?
20    A.  I'm not -- I probably do, but I don't
21  know.
22    Q.  Did any of your friends at that time?
23    A.  I don't remember.  I really didn't pay
24  attention to peoples' cars like that.

Page 145

1    Q.  Did you ever travel off-campus with
2  anyone in their motor vehicle?
3    A.  Yes.
4    Q.  On many occasions?
5    A.  To go get something to eat.  Wendy's
6  is right around the corner, or was.  Burger
7  King.  Wendy's was down the street.  Yes, we
8  would frequently -- frequently, you may catch a
9  ride with someone you don't even know to go get
10  something to eat.  Or if, you know, hitch a ride
11  down the road to get something to eat while
12  you're studying.
13    Q.  Do you ever remember getting in a
14  Mitsubishi with anyone?
15    A.  No.
16    Q.  And have you told me here today all of
17  the injuries you've suffered as a result of any
18  of the incidences that occurred on March 26,
19  2003?
20    A.  Would you restate that?
21    Q.  Sure.  Have you told me, to the best
22  of your ability here today, all of the injuries
23  that you suffered as a result of the incidents
24  that occurred on March 26, 2003?

Page 146

1    A.  Yes, ma'am.
2    Q.  And have you told me, to the best of
3  your ability today, your best memory of how
4  things transpired on March 26, 2003?
5    A.  Yes.
6    Q.  And have you identified for me here
7  today all of the witnesses that you're aware of
8  that would have information pertaining the
9  incidences of March 26, 2003?
10    A.  Can you restate that?
11    Q.  Yes.  Have you identified for me today
12  all of the people that you believe who would be
13  witnesses to the incident of March 26, 2003?
14    A.  There were many witnesses.
15    Q.  Do you know any of them by name?
16    A.  The names that -- no, I don't know a
17  lot of people by name.  I know a lot of people
18  by face.
19    Q.  Do you have a mental image of anyone
20  that you believe has knowledge of what occurred
21  on March 26, 2003?
22    A.  No.
23    Q.  Are there any photographs that you
24  personally took pertaining to the incidences of

Page 147

1  March 26, 2003?
2    A.  No.
3    Q.  Do you have any other documents -- did
4  you keep any documents or files or emails or
5  communications regarding the incident that
6  occurred on March 26, 2003?
7    A.  No, I didn't keep any.  No.  I gave --
8  I mean, anything that I have, Paul or Jim has
9  pertaining to this situation.
10    Q.  And can you identify any and all
11  documents that you produced to counsel that
12  would be relevant to the incident on March 26,
13  2003?
14    A.  Can you state that again?  I'm sorry.
15  It might be me just being hungry right now.
16    Q.  Don't worry.  You testified that any
17  documents that you had you would have produced
18  to Jim or Paul, and you're referring to your
19  attorneys; is that correct?
20    A.  Right.
21    Q.  What documents did you produce to
22  them?
23    A.  These documents that were given to me
24  by students.

Page 148

1    Q.  So the four witness statements that
2  we've marked as Exhibit 1; is that correct?
3    A.  Yes.
4    Q.  Any other documents that you've
5  produced?
6    A.  No.
7    Q.  Have you spoken with any of the
8  witnesses that gave statements all marked as
9  Exhibit No. 1 about this incident since they
10  gave you their statement?
11    A.  Can you say that again?
12    Q.  Yes.  Have you spoken to any of the
13  individuals who are identified in Exhibit 1
14  since they gave you their statements?
15    A.  I may have spoken to Gina again in a
16  class, but the other -- after, I'm not sure.
17  I'm not sure.
18    Q.  Let me narrow it down even more.  Did
19  you ever discuss the incident of March 26, 2003
20  with any of the individuals identified in
21  Exhibit No. 1 after they gave you the statement?
22    A.  No.
23    Q.  When was the last time you spoke to --
24        Strike that.

38 (Pages 149 to 152)

Page 149

1 Was the last time you spoke to
2 any of them while you were at Merrimack College?
3 A. Yes.
4 Q. Had you consumed any drugs or alcohol
5 on March 26, 2003?
6 A. No.
7 Q. Were you ever disciplined as a student
8 at Merrimack College?
9 A. No.
10 Q. Suspended, put on probation, expelled?
11 A. No.
12 Q. And you did graduate?
13 A. Yes.
14 Q. And with a major in business?
15 A. Business. Marketing. Concentration
16 of marketing.
17 Q. Okay. Were you ever put on like an
18 academic-type probation?
19 A. No.
20 Q. And do you remember your GPA when you
21 graduated?
22 A. I believe it's two-eight.
23 Q. Were your grades consistent throughout
24 the four years at Merrimack?

Page 150

1 A. Yes.
2 Q. And that's like a B student,
3 approximately; is that correct?
4 A. You can nudge me over, I guess.
5 Q. Bumped you up a little, right?
6 A. Yeah.
7 Q. When you testified earlier about your
8 pants falling down out in front of Monican Hall,
9 do you remember that?
10 A. Yes.
11 Q. Your boxers never came down; is that
12 correct?
13 A. No.
14 Q. Is that correct?
15 A. Yes, that's correct. My boxers never
16 came down.
17 Q. Thank you. Do you have any memory of
18 seeing any Andover police officers on March 26,
19 2003?
20 A. Again, I couldn't distinguish between
21 Boston police officer and a Andover police
22 officer. I don't know.
23 Q. And you don't have a memory of seeing
24 any insignia on any individual that identified

Page 151

1 them as an Andover police officer; is that
2 correct?
3 A. That is correct.
4 Q. What about North Andover? Do you
5 remember seeing any insignia identifying anyone
6 as a North Andover police officer?
7 A. Yeah, I didn't see any insignia.
8 Q. So the police officers that you
9 encountered on March 26, 2003 could have been
10 from any department. You have no identity of
11 any of them; is that correct?
12 A. Right.
13 MR. KLEHM: Objection.
14 MS. RYAN: I have nothing
15 further.
16 MR. KLEHM: Before you leave,
17 since you're leaving, I had two things I wanted
18 to ask him based on what you said. So since
19 you're going to leave, why don't I just go.
20 MS. RYAN: I would appreciate
21 that.
22 MR. KLEHM: It might be three,
23 but okay.
24 CROSS-EXAMINATION

Page 152

1 BY MR. KLEHM:
2 Q. When the police officers were at your
3 room, did they ask you to go through where you
4 were and when, your whereabouts for the day?
5 A. Yes.
6 Q. Can you relate what was said then?
7 A. Relate what was said then?
8 Q. What did you say to them, what did
9 they say to you during that conversation?
10 A. I said the same thing I'd been saying
11 the whole time. I woke up in the morning, went
12 to basketball practice, went to the cafeteria,
13 studied for an exam, took my exam, went to
14 class, came back to my dorm, and went to the
15 gym.
16 Q. When you got up that morning, what
17 color doo-rag did you have on?
18 A. I have a blue doo-rag.
19 Q. And when the police officers brought
20 you up to the room, did you feel like you were
21 being arrested?
22 MS. RYAN: Objection. You can
23 answer.
24 A. Yes.

**DUNN & GOUDREAU**

Page 153

1          MR. KLEHM: That's all I had.
2          MS. RYAN: Great. Do you guys
3    want to break for lunch? I think that's fair.
4          MR. KLEHM: Yes. I just didn't
5    know if that would prompt you for anything else.
6          MS. RYAN: No. I'm all set.
7          (A break was taken from
8          12:55 p.m. to 1:26 p.m.)
9          CROSS-EXAMINATION
10   BY MS. AYER:
11   Q. Mr. Godette, my name is Allison Ayer.
12   I introduced myself earlier off the record. I
13   represent Merrimack College in this case in
14   which you filed against Merrimack College and
15   the towns of Andover and North Andover.
16          And the same rules that applied when
17   you were being questioned earlier on the record
18   apply here, so I'm going to assume when I ask a
19   question that you understand it and that your
20   answer is responsive to that question, okay?
21   A. Yes.
22   Q. And you're going to have to answer
23   audibly, et cetera.
24   A. Yes.

Page 154

1    Q. Before March 26, 2003, did you know
2    members of the Merrimack College Police Services
3    Department?
4    A. No.
5    Q. I think you testified earlier that
6    Merrimack College is small, so you could
7    recognize people from being from Merrimack
8    College; is that fair?
9    A. Yes. You could recognize people from
10   being from there, yes.
11   Q. But you didn't know -- to the extent
12   you could recognize someone from being from
13   Merrimack College, you didn't know any specific
14   --
15   A. As far as the officers are concerned?
16          MR. KLEHM: Hold on. You got to
17   let her finish.
18   A. I'm sorry. I apologize for that.
19   Q. It's okay. As far as employees who
20   worked for the Merrimack College Police Services
21   Department, did you know anyone specifically by
22   sight? Did you recognize them as working
23   specifically for that department?
24   A. Well, probably that would be the only

Page 155

1    department I wouldn't know that well because I
2    think the officers change frequently or -- I
3    don't know. So they changed frequently.
4    Q. If you didn't know them, how would you
5    know that they changed frequently?
6    A. I mean, you see them on campus and you
7    see different faces. So there's different
8    faces.
9    Q. I guess that's my question to you:
10   When you say you saw them on campus --
11   A. And then they moved -- they changed
12   parts of campus, so...
13   Q. When you say you saw them on campus,
14   do you mean the Merrimack -- the employees of
15   the Merrimack College Police Services
16   Department?
17   A. Yes. I mean, I would see them any
18   time I lost -- I frequently lost my campus ID
19   and I'd have to go to their office to get a new
20   campus ID and there would be different people.
21   Q. So you knew some of them by sight?
22   A. I couldn't tell you who they were
23   today.
24   Q. And when you say you couldn't tell me

Page 156

1    who they were, do you mean you couldn't identify
2    them by name? You couldn't describe them at
3    all?
4          MR. KLEHM: Objection. Go ahead.
5    A. Yes.
6    Q. Okay. Before March 26, 2003, did you
7    know Lieutenant Riordon?
8    A. No. No.
9    Q. Is it your testimony that before March
10   26, 2003 you had never had any interaction with
11   Lieutenant Riordon?
12   A. Yes.
13   Q. Yes, that's your testimony? You never
14   interacted with him before March 26, 2003?
15   A. I don't know who Lieutenant Riordon
16   is.
17   Q. So as you sit here today, you're not
18   sure who Lieutenant Riordon is?
19   A. Yes, I don't know who that is.
20   Q. Do you recognize the name?
21   A. I recognize the name.
22   Q. Do you know how you recognize -- under
23   what circumstances, what the name -- what do you
24   recall about the name?

40 (Pages 157 to 160)

Page 157

1    A.   I mean, I've seen the name on these
2  documents.
3    Q.   But other than that, you don't ever
4  recall interacting with him either verbally or
5  meeting face-to-face with Lieutenant Riordon
6  before March 26, 2003?
7    A.   Maybe if -- I remember a lot of faces
8  on campus.
9    Q.   But not specifically -- you couldn't
10  describe Lieutenant Riordon today?
11    A.   No.
12    Q.   Do you know if the Merrimack College
13  police are armed?
14    A.   I don't know.
15    Q.   Okay.  So back in 2003, when you were
16  on campus, do you ever recall seeing any
17  Merrimack College police officer armed?  And
18  when I say armed, I mean, do they carry guns?
19  Did you ever see any Merrimack College police
20  officer with a gun?
21    A.   No, I never saw a Merrimack police
22  officer with a gun.  I never looked.
23    Q.   Okay.  Did the Merrimack College
24  police officers, back in 2003, when you were

Page 158

1  still a student at Merrimack College, did they
2  wear uniforms?
3    A.   Yes.
4    Q.   Can you describe the uniform of the
5  Merrimack College police?
6    A.   Blue.
7    Q.   Do you know that or are you guessing?
8    A.   Dark-colored.  Like a dark blue.
9    Q.   Any other distinguishing
10  characteristics?
11    A.   No.
12    Q.   Okay.  You testified earlier that
13  before the incident at the Monican dorm on March
14  26, 2003 you went to a few locations on campus.
15  You said that morning you left the dorm and you
16  went to the gym to work out with the basketball
17  team; is that correct?
18    A.   Yes.
19    Q.   Do you recall what you were wearing
20  when you went to that work out?
21    A.   I believe I was wearing athletic pants
22  and a Merrimack -- I believe I had a Merrimack
23  fleece on, but I may have had the fleece at the
24  locker room, so I'm not quite sure at that time.

Page 159

1    Q.   And I think you said the fleece was
2  gray; is that correct?
3    A.   Yes.
4    Q.   And it zipped up?
5    A.   Yes.
6    Q.   And I think you testified, please
7  correct me if I'm wrong, that you were wearing a
8  doo-rag when you left that morning?
9    A.   Yes.
10    Q.   Do you recall the color of the doo-rag
11  that you were wearing that day?
12    A.   Blue.
13    Q.   When you say blue, what tone of blue?
14    A.   I don't remember what tone of blue it
15  was.  I had pretty much every tone of blue.
16    Q.   So you don't recall whether it was
17  light blue, navy --
18    A.   It was probably -- I'm more -- I
19  usually wore my -- I usually wore my light blue
20  one, usually.  But I had every color.  Almost
21  every color.
22    Q.   And after you worked out at the gym, I
23  think you testified earlier that you went to the
24  cafeteria and had breakfast with Light Foot

Page 160

1  Taylor; is that correct?
2    A.   I don't know if I sat with Light Foot
3  first or whom I sat with first, but periodically
4  throughout that time period I sat with numerous
5  people.  Like, numerous people.  More than just
6  them.  Those are the ones I remember, but
7  periodically people would sit down, talk to me,
8  ask me questions about what occurred.
9    Q.   No.  I mean before this incident
10  occurred.  So we're still in the morning, the
11  morning of March 26, 2003.  I thought you
12  testified that after you worked out with the
13  basketball team you went to the cafeteria and
14  had breakfast.  Did I get that wrong?
15    A.   That's in the morning, right?
16    Q.   Right, in the morning.
17    A.   In the morning I had breakfast?
18    Q.   Yes.  I'm asking you.
19    A.   Yes.  And I studied in the cafeteria
20  while I sat amongst other students at the first
21  table when you come into the cafeteria.
22    Q.   Okay.  And did you go to the cafeteria
23  immediately from your workout at the gym that
24  you had that morning with the basketball team?

Page 161

1  A. Could you say that again?
2  Q. Sure. Immediately after you left the
3  gym after your workout with the basketball team
4  on the morning of March 26, 2003, is it correct
5  that you immediately went to the cafeteria?
6  A. Yes.
7  Q. You didn't stop any other place?
8  A. No.
9  Q. And what were you wearing when you
10  were at the cafeteria?
11  A. I believe I still had on my fleece. I
12  believe I still had on my Merrimack fleece.
13  Q. Do you recall if you were still
14  wearing your doo-rag?
15  A. I was not -- I was not wearing my
16  doo-rag. I pretty much took my -- I primarily
17  wore my doo-rag in the mornings on the way in
18  the gym just rolling out of bed. Brush your
19  teeth -- because I wear it to sleep. You know,
20  I don't wear them in class or -- take them off.
21  Q. Do you know what you did with the
22  doo-rag after you -- to the extent your
23  testimony today is that you took it off, do you
24  know what you did with it?

Page 162

1  A. No, I don't know what I did with it.
2  Q. Do you know for sure that you took it
3  off?
4  A. That I took it off that day?
5  Q. No. That you took it off before you
6  went to the cafeteria?
7  A. For sure. I'm pretty sure that I did
8  because I'm not allowed to play basketball with
9  the doo-rag on.
10  Q. But you had already played basketball
11  at that point?
12  A. Right. I may have. Because when I
13  get out of the shower, I put it back on and walk
14  to -- maybe take it off when I get there just to
15  dry my hair. Usually I keep it just to dry my
16  hair.
17  Q. And that day after you worked out with
18  the basketball team, did you shower after you
19  worked out?
20  A. Yes.
21  Q. And where was your class? After
22  leaving the cafeteria, you said you went to
23  class; is that correct?
24  A. Yes.

Page 163

1  Q. Do you recall where that class was?
2  A. That class was -- yeah, that class was
3  across from the cafeteria.
4  Q. Do you remember the name of the
5  building on campus?
6  A. No.
7  Q. And then you went to a second class
8  that day?
9  A. That was in the -- it was in the same
10  building.
11  Q. But you don't recall the name of the
12  building?
13  A. I don't recall the name of the
14  building.
15  Q. O'Reilly Hall? Does that ring a bell?
16  A. It rings a bell, but I'm not sure if
17  that's the building. I don't remember which
18  buildings are named what.
19  Q. Do you have any knowledge of what the
20  circumstances were by which the police happened
21  to be at Monican dorm on March 26, 2003?
22      MR. KLEHM: Objection. You can
23  answer.
24  A. Could you restate that?

Page 164

1  Q. Sure. Do you have any knowledge as to
2  how the police came to be at Monican dorm on
3  March 26, 2003?
4  A. Today or -- what are you saying?
5  Right now do I have any knowledge, knowledge
6  that I, knowledge that I've read?
7  Q. Other than what you've mentioned
8  today, do you know how the police came to be at
9  the Monican dorm on March 26, 2003 other than
10  what you've testified today?
11      MR. KLEHM: Objection. Go ahead.
12  A. No.
13  Q. When you went to class that day, that
14  day being March 26, 2003, again, you were still
15  wearing the gray zip-up Merrimack College
16  fleece; is that correct?
17  A. I believe.
18  Q. And were you still wearing the doo-rag
19  when you went to class that day?
20  A. Into the class? I'm not sure. I
21  don't think so. I highly doubt it.
22  Q. But you're not sure?
23  A. I definitely took it off at some point
24  before class.

Page 165

1    Q. And how do you know that?
2    A. Because I don't wear doo-rags in
3  class. My mother taught me not to wear hats at
4  the table, things of that nature.
5    Q. So during your four years at Merrimack
6  College, you never wore a doo-rag to class?
7    A. Only time I may have ever done it is
8  if my hair was still wet, to keep it dry because
9  it's very cold up here and coming from the gym,
10 just showering, running to class.
11   Q. So on occasions when your hair was
12 wet, you might have worn the doo-rag to class;
13 is that correct?
14   A. Yes. just to stay warm and I'd put
15 maybe a wool hat over it.
16   Q. Okay. Do you know if there was ever a
17 meeting between any officers of the North
18 Andover police, the Andover police, or the
19 Merrimack College police on March 26, 2003
20 before this incident at Monican dorm?
21   A. Do I know?
22   Q. Right. That's the question.
23   A. I was not present. I don't know.
24   Q. You testified earlier that on March

Page 166

1  26, 2003 a group of police officers met you
2  outside the Monican dorm; is that correct?
3    A. Yes.
4    Q. Do you recall specifically how many
5  there were? And again, I'm limiting my question
6  to just outside the dorm that day.
7    A. I do not recall how many. I didn't
8  count.
9    Q. More than five?
10   A. Yes.
11   Q. More than ten?
12   A. I'd say it was -- yes. Yes, more than
13 ten.
14   Q. More than 15?
15   A. That might be about it. That might be
16 safe to say. I just saw black cars and people
17 and, I mean, there was a lot of students
18 around. I didn't know who was a student, who's
19 what, really. I mean, everything was just a
20 blur at that moment.
21   Q. So is it your testimony that it's fair
22 to say that there were more than 15 police
23 officers?
24   A. You're asking my opinion?

Page 167

1    Q. I'm asking if -- do you have any
2  recollection -- I'm just trying to narrow it
3  down how many police officers were there, and
4  you said there were more than ten.
5    A. I would say ten to 15.
6    Q. Okay.
7    A. I don't know.
8    Q. And again, that's specifically outside
9  the dorm before anyone had ever entered the
10 dorm. You were coming out and you think there
11 were ten to 15 officers --
12   A. I was coming out. I didn't even -- I
13 didn't even see them coming towards me. Like, I
14 was more or less bombarded like a, like a riot
15 squad. Like a bunch of people just in front of
16 me.
17   Q. And again --
18   A. I didn't even see them coming.
19   Q. And I guess the question is: When you
20 were leaving Monican dorm that day, how many
21 people, as you just described, bombarded you as
22 you walked out? How many police officers
23 bombarded you?
24   A. Ten to 15.

Page 168

1    Q. Do you know how many of those officers
2  were members of the Merrimack College police?
3    A. Again, I don't even know who was
4  there. I don't know which departments -- I
5  don't know what was going on. I don't -- I
6  don't know.
7    Q. So it's possible that none of them
8  were Merrimack College police officers?
9        MR. KLEHM: Objection. You can
10 answer.
11   A. Yes, it's possible. It's possible --
12 it's possible -- it's possible except for a
13 statement of one of my teammates.
14   Q. And what was that statement?
15   A. One of my teammates told me that he
16 was walking towards the dorm and he heard -- he
17 saw Merrimack -- he saw and heard the Merrimack
18 police talking to each other saying -- talking
19 about me.
20   Q. But does that necessarily mean that
21 they were present?
22   A. Exactly. It doesn't mean that they
23 were present. But he said it was around the
24 time that this occurred. So they were present

Page 169

1  on campus and our campus is very small, so I
2  mean, I don't know what present is. You could
3  pretty much see what happened to me from the
4  cafeteria.
5        At that time, the campus was, had a
6  different structure. It had a boulevard. So I
7  got to see -- I mean, it's changed since.
8    Q.  So you don't have any specific
9  recollection of seeing a Merrimack College
10  campus police officer as you exited the Monican
11  dorm on March 26, 2003 and were bombarded, as
12  you say?
13    A.  No. There was just one officer who
14  looked familiar. The one who helped me with the
15  keys by the door when I opened the door, he
16  looked familiar, but...
17    Q.  And when you say he helped you with
18  your keys outside your door, that was later on
19  during the incident when you had gone upstairs?
20    A.  Right. But I saw him in the
21  background of everything the whole time.
22  He's --
23    Q.  I'm sorry. I didn't mean to interrupt
24  you.

Page 170

1    A.  That's okay. Go ahead. He was a -- I
2  believe he had a short crewcut. And I had seen
3  him before.
4    Q.  And I think you just said he was in
5  the background that entire time that day?
6    A.  Yes. He wasn't, you know, pointing
7  his finger at me. He wasn't asking any
8  questions. I don't know where he was from, but
9  he looked familiar.
10    Q.  So he looked familiar, but you're not
11  sure if he was a Merrimack College police
12  officer?
13    A.  Right.
14    Q.  And the one officer who looked
15  familiar to you that day, he never -- did he
16  ever touch you?
17    A.  The officer who looked familiar? I
18  believe he reached in my pocket and helped me
19  with the keys. That's the only time he touched
20  me.
21    Q.  When you say reached into your pocket
22  and helped you with your keys, that was once you
23  were upstairs in your dorm room; is that
24  correct?

Page 171

1    A.  No. Once we were upstairs outside of
2  my dorm room.
3    Q.  So that was not outside Monican dorm?
4    A.  That was not outside Monican dorm.
5    Q.  And that was not as you walked up to
6  the dorm room?
7    A.  When he helped me with my keys?
8    Q.  Right.
9    A.  It was upstairs outside of my dorm
10  room.
11    Q.  Other than helping you with your keys
12  outside of the dorm room, did the officer who
13  looked familiar to you, he was male; is that
14  correct?
15    A.  He was male.
16    Q.  At any other time, did he touch you
17  that day other than helping you with your keys
18  outside of the dorm room?
19    A.  Not that I recall. But then again,
20  there were people behind me when I was
21  downstairs and I couldn't see -- I couldn't see
22  whose hands were inside my pants, but at some
23  time, at some time during -- this all occurred
24  -- all right.

Page 172

1        If you know Monican dorm, here's the
2  dorm lobby. Then there's doors to go outside,
3  stairs and then here is another door that you
4  got to get buzzed in or use your card to go
5  inside the dorm. So there's two -- there's like
6  a lobby-way. I was confronted in the parking
7  lot. There's a parking lot right here
8  (indicating).
9    Q.  Here. Why don't we do this.
10    A.  Thank you.
11        MR. KLEHM: Just write big.
12    A.  So what do you...
13    Q.  You were using your hands on the table
14  to describe the, I guess, Monican dorm. I'm
15  just -- I guess I'm going to ask you to put what
16  would be your description on the table using pen
17  and paper on the paper that I've just handed
18  you. I think that might be easier when we're
19  describing whereabouts.
20    A.  (The witness draws on the paper.)
21    Q.  You don't have to be an artist.
22    A.  This is called --
23    Q.  Are you marking? Because I'm going to
24  have you stop.

44  (Pages 173 to 176)

Page 173

1    A.  Okay.
2    Q.  I'm going to walk you through it.  So
3  what you've drawn today is on this sheet of
4  paper that I guess we'll mark as an exhibit.
5  Can you date it, please?
6    A.  The 19th.
7      MR. KLEHM:  19th, yes.
8      (The stenographer marked the
9      diagram Exhibit No. 3 for
10     identification.)
11   Q.  Can you describe what you've drawn
12 here?
13   A.  Okay.  This is the grass.  This is the
14 boulevard.
15   Q.  Yes?
16   A.  There's parking all along the
17 boulevard.  The boulevard is two ways.  You can
18 make like a U-turn.
19   Q.  And this picture would indicate is
20 right in front of Monican; is that correct?
21   A.  This is the parking in front of
22 Monican.
23   Q.  But the boulevard, you can do the
24 U-turn around there?

Page 174

1    A.  Right.  And you can turn left here to
2  go to -- do you want me to stop writing?
3    Q.  No.  You don't have to -- you can take
4  a left out of the U-turn from your drawing?
5    A.  Yes.  You can take a left to go to the
6  apartments.  Over here is the townhouses and
7  here is Monican right in front of the boulevard.
8    Q.  And I think you marked an X right sort
9  of in the middle of that U-turn and you wrote
10 the word "initial"; is that correct?
11   A.  This is where I was initially
12 bombarded and cuffed, talked to and then
13 walked -- then they walked me to the inside of
14 the Monican entrance way.
15   Q.  Let's stop here.  This X where you've
16 written "initial" marks where you, you just
17 said, where you were initially bombarded and
18 where you were handcuffed, okay?  Did the police
19 officer, the male officer who you recognized as
20 familiar, touch you at any time when you were in
21 that initial location?
22   A.  No.
23   Q.  Did he question you at any time when
24 you were in that initial location?

Page 175

1    A.  No.
2    Q.  Did he handcuff you in that initial
3  location?
4    A.  I'm not really sure who handcuffed me,
5  but I don't think so.
6    Q.  Do you recall the male officer who you
7  recognized as familiar as saying anything at all
8  to you when you were in that initial location?
9    A.  No.
10   Q.  Which is marked with an X on this
11 drawing?
12   A.  No.
13   Q.  Then tell me what happened.  After you
14 were handcuffed --
15   A.  Sometime during the whole process of,
16 you know, bombarding me with questions, I was
17 being bombarded with questions and walked into
18 the dorm.
19   Q.  Okay.
20   A.  To here.
21   Q.  Let's mark that --
22   A.  Up against the wall.  This is where,
23 you know, they continued to ask questions.
24   Q.  Let's mark that with a different

Page 176

1  letter.  I think you had originally marked it
2  with an X, the spot where they walked you to.
3    A.  How about an X with a O around it?
4    Q.  Okay.  As long as it's different.  A
5  follow-up question:  When you were outside in
6  this picture where you've labelled an X and the
7  word "initial" above it, which is where you said
8  you were initially handcuffed and bombarded and
9  asked questions, do you recall where the male
10 officer who was familiar to you, where he was at
11 that time when you were out there?
12      MR. PFAFF:  Before you answer
13 that, I just want to introduce myself.  I'm
14 Attorney Stephen Pfaff.  I'm here for Gina
15 representing Andover and North Andover, just so
16 the record is clear.
17      MR. KLEHM:  Do you want to read
18 the question again?
19      (The stenographer read back the
20 last question.)
21   A.  It's easier -- can I draw it?
22 BY MS. AYER:
23   Q.  Yes.  Why don't you mark it with an
24 A?

Page 177

1    A.  Mark it with an A?
2    Q.  Yes.
3    A.  These are cars.
4    Q.  I got it.
5    A.  I don't know how many cars.  It was at
6    least two.  Do you want A and B, two different
7    cars?  This is where I saw him standing, like,
8    by the cars.
9    Q.  Can you just mark that with an A?
10   A.  (The witness complies.)
11   Q.  So that's where he was, the officer,
12   approximately where he was when you were
13   initially bombarded and handcuffed, at where you
14   marked an X in this picture; is that correct?
15   A.  Yes.
16   Q.  And I interrupted you.  I'm sorry.
17   You said that you walked into the entryway into
18   Monican dorm in that picture up to the point in
19   that picture where you've labelled an X with a
20   circle around it; is that correct?
21   A.  I was walked inside at some point.
22   Q.  And the destination after you were
23   walked inside was the X where you've put a
24   circle around it in this picture; is that

Page 178

1    correct?
2    A.  Yes.
3    Q.  Where was the male officer whom you
4    recognized as familiar at the time when you were
5    --
6    A.  After that, I --
7         MR. KLEHM:  Hold on.  Let her
8    finish.
9    Q.  At the time that you were in that
10   entryway that -- at the location where you've
11   marked an X with a circle on that?
12   A.  I don't know.
13   Q.  Was he in the entryway with you?
14   A.  I don't know.  I was facing the wall.
15   Q.  Okay.
16   A.  I was just facing the wall.
17   Q.  Do you know if he -- when I say he,
18   the officer who you recognized as familiar to
19   you.  Did he walk with you into the dorm?
20   A.  I'm not sure.
21   Q.  Do you recall, other than where you've
22   labelled him with an A on this drawing that
23   you've done, do you recall at any other time
24   during the incident on March 26, 2003 seeing

Page 179

1    him, whether as you walked into the dorm, in the
2    entryway, outside your dorm, other than when you
3    said he helped you with your keys, other than
4    that, do you remember seeing him at any other
5    time during that incident?
6    A.  During this incident?
7    Q.  During the entire incident at Monican
8    dorm, whether it be outside the dorm, in the
9    entryway, outside your room, in your room, at
10   any other time other than when he helped you
11   with your keys?
12   A.  The only time I saw him again after
13   that was when he helped me with my keys.
14   Q.  But at no other time do you recall
15   seeing him, seeing him being the male officer
16   you said was the only one you recognized?
17   A.  Correct.
18   Q.  So to the best of your recollection,
19   the officer who you recognized, the only officer
20   you recognized as familiar on March 26, 2003
21   didn't search you that day?
22   A.  Again, I don't know whose hand reached
23   into -- I don't know whose hand it was.
24   Q.  But to the best of your recollection,

Page 180

1    he didn't perform that search?  I mean, I know
2    you're saying you couldn't see, but you didn't
3    see him search you, I guess is a better way to
4    say it.  You never saw the officer who you
5    recognized as familiar to you that day perform a
6    search on your person that day, that day being
7    March 26, 2003; is that correct?
8    A.  I never -- no, I never saw it.
9    Q.  And I think you testified -- well, did
10   he ever question you, he being the only officer
11   who you identified that you were familiar with,
12   did he ever question you or ask you any question
13   on March 26, 2003?
14   A.  No.
15   Q.  When you were in the entryway, again,
16   where you've labelled an X with a circle, did
17   you see any person who you knew to be a member
18   of the Merrimack College Police Services in that
19   entryway on March 26, 2003?
20   A.  No.
21   Q.  What happened after you said the
22   officers stopped you at the position on this
23   drawing, which is Exhibit 3, where the X and in
24   the circle is?  What happened after that?

46 (Pages 181 to 184)

Page 181

1    A.  I was given many of the same questions
2  that I was given here.  Answering them and being
3  told I was lying.
4    Q.  Can you tell me what were those
5  questions?  Do you recall?
6    A.  They asked me about my whereabouts as
7  far as -- and they just told me -- they told
8  me -- they basically told me -- they told me my
9  whereabouts.  So when I would tell them, "No, I
10  was here," they would say, "No, you're lying.
11  We have you on camera.  You're better off just
12  telling the truth.  Trust me.  We got you."
13  Like, those kind of comments.  I mean, those
14  aren't exact comments, but that's the gist of
15  what was said.
16    Q.  And that was the type of questioning
17  at both the X on this and the X with the circle
18  on this?
19    A.  The same type of question.
20    Q.  Did any of the officers on March 26,
21  2003 ever utter a racial slur?
22    A.  No.
23    Q.  I think I interrupted you and I
24  apologize.  What happened after you were in the

Page 182

1  entryway where you've located with an X and a
2  circle in this drawing?  What happened after
3  that?
4    A.  I was taken inside the dorm.  You want
5  me to draw it or...
6    Q.  Sure.  To the extent that it's
7  different, a different location, yes.
8    A.  Okay.  I was taken inside the dorm to
9  my room.
10    Q.  Okay.  And how did you get from that
11  entryway to your room?
12    A.  I was escorted by officers.
13    Q.  Did you walk upstairs?  Did you use an
14  elevator?  Was it on the same floor that the
15  entryway was?
16       MR. KLEHM:  Objection.  Go ahead.
17    A.  We walked directly -- we actually, we
18  walked directly through the first floor, I
19  believe, went up the stairs and came up to the
20  second floor this way.  I don't believe there
21  are any elevators.
22    Q.  And once you got up to your room, I
23  think you testified earlier that the officers
24  asked you if you could unlock the door; is that

Page 183

1  correct?
2    A.  I believe -- I don't know the exact
3  wording or -- but, I mean, I opened the door.
4    Q.  And you entered the room, the room
5  meaning your dorm room in Monican, with certain
6  police officers; is that correct?
7    A.  Certain?
8    Q.  With police officers?
9    A.  Yes.
10    Q.  Or did you enter alone?
11    A.  No.  I entered with police office --
12  yes, with police officers.  And they were
13  guiding me into the room.
14    Q.  Okay.  Was the police officer who you
15  said was the only police officer who you were
16  familiar with that day, did he enter your room?
17    A.  I'm not sure.  Because, again, when
18  you enter, when you entered my room, it was a
19  big partition and, like, you had to go through
20  the partition to sit down.  But officers were
21  coming in and out of the partition, opening up
22  the partition.  So you can see -- because I was
23  sitting directly where you can see through the
24  door and, you know, there were officers outside.

Page 184

1    Q.  But do you recall seeing the officer,
2  the single officer you were familiar with that
3  day -- you said you could see officers walking
4  in and out.  Do you recall specifically seeing
5  him walk through the door?
6    A.  No.  No.  Just the -- no, I couldn't
7  specifically see anybody.  It's just you could
8  see -- you could see, for example, like, if you
9  put a -- if you put a shirt up to sunlight or if
10  you put a sheet up to sunlight, you can see
11  through it.  I saw figures of people walking in
12  and out.
13    Q.  But you could not see anyone
14  specifically?
15    A.  No.
16    Q.  Could you see the officers -- well,
17  were there officers who passed the partition
18  with you?  You said there was a partition
19  horizontally in the room; correct?
20    A.  Yes.
21    Q.  Were there officers with you once you
22  passed the partition to get to your half of the
23  room?
24    A.  Yes.

Page 185

1    Q. Was the single officer with whom you
2  were familiar with and recognized, did he at any
3  time enter that half of the room with you on
4  March 26, 2003?
5    A. I'm not sure.
6    Q. I think you just said you did observe
7  the officers who were in there on that half of
8  the room with you?
9    A. I mean, at that point, I really had my
10  head down like this (indicating). I wasn't
11  watching the whole search. When they asked me
12  questions, I would answer questions, but my head
13  was just, you know, I wasn't really watching the
14  search, watching everything they were touching.
15  I wasn't really.
16    Q. Do you know how many officers were
17  with you on that side of the room that day when
18  they were doing the search?
19    A. It was about, I'd say, three to six at
20  different times. I don't know.
21    Q. Do you recall their genders?
22    A. Well, there was one female officer and
23  the others were males.
24    Q. Was the female officer with you on the

Page 186

1  side of the partition searching the room?
2    A. I'm not sure. She came -- she
3  definitely -- I'm not sure.
4    Q. Is it fair to say that, to the best of
5  your recollection, that you don't recall any
6  Merrimack College police officer, including the
7  one, and/or the person you identified as
8  familiar with, questioning you at any time that
9  day?
10        MR. KLEHM: Objection. You can
11  answer.
12    A. Can you state that again?
13    Q. Sure. I don't think I worded it very
14  well in the first instance, so...
15    A. Okay.
16    Q. You have no specific recollection of a
17  Merrimack College police officer questioning you
18  at any time?
19    A. Verbally.
20    Q. About any subject on -- let me finish
21  the question -- on March 26, 2003; is that
22  correct?
23    A. Yes.
24    Q. And you have no specific recollection

Page 187

1  of the single officer who you said that you were
2  familiar with ever questioning you at any time
3  on March 26, 2003; correct?
4    A. Correct.
5    Q. And you don't have any specific
6  recollection of any Merrimack College police
7  officer ever touching you in any way on March
8  26, 2003; correct?
9    A. Could you state that again?
10    Q. Sure. You don't have any specific
11  recollection of any Merrimack College police
12  officer touching you in any way, using any force
13  against you, on March 26, 2003?
14    A. Visually. I didn't see. But then
15  again, I was touched in times where I didn't see
16  who was touching me.
17    Q. But you don't have a specific
18  recollection. You couldn't say, Yes, that was a
19  Merrimack College police officer who touched me
20  there or touched me that time. You have no
21  specific recollection in that way; is that
22  correct?
23        MR. KLEHM: Objection. You can
24  answer.

Page 188

1    A. Can you say that again?
2    Q. You said people touched you that you
3  don't know who they were, but you don't have a
4  specific recollection -- you couldn't identify a
5  specific Merrimack College police officer who
6  specifically touched you at any time during --
7    A. Right.
8    Q. -- on March 26, 2003; is that correct?
9        MR. KLEHM: Objection.
10    A. Correct.
11    Q. And other than the time when you have
12  a specific recollection of him helping you with
13  your keys when you were in front of your dorm
14  room in Monican Hall on March 26, 2003, you have
15  no other specific recollection of the single
16  officer who you were familiar with touching you
17  at any other time on March 26, 2003; correct?
18    A. Can you say that again? I'm sorry. I
19  wasn't...
20    Q. It's okay. Other than -- I think you
21  testified the single officer with whom you were
22  familiar, you have a specific recollection of
23  him helping you with your keys when you were
24  upstairs in your dorm room on March 26, 2003;

48 (Pages 189 to 192)

**Page 189**

1 is that correct?
2 A. (Witness shakes head.)
3 Q. When you opened the door; correct?
4 A. Correct.
5 Q. And is it fair to say that you have no
6 other specific recollection of him touching you,
7 him being the single officer with whom you were
8 familiar, at any other time on March 26, 2003
9 other than that?
10 A. Right.
11 Q. And is it fair to say that, to the
12 best of your recollection, you do not recall any
13 Merrimack College police officer searching your
14 room on March 26, 2003?
15 A. Correct.
16 Q. And is it fair to say that you do not
17 have a specific recollection of seeing the
18 single officer with whom you were familiar with
19 ever searching your room on March 26, 2003;
20 correct?
21 A. State that again?
22 Q. Is it fair to say that you don't have
23 any specific recollection of the single officer
24 who you said you were familiar with and

**Page 190**

1 recognize, is it fair to say that you don't
2 have a specific recollection that he searched
3 your room that day?
4 A. I never -- I never visually saw him in
5 my room.
6 Q. So is that "yes?"
7 A. Yes.
8 Q. While you were in the entryway, which
9 in Exhibit 3 that we've marked -- do you need to
10 take a break?
11 A. Mm-mmm.
12 Q. Are you sure?
13 A. Yes.
14 Q. Let me know if you do, okay?
15 A. No, I'm good.
16 Q. In the entryway when you were located
17 in the position marked X with the circle around
18 it in the drawing on what's marked Exhibit 3
19 here?
20 A. Where is 3?
21 Q. This is Exhibit 3. I'm sorry. This X
22 with the circle around it which is the entryway
23 to Monican dorm; is that correct?
24 A. Yes.

**Page 191**

1 Q. Did any student ever enter or exit
2 that entryway while you were in there that day?
3 A. Yes. Students were going in and out.
4 Q. While you were in there?
5 A. Yes.
6 Q. Do you have any recollection of who
7 they were?
8 A. No. I just saw -- because these are
9 windows (indicating). There's windows on the
10 doors.
11 Q. Okay.
12 A. You know, and I'm being bombarded by
13 questions. I'm not really -- I'm trying to pay
14 attention to the questions, but I'm seeing
15 students walking by.
16 Q. So you don't know who they were?
17 A. No.
18 Q. You just know there were students?
19 A. Yes.
20 Q. The partition that divided your room
21 horizontally, could you see to your half of the
22 room from the doorway to the hallway?
23 A. I mean, the partition.
24 Q. Yes?

**Page 192**

1 A. Was basically translucent. Like, you
2 can see through it. It's not like I was trying
3 to, like, not see him and he couldn't see me.
4 It's just like somewhat of a divide. Like, he
5 can see through it. It was just a sheet
6 hanging. So you can see, like, the t.v. on. I
7 mean, what do you mean -- I don't know what your
8 perception of seeing is.
9 Q. Well, I think you said from your
10 position seated at your desk on March 26, 2003,
11 you couldn't see -- you could only see figures?
12 A. From sitting on my desk looking to the
13 left through the partition, I can see figures,
14 the door. I can see the door open, the light,
15 but you can't see faces. You can't see people.
16 Q. So would it be fair to say that the
17 same is true looking the opposite
18 direction; i.e., looking into the room from the
19 door into your half of the room?
20 A. I mean, I didn't get that view, so I
21 don't --
22 Q. You --
23 A. I don't know. I don't know what the
24 light was.

Page 193

1   Q.  At a time other than that day, did you
2  ever get that view?
3      A.  To be honest, I never really paid
4  attention to that.  I just went in and went to
5  my side.
6      Q.  So you don't really know?
7      A.  I don't really know.
8      Q.  Where is the Merrimack College campus
9  located?
10     A.  Where is Merrimack College campus
11  located?
12     Q.  Yes.  And I mean town.
13     A.  Massachusetts.  Oh, town is -- I
14  believe it lies in two towns.
15     Q.  Do you know --
16     A.  North Andover and Andover.
17     Q.  And do you know where the armed bank
18  robbery that occurred on March 26, 2003, where
19  it occurred?  What town?
20     A.  No.
21     Q.  Merrimack College has a duty to
22  protect its students' safety.  Would you say
23  that's fair?
24     A.  Do I think it's fair that they have to

Page 194

1  protect their students?
2      Q.  No.
3      A.  I don't get what you're saying.
4      Q.  I apologize.  Is it fair to say -- is
5  the statement that Merrimack College has a duty
6  to protect the safety of its students a fair
7  statement?  Do you think that's true?
8          MR. KLEHM:  Objection.  Go ahead.
9      A.  I think that's true.  I think they
10  have a duty to.
11     Q.  Okay.  Do you think that duty to
12  protect its students includes protecting them
13  from suspects of heinous criminal acts such as
14  armed robbery?
15         MR. KLEHM:  Objection.  You can
16  answer.
17     A.  Yes.
18     Q.  And do you think it's fair to say that
19  one of the concerns of Merrimack College, if an
20  armed robbery occurred in the vicinity of the
21  campus, is that an individual who is armed could
22  be on campus and endangering the lives of
23  Merrimack College students?
24         MR. KLEHM:  Objection.  You can

Page 195

1  answer.
2      A.  Could you state that again?
3          MS. AYER:  I'm going to have you
4  read that back.
5          (The stenographer read back the
6          last question.)
7      A.  Say that again?
8      Q.  I'll try and rephrase it.  How about
9  that?  One of the concerns of Merrimack College,
10  if there was an armed robbery in the vicinity of
11  campus, might be that there was an armed robber
12  on campus endangering the lives of its
13  students; is that fair?
14         MR. KLEHM:  Objection.
15     A.  Yes.
16     Q.  Do you think that once Merrimack
17  College learned of an armed robbery in the
18  vicinity of its campus, they would have a duty
19  to investigate that armed robbery once they had
20  notice of it?
21         MR. KLEHM:  Objection.
22     A.  Could you state that again, please?
23     Q.  Sure.  Do you think that Merrimack
24  College has a duty to investigate information

Page 196

1  that they receive of an armed robbery in the
2  vicinity of the campus; for example, if one
3  occurred in North Andover or Andover?
4          MR. KLEHM:  Objection.
5      A.  No.  Do they have a -- if a robbery
6  occurred somewhere else?  I want to -- can you
7  clarify what you're saying?
8      Q.  Sure.  I guess my question is:  Do you
9  think Merrimack College, if they received notice
10  from some outside --
11     A.  I mean, what if --
12     Q.  -- agency.
13     A.  Go ahead.  No, I was cutting you off.
14     Q.  It's okay.  That there's been an armed
15  robbery, for example, in Andover or North
16  Andover, they received information about that,
17  do you think they should investigate the
18  information that they learned about that armed
19  robbery?
20         MR. KLEHM:  Objection.  You can
21  answer it.
22     A.  Yes.
23     Q.  So it would be reasonable for them to
24  investigate and look into any information that

Page 197

1   they learned from that?
2           MR. KLEHM: Objection. You can
3   answer it.
4       A.  If the information had -- I don't
5   know. Really, I mean, I'm not a police
6   officer. I don't know. I put my faith in
7   police officers, so I just -- I don't know. I
8   don't know.
9       Q.  Okay. As a former student of
10  Merrimack College, would you have expected that
11  they would have investigated information that
12  they had received about an armed robbery that
13  occurred in North Andover or Andover?
14          MR. KLEHM: Objection. You can
15  answer it.
16      A.  No.
17      Q.  So you wouldn't necessarily have
18  expected that?
19      A.  A robbery that occurs off-campus?
20      Q.  Correct.
21      A.  I wouldn't expect them to participate
22  in it, in --
23      Q.  Okay.
24      A.  Can we take a break?

Page 198

1           MS. AYER: Absolutely.
2           (A break was taken from 2:27 p.m.
3           to 2:38 p.m.)
4   BY MS. AYER:
5       Q.  Did you suffer any physical injuries
6   as a result of the incident on March 26, 2003?
7       A.  Except, you know, I had a couple of
8   marks on my wrist for a couple days from the
9   cuffs. That's about it.
10      Q.  Other than that, no physical injuries?
11      A.  No.
12      Q.  What about did you suffer any
13  emotional issues because of the incident on
14  March 26, 2003?
15      A.  Yes. I was very emotional. I was
16  depressed.
17      Q.  And I guess what do you mean by
18  depressed? Other than labeling it depressed,
19  can you describe the feelings any better than
20  that?
21      A.  I mean, I thought, to this day, I
22  still think about it a lot. I mean, it just
23  stayed on my mind. Usually -- it just stayed on
24  my mind. Thought about it a lot. Really just

Page 199

1   stayed in my room. Didn't even really hang out
2   with my, even my girlfriend.
3       Q.  Didn't you say that, generally, you
4   were anti -- or you hung out in your room even
5   before the incident?
6       A.  Yes.
7       Q.  Other than that, can you give any
8   other specific emotion that you felt or...
9       A.  I felt betrayed.
10      Q.  Why did you feel betrayed?
11      A.  I felt embarrassed.
12      Q.  Okay. Why did you feel betrayed?
13      A.  I just feel like somebody was supposed
14  to protect me from this happening to me. So
15  confused, not even knowing why you were
16  betrayed. Like, it's like what's going on?
17      Q.  Do you recall being involved in an
18  incident at Merrimack College in which you sold
19  stolen books back to the book store?
20          MR. KLEHM: Objection. You can
21  answer.
22      A.  Yes.
23      Q.  Can you tell me about that?
24      A.  I found some books. I took them back

Page 200

1   to the store. I've taken books back to the
2   store -- I worked in the library, so I found
3   books all the time.
4       Q.  So you worked in a library at
5   Merrimack College while you were there?
6       A.  Yes. So I found books very
7   frequently. Just returned some books and I
8   didn't know -- I didn't know they were stolen.
9   I found them.
10      Q.  And did you ever have any interaction
11  with any Merrimack police officers as a result
12  of that incident?
13      A.  Yes. I was taken from class and asked
14  about them by an officer. That was it.
15      Q.  Did you say you don't know who the
16  officer was?
17      A.  It was a man with, like, white face
18  hair. That's all I can remember.
19      Q.  How many times were you questioned?
20      A.  How many times was I questioned?
21      Q.  Yes. Was it just that one incidence
22  where you were?
23      A.  Yes. One time.
24      Q.  What was the resolution of it? Were

Page 201

1   you -- I don't know.
2           MR. KLEHM: Objection to the
3   form, but go ahead.
4       A.  What was the question?
5       Q.  I guess what happened as a result of
6   --
7       A.  As a result, he told me, "We know
8   whose books they are. Do you have the money?"
9   I gave him back the money and that was it.
10      Q.  Nothing else ever happened from that?
11      A.  (Witness shakes head.)
12      Q.  No?
13      A.  No.
14      Q.  Did you have any other instance where
15  you were questioned by Merrimack College police
16  officers other than that one you've just
17  described at any time during the time you were
18  enrolled at Merrimack College?
19      A.  No.
20      Q.  You talked earlier about being
21  eligible to play an additional -- or eligible
22  because you missed your junior year of
23  basketball at Merrimack College, you're eligible
24  to play another year of NCAAs. Did I get that

Page 202

1   right?
2           MR. KLEHM: Objection to the
3   form, but go ahead.
4       A.  What was the question again?
5       Q.  You talked earlier about being
6   eligible to play another year of NCAA
7   basketball?
8       A.  Yes.
9       Q.  Is that correct?
10      A.  Yes.
11      Q.  Have you, at any time since March
12  2003, applied to any college at which you seek
13  to play that last year of eligibility in NCAA
14  basketball?
15      A.  No.
16      Q.  It was your testimony earlier, I
17  think, that the first time you spoke with
18  Jermaine Channer -- no. Is that his name?
19      A.  Yes. If that's who you're referring
20  to, that's the name.
21      Q.  I didn't know if I had the last name
22  correct. That was in around November 2005 after
23  you moved out back from Maryland; is that true?
24  Approximately.

Page 203

1           MR. KLEHM: Objection to the
2   form, but go ahead.
3       A.  What was the question again?
4       Q.  Was it your testimony -- there was a
5   time when, a period of time where you didn't
6   talk to Jermaine Channer?
7       A.  The first time I have spoken to him in
8   six years was two months ago.
9       Q.  Okay. And so you didn't -- after this
10  incident on March 26, 2003, you didn't contact
11  him concerning the incident?
12      A.  No.
13      Q.  And you said that you, even currently,
14  you go down approximately every weekend to
15  Maryland to work for Brad Roos?
16      A.  (Witness shakes head.)
17      Q.  Is he part of the Montgomery County
18  Recreation Department?
19      A.  Yes.
20      Q.  Do you recall how much you received in
21  unemployment benefits? You mentioned earlier
22  that you received unemployment --
23      A.  I don't know the amount.
24      Q.  Did you ever have a car on campus at

Page 204

1   Merrimack College?
2       A.  Yes.
3       Q.  And was it the Mitsubishi 2002?
4       A.  No.
5       Q.  What kind of car did you have while
6   you were at --
7       A.  I had a Honda.
8       Q.  So you purchased the Mitsubishi after
9   you graduated?
10      A.  Yes.
11      Q.  When was the first time that you spoke
12  with your Coach Hammel about the incident on
13  March 26, 2003?
14      A.  The first time I spoke to him about
15  the incident?
16      Q.  Right.
17      A.  The day it happened.
18      Q.  Okay. And do you recall how long
19  after the incident that you spoke with Coach
20  Hammel?
21      A.  Maybe 40 minutes.
22      Q.  And do you recall anything specific
23  about that conversation, either what you said
24  specifically to him or what he said specifically

Page 205

1   to you?
2       A.  No.  I mean, I don't remember
3   specifics.  I was more or less just venting and
4   he was more or less just, you know, telling me
5   it's going to be all right.  You know,
6   player-coach -- good coach.
7       Q.  And do you have any idea how many
8   times after that you spoke with him, if at all,
9   about the incident on March 26, 2003?
10      A.  Can you -- what's the question?
11      Q.  Did you talk to him -- did you have
12  any other conversations with Coach Hammel after
13  March 26, 2003 about the March 26, 2003
14  incident, if at all?
15      A.  Yes.
16      Q.  Do you have any specific recollection
17  of those conversations?
18      A.  Those conversations, I mean, that one
19  conversation occurred, I don't remember exactly
20  when, but, you know, a couple days after and
21  that's when he -- he asked me, "Are you going to
22  go talk to the lady?"  And that's what we talked
23  about.  How you feeling?  How you doing?  You
24  all right?  You know I'm here for you.

Page 206

1       Q.  Other than that, you don't have any
2   recollection of what you said or what he said to
3   you?
4       A.  No.
5       Q.  Do you know if he had heard about the
6   incident before you spoke to him about it before
7   you told him what had happened on March 26,
8   2003?
9       A.  I don't know.  I don't believe he
10  knew.  It didn't seem like he knew.  I'm not
11  sure.
12      Q.  You mentioned earlier there was an
13  incident at Merrimack College involving football
14  players and members of the hockey team during
15  which football players were expelled?
16      A.  Yes.
17      Q.  Do you know what the specifics of that
18  incident were?  I mean, was there a fight?
19      A.  The specifics from what I've heard,
20  again, and what one of the gentleman told me
21  that was involved was that a fight -- a fight
22  occurred with two hockey players and the two
23  football players and the two football players
24  left the party, went back to their dorm room,

Page 207

1   which was -- what was the name of that place?
2       They went back to their dorm room and
3   then the hockey, the whole hockey team was
4   banging on his dorm room and something
5   happened.  I think they had another fight.  But
6   at the end, you know, they had, like, sticks and
7   bottles and -- I don't know.  But none of them
8   got expelled except he said, "I'm expelled."  He
9   was telling me goodbye and stuff.  That's what I
10  know from what he told me because he was
11  leaving.
12      Q.  Did he tell you that the Merrimack
13  College police were involved in that incident?
14      A.  I don't -- I didn't really get into
15  specifics.  I was just, more or less, just,
16  like, listening to him vent on me and I'm like,
17  "Everything all right?"
18      Q.  Can you describe race relations
19  generally at Merrimack College during the time
20  that you attended?
21          MR. KLEHM:  Objection.  Go ahead.
22      A.  What part of race relations?
23      Q.  Well, I guess, did you ever observe
24  any issues between minority students and --

Page 208

1       A.  Observe?
2       Q.  Yes.  Other than the incidences you've
3   mentioned today that you either observed or
4   heard about?
5       A.  Not that I can recall.
6       Q.  Did you feel discriminated against
7   while you were at Merrimack College in any way?
8       A.  Not so much -- I mean, I didn't
9   personally.  Not so much until this occurred to
10  me, this happened to me.
11      Q.  Okay.  But other than that, you never
12  felt discriminated against at Merrimack College
13  either by the police or by anybody else?
14      A.  No.  I think, generally, Merrimack
15  community are nice people.
16          MS. AYER:  I think that's all I
17  have.
18          MR. KLEHM:  Okay.  I don't think
19  I have anything.  Actually, I do want to just
20  make sure.  Can I talk to you for one second?
21          (A break was taken.)
22  BY MS. AYER:
23      Q.  I guess then, after a conversation
24  with counsel, do you recall any additional

Page 209

1  comments or statements made during your
2  conversations with Coach Hammel?
3      A.  Yes.  When I went -- when I went over
4  to the gym after it happened -- remember I said
5  I went there, like, approximately 40 minutes
6  after to talk to him, tell him I was late.  He
7  said, you know, he asked me like five times, as
8  if he didn't believe me the first time that I
9  didn't do anything.  So that's what he was
10 mentioning.
11     Q.  But you get along with Coach Hammel?
12     A.  Yes, we get along.
13     Q.  And always did?
14     A.  Right.  He's a shoot-from-the-hip
15 guy.  He's, like, just saying, "You can tell
16 me.  You can tell me if you did it.  You can
17 trust me."
18         I'm like, "I didn't do anything."
19         MS. AYER:  Okay.
20         MR. KLEHM:  Was there something
21 else you had to correct?  I forget what it was.
22         THE WITNESS:  No.  I don't know.
23         MR. KLEHM:  Okay.
24 (Deposition of Brett Godette concluded at 2:59 p.m.)

Page 210

1           E R R A T A   S H E E T
2     In accordance with the rules of procedure
3  governing depositions, you are entitled to read
4  and correct your depositions.  Accordingly,
5  please carefully read your deposition and, on
6  this errata sheet, make any changes or
7  corrections in form or substance to your
8  deposition that you feel should be made.  PLEASE
9  DO NOT MARK THE TRANSCRIPT.  After completing
10 this procedure, sign at the conclusion of such
11 changes/corrections (if any) and return it in
12 accordance with your instructions.
13 Page  Line  Change          Reason
14
15
16
17
18
19
20
21
22
23
24 Date: _____ Signature: _____

Page 211

1      COMMONWEALTH OF MASSACHUSETTS
2  SUFFOLK, ss.
3
4
5          I, Meredith A. Fairbanks, a
6  Shorthand Reporter and Notary Public duly
7  commissioned and qualified within and for the
8  Commonwealth of Massachusetts, do hereby
9  certify:
10         That Brett Godette, the witness
11 whose deposition is hereinbefore set forth, was
12 duly sworn by me, and that such deposition is a
13 true record of the testimony given by the
14 witness to the best of my skill, knowledge and
15 ability.
16         IN WITNESS WHEREOF, I have
17 hereunto set my hand and affixed my notarial
18 seal this 23rd day of October 2006.
19
20         _____
21         Meredith A. Fairbanks
22         Notary Public
23 My Commission Expires:
24 November 21, 2008

**North Andover Police Department**
566 Main Street
North Andover, Ma. 01845-4099
978-683-3168
Incident Report
NOJJ

Incident Number: 2003000004240
File No: N/A
Dispatch Incident Number: 2003000005081
Print Date: August 25, 2004
Printed By: esalois

---

Narrative by: Sergeant Diane Heffernan  Division: Patrol Officers

| Seq No: | Date & Time | Narrative Description | Entered by | Status | Reviewed by | Last Edit Date |
|---|---|---|---|---|---|---|
| 2 | 03/27/2003 :15:47 | Incident Report | Sergeant Diane Heffernan | Open | Lieutenant Paul Gallagher | 01/15/2004 |

March 27, 2003

Re: Armed Robbery – Sovereign Bank
Main Street, North Andover, MA 01845

Involved: Jose Salas - Bank Teller / DOB 04/03/83 / SS# 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 / phone# (978) 682-6220
70 Saunders Street
Lawrence, MA 01841

Report by: Insp. Diane M. Heffernan

On March 26, 2003 at approx. 11:30am, all units responded to Sovereign Bank, Main St., North Andover, for a reported armed robbery that had just occurred. As units responded to the bank, I surveyed the area for possible suspects. I proceeded down Second Street towards Waverly Rd. As I approached this intersection, I observed a Gray Mitsubishi Eclipse, bearing Ma. Reg 9095ZB, heading south on Waverly Rd. Dispatch had just relayed that the suspect was described as a white male, wearing a dark blue baseball cap and a light colored sweater. I could see inside this vehicle, as the windows were down, I observed two white males in the front seat wearing white baseball caps and white shirts. As we approached the intersection of Mass. Ave., and Waverly Road, the signal light changed red. I pulled beside the vehicle and looked inside. At this time I observed another male in the back seat wearing a dark blue baseball cap and a gray colored shirt or sweater. Det. Cronin radioed the station and stated he had the suspect on Main Street. I immediately turned around to head in his direction, while calling in the license plate on the Eclipse. Enroute to Det. Cronin's location, the listing had come back as belonging to Steven Iannelli out of East Boston. While passing Sovereign Bank, I picked up teller Jose Salas, and brought him to the scene where Det. Cronin was questioning a suspect to make an I.D. Mr. Salas did observe the suspect and stated he was not the man who robbed him, I returned Mr. Salas to the bank and went in to interview him. I also radioed the station to put out a BOLO for the Eclipse to stop and question the subjects for possible involvement in the robbery. I also requested dispatch to call East Boston police for information on Mr. Iannelli.

Bank security was responding to Main Street to pull the video tape and produce still photos for us as evidence.

During the interview with Jose Salas he described the following description of the bank robber: He states he was a white male or a light skinned Hispanic, with "dirty hands and dirt on his face", approx. 5'10" tall, medium build, approx. 25 years of age, wearing a white "do-rag" underneath a dark blue baseball cap. He states the brim of the cap was pulled down just above his eyes. The baseball cap had some sort of design on it, as did the shirt he was wearing. He thought the shirt was gray in color. I asked to explain what happened and he stated that he observed this male enter the bank, look around and leave. A short time later, he returned and approached Mr. Salas' window. He handed the teller a note which said, I have a gun - you have 20 seconds - 1st and 2nd draw. The teller looked up and he observed the suspect put his right hand into his pocket and pull out a newspaper, which covered his hand. He states he saw something under the newspaper that was black in color and believed it to be a gun. The suspect also handed the teller a brown paper lunch bag with the note. The note was on white notebook paper. The teller said he had trouble opening the top drawer so he immediately opened the second drawer and put the money in the bag. When I asked him how much money he gave him he said he didn't know, however he remembered he gave him only 20's and five's. The twenties are banded in $500. increments and the fives are banded in $100. increments. He estimated approx. $3,000., but said he had to balance his drawer to determine the correct amount. I asked him is the suspect talked to him and he said only to ask for the note back. He did not appear to have an accent. Mr. Salas explains that the suspect left out the side door and he immediately went over and locked it. He observed the suspect cross Second Street, but went back in the bank at that time.

In the meantime, East Boston Police had called and informed me that they were familiar with the owner of the Eclipse and they have never had trouble with him, nor does he have a criminal history. They were keeping an eye on his residence and would inform me if he returned. They also informed me that the owner's brother does have a criminal history and is a known heroin user. His last known

**North Andover Police Department**
566 Main Street
North Andover, Ma. 01845-4099
978-683-3168
Incident Report
NOH

Incident Number: 2003000004240
File No: N/A
Dispatch Incident Number: 2003000005081
Print Date: August 25, 2004
Printed By: esalois

address was in Saugus. I called Saugus police and had them check that address for the vehicle.

At approx. 2:00pm, we received a call from Merrimack College, North Andover. Lt. Riordon stated he had just received our Teletype and was familiar with that vehicle. He informed us that the owner of the vehicle is a commuter student at the college. He also informed us that the suspected robber matched the description of another student and both he and another Merrimack College detective observed this subject wearing the same clothing today. At this time, myself, Det. Cronin, Lt. Gallagher and Chief Stanley responded to the college. We met with Lt. Riordan who showed us Merrimack College I.D.'s of the owner of the vehicle and the suspect, who he believed to be Brett Gaudette. We viewed the photos and Mr. Gaudette and the suspect did indeed look alike. We split up at this time and looked for Mr. Gaudette throughout the grounds. I went to his dorm room with a campus police officer and knocked on his door. He did not appear to be in his room, so I left the dorm, with campus police and sat outside. Approx. 10 minutes later, the college radioed that Mr. Gaudette was in the lobby of his dorm. I exited the cruiser and met Mr. Gaudette at the door. My police badge was displayed around my neck. I identified myself as a police officer and told him to turn and put his hand on the wall so that I could pat him down for weapons. Mr. Gaudette became extremely agitated, so I placed him in handcuffs for my protection. I explained to him that he was not under arrest and that I was placing the handcuffs on him for my own protection. At this time, other officer's arrived, including Det. Cronin. I explained that we were currently investigating a bank robbery and read Mr. Gaudette his Miranda rights. He stated he understood. After being patted down, I asked if we could search his room. Mr. Gaudette said yes, but then changed his mind. We explained that if he was innocent he wouldn't mind and he agreed. We walked him to his room and once inside uncuffed him. Det. Cronin began questioning Mr. Gaudette while I looked around. I did observe a white "do-rag" on a night table, but did not find the outer clothing the suspect was wearing. Mr. Gaudette denied any involvement in the robbery. When asked where he was at the time of the robbery, he explained that he was taking a test. We had the college confirm this story with his teacher. Since they could not confirm the story at that time, we left Mr. Gaudette's room and explained that if things checked out, he would be all set. All officers left the campus at that time.

I radioed the station and had them remove the BOLO on the vehicle since he was a student at the college and we could not connect any involvement with the Sovereign Bank. I also called East Boston Police and Saugus Police to update them on the situation.