UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                   )
BRETT S. GODETTE,                  )
          Plaintiff,               )
                                   )     Civil Action No. 05-11354JLT
v.                                 )
                                   )
RICHARD STANLEY, et al,            )
          Defendants.              )
                                   )
```

**PLAINTIFF BRETT S. GODETTE'S RESPONSE TO DEFENDANTS, RICHARD STANLEY, DIANE HEFFERNAN, DANIEL CRONIN, PAUL GALLAGHER AND TOWN OF NORTH ANDOVER'S L.R. 56.1 STATEMENT OF UNDISPUTED FACTS AND PLAINTIFF'S CONCISESTATEMENT OF FURTHER MATERIAL FACTS**

Plaintiff Brett S. Godette hereby responds to Defendants, Richard Stanley, Diane Heffernan, Daniel Cronin, Paul Gallagher And Town Of North Andover's L.R. 56.1 Statement Of Undisputed Facts (hereinafter, "Defendants' Statement of Material Facts") as follows, and further, sets forth Plaintiff Brett S. Godette's Concise Statement of Further Material Facts as follows[1]:

**Alleged Fact No. 1**

The plaintiff, Brett Godette was a student a Merrimack College and a member of the men's basketball team. (See, plaintiff's complaint.)

**Response No. 1**

Godette admits that, as of the time of the events alleged in Plaintiff's Complaint, Godette, an African-American, was a junior at Merrimack College and a member of the men's basketball team. (Affidavit of Brett S. Godette ("Aff. Godette"), attached as **Exhibit A** to the Affidavit of

---

[1] For the convenience of the Court, Godette has included herein Defendants' alleged facts and Godette's responses thereto. As a result of including same, the within document exceeds 20 pages.

Paul J. Klehm, Esq.[2], filed herewith, ¶¶1,2,3). During his tenure at Merrimack College, there were few African-American or Hispanic students and faculty on the Merrimack College campus, and the majority of students were Caucasian.  (Aff. Godette, ¶1).

**Alleged Fact No. 2**

On March 26, 2003, Mr. Godette wore a "doo-rag" and a grey Merrimack basketball fleece jacket while on campus. (Id.)

**Response No. 2**

Denied as written. At approximately 7:00 a.m. or 7:30 a.m. on that date, Godette attended a basketball team workout (Aff. Godette, ¶4).  At the time, the team was off-season (Aff. Godette, ¶4).  During the early morning of March 26, 2003, Godette wore a blue "doo-rag" and a gray Merrimack Basketball fleece jacket (Aff. Godette, ¶5).  At some point before 11:00 a.m. that morning, Godette removed his blue "doo-rag" (Aff. Godette, ¶5).  He did not wear any other "doo-rag," including, without limitation, a white "doo-rag," at any other time on March 26, 2003. (Aff. Godette, ¶5;  see Deposition of Brett Godette ("Dep. Godette"), **Exhibit B**, p. 108, ln. 10-11;  p. 164, ln. 22-24, p. 165, ln. 1-4).

**Alleged Fact No. 3**

At approximately 11:30 a.m. on March 26, 2003, an individual robbed a bank in North Andover, Massachusetts.

**Response No. 3**

Admitted.

**Alleged Fact No. 4**

---

[2] In the Responses, "Exhibit X" shall refer to the appropriate exhibit attached to the Affidavit of Paul J. Klehm, Esq.

At approximately 2:00 p.m. on that date, Lt. Riordon of the Merrimack College Police Services read a "CJIS message" that described the suspect and identified a license plate. (See Exhibit A, police report of Merrimack College Police, Lt. Riordan.)

**Response No. 4**

Godette admits that Defendant Riordan wrote a report in which he referred to reading a CJIS message that described the suspect and identified a license plate. As to the time, denied. (See Assist to Outside Agency report dated March 26, 2003, **Exhibit C**). Further answering, the CJIS message described the suspect as an Hispanic male in his 20's, 5 ft 9 inches tall, wearing a white hat with a doo-rag underneath. (See CJIS, **Exhibit D**). Nonetheless, initial radio transmissions described the suspect as a white male wearing a blue baseball cap and possibly a light-colored top. (Deposition of Daniel Cronin ("Dep. Cronin"), **Exhibit E**, p. 21, ln. 12-15; Deposition of Dianne Heffernan ("Dep. Heffernan"), **Exhibit F**, p. 27, ln. 10-13; Deposition of Paul Gallagher ("Dep. Gallagher"), **Exhibit G**, p. 11, ln. 23-24, p. 16, ln. 12; Various North Andover Police Reports, including Incident Report by Sgt. Heffernan, p. 1, and Incident Report by Paul MacMillan, **Exhibit H**; Mass. State Police Daily Administrative Log, **Exhibit J**[3]. According to Gallagher, who interviewed several witnesses, the suspect was "medium build, medium height." (Dep. Gallagher, p. 16, ln. 9-14) The bank teller who had been robbed had described the suspect as white. (See Dep. Cronin, p. 27, ln. 8-13) Approximately twenty to twenty five minutes after Gallagher arrived at the scene, after Gallagher and Cronin reviewed the surveillance tapes, the officers determined that the individual was Hispanic and that the hat was white. (Dep. Cronin, p. 29, ln. 7-16; Dep. Gallagher, p. 14, ln. 13-24) Detective Cronin

---

[3] The notes of Dianne Heffernan pertaining to her conversation with the bank teller who was robbed refer to "W/M dirt on face." (**Exhibit K**; Dep. Heffernan, p. 70, ln. 10-15; p. 71, ln. 4-6).

determined that the suspect was Hispanic based upon the facial makeup and skin tone he observed in the black and white surveillance tape. (Dep. Cronin, p. 29, p. 12-15, p. 30, ln. 9-11). According to Cronin, he could only see from the nose area down on the face of the suspect. (Dep. Cronin, p. 32, ln. 11-13). Cronin described the skin tone of the suspect depicted in the surveillance photographs as "dark" which he described as "darker than light." (Dep. Cronin, p. 31, ln. 21-24;  p. 32, 1-7). Heffernan, on the other hand, said that she could not determine the race of the suspect from the photograph. (Dep. Heffernan, p. 39, ln. 14 to ln. 18). From then on, the North Andover police were looking for an Hispanic male with, among other things, a white hat, a doo-rag, and an emblem on this left chest. (Dep. Cronin, p. 33, ln. 2-9).

Shortly after the robbery, Heffernan observed a Mitsubishi traveling on Waverly Road (her attention had been drawn to the car because there were two males in the front seat wearing white hats and white shirts – although she later observed a third male in the back seat wearing a blue baseball had and a gray shirt), and she called in the plate. (Dep. Heffernan, p. 32, ln. 23 to p. 33, ln. 20;  Dep. Gallagher, p. 23, ln. 10-19). She never stopped the car. (Dep. Heffernan, p. 34, ln. 14 to ln. 16). That vehicle was later listed in the CJIS received by Riordan. (Dep. Heffernan, p. 35, ln. 7 to ln. 11). Riordan told Heffernan that the vehicle was registered to a Merrimack College commuter student – not Godette. (Dep. Heffernan, p. 65, ln. 21 to p. 66, ln. 10). At the time of receiving the CJIS, Riordan had no information linking Godette to the owner of the motor vehicle. (Deposition of Michael Riordan ("Dep. Riordan"), **Exhibit L**, p. 76, ln. 10-15). In fact, no link was ever established between Godette and the vehicle listed in the CJIS message. (Dep. Heffernan, p. 78, ln. 16 to ln. 18).

Godette denies the remaining allegations of Alleged Fact No. 4.

**Alleged Fact No. 5**

4

Lt. Riordan had seen Brett Godette earlier that day and the description, including clothing, had similarities to Brett Godette was wearing that day. Id.

**Response No. 5**

Admitted that Riordan's report contains the information cited.  Further answering, Riordan saw Brett Godette among a group of students exiting a classroom.  (Dep. Riordan, p. 67, ln. 2-4;  p. 68, ln. 14-18;  p. 70, ln. 5-7).  He could not name any other students exiting the room, and he could not describe any of the other students.  (Dep. Riordan, p. 67, ln. 5-11).  Riordan was able to state that Godette was wearing "athletic apparel, warm up type pants, a jacket and a doo-rag.  (Dep. Riordan, p. 67, ln. 12-14).  Riordan testified that he spent fifteen seconds looking directly at Brett Godette, although he later testified that he did not focus on Godette.  (Dep. Riordan, p. 70, ln. 12-19;  p. 73, ln. 11-17).  He does not recall "for sure" whether Godette was wearing a baseball hat.  (Dep. Riordan, p. 84, ln. 18-24, p. 85, ln. 1-5).  At no time on that date did Godette wear a hat.  (Aff. Godette, ¶5).  He is not sure about the color of the shirt or the shirtsleeves that Godette was wearing.  (Dep. Riordan, p. 85, ln. 10-19).  He does not recall whether the logo read "RW" on Godette's jacket.  (Dep. Riordan, p. 85, ln. 20-24, p. 86, ln. 1-2).  Godette's fleece neither had dark sleeves nor did it have the insignia: "RW" on the chest (Aff. Godette, ¶5).

The CJIS received by Riordan indicated that the sweatshirt had dark sleeves and "RW" on the chest.  (See **Exhibit D**).  In contrast, Godette wore a blue "doo-rag" (although he had taken it off before his 11:00 a.m. class) and a gray Merrimack Basketball fleece jacket (Aff. Godette, ¶5).  Godette's fleece had the writing "Merrimack College" and a basketball on it (Dep. Godette, pp. 107-108).   The CJIS did not include photographs.  (Dep. Riordan, p. 63, ln. 4-6).  Riordan is uncertain as to what time he saw Godette on the day of the robbery, other than it was

before the time that he received the CJIS message, which bears a time of 13:13.  (Dep. Riordan, p. 89, ln. 12 to p. 91 ln. 21).

At his deposition, Riordan described Godette as having a lean build (contrary to Gallagher's testimony regarding the suspect) and a medium - "not dark, not light" - skin tone (which differs from Cronin's description of the suspect).  (Dep. Riordan, p. 56, ln. 10-15). Cronin, in contrast, describes Godette's skin tone as light Hispanic.  (Dep. Cronin, p. 85, ln. 21-23).

**Alleged Fact No. 6**

The suspect was described as wearing a doo-rag, baggy clothing and a grey zip up sweatshirt.

**Response No. 6**

Admitted.  Further answering, *see* Response No. 5, *supra*.

**Alleged Fact No. 7**

Lt. Riordan ran the license plate included in the CJIS report and it came up with a match to another Merrimack College student. Id.

**Response No. 7**

Admitted.

**Alleged Fact No. 8**

Lt. Riordan reported this information to the North Andover Police via telephone.

**Response No. 8**

Denied as vague.  The assertion does not cite to any part of the record, and the term "this information" is vague and unclear.  Further answering, at approximately 2:00 p.m. on March 26, 2003, Riordan telephoned the North Andover Police Department and said to Detective Heffernan

that he was familiar with the vehicle on the teletype and that the suspect matched the description

of another student that he and another had seen that day.  (**Exhibit H**;  Dep. Heffernan, p. 65, ln.

14-24, p. 66, ln. 10). Riordan did not believe that he used the word "matched;"  he testified that

he probably used the term "similarities."   (Dep. Riordan, p. 103, ln. 15).  At the time, Riordan

had doubt in his mind that the description fit Godette.  (Dep. Riordan, p. 79, ln. 16-18;  p. 81, ln.

10-15). He made no effort to check on Godette's whereabouts before calling the North Andover

police.  (Dep. Riordan, p. 94, ln. 1-3).  He knew that the North Andover police would probably

follow up on the information because there was a gun involved in the alleged crime.  (Dep.

Riordan, p. 94, ln. 14-23).

As of that time, Gallagher did not believe that the North Andover police had probable

cause or reasonable suspicion to detain anyone.  (Dep. Gallagher, p. 23, ln. 9-24, p. 24 ln. 12).

**Alleged Fact No. 9**

Shortly thereafter, Lt. Riordon met with various police officers including, Heffernan,

Stanley, Cronin and Gallagher, all of the North Andover Police. (Id.)

**Response No. 9**

Admitted.  Further answering, William Mayrose, then Chief of the Merrimack College

Police Services, and Lt. Rogers of the Merrimack College Police Services also attended the

meeting. (Dep. Riordan, at p. 102, ln. 1-4).

**Alleged Fact No. 10**

Detectives Heffernan, Lt. Gallagher, Chief Stanley and Detective Cronin all met with Lt.

Riordan and he informed them of the license plate check that matched a Merrimack College

student and of the fact that he saw Mr. Godette that morning wearing a white doo rag and a hat

and similar clothing. (See Exhibit F, North Andover Police report.)

**Response No. 10**

Godette admits that such a meeting, attended by Heffernan, Gallagher, Stanley, Cronin, Merrimack Chief William Mayrose and Officer Rogers was held.  (Dep. Riordan, p. 101, ln. 19-24, p. 102, ln. 1-4). Godette denies that the paragraph accurately reflects the police report cited. As to the meeting, the report only states, in pertinent part, "We met with Lt. Riordan who showed us Merrimack College I.D.'s of the owner of the vehicle and the suspect, who he believed to be Brett Gaudette.  We viewed the photos and Mr. Gaudette and the suspect did indeed look alike."  (**Exhibit H**; Surveillance Photographs of the Bank Robber, **Exhibit L1**; Merrimack College Student Identification Cards, **Exhibit L2**).  Even so, Riordan testified that he used the term "similarities," and not "matched."  (Dep. Riordan, p. 103, ln. 16-18).  According to Gallagher, Riordan and Rogers stated that they thought the surveillance photographs looked "very much like Mr. Godette."  (Dep. Gallagher, p. 26, ln. 3-13; p. 27, ln. 11-15).  During the meeting, attendees examined Merrimack ID cards of Godette and the commuter student, along with various surveillance photographs. (See Dep. Riordan, p. 105, ln. 4-5;  p. 45, ln. 9-13, p. 106, ln. 1-20).  There was a consensus that "there were tremendous similarities" between the surveillance photographs and Godette's ID photograph.  (See Deposition of Richard Stanley ("Dep. Stanley"), **Exhibit M**, p. 121, ln. 20-24, p. 122, ln. 1-8).

The first discussion of obtaining a class schedule for Godette occurred after the meeting when the officers split into groups of threes.  (Dep. Gallagher, p. 37, p. 2-7).  Riordan never took any steps toward obtaining Godette's schedule, and he does not recall telling Officer Rogers to obtain Godette's schedule.  (Dep. Riordan, p. 98, ln. 10-24, p. 99, ln. 1-4).  *There was no discussion of waiting to find out whether Godette was in class at the time of the robbery before the officers approached Godette.*  (Dep. Gallagher, p. 37, ln. 8-12). Cronin contends that he had

reasonable suspicion and probable cause to detain Godette as of the time of the meeting.  (Dep.

Cronin, p. 59, ln. 16-24, p. 60, ln. 1-10).  Cronin based his determination on the similarities

between the surveillance photographs and the student ID, the clothing description provided by

Merrimack officers, the contention by Merrimack officers that Godette was wearing similar, if

not the same, clothing that morning, and the vehicle in the area belonging to a Merrimack

student.  (Dep. Cronin, p. 59, ln. 21-24, p. 60, ln. 1-19).  No link was ever established between

Godette and the vehicle listed in the CJIS message.  (Dep. Heffernan, p. 78, ln. 16 to ln. 18;

Dep. Cronin, p. 60, ln. 20-22).

**Alleged Fact No. 11**

Mr. Godette admits that on the morning of the incident when he went to workout at

approximately 7:00 a.m. he wore his doo-rag as he walked to the gym. (See Exhibit E, Plaintiff's

Deposition Transcript, p. 109).

**Response No. 11**

Admitted.  Further answering, *see* Response No. 2, *supra*.

**Alleged Fact No. 12**

Mr. Godette was also admits to wearing a grey zip up fleece with baggy clothing on the

date of this incident. (See Exhibit E, Plaintiff's Deposition Transcript, p. 107 - 108).

**Response No. 12**

Admitted that Godette wore a grey zip up fleece on the date of his arrest.  (Dep. Godette,

p. 108, ln. 4).  Further answering, *see* Response No. 5, *supra*.  Godette denies the remaining

allegations set forth in Paragraph 12.  Specifically, Godette denies his clothing was "baggy," as

that fact is not supported by the citation.

**Alleged Fact No. 13**

At the meeting, Lt. Riordon displayed to the officers a Merrimack College identification card with Mr. Godette's photograph on it which was compared to the surveillance photos from the armed robbery. (See Exhibit A Police Report of Michael Riordan.)

**Response No. 13**

Admitted.  Further answering, see Response No. 10, *supra.*

**Alleged Fact No. 14**

At approximately 3:10 p.m. on that date, Mr. Godette walked out of the Monican dormitory and was immediately surrounded by several police officers. (See plaintiff's complaint paragraph 32.)

**Response No. 14**

Admitted.  Further answering, at approximately 3:10 p.m. on that date, Godette began to walk out of the Monican dormitory and was immediately surrounded by ten to fifteen police officers whom he now understands to be from the North Andover and Merrimack College police departments (Aff. Godette, ¶16;  Dep. Godette, p. 167, ln. 1-5, 19-24).  At the time, Godette was not wearing a hat or a do-rag.  (Aff. Godette, ¶5; Dep. Heffernan, p. 92, ln. 2 to p. 92, ln. 3).  At no time on that date did Godette wear a hat.  (Aff. Godette, ¶5).

**Alleged Fact No. 15**

The officers were not in uniform and he does not remember what they looked like in appearance. (See Exhibit E, plaintiff's deposition page 79-80.)

**Response No. 15**

Admitted.  He does recall that one officer was a female.  (Dep. Godette, p. 84, ln. 11-15).

**Alleged Fact No. 16**

The officers did have police badges hanging on them but he does not remember what the badges said. (See Exhibit E, Exhibit E, plaintiff's deposition page 79-80.)

**Response No. 16**

Admitted.

**Alleged Fact No. 17**

Mr. Godette was handcuffed but he does not remember who handcuffed him. (See Exhibit E, plaintiff's deposition page 85-86.)

**Response No. 17**

Godette admits that he was handcuffed. Godette denies the remaining allegations of Paragraph 17. Further answering, a male officer violently pushed Godette against a wall (Aff. Godette, ¶17). Several officers yelled orders at Godette, some of which contradicted one another (Aff. Godette, ¶17). During the confrontation, North Andover Police Officer Diane Heffernan told Godette that he was under arrest (Aff. Godette, ¶18). Heffernan held Godette's wrists and arms tightly and placed Godette in handcuffs (Aff. Godette, ¶19; *see* Dep. Heffernan, at p. 90, ln. 12-13; **Exhibit H**, at Report of Heffernan, p. 2). Heffernan read Godette *Miranda* warnings, and Godette was not free to leave. (Dep. Heffernan, p. 89, ln. 14 to p. 90, ln. 4; Dep. Cronin, p. 56, ln. 20-23). Godette did not resist being searched or being handcuffed. (Dep. Heffernan, p. 90, ln. 10 to ln. 15).

**Alleged Fact No. 18**

A male reached in his pants pocket and said, "it's in his pocket." (See Exhibit E, plaintiff's deposition page 80-82.)

**Response No. 18**

Denied.  Further answering, without first seeking consent, Heffernan then began to search Godette's book bag. (Aff. Godette, ¶19).  When the book bag became entangled in the handcuffs, Godette was pulled away from the wall, and then another officer violently pushed Godette back against the wall. (Aff. Godette, ¶19;  Dep. Godette, p. 82, ln. 11-13).  For approximately fifteen minutes, in full view of onlookers, these police officers, all of whom were Caucasian, detained Godette in and around the lobby area of the Monican dormitory. (Aff. Godette, ¶20;  Dep. Godette, p. 166 ln. 17-18).  Without first seeking Godette's consent, an officer searched Godette's person and found no weapons. (Aff. Godette, ¶21).  Shortly thereafter, Godette heard Heffernan say, in words or substance, "It's in his pocket." (Aff. Godette, ¶22).  An officer reached inside Godette's pants, without consent, and pulled his left pocket inside out, thereby causing Godette's sweatpants or nylon workout pants to fall to his knees in an embarrassing manner. (Aff. Godette, ¶22;  Dep. Godette, p. 81, ln. 11-17; p. 83, ln. 1-2, 6-12, 16-18, 21). An officer removed the keychain and then quickly placed it in Godette's pocket. (Aff. Godette, ¶22).

**Alleged Fact No. 19**

He had a "big" set of keys in his pocket and the individual put the keys back in his pocket. (See Exhibit E, plaintiff's deposition page 82-83.)

**Response No. 19**

Admitted.  Further answering, *see* Response No. 18, *supra*.  The search of Godette revealed merely keys in his pants pocket.  (Dep. Heffernan, p. 90, ln. 22 to p. 91, ln. 3).  Heffernan did not characterize the keys as "big."  (*Id.*).

**Alleged Fact No. 20**

Mr. Godette was wearing "very loose" sweatpants at the time of the incident and he could not pull them up when his pants were being searched and as a result they fell to his knees. (See Exhibit E, plaintiff's deposition page 83-84.)

**Response No. 20**

Admitted.  Further answering, Godette could not pull his pants up because he had been handcuffed by Defendant Heffernan. (Dep. Godette, at p. 83, ln. 6-12;  see **Exhibit H**, at Report of Heffernan, p. 2).

**Alleged Fact No. 21**

Mr. Godette does not know who was searching his pants and can not give a physical description of this individual but knows this individual did not intentionally pull down his pants. (See Exhibit E, plaintiff's deposition page 83-85.)

**Response No. 21**

Godette admits that he does not remember which officer pulled his keys out of his pants and, therefore, he cannot describe the individual who searched his pants (Dep. Godette, at p. 83, ln. 22-24; p. 84, ln. 1-5).  Godette denies the remaining portion of the paragraph, as the citation does not support the sentence.  Further answering, see Response No. 18, *supra*.

**Alleged Fact No. 22**

Mr. Godette asserts that a female officer searched his gym bag in front of Monican Hall. (See Exhibit E, plaintiff's deposition page 85.)

**Response No. 22**

Godette admits that a female officer searched his gym bag in front of Monican Hall. Further answering, Detective Cronin testified that he picked up the bag and looked into it.

Further answering, *see* Response No. 18, *supra*. Further responding, the term "asserts that" does not comport with the obligation to take the evidence in the light most favorable to Godette, the non-moving party, as required by Fed. R. Civ. P. 56.

**Alleged Fact No. 23**

For approximately twenty minutes the plaintiff alleges that these officers detained him in and around the lobby area of the Monican dormitory. (See Exhibit E, plaintiff's deposition page 86.)

**Response No. 23**

Admitted. Further answering, *see* Response No. 18. (Dep. Godette, p. 80, ln. 23-24). The term "alleges that" does not comport with the obligation to take the evidence in the light most favorable to Godette, the non-moving party, as required by Fed. R. Civ. P. 56.

**Alleged Fact No. 24**

During this time period Mr. Godette was told that there was an armed robbery in North Andover and was asked to explain where he was earlier that day. (See Exhibit E, plaintiff's deposition page 86-89.) He said he was in class at the time.

**Response No. 24**

Admitted. Further answering, one of the officers became aggressive and upset at Godette. (Dep. Godette, p. 87, ln. 24 to p. 88, ln. 11). To Godette's great surprise, a male officer accused Godette of having robbed a bank. (Aff. Godette, ¶23). In an intimidating manner, the officer asked Godette a number of questions in rapid succession, without waiting for Godette's answers thereto. (Aff. Godette, ¶23). The officers told Godette, erroneously and falsely, that they possessed a surveillance videotape which depicted Godette's face. (Aff. Godette, ¶23; Dep. Godette, p. 88, ln. 2-6). Godette attempted to describe his whereabouts to the officers,

whereupon one officer flatly and wrongfully accused Godette of lying. (Aff. Godette, ¶24; see Dep. Godette, p. 86, ln. 9-11, p. 87, line 24 to p. 88, line 11; p. 89, ln. 19-23; p. 181, ln. 9-10).

**Alleged Fact No. 25**

Mr. Godette permitted the officers to visit and search his dormitory. (Complaint, ¶ 41.)

**Response No. 25**

Denied. Further answering, after an officer questioned and intimidated Godette for approximately fifteen minutes in or around the lobby of the Monican dormitory, a male officer told Godette that the officers wanted to visit Godette's dormitory room. (Aff. Godette, ¶25). Initially, Godette refused. (Aff. Godette, ¶25; Dep. Heffernan, p. 115, ln. 16 to p. 116, ln. 2; Dep. Godette, p. 81, ln. 3-5; p. 106 ln. 22-24, ;p. 107, ln. 1-5). Only in an effort to get away from the onlookers, and to limit his embarrassment, did Godette, while under duress, succumb to officers' pressure to permit them to invade his room. (Aff. Godette, ¶25; Dep. Godette, p. 81, ln. 7-10, p. 107, ln. 11-13). The officers led Godette through the dormitory in handcuffs, while students asked questions. (Dep. Godette, p. 91, ln. 1-2, 15-16, p. 100, ln. 18-23).

**Alleged Fact No. 26**

He does not remember who transported him to his room, how many individuals transported him to his room or what they looked like. (See Exhibit E, plaintiff's deposition page 91.)

**Response No. 26**

Admitted. Further answering, Godette experienced extreme humiliation and embarrassment as the officers led him in handcuffs past several onlookers through the dormitory to his dormitory room (Aff. Godette, ¶26). Godette kept his head down as they walked out of embarrassment (Aff. Godette, ¶26; Dep. Godette, at p. 91, ln. 9-16).

**Alleged Fact No. 27**

While in his room Mr. Godette saw 4-5 police officers. (See Exhibit E, plaintiff's deposition page 93.)

**Response No. 27**

Admitted.

**Alleged Fact No. 28**

There was a female officer and a heavyset gentleman. (See Exhibit E, plaintiff's deposition page 93.)

**Response No. 28**

Admitted.

**Alleged Fact No. 29**

While in his dorm room, they asked him where his white doo-rag was and he showed them he had a draw full of doo-rags. (See Exhibit E, Plaintiff's Deposition Transcript, p. 94.)

**Response No. 29**

Admitted.  Further answering, see Response No. 31, *infra*.

**Alleged Fact No. 30**

Mr. Godette then showed them where his white doo-rag was. (See Exhibit E, Plaintiff's Deposition Transcript, p. 95.)

**Response No. 30**

Admitted.

**Alleged Fact No. 31**

It took the officers approximately 30 to 45 minute to search his room. (See Exhibit E, Plaintiff Deposition Transcript, p. 95).

**Response No. 31**

Admitted.  Further answering, upon arriving at Godette's dormitory room, which Godette shared with another student, the officers began to conduct an illegal, unconsented to, search of the entire room while Defendant Cronin conducted an intense and intimidating interrogation of Godette (Aff. Godette, ¶27;  Dep. Godette, p. 96, ln. 11-12). *Cronin describes Godette's skin tone as "light Hispanic," even though Cronin described the skin tone of the person in the surveillance photographs as "dark," which, he testified, means "darker than light."* (Dep. Cronin, p. 85, ln. 21-23; p. 31, ln. 21-23;  p. 32, ln. 1-7). The search and interrogation in the room lasted for approximately forty-five minutes (Aff. Godette, ¶28).  A number officers stood outside the room (Aff. Godette, ¶28)  The officers found no contraband or evidence of the robbery during their search of Godette's room (Aff. Godette, ¶29).

Cronin then began taking notes of his conversation with Godette (Aff. Godette, ¶29; Dep. Cronin, p.55, ln. 18 to ln. 24; see **Exhibit N**).  For the first time since Godette was placed under arrest, Cronin asked Godette, in the presence of Heffernan, specific questions about Godette's whereabouts on that day, repeating many of the questions which Godette had already answered (Aff. Godette, ¶29). While still handcuffed, Godette provided detailed information about his whereabouts that day to the officer (Aff. Godette, ¶30).  During that time, Godette was not free to leave, and he felt that he was under arrest.  (Dep. Cronin, p. 56, ln. 16-19;  Dep. Godette, p. 152, ln. 19-24).

**Alleged Fact No. 32**

After the 35 minute period, he was left in his room with one officer present. (See Exhibit E, Plaintiff's Deposition Transcript, p. 96). It was not the female officer and it was not the heavy-set male officer. (See Exhibit E, Plaintiff's Deposition Transcript, p. 97). It was a

detective in plain clothes but he does not remember which department this individual was from. (See Exhibit E, Plaintiff's Deposition Transcript, p. 97).

**Response No. 32**

Admitted.  Further answering, five to ten minutes thereafter, Heffernan left the room, apparently to confirm Godette's whereabouts (Aff. Godette, ¶30).  Godette then remained handcuffed and seated for approximately thirty minutes in his dormitory room with a male officer, Detective Cronin. (Aff. Godette, ¶31;  see Dep. Godette, p. 57, ln. 18-24, p. 58, ln. 1-3).

**Alleged Fact No. 33**

There were officers outside his door and his door was open but he could only see their elbows. (See Exhibit E, Plaintiff's Deposition Transcript, p. 98).

**Response No. 33**

Admitted.  Further answering, *see* Response No. 31,  *supra*.

**Alleged Fact No. 34**

After the search of his room, all of the officers outside of his room left and he remained in his room with this one officer. (See Exhibit E, Plaintiff's Deposition Transcript, p. 101).

**Response No. 34**

Admitted.  Further answering, Godette remained handcuffed to the desk for 30 to 45 minutes in the presence of the one remaining officer in his room, Cronin (Dep. Godette, at p. 101, ln. 4-16; see pp. 57, 58).  *See* Response No. 32, *supra*.

**Alleged Fact No. 35**

The female officer then returned to the room and she showed him the surveillance pictures from the armed robbery and she advised him that she had confirmed his alibi with a

professor from Merrimack College. (See Exhibit E, Plaintiff's Deposition Transcript, pp. 101-103).

**Response No. 35**

Admitted.  Further answering, at that point, Heffernan returned to Godette's room and told Godette that the police had confirmed Godette's whereabouts and that Godette was no longer under arrest (Aff. Godette, ¶32).  Heffernan released Godette from handcuffs, which he had been wearing for almost three hours (Aff. Godette, ¶32;  *see* Dep. Godette, p. 101, ln. 18-19).  The officers then left Godette's room (Aff. Godette, ¶32).  At or around that time, Heffernan showed Godette four grainy and unclear photographs of the suspected bank robber wearing a white "doo-rag" and white hat (Aff. Godette, ¶33).  The photographs did not look like Godette at all (Aff. Godette, ¶34;  Dep. Godette, p. 143, ln. 1-6).  After looking at the photographs and conversing briefly with Heffernan, Godette asked the officers to leave his room (Aff. Godette, ¶35).  Cronin later learned from Riordan that Merrimack had confirmed with Godette's actual professor that he was in the class at the time of the robbery.  (Dep. Cronin, p. 69, ln. 4-23).

In a memorandum to Merrimack Police personnel dated April 11, 2003, Mayrose wrote that, during a meeting with Chief Stanley and Lt. Gallagher after the incident, the three of them "agreed that the student was subjected to a situation that could have been avoided with advance information about his 11:00 a.m. class."  (**Exhibit O**).  According to Mayrose, ".... it appears that the focus and course of the investigation would have been changed if the student's class schedule had been checked before searching for him on campus."  *Id.*  Mayrose further wrote that Chief Stanley "has offered to apologize to the student."  *Id.*  According to Mayrose, Stanley made this offer during the course of a meeting at the North Andover Police Department.

(Deposition of William Mayrose ("Dep. Mayrose"), **Exhibit P**, p. 100, ln. 23-24, p. 101, ln. 1-3).

Gallagher does not recall such a meeting.  (Continued Dep. Gallagher, **Exhibit Q**, p. 70, ln. 7-

18).  Stanley has some memory of a discussion in the hallway of the dormitory, but he denies

having any meeting with Mayrose to talk about this incident.  (Continued Dep. Stanley, **Exhibit

R**, p. 145, ln. 12-24, p. 146, ln. 1-4).

**Alleged Fact No. 36**

Mr. Godette took the surveillance pictures from her, swore at her and threw the pictures

at her. (See Exhibit E, Plaintiff's Deposition Transcript, p. 103).

**Response No. 36**

Godette admits that he took the photographs, he swore and he threw the pictures.

Godette denies the remaining allegations of Paragraph 36. Further answering, *see* Response No.

35, *supra*.

**Alleged Fact No. 37**

He then gathered his stuff for his workout and went to the gym. (See Exhibit E, Plaintiff's

Deposition Transcript, p. 104).

**Response No. 37**

Admitted.  Further answering, Godette was already an hour late for the workout, and he

missed it (Dep. Godette, p. 104, lines 23).  Godette told his coach what had happened and then

returned to his room (*Id.*).

**Alleged Fact No. 38**

Mr. Godette alleges that this incident was racially motivated because, "the doorag didn't

rest well with him". (See Exhibit E, Plaintiff's Deposition Transcript).

**Response No. 38**

Denied.  Godette also testified regarding an incident on campus involving minority

students.  (Dep. Godette, p. 133, ln. 21-24 to 136 ln. 3).  Further answering, during Godette's

tenure at Merrimack College, there were few African-American or Hispanic students and faculty

on the Merrimack College campus, and that the majority of students during his tenure at the

school were Caucasian (Aff. Godette, ¶1;  *see* Dep. Godette, p. 115, ln. 2-3;  see Dep. Mayrose,

p. 115, ln. 3-8).  Godette believes and asserts that his arrest was racially motivated (Aff. Godette,

¶40;  Dep. Godette, p. 133, ln. 16-20).  At no time did Godette participate in any robbery in any

bank (Aff. Godette, ¶40).

### Plaintiff Brett S. Godette's Statement of Additional Material Facts[4]

39.     At approximately 8:15 a.m. on that date, Godette was present in the cafeteria in

the Sakowitch Student Center on the campus of Merrimack College in order to study for a

Business Calculus examination with a fellow student named Gina Bertelli (Aff. Godette, ¶6).

40.     From approximately 8:30 a.m. to 10:00 a.m. on that date, Bertelli and Godette,

along with others, studied together in preparation for the examination (Aff. Godette, ¶7).  At

approximately 10:00 a.m. on that date, Bertelli left the cafeteria in order to attend a class (Aff.

Godette, ¶7).  From approximately 10:00 a.m. to 10:50 a.m. on that date, Godette remained in the

cafeteria and studied. (Aff. Godette, ¶8).  At approximately 10:50 a.m. on that date, Godette left

the cafeteria and traveled directly to his Business Calculus class (Aff. Godette, ¶9).  From

approximately 11:00 a.m. to 11:50 a.m. on that date, Godette was present at his Business

Calculus Class, taking a written examination (Aff. Godette, ¶9;  Dep. Godette, p. 65, ln. 24, p.

66, ln. 1). According to Riordan's report, "The instructor did, in fact, verify his attendance in his

class from approximately 11:00 a.m. until approximately 11:45 a.m."  (**Exhibit C**).

---

[4] Godette incorporates by reference his responses to Alleged Facts Nos. 1 to 38, *supra*, as if
expressly set forth herein.

41.    The robbery at a Sovereign Bank in North Andover took place at approximately 11:38 a.m. on March 26, 2003.  (**Exhibit H**).

42.    At approximately 11:55 a.m. on that date, Godette completed his examination and proceeded directly to his Strategic Marketing class in the same building on campus, which Godette attended from noon to 12:50 p.m. on that date (Aff. Godette, ¶10;  Dep. Godette, p. 66, ln. 1-3).  At approximately 12:50 p.m. on that date, Godette proceeded directly to the cafeteria in order to eat lunch (Aff. Godette, ¶11).  Godette remained in the cafeteria eating with friends until approximately 1:30 p.m. (Aff. Godette, ¶11).

43.    At approximately 1:30 p.m. on that date, Godette left the cafeteria and proceeded to the Office of Residence Life in order to reschedule an appointment, then scheduled for that afternoon, so that Godette could attend a workout with the Merrimack College varsity basketball team (Aff. Godette, ¶12).  At no time on March 26, 2003 from the time Godette awoke until 3:00 p.m., did Godette ever leave the Merrimack College campus (Aff. Godette, ¶13).

44.    The North Andover Police were in charge of the investigation of the robbery. (Dep. Cronin. p. 80, ln. 21, p. 81, ln. 1).

45.    The Merrimack Police Services office computers were able to access student class schedules.  (Dep. Mayrose, p. 69, ln. 11 – 20). Mayrose admitted that he could make a phone call to the registrar's office if he needed to get a student's class schedule.  (Dep. Mayrose, p. 72, ln. 20-23). The first time that Mayrose received any information regarding Godette's schedule that day was when Godette was up in his room with the officers, to the best of Mayrose's recollection.  (Dep. Mayrose, p. 68, ln. 17-20;  p. 69, ln. 4-7).   Mayrose cannot recall asking for information regarding Godette's schedule before that time.  (Dep. Mayrose, p. 69, ln. 8-10).

46.     At approximately 2:00 p.m. on that date, Godette returned to his room in the Monican dormitory and then proceeded directly to a friend's room in the same dormitory (Aff. Godette, ¶14).  At approximately 2:55 p.m. on that date, Godette left his friend's room (Aff. Godette, ¶15).  Godette thereafter returned directly to his own room in order to gather his belongings in order to attend a workout with the basketball team (Aff. Godette, ¶15).

47.     On or about March 27, 2003, President of Merrimack College Richard Santagati approached Godette and invited Godette to join him for lunch (Aff. Godette, ¶36;  Dep. Godette, p. 112, ln. 11-19).  Godette agreed to have lunch with President Santagati (Aff. Godette, ¶36).  Godette had never been invited to lunch with the President throughout his college career before that date (Aff. Godette, ¶36).  During lunch, Santagati apologized to Godette and, further, told Godette, in essence, that the individual accountable for the wrongdoing would be disciplined (Aff. Godette, ¶37;  Dep. Godette, p. 113, ln. 9-13).  Santagati also told Godette, falsely, that Merrimack College Public Safety had nothing to do with the arrest and that the arrest was the result of all outside police work (Aff. Godette, ¶37).

48.     In or around March, 2003, at the request of Merrimack College Men's Basketball Coach Bert Hammel, Godette spoke with a counselor at the school about the trauma and humiliation Godette had endured in the incident (Aff. Godette, ¶38;  Dep. Godette, p. 122, ln. 24, p. 123. ln. 1-10, p. 125, ln. 18-24, p. 126, ln. 1-3).

49.     As a direct and proximate result of the wrongful action of the Defendants, Godette has suffered from, and will continue to suffer from, various injuries and damages. (Aff. Godette, ¶39; Dep. Godette, p. 198, ln. 12-24, p. 199, ln. 1-2, p. 199, ln. 7-11).  Godette had marks on his wrists for a few days from the handcuffs (Aff. Godette, ¶39;  Dep. Godette, p. 198, ln. 5-9). Godette felt betrayed, embarrassed and depressed about the incident (Aff. Godette, ¶39).  After

the incident, several students approached Godette to discuss the incident, which was

embarrassing (Aff. Godette, ¶39; Dep. Godette, p. 111, ln. 3-8, p. 104, ln. 24, p. 105, ln. 11).

According to Chief Mayrose:

> The student was, understandably, unsettled and embarrassed by the experience of being handcuffed in front of fellow students, particularly due to the fact that he was mistakenly identified as the suspect.  After this incident, rumors began circulating around campus that he had been arrested for armed robbery and this caused further frustration and embarrassment to the student and to the college community.

**(Exhibit O)**.

50.     On October 5, 2004, Godette, through counsel, forwarded presentment letters

pursuant to M.G.L. c. 258 § 4 to the appropriate town officials for the Town of North Andover

(Aff. Godette, ¶41).

51.    Cronin testified that he followed the procedures set forth in the incomplete version of the North Andover Policies and Procedures Manual in detaining Mr. Godette.  (Dep. Cronin, p. 78, ln. 21-24, p. 79, ln. 1-6; North Andover Police Department Manual Cover and Table of Contents, **Exhibit S**).  According to Chief Stanley, that manual is a guide.  (Dep. Stanley, p. 73, ln. 8).   The manual provided through discovery was missing Chapter 70, which dealt with Criminal Investigations, as Heffernan is in the process of rewriting same.  (Dep. Heffernan, p. 13, ln. 19-24 to p. 15, ln. 18).  Heffernan does not recall whether that chapter was in effect in March, 2003.  (Dep. Heffernan, p. 15, ln. 14-18).

Plaintiff
Brett S. Godette
By his Attorneys,

*/s/ Paul J. Klehm*
James B. Krasnoo (BBO#279300)
*james@krasnooklehm.com*
Paul J. Klehm (BBO#561605)
*pklehm@krasnooklehm.com*
Benjamin L. Falkner (BBO#667951)
*bfalkner@krasnooklehm.com*
Krasnoo | Klehm LLP
23 Main Street, Suite 6
Andover, MA 01810
(978) 475-9955

Dated:  March 22, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record via ECF on March 22, 2007.

*/s/ Paul J. Klehm*