UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRETT S. GODETTE,  )
    Plaintiff  )
v.  )
  )    CIVIL ACTION NO. 05-11354JLT
RICHARD STANLEY, *et al*,  )
    Defendants.  )
  )

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS RICHARD STANLEY, DIANE HEFFERNAN, DANIEL CRONIN, PAUL GALLAGHER AND TOWN OF NORTH ANDOVER'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Brett S. Godette (hereinafter "Godette") hereby submits the within memorandum of law in support of his opposition to Defendants Richard Stanley, Diane Heffernan, Daniel Cronin, Paul Gallagher and Town of North Andover's Motion for Summary Judgment.[1]

**FACTS**

A. **The Robbery and Initial Investigation**

At approximately 11:30 a.m. on March 26, 2003, an individual robbed a bank in North Andover, Massachusetts, and various North Andover police officers, including, without limitation, Detective Daniel Cronin, Detective Dianne Heffernan and Lt. Paul Gallagher, responded to the scene. (See **Reponses Nos. 3 & 4**).[2]  Initial radio transmissions from the North Andover Police described the suspect as a white male wearing a blue baseball cap and possibly a light-colored top. (**Resp., 4**). According to Gallagher, who interviewed several witnesses, the suspect was "medium build, medium height." *Id.*  The bank teller who had been robbed had described the suspect as white. *Id.*  Approximately twenty to twenty five minutes after Gallagher

---

[1] Defendants Merrimack College and Michael Riordan are not movants in this motion for summary judgment.
[2] "Resp., X" shall refer to Plaintiff's numbered responses or further facts filed herewith.

arrived at the scene, after Gallagher and Cronin reviewed the surveillance tapes, the officers determined that the individual was Hispanic (even though one could only see from the nose area down on the face of the suspect) and that the hat was white. *Id.* Cronin described the skin tone of the suspect depicted in the surveillance photographs as "dark" which he described as "darker than light." *Id.* Heffernan, on the other hand, said that she could not determine the race of the suspect from the photograph. *Id*.

North Andover Police then issued a CJIS to area police departments. (**Exhibit D**). At approximately 2:30 p.m. on that date, Lt. Riordan of the Merrimack College Police Services read the CJIS, which described the suspect as an Hispanic male in his 20's, 5 ft 9 inches tall, wearing a white hat with a doo-rag underneath, and a sweatshirt with dark sleeves and "RW" on the chest. (See **Exhibit D**). The CJIS did not include photographs. (**Resp. 4**).

Riordan claims that, on March 26, 2003, he saw Godette among a group of students exiting a classroom at Merrimack. (**Resp. 5**). Riordan is uncertain as to what time he saw Godette on the day of the robbery, other than that it was before the time that he received the CJIS message, which bears a time of 13:13. *Id.* He could neither name nor describe any other students exiting the classroom. *Id*. Riordan stated that Godette wore "athletic apparel, warm up type pants, a jacket and a doo-rag." (**Resp. 5**). Riordan testified that he looked directly at Godette for fifteen seconds, although he later testified that he did not focus on Godette. *Id.* Riordan described Godette as having a lean build (contrary to Gallagher's testimony regarding the suspect) and a medium - "not dark, not light" - skin tone (which differs from Cronin's description of the suspect). *Id*. *Cronin describes Godette's skin tone as "light Hispanic," even though Cronin described the skin tone of the person in the surveillance photographs as "dark," which, he testified, means "darker than light."* (**Resp., 31**).

Riordan ran a license plate number included in the CJIS report and it came up with a match to another Merrimack College student. (**Resp. 7**). At approximately 2:30 p.m. on March 26, 2003, Riordan telephoned North Andover Police and told Heffernan that he was familiar with the vehicle on the teletype and that the suspect matched, or had similarities to, another student that he and another had seen that day. (**Resp., 8**). As of that time, Gallagher did not believe that the police had probable cause or reasonable suspicion to detain anyone. (**Resp., 8**).

Shortly thereafter, Riordon met with various North Andover police officers, including Heffernan, Stanley, Cronin and Gallagher. (**Resp. 9**). William Mayrose, then Chief of the Merrimack College Police Services, and Lt. Rogers of the Merrimack College Police Services also attended the meeting. *Id*. According to the North Andover Police Report, "We met with Lt. Riordan who showed us Merrimack College I.D.'s of the owner of the vehicle and the suspect, who he believed to be Brett Gaudette[*sic*]. We viewed the photos and Mr. Gaudette [*sic*] and the suspect did indeed look alike." (**Resp., 10**). According to Gallagher, Riordan and Rogers stated that they thought the surveillance photographs looked "very much like Mr. Godette." *Id.* During the meeting, attendees examined Merrimack ID cards of Godette and the commuter student, along with various surveillance photographs. *Id.* There was a consensus that "there were tremendous similarities" between the photographs and Godette's ID. (**Resp., 10; Exhibit M**).

The first discussion of obtaining a class schedule for Godette occurred after the meeting when the officers split into groups of three. (**Resp. 10**). Riordan never took any steps toward obtaining Godette's schedule, and he does not recall telling Officer Rogers to obtain Godette's schedule. *Id*. *There was no discussion of waiting to find out whether Godette was in class at the time of the robbery before the officers approached Godette. Id*. Merrimack Police computers

3

were able to access student class schedules. (**Resp., 45**). Mayrose admitted that he could phone the registrar's office to get a student's class schedule. *Id*.

Cronin contends that he had reasonable suspicion and probable cause to detain Godette as of the time of the meeting. (**Resp., 10**). Cronin based his determination on the similarities between the surveillance photographs and the student ID, the clothing description provided by Merrimack officers, the contention by Merrimack officers that Godette was wearing similar, if not the same, clothing that morning, and the vehicle in the area belonging to a student. (**Resp., 10**).

### B.  Brett Godette

As of March 26, 2003, Brett Godette, an African-American, was a junior at Merrimack College and a member of the men's basketball team. (**Resp. 1**). During his tenure at Merrimack College, there were few African-American or Hispanic students and faculty on the Merrimack College campus, and the majority of students were Caucasian. (**Resp., 1**).

At approximately 7:00 a.m. or 7:30 a.m. on that date, Godette attended a basketball team workout (**Resp., 2**). During the early morning of March 26, 2003, Godette wore a blue "doo-rag" and a gray Merrimack Basketball fleece jacket with the writing "Merrimack College" and a basketball. *Id*. Godette's fleece neither had dark sleeves nor did it have the insignia: "RW" on the chest (**Resp., 2**). At some point before 11:00 a.m. that morning, Godette removed his blue "doo-rag". *Id*. He did not wear any other "doo-rag," including, without limitation, a white "doo-rag," at any other time on that date. (**Resp., 2**). He did not wear any hat on that date. (**Resp., 5**).

Godette then went to the cafeteria at approximately 8:15 a.m., where he stayed until 10:50 a.m. while preparing for an 11:00 a.m. examination. (**Resp., 39, 40**). At approximately 10:50 a.m. on that date, Godette left the cafeteria and traveled directly to his Business Calculus class (**Resp., 40**). From approximately 11:00 a.m. to 11:50 a.m. on that date, Godette was

present at his Business Calculus Class, taking a written examination. *Id.* His attendance in that class was later confirmed through the instructor. *Id.*

At approximately 11:55 a.m. on that date, Godette completed his examination and proceeded directly to his Strategic Marketing class in the same building on campus, which Godette attended from noon to 12:50 p.m. on that date. (**Resp., 42**). At approximately 12:50 p.m, Godette proceeded directly to the cafeteria, where he remained until approximately 1:30 p.m. He then went to the residence life office. (**Resp., 43**).

### C.  The Wrongful Arrest of Brett Godette

At approximately 3:10 p.m., Godette began to walk out of the Monican dormitory and was immediately surrounded by ten to fifteen police officers from the North Andover and Merrimack College police departments (**Resp., 14**). At the time, Godette was not wearing a hat or a do-rag. *Id.* At no time on March 26, 2003 from the time Godette awoke until 3:00 p.m., did Godette ever leave the Merrimack College campus (**Resp., 43**).

A male officer violently pushed Godette against a wall (**Resp., 17**). Several officers yelled orders at Godette, some of which contradicted one another. *Id.* During the confrontation, North Andover Police Officer Diane Heffernan told Godette that he was under arrest. *Id.* Heffernan held Godette's wrists and arms tightly and placed Godette in handcuffs (**Resp., 17**). Heffernan read Godette *Miranda* warnings, and Godette was not free to leave. *Id.* Godette did not resist being searched or being handcuffed. *Id.*

Heffernan searched Godette's bookbag without consent. (**Resp., 18**). When the book bag became entangled in the handcuffs, Godette was pulled away from the wall, and then another officer violently pushed Godette back against the wall. *Id.* For approximately fifteen minutes, in full view of onlookers, these police officers, all of whom were Caucasian, detained Godette in

and around the lobby area of the Monican dormitory. *Id.* Without seeking Godette's consent, an officer searched Godette's person and found no weapons. (**Resp., 18**). An officer reached inside Godette's pants, without consent, and pulled his left pocket inside out, thereby causing Godette's sweatpants or nylon workout pants to fall to his knees in an embarrassing manner. *Id.*

One of the officers became aggressive and upset at Godette. (**Resp., 24**). To Godette's great surprise, a male officer accused Godette of having robbed a bank. *Id.* In an intimidating manner, the officer asked Godette a number of questions in rapid succession, without waiting for Godette's answers thereto. *Id.* The officers told Godette, erroneously and falsely, that they possessed a videotape which depicted Godette's face. (**Resp., 24**). Godette attempted to describe his whereabouts to the officers, whereupon an officer wrongfully accused Godette of lying. *Id.*

After an officer questioned Godette for approximately fifteen minutes in or around the lobby of the Monican dormitory, a male officer told Godette that the officers wanted to visit Godette's dormitory room. (**Resp., 15**). Initially, Godette refused. *Id.* Only in an effort to get away from the onlookers, and to limit his embarrassment, did Godette, while under duress, succumb to officers' pressure to permit them to invade his room. *Id.* The officers led Godette through the dormitory in handcuffs, while students asked questions. (**Resp., 25**). Godette experienced extreme humiliation and embarrassment as the officers led him in handcuffs past several onlookers through the dormitory to his dormitory room (**Resp., 26**). Godette, out of embarassment, kept his head down as they walked. *Id.*

Upon arriving at Godette's room, the officers began to conduct an illegal, unconsented to, search of the entire room while Cronin conducted an intense and intimidating interrogation of Godette (**Resp., 31**). The search and interrogation in the room lasted for approximately forty-five

6

minutes. *Id.* More than ten officers stood outside the room (Aff. Godette, ¶28). The officers found no evidence of the robbery during the search of Godette's room (**Resp., 31**).

Cronin asked Godette, in the presence of Heffernan, specific questions about Godette's whereabouts on that day, repeating many of the questions which Godette had already answered. *Id.* While still handcuffed, Godette provided detailed information about his whereabouts that day to the officer (**Resp., 31**). During that time, Godette was not free to leave, and he felt that he was under arrest. *Id.* After thirty-five minutes, Godette was left in his room with Cronin. (**Resp., 32**). Five to ten minutes thereafter, Heffernan left the room, apparently to confirm Godette's whereabouts. *Id.* Godette then remained handcuffed and seated for approximately thirty minutes in his dormitory room with Cronin. (**Resp., 32**).

Heffernan then returned to Godette's room and told Godette that the police had confirmed Godette's whereabouts and that Godette was no longer under arrest (**Resp., 35**). Heffernan released Godette from handcuffs, which he had been wearing for almost three hours. *Id.* The officers then left Godette's room. *Id.* At or around that time, Heffernan showed Godette four grainy and unclear surveillance photographs of the suspected bank robber wearing a white "doo-rag" and white hat (**Resp., 35**). The photographs did not look like Godette at all. *Id.* After looking at the photos and conversing with Heffernan, Godette asked the officers to leave. *Id.*

The Merrimack Police Chief admitted that he, Chief Stanley and Lt. Gallagher had agreed that the situation "could have been avoided with advance information about his 11:00 a.m. class." (**Resp., 35; Exhibit O**). Chief Stanley offered to apologize to Godette. (**Resp., 35**). During a lunch with the President of Merrimack College on or about the next day, the President, among other things, apologized to Godette. (**Resp., 47**).

7

Godette, who did not participate in any robbery of any bank, alleges that the incident was racially motivated. (**Resp., 38**). Godette later spoke with a school counselor regarding the trauma and humiliation that he endured. (**Resp., 48**). He has suffered from emotional distress and other damages. (**Resp., 49**). Godette had marks on his wrists for a few days from the handcuffs. *Id.* Mayrose admitted that Godette was embarrassed by the experience. (**Resp. 49**).

Through this action, Godette asserts the following remaining claims:

I. §1983 Claims against Stanley, Gallagher, Cronin and Heffernan
II. Conspiracy to Violate Civil Rights against Stanley, Heffernan, Gallagher, Cronin and Riordan
III. §1983 Claim against Town of North Andover
V. State Civil Rights Claim against Stanley, Heffernan, Gallagher, Cronin, Riordan and Merrimack
VI. Conspiracy to violate state civil rights claim against Stanley, Heffernan, Gallagher, Cronin and Riordan
VIII. False Imprisonment claim against Stanley, Heffernan, Gallagher, Cronin, Riordan and Merrimack
IX. Assault and Battery claim against Stanley, Heffernan, Gallagher, Cronin, Riordan and Merrimack
X. Intentional/Negligent Infliction of Emotional Distress claim against Stanley, Heffernan, Cronin, Gallagher, Riordan and Merrimack, and Negligent Infliction of Emotional Distress claim against Town of North Andover, and

other claims solely against Merrimack College and Lt. Riordan.

## ARGUMENT

### Standard of Review

The party moving for summary judgment must meet the initial burden of demonstrating the absence of a genuine issue of material fact, upon which a reasonable jury could find for the nonmovant. Fed. R. Civ. P. 56(c). All facts must be viewed in the light most favorable to the nonmovant, giving the nonmovant "the benefit of all reasonable inferences that can be drawn from these facts." *Lockhart v. Cedar Rapids Comm. Sch. Dist.,* 963 F. Supp. 805, 814 (N.D. Iowa 1997) (citation omitted). "A 'genuine' issue is one that must be decided at trial because the

evidence, viewed in the light most flattering to the nonmovant, *Mack v. Great Atlantic and Pacific Tea Co.,* 871 F.2d 179, 181 (1st Cir. 1989), would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds,* 896 F.2d 5, 7 (1st Cir. 1990).

> **A.    This Court Should Deny the Defendants' Motion For Summary Judgment On Godette's 42 U.S.C. § 1983 Claim Against the Defendant Police Officers, Where (1) the Police Lacked Probable Cause to Arrest Plaintiff and (2) the Police Engaged in Unconsented Searches and Used Excessive Force.**
>
> **1.    The Determination as to Whether Probable Cause Exists is Not Appropriate for Summary Judgment, and, Even so, the Defendant <u>Police Officers Lacked Probable Cause to Arrest Plaintiff Godette.</u>**

A warrantless arrest must be supported by probable cause under the Fourth Amendment's right to be free from unreasonable seizures. See *Santiago v. Fenton*, 891 F.2d 373, 383 (1989)(jury question as to whether officer violated Fourth Amendment rights and common-law right to be free from false arrest and imprisonment).

> Probable cause exists if the facts and circumstances known to the officer, and of which he had reasonably trustworthy information, are sufficient to warrant a prudent person in believing that the suspect probably has committed a crime. A mere possibility that the person has committed a crime is not enough. The hunch, guess, conjecture, or surmise of an officer is not enough, and there must be enough actual evidence to reasonably lead to the conclusion that the suspect has committed a crime.

Avery, Rudovsky, and Blum, <u>Police Misconduct, Law and Litigation</u>, §12:12 (3rd edition, 2001). In the absence of probable cause to arrest, an individual may seek redress under 42 U.S.C.§1983 and M.G.L. c. 12 §11I. *Id.*

Probable cause requires a showing of the *probability*, not merely the possibility, of criminal activity. *See Illinois v. Gates*, 462 U.S. 213, 235 (1983). In order for the police to detain a suspect, the totality of the circumstances must give rise to *particularized suspicion* that the *particular person* arrested is or was engaged in wrongdoing. *See id.*, 462 U.S. at 231; *United States v. Cortez*, 449 U.S. 411, 418 (1981). In short, the term "probable cause" means

9

"reasonable likelihood." *Valente v. Wallace*, 332 F.3d 30, 32 (1st Cir. 2003). The question as to the existence of probable cause is "left more appropriately to the trier of fact." *Woodley v. Town of Nantucket*, 645 F. Supp. 1365, 1370 (D. Mass. 1986)(summary judgment denied where disputed questions of fact as to whether officer had probable cause to arrest); *Sheppard v. Aloisi*, 384 F.Supp.2d 478, 488 (D.Mass. 2005)(genuine issue of material fact as to whether probable cause to arrest); *Nolan v. Krajcik*, 384 F.Supp.2d 447 (D.Mass. 2005)[3].

Even if this Court were to find that the question of whether probable cause to arrest and/or to detain Godette existed is appropriate for review at the summary judgment stage, the facts, taken in the light most favorable to Godette, demonstrate a lack of probable cause for the police to have arrested Godette:

    a.    **Race of Suspect**. The North Andover police relied upon photographs which were of poor quality and from which one could not reasonably determine the race or nationality of the suspect. The teller who was robbed identified the suspect as being white. Even so, the North Andover police somehow concluded, based upon their review of the poor quality surveillance photographs, that the individual was Hispanic. Plaintiff urges the Court to request the original photographs for an *in camera* review. Detective Cronin described the skin tone of the suspect depicted, from the nose down, in the surveillance photographs, to be "dark." Cronin described Godette's skin tone as "light Hispanic." Riordan described Godette as being a medium skin tone, "not dark, not light." Heffernan testified that she could not determine the race of the suspect from the photograph. (Moreover, there is no evidence to suggest that the police showed the photographs to the teller to see whether he changed his opinion of the race of the individual.)

---

[3] Defendants cite to *Martin v. Applied Cellular Technology, Inc.*, 284 F.3d 1, 7 (1st Cir. 2002). That case is distinguishable because (1) it arises out of New Hampshire law, and (2) it appears that at least one judge in the federal district court in Massachusetts is not following the case. See cases cited. Finally, it appears that no cases have cited to *Martin*.

A cursory review of the photographs demonstrates that the photographs could identify any number of people from any number of races. It was simply unreasonable and appalling that the North Andover police would take the drastic step of arresting/detaining a Merrimack College student based upon such flimsy, unsubstantiated evidence.

     b.     **Build**. According to Gallagher, the suspect was medium build. Riordan described Godette as having a lean build.

     c.     **Motor Vehicle**. No link was ever found between the motor vehicle and Godette.

     d.     **Clothing**. The CJIS stated that the suspect was wearing a logo which read "RW." On that date, Godette was wearing a Merrimack basketball jacket which did not read "RW," and he did not have dark sleeves as did the suspect. The surveillance photograph showed the suspect wearing a white hat (contrary to initial reports of a blue hat) and a white doo-rag. Godette had worn a blue doo-rag early that morning, but he had taken it off before his 11:00 a.m. class. Godette did not wear a hat on March 26, 2003.

     e.     **Class Schedule.** There is no evidence to show that any of the police officers obtained Godette's class schedule, or verified his whereabouts at the time of the robbery with a professor, in advance of arresting and/or detaining Godette, even though the Merrimack Police had the capacity to check such information on its own computers and even though Chief Mayrose could have simply called the Registrar's office for such information.

Given the limitations and uncertainties of the factors set forth above, the municipal defendants had no particularized and objective basis for suspecting that Godette had engaged in any criminal activity. See *Cortez*, 449 U.S. 411, 417-18 (1981)[4]. At best, the municipal defendants acted on a hunch, and an erroneous one at that.

---

[4] Even if this Court were to find that the Defendants merely made a *Terry* stop of Godette, the stop was not supported by reasonable suspicion. See *Terry v. Ohio*, 392 U.S. 1, 27 (1968). Defendants point to no conduct on

In *United States v. Reyes*, 225 F.3d 71, 75-76 (1st Cir. 2000), the Court relied heavily upon particularized and individualized facts in its determination that there was probable cause to arrest defendant. Under the totality of the circumstances, the *Reyes* Court found that the defendant's behavior gave the officers probable cause to arrest him for conspiracy to distribute cocaine, where he also sat and watched the driver of the truck as he "stood in front of the vehicle and reached under it, in a way consistent with prior suspected drug activity observed … at [that] address." *Id.* Unlike in *Reyes*, no facts in the case at bar suggest in any way that Godette was engaging in any suspicious activities. At the time of his arrest, Godette was merely walking out of his dormitory, consistent with entirely legal activity.

In other cases cited in the Defendants' Memorandum finding probable cause or reasonable suspicion, there were particular facts pointing to the defendant as an individual -- facts which simply do not exist in the case at bar. For instance, in *Commonwealth v. Willis*, 415 Mass. 814, 816 (1993), the Court found that there was reasonable suspicion to stop Willis, where the officer who knew Willis received a teletype from the Michigan State Police describing Willis' height, weight, clothes worn, and a striped pillowcase he carried, which contained a loaded firearm, and setting forth his expected time of arrival by bus. A heavy factor in determining reasonable suspicion in *Willis* was the presence of an identifying police officer who had previous encounters with the defendant and knew him to be involved with guns. The case at bar includes no similar facts establishing probable cause.

Similarly, in *Roche v. John Hancock Mutual Life Ins. Co.*, 81 F.3d 249, 255 (1st Cir. 1999), the Court found that probable cause existed to believe that an employee had left threatening messages after John Hancock had performed extensive investigation. Here, however,

---

the part of Godette which would give rise to any fair inference that any Defendant presented any danger to the officers. As a result, the Defendants cannot escape liability by claiming that they made a *Terry* stop of Godette.

the officers had performed only a brief review of limited information about Godette. Ultimately the facts and circumstances known by the North Andover police officers were that an African-American male was on the campus of Merrimack College hours after an off-campus robbery. *See United States v. Lee*, 317 F.3d 26, 31-32 (1st Cir. 2003) (reasonable suspicion to stop two Asian men attempting flight in the very parking lot of the robbed store and only minutes after the robbery). Those facts, even if true, do not give rise to probable cause.

    **2.**    **Genuine Issues of Material Fact Support Godette's §1983 Claim Based Upon the Unconsented Search of His Dorm Room, the Use of Excessive Force by Defendants, and Race-Based Discrimination.**

    **a**.    **Claim Based Upon Unconsented Search**

A consented-to warrantless search is constitutionally permissible. *Crooker v. Van Higgins*, 682 F.Supp. 1274, 1282 (D.Mass. 1988)(Material issue of fact in §1983 claim regarding whether Plaintiff consented to search of strongbox by officers). The consent must be voluntary –something which is a question of fact to be assessed based upon the totality of the circumstances. *Id, Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973). A civil rights claim may be based upon an improper, unconsented to, warrantless search. See *Tyree v. Keane*, 400 Mass. 1, 507 N.E.2d 572 (1987).

Here, the scope of the search should have been limited to a protective search of Godette's person, and perhaps the bag that he was carrying. See *Chimel v. California*, 395 U.S. 752, 763 (1969)(search restricted to area in which suspect may obtain weapon), see *Florida v. Jimeno*, 500 U.S. 248 (1991), *Commonwealth v. Silva*, 366 Mass. 402 (1974). The police persisted, however, and, by means of duress, obtained Godette's involuntary consent to a search of his room. See *Commonwealth v. Voisine*, 414 Mass. 772, 783 (1993). There was no basis upon which the officers could ever have probable cause to search Godette's room and, therefore, there are

13

genuine issues of material fact that preclude summary judgment in favor of the municipal defendants on the §1983 claim insofar as it relates to the scope of the search.

### b.  Claim Based Upon Excessive Force

"[A] police officer may use only such force as is reasonably necessary to effect an arrest," *United States v. McQueeney*, 674 F.2d 109, 113 (1st Cir. 1982).  The evidence shows that the officers violently pushed Godette against a wall, caused injuries to his wrists from the handcuffs and took actions to cause his pants to fall down.  Serious injury is not a prerequisite to recovery under a theory of excessive force.  *Bastien v. Goddard*, 279 F.3d 10, 14 (1st Cir. 2002).

Defendants argue that Godette's excessive force claim should be dismissed because he was handcuffed for the safety of the officers and the Merrimack College community.  (Def. Memo., at p. 8).  The Defendants have no basis in the evidence for making this assertion, although Defendants assert that Godette's "big set of keys" could have been a weapon. (Def. Memo., at p. 8).   Taking the evidence in the light most favorable to Godette, there is a genuine issue of material fact as to whether the Defendants used excessive force at the time of Godette's arrest and/or detention, as this Court must, at this stage of the proceedings, consider the evidence in the light most favorable to Godette.

Defendants, relying on *Calvi v. Knox County*, 470 F.3d 422 (1st Cir. 2006) and *Gaudreault v. Municipality of Salem, Mass.*, 923 F.2d 203 (1st Cir. 1990), further argue that "any of the officers who were present and did not handcuff the plaintiff cannot be liable for excessive force when handcuffing the plaintiff." (Def. Memo., at p. 8).  Defendants' argument fails because "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable under section 1983 for his nonfeasance." *Gaudreault*, 923 F.3d at 207 n.3.  In *Gaudreault*, the Court found that

defendant police officers who witnessed another police officer attack the plaintiff could not be held liable because they had no realistic opportunity to prevent the attack. *Id.* Thus, Godette's excessive force claim against Defendants Cronin, Stanley and Gallagher may proceed.

      c.    **Race-Based Discrimination**

The municipal defendants, all of whom are white, ignored the bank teller's description of the robber as a white male. The municipal defendants changed the description of the robber to an Hispanic; perhaps, one may reasonably conclude, because of the prevalence of the use of doo-rags in non-white communities. They ultimately arrested an African-American, one of the few African-Americans on campus, after walking him around in handcuffs.

**B.    Summary Judgment Should Be Denied As To Godette's Claim Against the Defendant Police Officers Under M.G.L. c. 12, §§ 11H, 11I.**

To recover under M.G.L. c. 12, §§ 11H, 11I, Godette must show that his secured rights were violated by "threats, coercion or intimidation." *See Bally v. North Eastern University*, 403 Mass. 713, 717 (1989). In their memorandum, Defendants argue only that Godette's claim, pursuant to the Massachusetts Civil Rights Act should be dismissed because Godette has failed to demonstrate "threats, coercion or intimidation." (Def. Memo. at pp. 12-13).

In *Delaney v. Chief of Police of Wareham*, 27 Mass. App. Ct. 398, 409 (1989), the Court defined the phrase: "threat (acts or language by which another is placed in fear of injury or damage), intimidation (creation of fear to compel conduct), or coercion (the active domination of another's will)." In the Verified Complaint, Godette specifically alleges that his secured rights were violated by not only "threats, intimidation or coercion," but, instead, by all three.

Godette has demonstrated several instances of misconduct on the part of the police officers which deprived him of secured rights by threats, intimidation or coercion, including without limitation, (a) he was pushed against a wall, (c) he was arrested in a public area, (c) he

15

was subjected to an unconsented to search of his person, his bookbag and his dormitory room, (d) he was subjected to having his pants fall down, (e) he was led in handcuffs to his room, past onlookers, and (f) he was subjected to an intense interrogation. Moreover, he permitted the officers to search his room only as a result of Defendants' threats, intimidation and coercion. Thus, Defendants' motion for summary judgment must fail as to the claim against the police officers under M.G.L. c. 12, §§ 11H, 11I (Count V).

### C. Plaintiff Has Properly Demonstrated a Claim for Intentional Infliction of Emotional Distress Against the Defendant Police Officers.

In Count X, Godette asserts a claim for Intentional and/or Negligent Infliction of Emotional Distress against all of the Defendants. The Defendants seek summary judgment only on the intentional infliction of emotional distress claims against all of the municipal officers, and not the negligent infliction of emotional distress claims against the municipality and the municipal police officers. As to the intentional infliction of emotional distress claim, Godette has demonstrated each of the four elements of such a claim. *Agis v. Howard Johnson Co.*, 371 Mass. 140, 355 N.E.2d 315, 318-319 (1976). Godette has shown that the conduct of the Defendants was extreme and outrageous, beyond all possible bounds of decency, utterly intolerable in a civilized community and that no reasonable person should be expected to bear it. The evidence adduced has demonstrated that Godette was embarrassed by the harrowing incident – so much so that he sought help from the counseling services at Merrimack. An arrest can be a "traumatic experience." *Finucane v. Town of Belchertown*, 808 F.Supp. 906, 909 (1992)(no intentional infliction of emotional distress claim where probable cause to arrest); *see Wagenmann v. Adams*, 829 F.2d 196, 214 (1st Cir. 1987)(man arrested without probable cause could recover on intentional infliction of emotional distress claim). Had the North Andover Police simply checked on Godette's whereabouts before arresting him, the whole incident could

16

have been avoided. No reasonable person expects to be arrested and treated roughly simply for walking out of a building. As a result, Godette has demonstrated genuine issues of material fact supporting his claim for intentional infliction of emotional distress.

> **D. Genuine Issues of Material Fact Exist As To Godette's Claim for False Imprisonment Against the Defendant Police Officers.**

In Count VIII, Godette asserts a claim for False Imprisonment against all Defendants. Defendants argue that, since the "detention [of Godette] was lawful, … the tort of false imprisonment must fail." (Def. Memo., at p. 14). "The tort of false imprisonment consists in (1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or harmed by such confinement." *Ball v. Wal-Mart, Inc.*, 102 F.Supp. 44, 54 (D.Mass. 2000)(internal quotation marks omitted)(summary judgment on false imprisonment claim denied). The determination of whether the detention and/or arrest of Godette was lawful is a factual determination which must be made by the trier of fact and not at the summary judgment stage of the proceedings. As a result, this Court should deny Defendants' motion for summary judgment as to Count VIII (False Imprisonment).

> **E. Plaintiff Has Properly Stated a Claim for Assault and Battery Against the Defendant Police Officers.**

In Count IX, Godette asserts a claim for assault and battery against all Defendants. Heffernan applied the handcuffs, and a male officer, presumably Cronin, pushed Godette against the wall violently. As mentioned above, whether the police officers were authorized to use certain levels of force is a factual determination to be made by the trier of fact, but not at the summary judgment stage. As a result, this Court should deny Defendants' motion for summary judgment as to Count IX (Assault and Battery).

> **F. Plaintiff Has Properly Demonstrated a Civil Rights Claims Against the Town of North Andover.**

In order to establish liability for an unconstitutional municipal custom or policy under 42 U.S.C. § 1983, a plaintiff must prove:

> (1) that the governmental entity's employees engaged in a continuing, widespread, persistent pattern of conduct in violation of the constitutional standard, (2) that the governmental entity's policymaking officials, after having notice of the misconduct, remained deliberately indifferent to or tacitly authorized continuation of that misconduct, and (3) that the plaintiff was injured by continued misconduct within the persistent pattern, thus showing that the custom was a moving force behind the violation of the constitutional standard.

*Jonielunas v. City of Worcester*, 338 F.Supp.2d 173, 177 (D.Mass. 2004), citing *Armstrong v. Lamy*, 938 F.Supp. 1018, 1035-36 (D.Mass.1996), citing *Gates v. Unified School Dist. No. 449 of Leavenworth, Kan.*, 996 F.2d 1035, 1041 (10th Cir.1993). A municipality may be liable under §1983 when the failure to train, supervise or discipline its employees is the result of the deliberate indifference of the policymaker to the constitutional rights of persons who come in contact with the government. *City of Canton*, 489 U.S. 378 (1989). Thus, Godette has sufficiently demonstrated §1983 claims against the Town of North Andover in order to defeat summary judgment. Here, Stanley, the Chief of the North Andover Police, was involved in the investigation and arrest of Godette. Stanley, the chief policymaker of the North Andover Police, exhibited deliberate indifference to Godette's civil rights when he met with the officers in Riordan's office and then stood by while the officers assaulted Godette, unconstitutionally searched his room, and left him handcuffed for over three hours. Moreover, Heffernan is one of the drafter's of the North Andover Police policies and procedures manual.

A single incident of misconduct, with other evidence of a program's inadequacy, can provide the basis for a §1983 municipal claim. *Brown v. Gray*, 227 F.3d 1278 (10th Cir. 2000) (municipal liability under §1983 arising from a single incident); *see also Willhauck v. Halpin*, 953 F.2d 689, 714 n.25 (1st Cir. 1992) (expressly disclaiming that municipal liability is

18

precluded because only a single incident is alleged); *but see Bordanaro v. McLeod*, 871 F.2d 1151, 1161 n. 8 (1st Cir. 1989). In the case at bar, the facts demonstrate that North Andover engaged in a pattern of wrongful conduct, consisting of arresting Godette without probable cause and promulgating an incomplete policies and procedures manual. The claims against North Andover must survive summary judgment.

### G. The Police Officers Are Not Entitled to Qualified Immunity

To determine whether an official is entitled to qualified immunity, courts must follow a two-part test. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). The first inquiry must be whether a constitutional right was violated on the facts alleged by the plaintiff. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Wilson*, 526 U.S. at 609. Here, Godette has alleged, and shown, that his arrest deprived him of numerous federal constitutional rights, including, but not limited to, freedom from unreasonable seizure of his person under the Fourth Amendment, freedom from false accusations, due process and equal protection under the Fifth and Fourteenth Amendments, privileges and immunities under Article IV and the Fourteenth Amendment, freedom from racial discrimination, freedom from malicious prosecution and freedom from intimidation and humiliation.

The second prong of the qualified immunity determination is whether the right violated was clearly established. *Saucier*, 533 U.S. at 201. In the case at bar, the relevant objective question is whether a reasonable officer could have believed there was probable cause to arrest Godette, in light of clearly established law and the information the arresting officers possessed. *Anderson v. Creighton*, 483 U.S. 635, 636 (1987).

> Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding … the salient question … is whether the state of the law … gave respondents fair warning that their alleged treatment of Hope was unconstitutional.

19

*Hope v. Pelzer*, 536 U.S. 730, 741 (2002). For the reasons set forth herein, any reasonable officer would have understood that the challenged conduct violated Godette's clearly established constitutional right to be free from arrest without probable cause. *See Swain v. Spinney*, 117 F.3d 1, 9 (1st Cir. 1997). A reasonable officer would have also understood, under the same analysis, that the challenged conduct would have also violated Godette's clearly established right to be free from, among other things, unconsented to searches in violation of the Fourth Amendment, to be free from excessive force and from race-based discrimination. As such, the Defendant officers are not entitled to qualified immunity.

## Conclusion

Plaintiff Brett Godette respectfully requests that, with the exceptions set forth herein, this Court deny the Defendants' motion for summary judgment.

> The Plaintiff
> Brett S. Godette
> By his Attorneys,
>
> */s/ Paul J. Klehm*
> James B. Krasnoo  BBO #279300
> *jkrasnoo@krasnooklehm.com*
> Paul J. Klehm  BBO #561605
> *pklehm@krasnooklehm.com*
> Benjamin L. Falkner  BBO #667951
> *bfalkner@krasnooklehm.com*
> Krasnoo | Klehm LLP
> 23 Main Street
> Andover, MA 01810
> (978) 475-9955

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record for each other party via ECF on March 22, 2007.

> */s/ Paul J. Klehm*