UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____

BRETT S. GODETTE                          )
    Plaintiff                              )
v.                                         )
                                           )     CIVIL ACTION
RICHARD STANLEY, DIANE HEFFERNAN,          )     No. 05-11354-JLT
DANIEL CRONIN,                             )
PAUL GALLAGHER,                            )
TOWN OF NORTH ANDOVER,                     )
and MERRIMACK COLLEGE                      )
    Defendants                             )
_____)

## AFFIDAVIT OF PAUL J. KLEHM, ESQ.

I, Paul J. Klehm, Esq., under oath, depose and state as follows:

1.     I am counsel to the Plaintiff in the above-referenced matter.

2.     I have caused to be attached hereto true and genuine copies of the following

documents:

|  |  |
|---|---|
| A. | Affidavit of Brett S. Godette |
| B. | Excerpts of Deposition of Brett S. Godette |
| C. | Assist to Outside Agency (Riordan Report) |
| D. | CJIS form |
| E. | Excerpts of Deposition of Daniel Cronin |
| F. | Excerpts of Deposition of Dianne Heffernan |
| G. | Excerpts of Deposition of Paul Gallagher |
| H. | Various North Andover Police Reports |
| I. | (Omitted) |
| J. | Massachusetts State Police Report |

K.                    Notes of Dianne Heffernan

L.                    Excerpts of Deposition of Michael Riordan

L1.                   Surveillance Photographs of the Bank Robber

L2.                   Merrimack College Student Identification Cards

M.                    Excerpts of Deposition of Chief Richard Stanley

N.                    Notes of Daniel Cronin

O.                    Memorandum dated April 11, 2003 (Mayrose)

P.                    Excerpts of Deposition of William Mayrose

Q.                    Excerpts of Continued Deposition of Gallagher

R.                    Excerpts from Continued Deposition of Stanley

S.                    North Andover Police Department Manual Cover and

                      Table of Contents

Signed under the pains and penalties of perjury this 22nd day of March, 2007

                                    _/s/ Paul J. Klehm_____
                                    Paul J. Klehm


## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the above document was served upon the attorney(s) of record via ECF on March 22, 2007.

                                    _/s/ Paul J. Klehm_____
                                    Paul J. Klehm

**EXHIBIT "A"**

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____

BRETT S. GODETTE                                    )
     Plaintiff                                         )
v.                                                  )
                                             )    CIVIL ACTION
RICHARD STANLEY, DIANE HEFFERNAN,                   )    No. 05-11354-JLT
DANIEL CRONIN,                                      )
PAUL GALLAGHER,                                     )
TOWN OF NORTH ANDOVER,                              )
and MERRIMACK COLLEGE                               )
     Defendants                                        )
_____)

**AFFIDAVIT OF BRETT S. GODETTE**

    I, Brett S. Godette, under oath, depose and state as follows:

    1.     I am the Plaintiff in the above-referenced matter.  I am an African-American. During my tenure at Merrimack College, there were few African-American or Hispanic students and faculty on the Merrimack College campus.  The majority of students during my tenure at the school were Caucasian.

    2.     I attended Merrimack College, located in North Andover/Andover, Massachusetts, from the Fall of 2000 through the Spring of 2004.  I was a member of the men's varsity basketball team.   I received a bachelor's degree from Merrimack in the Spring of 2004.

    3.     On March 26, 2003, I was a junior at Merrimack.

    4.     At approximately 7:00 a.m. or 7:30 a.m. on that date, I attended a basketball team workout.  At the time, the team was off-season.

    5.     During the early morning of March 26, 2003, I wore a blue "doo-rag" and a gray Merrimack Basketball fleece jacket.  The jacket had neither dark sleeves nor the insignia "RW" on the chest.  At some point before 11:00 a.m. that morning, I removed my blue "doo-rag."  I did

not wear any other "doo-rag", including without limitation, a white "doo-rag", at any other time on March 26, 2003.   At no time on that date did I wear a hat.

6.      At approximately 8:15 a.m. on that date, I was present in the cafeteria in the Sakowitch Student Center on the campus of Merrimack College in order to study for a Business Calculus examination with a fellow student named Gina Bertelli.

7.      From approximately 8:30 a.m. to 10:00 a.m. on that date, Bertelli and I, along with others, studied together in preparation for the examination.  At approximately 10:00 a.m. on that date, Bertelli left the cafeteria in order to attend a class.

8.      From approximately 10:00 a.m. to 10:50 a.m. on that date, I remained in the cafeteria and studied with a fellow student named Lightfoot Taylor.

9.      At approximately 10:50 a.m. on that date, I left the cafeteria and traveled directly to my Business Calculus class.  From approximately 11:00 a.m. to 11:50 a.m. on that date, I was present at my Business Calculus Class, given by Professor Dawn Kalinowski, taking a written examination.

10.     At approximately 11:55 a.m. on that date, I completed my examination and proceeded directly to my Strategic Marketing class in the same building on campus, which I attended from noon to 12:50 p.m. on that date.

11.     At approximately 12:50 p.m. on that date, I proceeded directly to the cafeteria in order to eat lunch.  I remained in the cafeteria eating with friends until approximately 1:30 p.m.

12.     At approximately 1:30 p.m. on that date, I left the cafeteria and proceeded to the Office of Residence Life in order to reschedule an appointment, then scheduled for that afternoon, so that I could attend a workout with the Merrimack College varsity basketball team.

13.     At no time on March 26, 2003 from the time I awoke until 3:00 p.m., did I ever leave the Merrimack College campus.

14.     At approximately 2:00 p.m. on that date, I returned to my room in the Monican dormitory and then proceeded directly to a friend's room in the same dormitory.

15.     At approximately 2:55 p.m. on that date, I left my friend's room. I thereafter returned directly to my own room in order to gather my belongings in order to attend a workout with the basketball team.

16.     At approximately 3:10 p.m. on that date, I began to walk out of the Monican dormitory and was immediately surrounded by several police officers whom I now understand to be from the North Andover and Merrimack College police departments.

17.     A male officer violently pushed me against a wall.  Several officers yelled orders at me, some of which contradicted one another.

18.     During the confrontation, North Andover Police Officer Diane Heffernan put her hand on her gun and told me that I was under arrest.

19.     Heffernan held my wrists and arms tightly and, in a rough manner, placed me in handcuffs. Without first seeking consent, Heffernan then began to search my book bag. When the book bag became entangled in the handcuffs, I was pulled away from the wall, and then another officer violently pushed me back against the wall.

20.     For approximately fifteen minutes, in full view of onlookers, these police officers, all of whom were Caucasian, detained me in and around the lobby area of the Monican dormitory.  I did not resist the arrest.

21.     Without first seeking my consent, an officer searched my person and asked me whether I had any weapons.  I denied possession of any weapons, and the officer found no weapons.  I was not carrying any weapons.

22.     Shortly thereafter, I heard Heffernan say, in words or substance, "It's in his pocket."  An officer reached inside my pants, without consent, and pulled my left pocket inside out, thereby causing my sweatpants or nylon workout pants to fall to my knees in an embarrassing manner. The officer asked me what was in my pocket and felt the object in order to determine what it was.  I told the officer the object was a keychain. An officer removed the keychain and then quickly placed it back in my pocket.

23.    To my great surprise, a male officer then accused me of having robbed a bank.  In an intimidating manner, the officer asked me a number of questions in rapid succession, without waiting for my answers thereto.  The officers told me, erroneously and falsely, that they possessed a surveillance videotape which depicted my face.

24.    I attempted to describe my whereabouts to the officers, whereupon one officer flatly and wrongfully accused me of lying.  The officers also interrupted my answers several times in order to ask me more questions.

25.    After an officer questioned and intimidated me for approximately fifteen minutes in or around the lobby of the Monican dormitory, a male officer told me that the officers wanted to visit my dormitory room.  Initially, I refused, but, in an effort to get away from the crowd of onlookers, and to limit my embarrassment, I, while under duress, succumbed to officers' pressure to permit them to invade my room.

26.    I experienced extreme humiliation and embarrassment as the officers led me in handcuffs past several onlookers through the dormitory to my dormitory room.  I kept my head down as we walked out of embarrassment.

27.    Upon arriving at my dormitory room, which I shared with another student, the officers began to conduct an illegal, unconsented to, search of the entire room while Defendant Cronin conducted an intense and intimidating interrogation of me.  The officer did not inform me of the time of the alleged robbery during the course of the interrogation. As a result of the search, my room was left in a state of disarray.

28.    The search and interrogation in the room lasted for approximately forty-five minutes.  During that time, a number of officers stood outside the room.

29.    The officers found no contraband or evidence of the robbery during their search of my room.  Cronin then began taking notes of his conversation with me.  For the first time since I was placed under arrest, Cronin asked me, in the presence of Heffernan, specific questions about my whereabouts on that day, repeating many of the questions which I had

4

already answered. Cronin warned me in a threatening manner that I needed to be accurate with my responses.

30.    While still handcuffed, I provided detailed information about my whereabouts that day to the officer.  After five to ten minutes, Heffernan left the room, apparently to confirm my whereabouts.

31.    I then remained handcuffed and seated for approximately thirty minutes in my dormitory room with a male officer.

32.    At that point, Heffernan returned to my room and told me that the police had confirmed my whereabouts and that I was no longer under arrest.  Heffernan released me from handcuffs, which I had been wearing for almost three hours.  The officers then left my room. They offered no apology for treating me the way they did.

33.    At or around this time, Heffernan showed me four grainy and unclear photographs of the suspected bank robber wearing a white "doo-rag" and white hat.

34.    The photographs did not look like me at all.

35.    After looking at the photographs and conversing briefly with Heffernan, I asked the officers to leave my room.  I never told any police officer that the surveillance photographs looked like or resembled me.

36.    On or about March 27, 2003, President of Merrimack College Richard Santagati approached me and invited me to join him for lunch.  I agreed to have lunch with President Santagati.  I had never before been invited to lunch with the President throughout my college career before that date.  I have not since been invited to lunch with the President of the College.

37.    During the lunch that day, Santagati apologized to me and, further, told me, in essence, that the individual accountable for the wrongdoing would be disciplined.  Santagati also told me, falsely, that Merrimack College Public Safety had nothing to do with the arrest and that the arrest was the result of all outside police work.

5

38.     In or around March, 2003, at the request of Merrimack College Men's Basketball Coach Bert Hammel, I spoke with a counselor at the school about the trauma and humiliation I had endured in the incident.

39.     As a direct and proximate result of the wrongful action of the Defendants in, among other things (a) falsely arresting me, handcuffing me, interrogating me, detaining me, forcing me to accompany them and forcing me to acquiesce reluctantly to a search of my room, all without probable cause, (b) in using excessive and unnecessary force, and (c) in causing me to suffer extreme humiliation and embarrassment, I have suffered from, and will continue to suffer from, injuries to both body and mind, including, without limitation, emotional distress, mental anguish and physical harm.  I had marks on my wrists for a few days from the handcuffs.  I still think about the incident to this day.  I felt betrayed, embarrassed and depressed about the incident.  After the incident, several students approached me to discuss the incident, which was embarrassing.

40.     I believe that my arrest was racially motivated.  At no time did I participate in any robbery in any bank.

41.     On October 5, 2004, I, through counsel, forwarded presentment letters pursuant to M.G.L. c. 258 § 4 to the appropriate town officials for the Town of Andover and the Town of North Andover.   Upon information and belief, my counsel received no timely responses to those letters within six months.

Signed under the pains and penalties of perjury this 22nd day of March, 2007

_/s/ Brett S. Godette_____

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record via ECF on March 22, 2007.

_/s/ Paul J. Klehm_____
Paul J. Klehm

6

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. NO.: 05-11354JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BRETT S. GODETTE,
            PLAINTIFF

    vs.

RICHARD STANLEY, DIANE HEFFERNAN,
DANIEL CRONIN, PAUL CALLAGHER,
WILLIAM WALLACE, DONALD ATTULLO,
CHARLES HESELTINE and PATRICK KEEFE,
Individually and as Police Officers
of Their Respective Municipalities,
LT. RIORDON, TOWN OF NORTH ANDVOER,
TOWN OF ANDOVER, and MERRIMACK
COLLEGE,
            DEFENDANTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

        DEPOSITION OF BRETT S. GODETTE, a

witness called on behalf of the Defendants,

pursuant to Massachussetts Rules of Civil

Procedure, before Meredith A. Fairbanks, a

Notary Public and Shorthand Reporter in and for

the Commonwealth of Massachusetts, at the

offices of Merrick, Louison & Costello, 67

Batterymarch Street, Boston, Massachusetts

02110, on Thursday, October 19, 2006, commencing

at 9:31 a.m.

COPY

1    A.    Yes.

2    Q.    And is that matter still pending?

3    A.    No.

4    Q.    What happened to that matter?

5    A.    PBJ.

6    Q.    Do you know what that stands for?

7    A.    PBJ?  I think it was "probation before

8    judgment."

9    Q.    And do you have to pay a fine?

10    A.    Yes, I had to pay a fine.

11    Q.    How much?

12    A.    $150.

13    Q.    What about Marcus Whittaker?  Did he

14    get the same --

15    A.    Yes.

16          MR. KLEHM:  Wait.  Can we --

17          MS. RYAN:  I know.

18    Q.    Was Marcus Whittaker also given a PBJ

19    and asked to pay a fine of $150?

20    A.    Yes.

21          MR. KLEHM:  Thanks.

22    Q.    Did it go to trial?

23    A.    No.

24    Q.    Where were you or what were you doing

1    when you got arrested?

2        A.    Sleeping.

3        Q.    Did they come in your -- where were

4    you sleeping?

5        A.    Sleeping in my vehicle.

6        Q.    Is this when you were employed by Ober

7    Wireless?

8        A.    Yes.

9        Q.    Did that have anything to do with your

10   termination?

11       A.    No.

12       Q.    Aside from those two times, have you

13   been arrested on any other occasion?

14       A.    Not that I recall.

15       Q.    Were you ever arrested as a juvenile?

16            MR. KLEHM:   Objection.   You can

17   answer.

18       A.    Not that I recall.

19       Q.    Did anyone else ever have custody

20   aside from your mother?

21       A.    Yes.

22       Q.    Who was that?

23       A.    Bob Green and Patricia Green.

24       Q.    And your mother legally gave them

1    custody of you?

2        A.    To allow them to make decisions for my

3    well-being.

4        Q.    And that's when you were in high

5    school; correct?

6        A.    Yes.

7        Q.    Did any state ever have custody of

8    you?

9        A.    No.

10       Q.    So it's your best testimony today that

11   you've been arrested two times in your life; is

12   that correct?

13       A.    Yes.

14       Q.    And are you presently on probation as

15   a result of the marijuana charges?

16       A.    Yes.

17       Q.    And for how long are you on probation?

18       A.    One year.

19       Q.    Have you ever had a restraining order

20   taken out against you?

21       A.    Yes.

22       Q.    And by whom?

23       A.    My ex-girlfriend.

24       Q.    And who is that?

1    A.    In the gym with the team, as a team.

2    Q.    Go ahead.

3    A.    Okay.  Then we -- I believe I went to

4  breakfast with Light Foot or Light Foot met me

5  over there in the breakfast hall or the dining

6  hall.

7    Q.    Who is Light Foot?

8    A.    Light Foot Taylor.

9    Q.    Is that his real name?

10    A.    Yes.  He's also a Merrimack basketball

11  player.  Currently still plays.

12    Q.    So you met him for breakfast; is that

13  your testimony?

14    A.    Yes.  I'm not sure if we walked

15  together or I met him there.

16    Q.    Okay.  What else do you remember about

17  this day?

18    A.    I remained in the study hall eating on

19  and off while -- I mean, not study hall.  In the

20  cafeteria studying, eating on and off with other

21  students who came in and left for their class

22  until my examination.

23    Q.    You can keep going.

24    A.    Oh, I didn't -- okay.  Then I went to

1  take an exam.  Left the exam.  Went to my next

2  class, which was a marketing class that I had.

3  Left that class.  Went to the resident life

4  office in order to reschedule an appointment

5  that I had because of some issues that were

6  going on with Chuck Dukus, my roommate.

7  Rescheduled that in order to attend a mandatory

8  lift, weightlifting workout.

9           Went back to my dorm room to go get my

10  items, stuff that I needed.  May have just

11  relaxed for like a half hour.  Went back.  Left

12  to go back to the gym.  As I left the gym, I was

13  confronted by a lot of police officers.

14      Q.   Let me stop you there.  You said you

15  went to go back to -- did you go to the gym?

16      A.   I was there in the morning for the

17  morning workout.

18      Q.   When you were confronted by police

19  officers, were you at the gym or were you on

20  your way to the gym?

21      A.   I was leaving Monican to go back to

22  the gym from this morning.

23      Q.   Now, you testified a few minutes ago

24  that you went to Monican and you relaxed for a

1      Q.   To the best of your memory, what

2   occurred during that 20-minute period?

3      A.   I was told -- I was just told that

4   they wanted to go into my dorm room.  I stated I

5   didn't want anyone going in my dorm room.  I was

6   told, "If you have nothing to hide, you'll let

7   us in your dorm room."  At this point, I was

8   really embarrassed, so, you know, to minimize my

9   embarrassment, I said, "Fine, we can go to the

10  dorm room."

11              At this time, I'm -- at some point

12  during this process my pants were pulled down

13  because I had on, I believe it was -- it was

14  either some sweats or some nylon, nylon, like,

15  basketball pants.  They were basketball pants.

16  I was embarrassed, totally embarrassed when my

17  pants came down.  An officer went inside my

18  pants to, I believe to see what was in my pocket

19  because he was juggling my pocket, whoever it

20  was.

21              Because I had my face to the, to the

22  wall, but there were numerous officers behind

23  me.  Someone put a hand in my pocket, juggled

24  it, said, "It's in his pocket."  That's what I

1    heard.  I heard from behind me, "It's in his

2    pocket."

3            Then someone reached in my pocket,

4    pulled out the keys, which they were keys to the

5    dorm room.  I just had a big set of keys

6    probably because of all, you know, the places

7    I've grown up.  I have keys -- at that time, I

8    had a lot of keys.

9            Then they were placed back in my

10   pocket.  They were going through my -- at the

11   same time, someone was going through my bag, but

12   the bag was -- my hands were behind my back

13   cuffed, so the bag got stuck in my cuffs.  But

14   they were going in my bag where I had my shorts,

15   items for the gym.

16       Q.   Anything else you remember about being

17   outside in front of the Monican Hall during that

18   20-minute period?

19       A.   That's all I remember.  That's all I

20   remember right now.

21       Q.   Okay.  Now, you testified a few

22   moments ago that you had, am I right, you had

23   sweatpants on?

24            MR. KLEHM:  Objection.

1      A.    I had nylon or sweatpants, nylon

2    sweats.  Some kind of athletic wear.

3      Q.    And did you have anything on

4    underneath those?

5      A.    Boxer shorts.

6      Q.    And you said that someone pulled down

7    your pants?

8      A.    Yes.  By going inside my pants, they

9    were very loose and I was cuffed so I couldn't

10   pull them up, so they fell to my knees.

11     Q.    So your pants fell?

12     A.    Yes.

13     Q.    And you said that it was by someone

14   going inside your pants.  Is that when they were

15   going in to pull out the keys?

16     A.    They went on the inside, not in my

17   pocket, but inside of my pants, and pulled the

18   pocket inside out.

19     Q.    Okay.  And where was the pocket

20   located?

21     A.    It was my left pocket.

22     Q.    And can you describe the individual

23   that did this?

24     A.    I don't know whose hand it was.

Page 84

1        Q.    Do you remember anything about this

2    person?

3        A.    Which person?

4        Q.    That took the keys out of your pocket.

5        A.    I don't know whose hand it was.  I was

6    answering questions at the same time.  I was

7    doing multiple things.

8        Q.    Can you give a physical description of

9    any of the officers that confronted you outside

10   of the Monican Hall?

11       A.    There was one female.  I know there

12   were no -- there may have been -- I don't know

13   if one officer was maybe Spanish, but other than

14   that, you know, all Caucasian officers.

15       Q.    And you, in fact, had keys in your

16   pocket; is that correct?

17       A.    Yes.

18       Q.    And they were in your left pocket; is

19   that correct?

20       A.    Yes.

21       Q.    Now, it's not your testimony that one

22   of these officers went up to you and pulled down

23   your pants; is that correct?

24       A.    No.

Page 86

1   on you?

2       A.    No.

3       Q.    And you were handcuffed behind your

4   back; is that correct?

5       A.    Yes.

6       Q.    Do you remember any other things that

7   were stated during this period of 20 minutes, or

8   approximately 20 minutes?

9       A.    I mean, I was numerously called a

10  liar.  I was asked about my day, to give recount

11  where I was.

12      Q.    And this was all outside, right?

13      A.    Yes.

14      Q.    And who asked you that?  Do you

15  remember?

16      A.    Numerous -- I believe it was a couple

17  different officers, but it was mainly one male

18  officer.

19      Q.    Do you remember if there were any

20  Merrimack police officers --

21      A.    Yes.

22      Q.    -- that were involved with the

23  incident in front of Monican Hall?

24      A.    Yes, I believe I saw some.

1       Q.   Were they in uniform?

2       A.   I'm not sure.

3       Q.   Had you known these individuals?

4       A.   Yes.  I mean, you see -- you see

5   different -- yeah, you see everyone at Merrimack

6   knows everyone.

7       Q.   So during your three years at

8   Merrimack, you had recognized some of the

9   individuals that were --

10      A.   Yes.

11      Q.   -- with you out in front of Monican

12  Hall as Merrimack police officers; is that

13  correct?

14      A.   Yes.

15      Q.   Do you remember anything that any of

16  those officers said or did?

17      A.   I do not recall.

18      Q.   So one of the officers -- it's fair to

19  say you don't have a specific memory of one

20  officer saying one thing or another officer

21  saying another thing; is that correct?

22      A.   Well, the main was a heavyset

23  gentleman that did most of the talking.

24      Q.   Do you remember anything he said

1    specifically?

2       A.    He just said with his finger in my

3    face, "We have your face on surveillance

4    videotape.  We know you did it."  But for a

5    period of time, I responded by saying, "Did

6    what?"  I didn't understand what he was talking

7    about.  And he was getting more aggressive,

8    rather upset with me.  Whereas I told him, you

9    know, "I had basketball practice this morning,"

10   he stated, "Basketball's out of season.  You're

11   lying."

12      Q.    So you remember that one officer

13   saying those things to you; is that correct?

14      A.    Yes.

15      Q.    But then is it correct in saying that

16   the other things you remember, you're not sure

17   which officer said what?

18      A.    As far as when I was given initial

19   directives as far as...

20      Q.    For the entire time that you were out

21   in front of the Monican Hall?

22      A.    Yeah, I don't remember anyone else

23   intimidating me, like, you know -- he was the

24   only one, like, really intimidating me at that

1    time.

2        Q.    And did anyone ever tell you that

3    there had been an armed robbery in North

4    Andover?

5        A.    Yes.

6        Q.    How did that -- when did you first

7    become aware of that?

8        A.    I first became aware of that in the,

9    in the same area.

10        Q.    When you first walked out of the

11    Monican Hall?

12        A.    When I was first cuffed in front of

13    the dormitory.

14        Q.    What was said to you?

15        A.    First, I was called a liar and I

16    repeated to say what I was saying.

17        Q.    What's that?  Just say everything so

18    the record can be clear.

19        A.    First I was called a liar as far as,

20    you know, they asked me about my whole day.  The

21    recount that I gave you earlier as far as what I

22    did that day, that's the same -- that's what I

23    did that day, so I told the officer that and...

24        Q.    My question is:  When was it first

1     A.   I was then led through the dormitory

2  handcuffed.

3     Q.   By whom?

4     A.   Whoever placed the handcuffs on me

5  initially.  I don't know who it was.

6     Q.   Was it the heavyset gentleman that was

7  pointing his finger in your face?

8     A.   I'm not sure.

9     Q.   How many officers escorted you through

10  the dorm to your room?

11     A.   I'm not sure.  I couldn't see behind

12  me.  I was just walking forward.  I was keeping

13  my head down because I was embarrassed.  So I

14  just would see a lot of the dorm doors were open

15  and, you know, kids were sticking out and

16  they're like, "Hey, Brett, what's going on?"

17     Q.   So what's the next thing you remember

18  occurring?

19     A.   We got to my dorm room.  They asked me

20  to unlock the door with my keys that were in my

21  pocket, but I couldn't get the keys out of my

22  pocket.  So I don't know who this person was.  I

23  think he may have worked for Merrimack, but I'm

24  not sure.  But he went in my pocket and got the

1    time; correct?

2        A.    Yes.

3        Q.    And where was it?

4        A.    In a drawer with my other doo-rags.

5        Q.    You didn't have one separately hanging

6    from, like, a light fixture?

7        A.    I may have.

8        Q.    And anything else that you remember

9    that occurred in the room during that 30- to

10   45-minute period?

11       A.    Just police search.  Police conducted

12   a search.

13       Q.    And you don't remember anything else

14   that they were saying amongst themselves?

15       A.    No.

16       Q.    Now, what's the next thing you

17   remember occurring after that 30- to 45-minute

18   period?

19       A.    After the 30- to 45-minute period?

20   Well, I was left -- after the 30- to 45-minute

21   search, I was left cuffed to the desk with one

22   officer.

23       Q.    And who was that?

24       A.    Ummm...

Page 100

1    going on outside.

2        Q.    And do you remember anything that was

3    said outside?

4        A.    No.    I just heard walkie-talkies and

5    police noises.

6        Q.    At any point up until the conclusion

7    of this 30- to 45-minute search of your room did

8    you ever recognize any police officers as being

9    Merrimack police officers, Andover police

10   officers, or North Andover police officers?

11       A.    There was one gentleman that I said I

12   thought might have been a Merrimack police

13   officer.    I thought I may have seen him before,

14   but I wasn't sure.

15       Q.    And aside from him, anyone else that

16   you recognized?

17       A.    No.

18       Q.    Now, you testified earlier that as you

19   were walking down the hall to your room, as you

20   were being escorted down, kids were poking their

21   heads out of the room and saying, "Hey, Brett,

22   what's going on?"    Is that correct?

23       A.    Yes.    To that effect, yes.

24       Q.    Can you identify for me any of the

1    kids that poked their heads out?

2        A.    A lot of these kids I don't even know

3    the names of.  I just know by face.

4        Q.    Okay.  Now, at the conclusion of that

5    30- to 45-minute search of your room, what

6    occurred?

7        A.    At the conclusion of the search, the

8    officers that were in my room left and the quiet

9    outside died down, so I'm assuming everyone

10    left.  I was left in the room with one officer

11    who just sat there for approximately 30 to --

12    I'd say another 30 to 45 minutes or so.

13        Q.    And were you still handcuffed?

14        A.    Still handcuffed to the desk.  He

15    would periodically get up to browse around the

16    room, but he never said anything to me.

17        Q.    And then what occurred?

18        A.    Then the female officer came back into

19    the room and uncuffed me.

20        Q.    Anything else you remember?

21        A.    She showed me some surveillance

22    pictures because I asked her, "Let me see the

23    pictures of who I'm supposed to be."

24        Q.    And can you describe her demeanor at

1    Q.    So then you knew that you were no

2    longer a suspect; is that correct?

3    A.    Yes.

4    Q.    And how long did that take, this last

5    period of time when the female officer returned,

6    uncuffed you, showed the pictures to you --

7    A.    Less than five minutes.

8    Q.    What's the next thing you remember

9    occurring?

10    A.    I then gathered my stuff for the

11    workout that I was trying to go to, but I was

12    already late by a hour, so I wanted to go over

13    to tell my coach why I was late because I've

14    never really been late for anything.  And he

15    just asked me, you know, "What happened?  What's

16    going on?"  He had overheard.  I told him what

17    had happened.

18    Q.    And then did you, at that time, work

19    out with the team?

20    A.    No.

21    Q.    Was the workout over?

22    A.    The workout was over.  I just went

23    back to my room.

24    Q.    Did anyone ever tell you that they

1   witnessed the incident involving the police?

2       A.    Yes.

3       Q.    And who was that?

4       A.    Again, I don't know the names.  A lot

5   of people knew me on the college, but I didn't

6   know them.

7       Q.    Did anyone ever tell you they

8   witnessed it?

9       A.    Yeah.  They're like, "I saw what

10  happened, man.  What happened?  What's going

11  on?"  And I was just like, "Nothing."

12      Q.    And you don't know the names of any of

13  these people; is that correct?

14      A.    I don't remember their names.

15      Q.    Do you remember anything else about

16  that day that you haven't already told me here

17  today?

18      A.    No.

19      Q.    Did you miss any classes that day?

20      A.    No.

21      Q.    You had completed them in the morning?

22      A.    Yes.

23      Q.    And do you remember what you did that

24  night?

1    A.    I went to the cafeteria.  I just

2  went -- then went back to my room and just went

3  to sleep.

4    Q.    Do you remember what time the whole

5  incident ended at?  Was it around dinner time

6  that you would have gone to the cafeteria?

7    A.    The time which incident ended?  Like,

8  when I was uncuffed and --

9    Q.    When you were freed.

10    A.    I'd say that was around 3:30.  Three,

11  four.  Three or four.

12    Q.    Then you ultimately went to dinner at

13  some point and then returned and went to bed; is

14  that correct?

15    A.    I went then at 4:30-ish.  After it

16  happened to me, I went to talk to my coach.

17  Then from there I'm not sure if I went back to

18  my dorm or the cafeteria first, but I either

19  went to my dorm to the cafeteria or straight to

20  the cafeteria to the dorm, ate and just went to

21  my room, ate by myself.

22    Q.    Now, you testified earlier, I believe,

23  I just want to clarify, that they asked -- the

24  police officers when you were in front of the

Page 107

1    Monican Hall asked if they could search your

2    room; correct?

3        A.    Yes.

4        Q.    And how did you respond?

5        A.    I said no.

6        Q.    And then what happened?

7        A.    An officer said, "If you have nothing

8    to hide, you'll let us in your room.  You better

9    tell the truth."  You know, it was a bunch of

10   just...

11       Q.    And then what, ultimately, how did you

12   respond?

13       A.    Ultimately, I then said okay.

14       Q.    Now, do you remember if you changed

15   your clothes from the morning until the time

16   that you were getting ready to go to the gym?

17       A.    I did not change my clothes.

18       Q.    So you had the same outfit on all

19   day; is that correct?

20       A.    Well, I might have put on a fleece.

21   I'm not sure if I had -- no, I believe I had the

22   fleece on the whole day.

23       Q.    So you had these like --

24       A.    Merrimack College basketball fleece.

1    That's what I was wearing.  College basketball

2    fleece.

3         Q.    What color was that?

4         A.    Gray.  It zipped up.  It had

5    "Merrimack College" right here and a basketball

6    here (indicating).

7         Q.    And what did you have on underneath

8    that?

9         A.    I don't remember.

10        Q.    And you had your doo-rag on?

11        A.    I had my doo-rag off.

12             MR. KLEHM:  Objection.

13        Q.    At any point that day did you have a

14    doo-rag on?

15        A.    Yes.

16        Q.    When was that?

17        A.    During the morning when I first

18   awoke.  Because I usually wear it when I go to

19   sleep.

20        Q.    And did you wear it to class that day?

21        A.    No.

22        Q.    So you never left your dorm with the

23   doo-rag on that day; is that correct?

24        A.    I always -- huh?

 1  this incident prior to having -- was it lunch or

 2  dinner?

 3      A.   I mean, I went to the cafeteria and,

 4  you know, being an athlete, you're like a --

 5  you're a public figure, so -- and, you know,

 6  cafeteria is full of the whole college, so some

 7  people were asking me what happened.  You know,

 8  I pretty much was saying, "I don't know."

 9      Q.   Why were you saying that?

10      A.   Because I don't know why I was, you

11  know, I don't know why I was believed to have

12  looked like the person in the pictures.

13      Q.   Did you tell these people that you

14  were thought to have been a suspect in an armed

15  robbery and then released?

16      A.   No.   I was just -- I was saying, "I

17  don't know."  Basically, you know, it's none of

18  their business and, also, I really didn't know.

19      Q.   Anything else that you remember

20  occurring?

21      A.   What did you say, prior to?

22      Q.   Your dinner or lunch with

23  Mr. Santagati.  Lunch.

24      A.   I don't recall anything.  That was the

Page 112

1    next -- that wasn't the same day.

2        Q.    And in your complaint you allege that

3    it was on March 27th.  Do you have any reason to

4    believe that that wouldn't have been correct?

5        A.    No.

6        Q.    So that was a substantial time later;

7    is that correct?

8                    MR. KLEHM:  Objection.

9        Q.    It was 23 days later, right?

10   Twenty-four days?

11                   MR. KLEHM:  Objection.

12       Q.    I'm sorry.  One day, wasn't it?

13       A.    Yes, it was one day.  You confused me

14   right there.  I'm sorry.

15       Q.    Was it the next day?

16       A.    Yes, it was the next day.

17       Q.    So the next day you had lunch with the

18   president of Merrimack College; is that correct?

19       A.    Yes.

20       Q.    How did that get initiated?  Did he

21   contact you?  Did you contact him?

22       A.    I was just going about my regular day,

23   going to lunch.  He approached me in the lunch

24   line at the cafeteria and said, "Do you mind

1   sitting down, chatting?  I want to talk to

2   you."  Something like that.

3       Q.   So where did you have lunch, in the

4   cafeteria?

5       A.   Yes.  The Merrimack cafeteria.

6       Q.   Did you know him to be the president

7   before he approached you?

8       A.   Oh, yes.  Of course.

9       Q.   And can you describe the conversation

10  that you had with him?

11      A.   He stated, you know, "I'm sorry about

12  what happened.  Whoever is at fault for this

13  will be disciplined.  Whatever we can do to help

14  you.  We had, you know, we had nothing to do

15  with the situation.  It was an outside

16  operation."

17              Pretty much that was the gist of the

18  conversation.  It wasn't long.  I was very -- I

19  was -- at that time, I was just anti-social in

20  general, but, then again, this is the president

21  of the college you play for, so I was, you know,

22  showing respect.

23      Q.   So when you were at Merrimack, would

24  you describe yourself as being anti-social?

1   fact that I -- when I signed to go to Merrimack,

2   you know, I was going to be one of very few

3   minorities and, I mean, I come from an area --

4   I've been involved in situations in the past

5   where, you know, things like this have occurred

6   to me.  So I more keep to my -- I'm a

7   keep-to-myself person.  You know, I try to avoid

8   trouble.

9       Q.   So were you unhappy when you were at

10  Merrimack?

11              MR. KLEHM:  Objection.  Do you

12  want to say when?

13      Q.   At any time were you unhappy --

14              Strike that.  You just testified

15  that you understood you were going to be one of

16  very few minorities at Merrimack; is that true?

17      A.   Yes.  But I was -- I wasn't raised to

18  view color.  My brother is half white.  I don't

19  know my father but a name.  I'm -- but I'm

20  aware.  I'm aware of my surroundings always.

21      Q.   What do you mean by that?

22      A.   I mean, while at Merrimack, I'd seen

23  things happen to other students of color.

24  That's all.

1          MS. RYAN:  Well, I want to hear a

2    conversation that he had with the president.

3    It's not -- as long as it's nothing that you

4    learned from your attorney.

5          MR. KLEHM:  Right.  Can I just

6    talk to him for a second?  You can answer as to

7    conversation you had with the president.

8          MS. AYER:  The president on the

9    day after.  On that day.

10          MS. RYAN:  That day, right.

11    Well, or that school year.

12          MR. KLEHM:  Right.

13    A.    What I was going to say was he said,

14    "We're fully behind you."  That's what I was

15    going to say.

16    BY MS. RYAN:

17    Q.    Now, were you allowed to live

18    off-campus as a student at Merrimack?

19    A.    I believe so, yes.  I mean, there was

20    commuters.

21    Q.    And to play on the basketball team?

22    A.    Yes.  I still had a dorm room at the

23    time.

24    Q.    Now, after your meeting with President

1    Santagati, do you remember anything else that

2    occurred?  Did you have anymore communications

3    with anyone from the college or from the police

4    or your coaches regarding this incident?

5        A.    After I had my conversation with Coach

6    Hammel, probably about couple days after that, I

7    don't know the exact date, he said, "I think you

8    should talk to somebody."  And he told me I

9    should go talk to a therapist or psychologist

10   over at the school.

11       Q.    Do you know why he told you to do

12   that?

13       A.    No, I don't.

14       Q.    Did you, in fact, do that?

15       A.    Yes, I did.

16       Q.    Do you remember what you told the

17   counselor?

18              MR. KLEHM:  I'm going to object

19   on the grounds of patient-therapist privilege.

20              MS. RYAN:  Well, is he seeking

21   damages?

22              MR. KLEHM:  He is.  If you look

23   at Sorrenson vs. H&R Block, which is our case,

24   which is a District Court of Massachusetts case,

Page 125

1    records had been destroyed and that's the reason

2    why they were not being produced.  It was never

3    disclosed to me that you were making those

4    records confidential or --

5              MR. KLEHM:  Oh, no.  You're

6    misunderstanding.  I didn't say anything about

7    -- we never object to the production -- well, I

8    shouldn't say never, but we don't object to the

9    production of records.  These happen not to

10   exist.  But the contents of the communications

11   between them is governed by the privilege, so

12   you can't get it through him.

13             MS. RYAN:  I disagree and we can

14   bring it up with the court, but are you

15   instructing him not to answer?

16             MR. KLEHM:  Yes, I am.

17   BY MS. RYAN:

18        Q.   So who was the counselor that you met

19   with?

20        A.   I don't recall her name.

21        Q.   How many times did you meet with her?

22        A.   Once.

23        Q.   Where did you meet with her?

24        A.   In her office.

1    Q.    At the college or was she from an

2    outside agency?

3    A.    At the college.

4    Q.    Did she prescribe you any medications?

5    A.    No.

6    Q.    Did she prescribe you any course of

7    treatment?

8    A.    No.

9    Q.    Did you schedule a second appointment

10   with her?

11   A.    No.

12   Q.    Have you sought any other counseling

13   as a result of any of the incidents that serve

14   as the base of your complaint against my

15   clients?

16   A.    No.

17   Q.    Any medical treatment?

18   A.    I would if I had insurance.  But no, I

19   haven't.

20   Q.    When you were in college you had

21   medical insurance, right?

22   A.    Yes.

23   Q.    So when you were in college, if you --

24   A.    I did?  Yes, I did.

1    College in your whole life?

2        A.    Have I ever been counseled?  Say that

3    again.

4        Q.    Have you ever sought any treatment

5    with a counselor, being a psychiatrist,

6    psychologist, a social worker, at any point in

7    your life aside from the one you've already

8    testified to here today?

9        A.    No, not that I recall.  Well, when I

10   was at East Brunswick High School, I don't know

11   if it counts, but my guidance counselor used to

12   sit and talk with me about, like, my plans for

13   college and stuff.

14       Q.    Anything else you can think of?

15       A.    That's it.

16       Q.    Now, is it your testimony that you

17   believe that this incident that serves as the

18   basis of the complaint today was racially

19   motivated?

20       A.    I mean, yes.

21       Q.    And what evidence do you have to

22   support your position that this was motivated by

23   race?

24       A.    I mean, just the whole doo-rag

1    incident just really didn't rest easy with me.

2    Like, what did that have to do with anything?

3    Like, I wear a doo-rag.  You know, and then the

4    prior things that occurred on campus that I

5    already discussed.

6        Q.    The one incident with the hockey

7    players and the football players?

8        A.    Yes.  And then there was another

9    incident with -- there was other incidents, too,

10   like, that my teammates had.

11       Q.    With the Merrimack police or with an

12   outside police agency?

13       A.    With other students and the police.

14       Q.    Outside police agencies?

15       A.    I'm not really sure what happened in

16   their case, but that would be Light Foot Taylor

17   and those guys.  They had an incident.

18       Q.    What was the incident with Light Foot

19   Taylor?

20       A.    Light Foot Taylor and Kenny Jones,

21   they're current athletes.  That's who I stopped

22   in to see yesterday.  Kenny Jones hurt his

23   back.  Light Foot just had surgery on his leg,

24   so I wanted to, you know, I had to stop by and

1    say hello, see how they were doing.  And but

2    those guys were involved in a incident where,

3    from what they tell me, they were called the "N"

4    word by other students.

5        Q.    Did that involve the police?

6        A.    And then when the police came, I

7    believe they were arrested and the other people

8    weren't.

9        Q.    Do you know who they were arrested by?

10       A.    No, I'm not sure.

11       Q.    Do you know when this occurred?

12       A.    No, I'm not sure.

13       Q.    Was it after your incident?

14       A.    Yes.  Was it?  Yes.

15       Q.    And do you know if it's still pending?

16       A.    I'm not sure.

17       Q.    You said that when I asked you why you

18   believe that this incident was racially

19   motivated, you said the doo-rag didn't rest well

20   with you and then you said because of prior

21   incidences including the incident involving

22   Light Foot Tailor and Kenny Jones.

23            Anything else that you're aware of

24   that supports your assertion that this incident

1    involving the police was racially motivated?

2        A.   I have nothing that comes to mind.

3    Something may come to mind later.

4        Q.   Is your leg bothering you?

5        A.   Yes.  We can finish.

6        Q.        Do you want to walk around for a few

7    minutes?  Does that help it?

8        A.   Yes, it does.  It's just that the

9    circulation needs to switch.

10              MS. RYAN:  Why don't you walk

11   around for a little bit and then we can come

12   right back in.

13              (A break was taken from

14              12:30 p.m. to 12:34 p.m.)

15   BY MS. RYAN:

16       Q.   Now, I'm just going to -- your counsel

17   has produced the names of some people that he

18   believes might have information that would be

19   relevant to this case, so I'm just going to go

20   through the names and ask you if you know what

21   information these individuals could have that

22   could be relevant to this lawsuit, okay?

23   Patrick Foley.  Who is Patrick Foley?

24       A.   (Witness shakes head.)

Page 143

1      Q.    Okay.  And when you testified earlier

2  that you threw the pictures and swore, why did

3  you do that?  Did you think it didn't look like

4  you?

5                  MS. AYER:  Objection.

6      Q.    You can answer.

7      A.    Yes.  I still think it doesn't look

8  like me.

9                  MS. RYAN:  Can we have this

10  marked as Exhibit 2.  And it's a four-page

11  document.

12                  (The stenographer marked the

13                  document Exhibit No. 2 for identification.)

14      Q.    Now, are you familiar with an

15  individual by the name of Steven Bertelli?

16      A.    No.

17      Q.    Did you know an individual by the name

18  of John or Steven Ionelli?

19      A.    No.

20      Q.    Did anyone ever mention anything to

21  you about a getaway car?

22      A.    I'm not sure.  I'm not sure about

23  that.  Matter of fact, I do remember the name

24  Steven Ionelli.

Page 152

1    BY MR. KLEHM:

2        Q.    When the police officers were at your

3    room, did they ask you to go through where you

4    were and when, your whereabouts for the day?

5        A.    Yes.

6        Q.    Can you relate what was said then?

7        A.    Relate what was said then?

8        Q.    What did you say to them, what did

9    they say to you during that conversation?

10       A.    I said the same thing I'd been saying

11   the whole time.  I woke up in the morning, went

12   to basketball practice, went to the cafeteria,

13   studied for an exam, took my exam, went to

14   class, came back to my dorm, and went to the

15   gym.

16       Q.    When you got up that morning, what

17   color doo-rag did you have on?

18       A.    I have a blue doo-rag.

19       Q.    And when the police officers brought

20   you up to the room, did you feel like you were

21   being arrested?

22            MS. RYAN:  Objection.  You can

23   answer.

24       A.    Yes.

Page 164

1    Q.    Sure.    Do you have any knowledge as to

2    how the police came to be at Monican dorm on

3    March 26, 2003?

4    A.    Today or -- what are you saying?

5    Right now do I have any knowledge, knowledge

6    that I, knowledge that I've read?

7    Q.    Other than what you've mentioned

8    today, do you know how the police came to be at

9    the Monican dorm on March 26, 2003 other than

10   what you've testified today?

11            MR. KLEHM:    Objection.    Go ahead.

12   A.    No.

13   Q.    When you went to class that day, that

14   day being March 26, 2003, again, you were still

15   wearing the gray zip-up Merrimack College

16   fleece; is that correct?

17   A.    I believe.

18   Q.    And were you still wearing the doo-rag

19   when you went to class that day?

20   A.    Into the class?    I'm not sure.    I

21   don't think so.    I highly doubt it.

22   Q.    But you're not sure?

23   A.    I definitely took it off at some point

24   before class.

Page 165

1      Q.    And how do you know that?

2      A.    Because I don't wear doo-rags in

3  class.   My mother taught me not to wear hats at

4  the table, things of that nature.

5      Q.    So during your four years at Merrimack

6  College, you never wore a doo-rag to class?

7      A.    Only time I may have ever done it is

8  if my hair was still wet, to keep it dry because

9  it's very cold up here and coming from the gym,

10  just showering, running to class.

11     Q.    So on occasions when your hair was

12  wet, you might have worn the doo-rag to class;

13  is that correct?

14     A.    Yes.  just to stay warm and I'd put

15  maybe a wool hat over it.

16     Q.    Okay.  Do you know if there was ever a

17  meeting between any officers of the North

18  Andover police, the Andover police, or the

19  Merrimack College police on March 26, 2003

20  before this incident at Monican dorm?

21     A.    Do I know?

22     Q.    Right.  That's the question.

23     A.    I was not present.  I don't know.

24     Q.    You testified earlier that on March

1    26, 2003 a group of police officers met you

2    outside the Monican dorm; is that correct?

3       A.   Yes.

4       Q.   Do you recall specifically how many

5    there were?  And again, I'm limiting my question

6    to just outside the dorm that day.

7       A.   I do not recall how many.  I didn't

8    count.

9       Q.   More than five?

10      A.   Yes.

11      Q.   More than ten?

12      A.   I'd say it was -- yes.  Yes, more than

13   ten.

14      Q.   More than 15?

15      A.   That might be about it.  That might be

16   safe to say.  I just saw black cars and people

17   and, I mean, there was a lot of students

18   around.  I didn't know who was a student, who's

19   what, really.  I mean, everything was just a

20   blur at that moment.

21      Q.   So is it your testimony that it's fair

22   to say that there were more than 15 police

23   officers?

24      A.   You're asking my opinion?

Page 167

1      Q.    I'm asking if -- do you have any

2    recollection -- I'm just trying to narrow it

3    down how many police officers were there, and

4    you said there were more than ten.

5      A.    I would say ten to 15.

6      Q.    Okay.

7      A.    I don't know.

8      Q.    And again, that's specifically outside

9    the dorm before anyone had ever entered the

10   dorm.  You were coming out and you think there

11   were ten to 15 officers --

12     A.    I was coming out.  I didn't even -- I

13   didn't even see them coming towards me.  Like, I

14   was more or less bombarded like a, like a riot

15   squad.  Like a bunch of people just in front of

16   me.

17     Q.    And again --

18     A.    I didn't even see them coming.

19     Q.    And I guess the question is:  When you

20   were leaving Monican dorm that day, how many

21   people, as you just described, bombarded you as

22   you walked out?  How many police officers

23   bombarded you?

24     A.    Ten to 15.

1      A.    I was given many of the same questions

2    that I was given here.  Answering them and being

3    told I was lying.

4      Q.    Can you tell me what were those

5    questions?  Do you recall?

6      A.    They asked me about my whereabouts as

7    far as -- and they just told me -- they told

8    me -- they basically told me -- they told me my

9    whereabouts.  So when I would tell them, "No, I

10    was here," they would say, "No, you're lying.

11    We have you on camera.  You're better off just

12    telling the truth.  Trust me.  We got you."

13    Like, those kind of comments.  I mean, those

14    aren't exact comments, but that's the gist of

15    what was said.

16      Q.    And that was the type of questioning

17    at both the X on this and the X with the circle

18    on this?

19      A.    The same type of question.

20      Q.    Did any of the officers on March 26,

21    2003 ever utter a racial slur?

22      A.    No.

23      Q.    I think I interrupted you and I

24    apologize.  What happened after you were in the

Page 198

1              MS. AYER:  Absolutely.

2              (A break was taken from 2:27 p.m.

3              to 2:38 p.m.)

4   BY MS. AYER:

5      Q.    Did you suffer any physical injuries

6   as a result of the incident on March 26, 2003?

7      A.    Except, you know, I had a couple of

8   marks on my wrist for a couple days from the

9   cuffs.  That's about it.

10     Q.    Other than that, no physical injuries?

11     A.    No.

12     Q.    What about did you suffer any

13  emotional issues because of the incident on

14  March 26, 2003?

15     A.    Yes.  I was very emotional.  I was

16  depressed.

17     Q.    And I guess what do you mean by

18  depressed?  Other than labeling it depressed,

19  can you describe the feelings any better than

20  that?

21     A.    I mean, I thought, to this day, I

22  still think about it a lot.  I mean, it just

23  stayed on my mind.  Usually -- it just stayed on

24  my mind.  Thought about it a lot.  Really just

1  stayed in my room.  Didn't even really hang out

2  with my, even my girlfriend.

3      Q.   Didn't you say that, generally, you

4  were anti -- or you hung out in your room even

5  before the incident?

6      A.   Yes.

7      Q.   Other than that, can you give any

8  other specific emotion that you felt or...

9      A.   I felt betrayed.

10      Q.   Why did you feel betrayed?

11      A.   I felt embarrassed.

12      Q.   Okay.  Why did you feel betrayed?

13      A.   I just feel like somebody was supposed

14  to protect me from this happening to me.  So

15  confused, not even knowing why you were

16  betrayed.  Like, it's like what's going on?

17      Q.   Do you recall being involved in an

18  incident at Merrimack College in which you sold

19  stolen books back to the book store?

20              MR. KLEHM:  Objection.  You can

21  answer.

22      A.   Yes.

23      Q.   Can you tell me about that?

24      A.   I found some books.  I took them back


DEPOSITION
EXHIBIT
Stanley 7
DR 2/27/07

Exhibit "C"

March 26, 2003

Assist to Outside Agency.

At approximately 2:30pm I, Sgt. Riordan, while in the dispatch area read a CJIS message regarding a bank robbery that had occurred earlier in the day in No. Andover. The description of the individual involved, including clothing, had similarities to a M.C. student, (Brett Godette),I had seen earlier in the day and was familiar with. The individual was wearing a "dew-rag", baggy clothing, baggy grey sweatshirt with front zipper and what I perceived to be workout clothing. I ran the listed plate included in the CJIS message through our in house decal program and came up with a match to another M.C. student. I informed Lt. Wlodyka of this and asked him to inform Chief Mayrose as soon as possible and that I would be notifying N.A.P.D. I informed Officer Rogers of this as he had also seen the individual in question earlier in the day and agreed that there were similarities in the description of the individual as well as the clothing being worn.

Two M.C. mobile units were given the plate information and conducted a campus wide search for same. This search produced negative results. Chief Stanley, Lt. Gallagher, Inspectors Cronin and Heffernan of the N.A.P.D. responded to the campus and met with Chief Mayrose, Officer Rogers and myself. Officer Salois, N.A.P.D., also responded in a marked unit and stood-by in same. They were shown, per Chief Mayrose's instructions, photos of both individuals. These photos were compared to surveillance photos from the incident and again similarities were noted.

Officer Anderson was dispatched to pickup Inspector Heffernan and Officer Rogers. They proceeded in a M.C. marked unit to the Monican dorm. They responded to the on campus resident of the individual in question to check on his whereabouts. All three officers went to the approximate location of the individual's residence. All three stood in the area while dispatch placed a telephone call to the room. The call went unanswered and began to go to Audix (voice mail) and was terminated. Officer Rogers, in plainclothes stayed in the foyer area to watch for the individual while Officer Anderson and Inspector Heffernan returned to the marked cruiser parked in front of Monican. Officer Rogers radioed that the individual was walking through the lobby of the building heading in the direction of the exit. Officer Anderson and Inspector Heffernan responded immediately from their location. They made contact with the individual in the lobby area. Inspector Heffernan told the individual that she wanted to talk to him and to walk over to the wall and to put his hands up on the wall. Inspector Heffernan told him that he was not under arrest but that she just wanted to talk to him and was handcuffing him for our safety. Chief Stanley, Lt. Gallagher, Inspector Cronin and I arrived shortly after hearing Officer Rogers transmission. Officer Anderson and I exited the foyer area and stood-by at the entrance to the dorm. Chief Mayrose arrived shortly after.

Inspectors Heffernan and Cronin escorted the individual to his room. Chief Stanley, Lt. Gallagher, Chief Mayrose and I followed behind. Inspectors Heffernan and Cronin along with the individual entered his room. All other parties present including

Officer Salois, who had arrived at the location, remained in the hallway. We were joined there by Sgt. Pattullo, Inspectors Wallace, Heseltine and Keefe of the A.P.D. Detective Division.

Comparisons of the surveillance photos with the individual were made by most parties present and again similarities were noted. The interview was completed and the individual exited his room and left the area. All investigating personnel cleared at this time.

Officer Rogers, during the process, attempted to contact the individual's instructor to verify his whereabouts during the time of the incident. Officer Rogers received a return call from the instructor sometime later. The instructor did in fact verify his attendance in her class from approximately 11:00am 'til approximately 11:45am. I immediately notified Inspector Cronin of this. As previously requested, by Inspector Cronin, M.C.C.P. checked all campus parking lots looking for the previously referenced M.V. The registered owner was scheduled for a class here at 6:00pm that evening. This check resulted in negative results.

This is a summary of events as they occurred to the best of my knowledge.

Sgt. Michael E.

Riordan

M.C.C.P.

Exhibit "D"

DEPOSITION EXHIBIT

Stanley 1
DR  2/27/07

```
**** CJIS DISPLAY FOR LMCS01  ON 01/05/05  10:52 EST
*** RECORD NOT FOUND        MSG ID = 02.3001
  KEYS USED = REF/        NIC/          LOJACK REPLY CODE/
            LIC/  9095ZB LIS/    LIT/PC  VIN/
            NAM/                      DOB/      RAC/  SEX/
            SOC/        OLN/              WAR/


ALARS,NCIC
                        CJIS 009184   01/05/2005 1052    S0751/6512.

UN.
     1N01VP00002619
MA005389E

NO NCIC WANT LIC/9095ZB.)-<
                        CJIS 009184   01/05/2005 1052    S1512/6512.
                MASSACHUSETTS REGISTRY OF MOTOR VEHICLES     01/05/05 1052
                    REGISTRATION / TITLE  INQUIRY
  STATUS: SWAP/                              STATUS DATE:06/06/2003
  REG#: 9095ZB   TYPE: PAN.  PLATE-COLOR: R    VIN#:
                            DR  PASS  CYL  WT:0000000.  MDL#
  EFF DT: 07/18/2002  EXP DT: 05/04  ORI-ISS-DT:07/18/2002  BUS:
                        ----------OWNERS----------
  1:IANNELLI        ,STEVEN    M    2:                  ,
  LIC1: S16136302    DOB 08/19/1980   LIC2:           DOB 00/00/0000
  CORP/CO NAME:
  MAIL ADD:93 WEBSTER ST        ,        E. BOSTON     ,MA 02128-2708
  RES  ADD:                     ,                      ,  00000-0000
                        ----------TITLE----------
  TITLE#       .    STATUS,DATE:    ,00/00/0000.    PURCH DT:00/00/0000
  TITLE-DT:00/00/0000                          PREV-TITLE-ST:
  INS-CO: 153.  NAME: ARBELLA MUTUAL INS
                        ----------LESSEE----------
  LESSEE NAME 1:
  LESSEE NAME 2:
  LESSEE ADDR:
  LESSEE LIC# 1:              LESSEE STATE1:
  LESSEE LIC# 2:              LESSEE STATE2:
  LESSEE-CORP:
  Stkr#-dt:   - 01/12/1985   Insp rslt:
```

S 124385    03/26/03 1313 AGB.

JIS ADMINISTRATIVE BROADCAST FOR AGB 032603 1312 EST
        FROM LNOH01    MSGNO 0253

XT
M:   NORTH ANDOVER POLICE DEPARTMENT
O:   SURROUNDING TOWNS AND COMMUNITIES
E:   ARMED BANK ROBBERY
URED ON 03/26/03 AT ABOUT 11:38 OUR SOVEREIGN BANK, 149 MAIN ST,
TH ANDOVER, WAS ROBBED BY A HISPANIC MALE, 20'S, 5'09" WEARING A
TE HAT WITH A DO-RAG UNDERNEATH   GRAY SHIRT ZIP UP SHIRT WITH DARK
EVES, "RW" ON CHEST.   ALSO LOOKING FOR MA REG 9095ZB ON A 2003
SUBISHI ECLIPSE HATCH GRAY.   TWO MALES WEARING WHITE BASEBALL CAPS IN
NT SEAT AND ONE MALE IN BACKSEAT WEARING A BLUE BASEBALL CAP.
**GUN WAS SHOW***** CONTACT NORTH ANDOVER POLICE. 978-683-3168.

        AUTH:  LT JOHN CARNEY    OPER:  DONNA SAVASTANO


IS 137101    03/26/2003 1348    S1512/6512.
= = = = = = = MATCHING RECENT QUERIES = = = = = = = =

Y   MALDEN PD - MOBILE         DEA: MAL  STA: 1091  TEL: 781-397-7171
C:  2440YX    MA PC VIN:                 DATE: 031303 TIME: 0621
M:  CRONIN-                                RSN:

ORIGINAL Exhibit "E"

VOLUME I
PAGES 1 TO 89
EXHIBITS: 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

BRETT S. GODETTE,　　　　　　　　　　　)
　　　　　Plaintiff,　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
　　VS　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　)
RICHARD STANLEY, DIANE HEFFERNAN,　　 )
DANIEL CRONIN, PAUL GALLAGHER,　　　　 )
WILLIAM WALLACE, DONALD ATTULO,　　　　)
CHARLES HESELTINE and PATRICK KEEFE　 )
Individually, and as Police Officers )
of Their Respective Municipalities,　 )
LT. RIORDAN, TOWN OF NORTH ANDOVER,　 )
TOWN OF ANDOVER, and MERRIMACK　　　　 )
COLLEGE,　　　　　　　　　　　　　　　　 )
　　　　　Defendants.　　　　　　　　　　)

　　　　　DEPOSITION OF DETECTIVE DANIEL G. CRONIN, a
witness called on behalf of the Plaintiff, taken
pursuant to the Federal Rules of Civil Procedure,
before Lisa Abdo, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, at the Offices of Krasnoo Klehm LLP,
23 Main Street, Andover, Massachusetts, on Tuesday,
March 13, 2007, commencing at 10:07 a.m.

1      you mean?

2  A.   I don't generally go directly to the scene.

3      We observe any people's or person's vehicles

4      leaving the area.  I knew that there was a

5      number of officers already at the scene.

6  Q.   How did you know that?

7  A.   Radio transmissions.

8  Q.   As you were driving to the area of the scene, did

9      you hear any radio transmissions regarding the

10     description of the suspect?

11  A.   Yes.

12  Q.   What did you hear?

13  A.   I heard that it was a white male wearing a

14     blue baseball cap and possibly a

15     light-colored top.

16  Q.   Did you know the source of that information?

17  A.   I did not.

18  Q.   You said a white male wearing a blue baseball cap

19     and one other thing.  What was the other thing?

20  A.   I'm sorry?

21  Q.   You said it was a white male wearing a blue

22     baseball cap, and I think you said one other thing.

23  A.   A light-colored top.

24  Q.   When you reached the area of the scene, what did

1    Q.   Okay.  Do you know what the time lapse is?

2    A.   I don't.  I'm not sure how many seconds or

3         how many photos it takes or captures within a

4         second.

5    Q.   All right.  Were you able to view the tape at that

6         time with this individual Tracy?

7    A.   Yes.

8    Q.   And what observations did you make while reviewing

9         the tape?

10   A.   I made an observation that there was a huge

11        discrepancy in what the witness had

12        identified the person as and the actual

13        robber.

14   Q.   Now, up until this point, had you had any other

15        information regarding the description of the

16        suspect?

17   A.   Just the white male, blue baseball cap,

18        light-colored top.

19   Q.   What time was it when you were reviewing the

20        videotape?

21   A.   I don't know.

22   Q.   Can you give me an estimate of how much time had

23        elapsed between the time you left the station and

24        the time you were looking at the videotape?

1    Q.   The visions that you saw on the videotape, were

2         they similar in nature to what you saw on the

3         printouts?

4    A.   Yes.

5    Q.   And they're of similar quality?

6    A.   Yes.

7    Q.   What was the huge discrepancy between what the

8         witness had said and the actual robber that you

9         observed?

10   A.   Well, the color of the hat was white.  The

11        person was wearing a do-rag.  And the top was

12        either gray and with some darker color.  And

13        with the black and white, it's difficult to

14        say whether it was red or gray or darker

15        gray.  But it was different than as

16        described, and it was a Hispanic male.

17   Q.   Does part of the training you receive include the

18        examination of photographs?

19   A.   In what area?

20   Q.   As a part of investigations.

21   A.   Well, yes.

22   Q.   And are you trained in reviewing photographs for

23        purposes of identifying suspects?

24   A.   Well, I don't think that there's any specific

1     training in looking at surveillance photos to

2     say that.  But I've had plenty of training

3     in -- forensically in examining photographs

4     for fingerprints and other detail

5     information.

6   Q.  You mean examining pictures themselves to see if

7     there are fingerprints on them?

8   A.  Correct, or in them or however it might be.

9     It's more of being trained to observe detail.

10  Q.  Does a part of any of the training you receive

11     allow you -- sorry.  I'm having a false start day

12     here.

13         Does any part of the training you receive

14     enable you to detect the colors depicted in black

15     and white surveillance photos?

16  A.  No.

17  Q.  Does any part of the training you receive enable

18     you to determine the race or ethnic background of

19     any of the persons depicted in the photos?

20  A.  I would think that that would be a

21     self-observation.

22  Q.  What do you mean by self-observation?

23  A.  That would be a determination that one would

24     make by examining that based on your

1    training.

2  Q.  Can you point me to any particular training that

3    would enable you to determine the race of an

4    individual from a photograph?

5  A.  No, but I think any human being can do that.

6  Q.  So there's no specialized skill involved in

7    determining the race of someone from a photograph?

8  A.  Correct.

9  Q.  What is or are the bases upon which you determined

10    that the suspect was Hispanic?

11  A.  Facial makeup and skin tone.

12  Q.  What about the facial makeup made you think it was

13    Hispanic?

14  A.  I probably couldn't describe it.

15  Q.  You said you probably couldn't describe it.  Are

16    you able to describe it?

17  A.  Well, it would be the skin tone and, you

18    know, the facial makeup.

19  Q.  Okay.  Can you be any more specific than that?

20  A.  No.

21  Q.  Was there anything in particular about the skin

22    tone that made you believe it was a Hispanic?

23  A.  Yes.  It was dark.

24  Q.  So it's your testimony that the individual that you

1      saw depicted on the surveillance photos when you

2      looked at it at the bank while reviewing the

3      surveillance tape was dark?

4  A.  Yes.

5  Q.  How do you describe dark?

6           MS. RYAN:  Objection.  You can answer.

7  A.  Darker than light.

8           MS. RYAN:  I have the photos if you need

9      them, Paul.

10          MR. KLEHM:  Okay.

11 Q.  How much of the face could you see on the

12     surveillance photos?

13 A.  It would be from the nose area down.

14 Q.  At that point did you discredit the description

15     provided by the witness with regard to the racial

16     background of the suspect?

17          MS. RYAN:  Objection.  You can answer.

18 A.  I don't know what you would mean by

19     discredit.

20 Q.  Did you no longer accept the description provided

21     by the witness with regard to the race of the

22     suspect upon reviewing the surveillance tape?

23 A.  I wouldn't say completely discredit it.  I

24     would say that we changed it and added to it,

1       yes.

2   Q.  What do you mean when you say you changed it and

3       added to it?

4   A.  We changed that it was a Hispanic male and

5       that it wasn't a blue hat, that it was a

6       white hat.  We added that he had a do-rag on.

7       We added that he had an emblem on his left

8       chest and that there was some other color

9       involved.

10   Q.  So as of that point, was the North Andover Police

11      Department looking for a white male as the suspect?

12   A.  As of what point?

13   Q.  As of the point when you were looking at the

14      surveillance tape?

15   A.  Yes.

16   Q.  And did that change at all?

17   A.  Yes.

18   Q.  When did it change?

19   A.  When I looked at the surveillance tape.

20   Q.  And what did you do at that point with regard to

21      informing other officers about who you were looking

22      for?

23   A.  I contacted the police station.

24   Q.  Who did you speak with?

1    Q.   How long were you in that room?

2    A.   No more than a half hour.

3    Q.   When you were back at the Merrimack Police Station

4         before you went out to look for Mr. Godette, did

5         you have any information regarding Mr. Godette's

6         class schedule?

7    A.   I did not.

8    Q.   Was there any discussion of waiting until you got

9         information regarding Mr. Godette's class schedule

10        before going out to look for him?

11   A.   I'm sorry?

12   Q.   Was there any discussion regarding waiting until

13        you got Mr. Godette's class schedule before you

14        went out to look for him?

15   A.   No.  I requested it to being done at the time

16        we were looking for him and was under the

17        belief that it was being done simultaneously.

18   Q.   When did you first receive any information

19        regarding Mr. Godette's class schedule that day?

20   A.   When I spoke to Mr. Godette.

21   Q.   Up in his room?

22   A.   Yes.

23   Q.   Did you take notes of that discussion?

24   A.   Yes, I did.

1  Q.  As best you can recall, what was said by you,

2      Sergeant Heffernan and Mr. Godette in his room?

3  A.  I told Mr. Godette who I was and why we were

4      there, what led us there, all the events

5      leading up to that.  And he indicated that it

6      was not him.  I told him, "Okay.  And this is

7      what I need to know, for you to explain what

8      your schedule was and where you were" and

9      account for his time of that day.

10  Q.  Okay.  Have you told me everything that was said in

11      that room by any of you?

12  A.  Well, I don't have an exact memory of what

13      his schedule was.  But we went over exactly

14      from the moment he got up to the moment that

15      he met with Diane Heffernan.

16  Q.  During the course of the time you were talking to

17      Mr. Godette, was he free to leave?

18            MS. RYAN:  Objection.  You can answer.

19  A.  No.

20  Q.  Was he free to leave back down when Sergeant

21      Heffernan initially detained him?

22            MS. RYAN:  Objection.  You can answer.

23  A.  No.

24  Q.  Was he under arrest?

1    handcuffed.  And I told him that the person

2    depicted in the photos had pointed a gun at a

3    teller and that Sergeant Heffernan had

4    handcuffed him for her safety and the safety

5    of the students that were in the area.

6    Q.   What words did Mr. Godette use when he said he

7         agreed that he looked like the person?

8    A.   I don't remember.  I know it was, "Yeah, it

9         kind of looks like me.  Yeah, it looks like

10        me."

11   Q.   Do you remember anything else that he said on that

12        subject matter?

13   A.   That's it.

14   Q.   What happened next?

15   A.   We left the area.

16   Q.   In your mind, when did you first have reasonable

17        suspicion to detain Brett Godette?

18              MS. RYAN:   Objection.  You can answer.

19   A.   During that meeting back at the Merrimack

20        campus police.

21   Q.   What are the bases upon which you believed that you

22        had reasonable suspicion as of that time?

23   A.   It would be the likenesses of the images from

24        the surveillance photo to the image depicted

1    on his student ID, and it would have been the

2    clothing description provided by Merrimack.

3    It would have been the -- Riordan and Rogers

4    indicating that he was wearing similar, if

5    not the same, clothing that morning.

6  Q.  Anything else?

7  A.  That's it.

8  Q.  At any point during that day, did you believe you

9    had probable cause to detain or arrest Mr. Godette?

10 A.  At that same time, yes.

11 Q.  And when you're saying that, you mean during the

12    course of your meeting at the Merrimack police

13    station; is that right?

14 A.  Yes.

15 Q.  And what's the basis upon when you believed you had

16    probable cause to detain or arrest Mr. Godette?

17 A.  It would be the same as what I've just

18    described.  And I would add that the vehicle

19    in the area belonging to a Merrimack student.

20 Q.  Did you ever link the vehicle to Mr. Godette in any

21    way?

22 A.  No.

23 Q.  Did you ever interview the owner of that vehicle?

24 A.  I did not.

1    the name Beth, Gina Lightfoot.  Did you interview

2    at any time any of those individuals?

3  A.  No.

4  Q.  Did you perform any other investigation with regard

5    to Mr. Godette after you left his room that day?

6  A.  I only learned afterwards from Lieutenant or

7    Sergeant Riordan that they had confirmed with

8    Mr. Godette's actual professor that he was in

9    the class.

10  Q.  Who was it that told you that?

11  A.  Riordan.

12  Q.  When did he tell you that?

13  A.  I don't know.

14  Q.  A day or so later?

15  A.  It was later that evening.

16  Q.  The same day?

17  A.  Yes.

18  Q.  Was that by telephone?

19  A.  I believe so.

20  Q.  As best you can recall, what was it that Lieutenant

21    Riordan said?

22  A.  He said that somebody had spoken to the

23    professor and that he was in class.

24  Q.  Did you receive any other further communications

```
 1              MS. AYER:  Objection.
 2              MS. RYAN:  Objection.
 3   A.   Initially, he was angry.  But when I was
 4        talking to him, he was very calm.
 5   Q.   You had no sense that he was embarrassed by the
 6        situation?
 7              MS. AYER:  Objection.
 8   A.   No.
 9   Q.   Have you ever been accused of engaging in any
10        racial discrimination?
11              MS. RYAN:  Objection.  You can answer.
12   A.   No, I have not.
13   Q.   Has Sergeant Heffernan, to your knowledge?
14              MS. RYAN:  Objection.  You can answer.
15   A.   I don't believe so.
16   Q.   I'm going to show you Heffernan Exhibit 1 and ask
17        you if you recognize that?
18   A.   (Witness reviews document)  Yes, I do.
19   Q.   Is that the Eagle book?
20   A.   That is the term for it, yes.
21   Q.   And is that the policies and procedures manual for
22        the Town of North Andover Police Department?
23   A.   It is an incomplete version, yes.
24   Q.   What do you mean by incomplete version?
```

```
 1   A.   Well, I know there's portions that are either

 2        out of date or being worked on.

 3   Q.   With the exception of the portion that's either out

 4        of date or being worked on, is that the procedures

 5        that you followed when detaining Mr. Godette?

 6   A.   Yes.

 7   Q.   I'm going to show you Heffernan Exhibit 2 and ask

 8        you what this is?

 9   A.   (Witness reviews document)   I would say this

10        is a -- I don't know what it is to be honest

11        with you.

12   Q.   Have you ever seen that set of documents before?

13   A.   No.

14   Q.   Okay.   Other than what you've testified to today,

15        have you had any conversations with anyone

16        regarding this lawsuit?

17   A.   No.  Just my counsel.

18   Q.   Are you married?

19   A.   Yes.

20   Q.   Any children?

21   A.   No.

22   Q.   Did you review any documents in preparation for

23        your deposition today?

24   A.   No.
```

1   Q.   Other than -- you did review the document, Chief

2        Mayrose report?

3   A.   Correct.

4   Q.   In total, how long -- how much time passed between

5        the time you first approached Mr. Godette and the

6        time that you left his room?

7   A.   The time that I approached him?  No more than

8        a half hour.

9              MR. KLEHM:  Okay.  That's all I have.

10            MS. RYAN:  Deposition concluded?

11            MS. AYER:  No.  I have a few questions.

12               CROSS EXAMINATION

13   BY MS. AYER:

14   Q.   Good morning, Detective Cronin.

15   A.   It's still morning.

16   Q.   Yes, it is still morning.  My name is Allison Ayer.

17        I represent Michael Riordan and Merrimack College

18        in this case.  And I just have a few questions for

19        you.

20   A.   Yes.

21   Q.   On March 26, 2003, who was in control of the

22        investigation of the armed robbery at the Sovereign

23        Bank in North Andover?

24            MS. RYAN:  Objection.  You can answer.

```
 1    A.   The North Andover Police.
 2    Q.   Was there any specific person that was controlling
 3         the investigation?
 4    A.   I would say Lieutenant Gallagher would have,
 5         you know, absolute control over the
 6         investigation who then would answer to the
 7         chief.
 8    Q.   Did anyone from Merrimack College at any time
 9         indicate to you that they believed Godette may have
10         similarities to the suspect because of his race?
11                   MR. KLEHM:  Objection, but go ahead.
12    A.   I don't know how they came to their
13         conclusion that he looked like the person in
14         the photos.
15    Q.   Did they ever make any statement to you that
16         indicated that the reason they thought Godette may
17         be the suspect in the photos was because of his
18         race?
19    A.   No.
20    Q.   Would it be fair to say that their statements to
21         you that Godette may be the suspect were based
22         primarily on the clothing they had seen him wearing
23         earlier that day?
24                   MR. KLEHM:  Objection.
```

1  Q.  On March 26, 2003, did you observe any Merrimack

2      College campus security officer search Brett

3      Godette's room?

4  A.  No, I did not.

5  Q.  On March 26, 2003, did you observe any Merrimack

6      College campus security officer enter Brett

7      Godette's room?

8  A.  I did not.

9  Q.  Other than the Merrimack College campus security

10     officers that you've mentioned earlier in your

11     deposition, do you have any recollection of any

12     other Merrimack College campus security officer

13     being involved at all in that incident on March 26,

14     2003?

15              MR. KLEHM:  Objection.  Go ahead.

16 A.  None that I remember at this time.

17              MS. AYER:  I'm done.  Thank you.

18              MR. KLEHM:  A couple quick ones.

19              REDIRECT EXAMINATION

20     BY MR. KLEHM:

21 Q.  Would you describe Mr. Godette's skin tone as light

22     Hispanic?

23 A.  Yes.

24 Q.  Did you see any Hispanics or African Americans

Exhibit "F"

ORIGINAL

VOLUME:  I
PAGES:  1 - 134
EXHIBITS:  1-3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

*************************************

BRETT S. GODETTE,                                )
              Plaintiff                          )
                                                 )
vs.                                              )
                                                 )
                                                 )
RICHARD STANLEY, DIANE HEFFERNAN,                )
DANIEL CRONIN, PAUL GALLAGHER,                   )
WILLIAM WALLACE, DONALD ATTULO,                  )
CHARLES HESELTINE and PATRICK KEEFE,             )
Individually, and as Police Officers             )
of Their Respective Municipalities,              )
LT. RIORDAN, TOWN OF NORTH ANDOVER,              )
TOWN OF ANDOVER, and                             )
MERRIMACK COLLEGE,                               )
              Defendants                         )

*************************************

DEPOSITION OF

DIANE HEFFERNAN

TUESDAY, FEBRUARY 27, 2007

COMMENCING:  1:31 P.M.

1    discussion about a section of the book which

2    is not present.

3    A.    Yes.

4    Q.    Were you here for that discussion?

5    A.    Yes.

6    Q.    It appears to me -- and correct me if I'm

7    wrong -- that the section from Section 55 to

8    approximately Chapter 80 is not contained in

9    this copy of the Eagle Book that I have.  Do

10    you know the reason for that?

11    A.    The reason is that the book is in the

12    process of being re-written for

13    accreditation purposes and a lot of the

14    sections might be missing.

15            (Document entitled "North Andover

16            Police Department Manual" is marked

17            Exhibit Number 1 for

18            Identification.)

19    Q.    Sergeant, with regard to Heffernan Exhibit

20    1, was this the Policy and Procedures Manual

21    in place at North Andover Police Department

22    on March 26, 2003?

23            MS. RYAN:  Objection.  You can

24    answer.

1    A.    Yes.

2    Q.    The portion that we just talked about a

3          minute ago from 55 to 80, was there a

4          section with Chapters 55 to 80 back in March

5          of '03?

6    A.    I don't recall.

7    Q.    All right.  Have you ever seen any Chapter,

8          55 through 80?

9    A.    I don't recall.

10   Q.    Do you refer to this Policy and Procedures

11         Manual from time to time?

12   A.    Yes, I do, because I'm in the process of

13         re-writing it.

14   Q.    You're the person re-writing it?

15   A.    Uh-huh.

16   Q.    Yes?

17   A.    Yes.

18   Q.    I'm going to show you a portion of -- I

19         guess this is a Table of Contents.  It says

20         "Page 2" at the top and there's a Chapter

21         70?

22   A.    Yes.

23   Q.    It's entitled "Criminal Investigations."

24   A.    Yes.

1   Q.   What, to your knowledge, does that chapter

2        cover?

3   A.   That chapter would cover various topics from

4        what type of cases detectives and inspectors

5        would handle, the policies and procedures

6        for handling a bank robbery, how we would

7        proceed to the call, the investigative

8        procedures that we would do, how to obtain

9        information, how to handle sudden deaths,

10       death notifications, drug work, evidence,

11       securing evidence.  Various -- you know,

12       anything having to do with the Detective

13       Division.

14  Q.   Was there a Chapter 70 that was in effect

15       back in March of '03?

16              MS. RYAN:   Objection.  You can

17       answer.

18  A.   I don't recall.

19  Q.   So if you wanted to find out the answer to

20       that, where would you look?

21  A.   I would have to research it, find an

22       original book to see if it was in there.

23  Q.   Okay.

24  A.   We used to be issued these books as soon as

1      sort -- or you overheard a dispatch; is that

2      right?

3   A.   Yes.

4   Q.   What was the content that have dispatch?

5   A.   The that the Sovereign Bank just had an

6      armed robbery.  It was one male subject and

7      he had fled on foot, unknown direction of

8      travel, last seen running down second

9      street, which runs beside the bank.

10  Q.   What was the race of the suspect?

11  A.   It changed.  At first, it was put out that

12     it was a white male wearing a do-rag and a

13     baseball cap and baggy clothing, and then

14     later on in the day, it came back that,

15     after watching the tape that the bank had,

16     that he could have been possibly Hispanic

17     and that he was wearing a white baseball cap

18     with a do-rag underneath.  I believe the

19     original said a blue baseball cap, and then

20     it was changed to a white baseball cap, as

21     we got further information upon viewing the

22     pictures.

23  Q.   Okay.  Am I right that the first dispatch

24     you heard about the description of the

1    approximately ten minutes prior to the bank

2    robbery, using the side door, which faces

3    Second Street, that he looked around, he

4    walked out, and then he walked back into the

5    bank and went to the teller, handed the

6    teller a note saying "Give me your money" --

7    I'm not exactly sure what it says, but to

8    the fact "Give me your money.  You have" --

9    so many -- "minutes to do it, first and

10   second drawers, no dye packs."

11  Q.  Did you receive any information about the

12      description of the suspect?

13  A.  I still had the description of the suspect

14      at the time.  Like I said, the white male,

15      baggy clothing, do-rag, blue baseball cap."

16  Q.  Okay.  So the same description as you

17      received initially?

18  A.  Yes.

19  Q.  Then how long did you drive around?

20  A.  Oh, maybe ten minutes.

21  Q.  How long had you been in the bank?

22  A.  Just a few minutes.

23  Q.  And then what did you do after the ten

24      minutes?

1    A.    I drove around and, as I was driving south

2          on Waverly Road heading towards Mass. Ave.,

3          I observed a vehicle, a couple of vehicles

4          in front of me, and I saw two subjects in

5          the front seat wearing baseball caps.  So at

6          this time, I pulled up closer to the

7          vehicle.  The windows were down, I remember,

8          and I called in the plate.  I asked for a

9          listing on the plate of the vehicle.  It was

10         a Mitsubishi.  At that time, the light

11         changed red, so I pulled up aside the

12         vehicle to look to see if I could see who

13         was in the vehicle and I saw two males in

14         the front seat.  I believe they had white

15         baseball caps on and white T-shirts, and at

16         that time, I noticed there was a third

17         subject in the back seat and he was wearing

18         a blue baseball cap and I believe a gray

19         shirt.  He was the only one in the back

20         seat.

21   Q.    Okay.  As of the time you initially received

22         a description of the suspect, did you have

23         any understanding of any gray shirt?

24   A.    I don't recall.

1    Q.    Okay.  What did you do next?

2    A.    I called in the plate.  At that time, about

3          30 seconds after I called the plate in, a

4          transmission came over the air that

5          Detective Cronin believed he had the subject

6          on Main Street.  So at that time, I turned

7          around and headed towards Detective Cronin.

8    Q.    Was it Detective Cronin's voice that you

9          heard over the radio?

10   A.    I believe so.

11   Q.    Okay, and what was it that he said?

12   A.    "I believe I have the subject on Main

13         Street."

14   Q.    Did you at any time that day stop that other

15         car that we were just talking about?

16   A.    No.

17   Q.    Okay.  I don't want to lead you through

18         this, but I assume you then went to wherever

19         Detective Cronin was?

20   A.    Yes.

21   Q.    Okay, and what did you do next?

22   A.    As I was en route to Detective Cronin's

23         location on Main Street, they called back

24         the listing and it came to someone out of

1      Boston.  On the way back, I stopped and

2      picked up the teller to bring him to see if

3      he could make an ID of the subject that

4      Detective Cronin had on Main Street.

5   Q.  On the way to Officer Cronin?

6   A.  Yes.

7   Q.  Was the license plate that you read off of

8      that vehicle the same vehicle that was later

9      determined to have some association with

10     Merrimack College?

11  A.  Yes.

12  Q.  Okay, and when you stopped at the bank, did

13     you stop with the express purpose of picking

14     up a particular teller?

15  A.  Yes.

16  Q.  Okay, and which teller?

17  A.  The teller that was involved -- that was

18     robbed.

19  Q.  Okay, and how did you learn that that teller

20     existed?

21  A.  Because he was outside the bank.  He must

22     have been with an officer because I wouldn't

23     have just picked up anybody.

24  Q.  What I'm getting at is, had you had a

1    determination with regard to the suspect?

2  A.  What do you mean?

3  Q.  Were you able to make any determination of

4    the physical characteristics of the suspect

5    from reviewing the photographs?

6  A.  Yes.

7  Q.  Okay.  What did you determine?

8  A.  That he had a white baseball cap on, not a

9    blue baseball cap, and he did appear to have

10    a white do-rag on underneath the baseball

11    cap.  Determination as to race, I really

12    couldn't say.  Could be various races, and

13    the clothing description.

14  Q.  So Sergeant, as of the time you were looking

15    at those original photographs, you could not

16    determine the race of the subject for the

17    bank robbery; is that correct?

18  A.  No, no.  I could not determine it, no.

19  Q.  Okay.  Thanks.  Did you have any

20    conversations with anyone, while you were at

21    the bank that second time?

22  A.  I believe, the teller.

23  Q.  And by "the teller," Mr. Salas, is who you

24    are referring to?

1      be staying in Revere.  I asked if he got any

2      prints.  I couldn't tell you the exact

3      conversation.  It was just conversation

4      regarding the investigation.

5   Q.  Were there any other descriptions of the

6      suspect that you and --

7   A.  No.

8   Q.  -- Officer Cronin discussed?

9   A.  No.

10  Q.  Do you have any memory of what you did after

11     you spoke to these police departments and

12     spoke to Officer Cronin?

13  A.  Eventually, we went to Merrimack College.

14  Q.  Okay.  What was it that precipitated you

15     going to Merrimack?

16  A.  We got a call from Lieutenant Riordan.  I

17     believe I answered the call from Lieutenant

18     Riordan, of the Merrimack College Police.

19  Q.  Okay.  What time did you receive the call?

20  A.  I don't recall.

21  Q.  As best you can recall, what did you say to

22     him and what did he say to you?

23  A.  As best I can recall, he said that he

24     received the BOLO and that vehicle sounded

1  familiar to him and he ran it and realized

2  that it was a commuter student that attended

3  Merrimack College.

4  Q.  Do you remember anything else from that

5  conversation?

6  A.  He said that the description of the suspect

7  matched a student at the college, also,

8  another student.

9  Q.  Okay.  Was that Brett Godette?

10  A.  Yes.

11  Q.  Okay.  Did he name Brett Godette in that

12  phone call?

13  A.  I don't recall.

14  Q.  Okay.  Do you remember anything else from

15  that phone call with Lieutenant Riordan?

16  A.  He said that he could show us a student ID

17  and we were going to bring the pictures

18  there, the photos there, to show him.

19  Q.  All right.  Did anyone else participate in

20  the phone call, other than you and

21  Lieutenant Riordan?

22  A.  No.

23  Q.  Do you remember anything else from that

24  conversation?

1        table?

2    A.  We weren't sitting at a table.

3    Q.  Okay.  Where are you?

4    A.  We were just standing in the office.

5    Q.  Have you now told me everything that was

6        said during that meeting?

7    A.  As much as I can recall.

8    Q.  Did you take notes of that meeting?

9    A.  I don't recall.

10   Q.  I'm going to show you what was marked as

11       Stanley Exhibit 2, and ask you if you

12       recognize any of those pages.  (Indicating.)

13   A.  Yes.

14   Q.  Which pages do you recognize?

15   A.  The top page is my handwriting.

16   Q.  Okay.  Let's skip to the second page for a

17       minute.  Do you know whose handwriting that

18       is?

19   A.  No.

20   Q.  If we skip to the third page, do you know

21       whose handwriting that is?

22   A.  That would be Detective Cronin's.

23   Q.  Go back to the first page.  What are these

24       notes of?

```
 1   A.  These are notes -- what starts off with a
 2       description -- these are all the notes I
 3       took at the bank.
 4   Q.  Are these notes of your conversation with
 5       Jose Salas?
 6   A.  Yes.
 7   Q.  On the top right-hand corner, it says "Mark
 8       Vitigliano"?
 9   A.  Yes.
10   Q.  What is that?
11   A.  Somehow had connection with the owner of the
12       vehicle.
13   Q.  Did these notes assist you at all in
14       determining to detain Brett Godette on
15       March 26, 2003?
16   A.  Did it assist me?
17   Q.  Yes.
18              MS. RYAN:  Objection.  You can
19       answer.
20   A.  Yes.
21   Q.  Okay.  How did they assist you?
22   A.  By the description.
23   Q.  Now, what happened after the meeting
24       involving you and Officer Cronin, Lieutenant
```

1    bank.  The second would have been

2    information that we received that he was

3    last seen that day wearing a do-rag and a

4    baseball cap with baggy clothing.  The third

5    would have been that Merrimack College is

6    located in Andover/North Andover, and is in

7    close proximity to the bank where the felony

8    took place.  The next would have been the

9    fact that the vehicle that just happened to

10   be in the area also came back to a Merrimack

11   College student who was a commuter student

12   out of Boston.  All those things, and the

13   fact that he looked so much like the photo,

14   brought us to believe that we needed to

15   question him.

16   Q.  Okay.  Did you ever establish any link

17       between the vehicle and Brett Godette?

18   A.  No.

19   Q.  Other than the fact that the vehicle had

20       come back to a Merrimack student, was there

21       any information you had at any time that

22       suggested that Brett Godette had ever been

23       in that vehicle?

24   A.  No.

1  A.  When I reached Mr. Godette, I had my badge
2      displayed.  I said "North Andover Police.
3      Turn around and put your hands up against
4      the wall."
5  Q.  And what did he do?
6  A.  He turned around and put his hands up
7      against the wall.
8  Q.  He complied?
9  A.  Yes.
10 Q.  Did he say anything?
11 A.  He asked what was going on.  I don't know
12     exactly how he put it.  I don't think he
13     said "Excuse me.  What's going on?"
14 Q.  Did you touch any portion of his body at
15     all?
16 A.  I patted him down.
17 Q.  How did you go about patting him down?
18 A.  When I told him to turn around and put his
19     hands against the wall, at that point, he's
20     like "What's going on," and he started
21     getting a little upset.  At that time, I
22     put the handcuffs on him and I explained to
23     him that he was "not under arrest at this
24     time, that we're investigating a bank

1   robbery that had taken place today in North

2   Andover," and we wanted to speak to him.

3   Then I read him his Miranda rights.  Then I

4   patted him down.

5  Q. Where did this all take place?

6  A. In the vestibule.

7  Q. Were there students within 50 feet of where

8   you were?

9  A. I don't recall if there were.

10 Q. Did you have any physical contact with Mr.

11   Godette during this process?

12 A. Yes.  When I patted him down.  When I

13   handcuffed him.

14 Q. Did he resist?

15 A. No.

16 Q. All right.  When you patted him down, did

17   you pull down any portion of his clothing at

18   all?

19 A. No.

20 Q. Did he expose his underwear at all?

21 A. No.

22 Q. Okay.  Did you find anything during the

23   search?

24 A. Keys.

1    Q.   Anything else?

2    A.   That's all I recall is he had keys in his

3         pants pocket.

4    Q.   How did you know that the person you went up

5         to was Brett Godette?

6    A.   Because they told me he was coming through

7         the lobby and because I had recognized him

8         through the photo I had seen.

9    Q.   What was he wearing?

10   A.   From what I recall, I believe he was on his

11        way to go work out, so I believe he had a

12        work-out suit on, with the nylon suit pants,

13        which there was a couple of pairs on, at

14        least.  You could see the other pair

15        sticking out.

16   Q.   What about his upper body?

17   A.   I don't recall.  I don't recall if he had a

18        jacket on or not.

19   Q.   What color nylon pants did he have on?

20   A.   I thought they were blue.

21   Q.   Do you remember the color of any other layer

22        or layers?

23   A.   No.

24   Q.   Was he wearing a hat?

1    A.  I don't recall.

2    Q.  Was he wearing a do-rag?

3    A.  I don't believe so.

4    Q.  Was Mr. Godette under arrest at that point?

5    A.  No.

6                MS. RYAN:  Objection.  You can

7         answer.

8    A.  No.

9    Q.  Why did you read him his Miranda rights?

10   A.  Because I was questioning him as to a crime

11        that had occurred.

12   Q.  What was Officer Anderson doing while you

13        were putting the cuffs on Mr. Godette?

14   A.  Just standing there.

15   Q.  Okay.  All right.  Tell me the rest of the

16        conversation you had with Mr. Godette at

17        that point.

18   A.  At that point, I explained to him that "We

19        are in the process of conducting an

20        investigation in regards to a bank robbery

21        that occurred in North Andover."

22   Q.  By the way, as you approached Mr. Godette,

23        he wasn't doing anything suspicious in your

24        mind; was he?

```
 1        check the area, the lots, and we were unable

 2        to come up with that vehicle.

 3   Q.   At the time you removed the BOLO, is it fair

 4        to say that you couldn't connect Mr. Godette

 5        to this particular robbery?

 6   A.   Yes.

 7   Q.   And he was no longer a suspect?

 8   A.   Correct.

 9   Q.   Have you ever discussed this incident with

10        Lieutenant Riordan?

11   A.   Just at the time of the incident.

12   Q.   Okay.  Other than what you've related to me

13        today, have you ever discussed this incident

14        with Lieutenant Riordan?

15   A.   No.

16   Q.   Okay.  Did Mr. Godette ever refuse to

17        consent to the search of his room?

18   A.   Yes.

19   Q.   Tell me about that.

20   A.   I asked him if we could search his room and

21        he said no.  I said "Well, if you had

22        nothing to hide and you were innocent, then

23        you wouldn't mind if we searched your

24        room."  So he said "Okay.  Fine.  Go ahead
```

1    and do whatever you want." So we went up

2    and searched his room.

3    Q.  Did you ever learn as to whether or not the

4    instructor, his or herself, verified Mr.

5    Godette's attendance in the class?

6    A.  Yes.

7    Q.  And what did you learn?

8    A.  That he was in fact in his class at the time

9    of the robbery.

10   Q.  When did you learn that?

11   A.  Sometime later on that day.

12   Q.  How did you learn it?

13   A.  From a call from Merrimack College, and I

14   don't remember who made the call.

15   Q.  You anticipated my question. Did you ever

16   speak to a Susan Garg, G-a-r-g, that day?

17   A.  I don't know. It doesn't sound familiar.

18   Q.  Did you ever complete any field

19   interrogation sheet for anyone you spoke to

20   that day?

21   A.  I don't believe so.

22            MR. KLEHM: Let's just take one

23   minute. I think we'll be done.

24            (Recess.)

Exhibit "G"

ORIGINAL

VOLUME:  I
PAGES:  1 - 63
EXHIBITS:  1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

BRETT S. GODETTE,                          )
          Plaintiff                        )
                                           )
vs.                                        )
                                           )
                                           )
RICHARD STANLEY, DIANE HEFFERNAN,          )
DANIEL CRONIN, PAUL GALLAGHER,             )
WILLIAM WALLACE, DONALD ATTULO,            )
CHARLES HESELTINE and PATRICK KEEFE,       )
Individually, and as Police Officers       )
of Their Respective Municipalities,        )
LT. RIORDAN, TOWN OF NORTH ANDOVER,        )
TOWN OF ANDOVER, and                       )
MERRIMACK COLLEGE,                         )
          Defendants                       )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

PAUL J. GALLAGHER

TUESDAY, FEBRUARY 27, 2007

COMMENCING:  4:11 P.M.

1    outside before you went inside?

2  A.  She came outside and we went inside.

3  Q.  Okay, and when you went inside, what did you

4       do?

5  A.  There was customers in there and there were

6       bank personnel.  I told everybody not to

7       speak to each other, "We'll be interviewing

8       everybody," and I started taking names of

9       everybody in there for the detectives who

10      will follow up interviewing, and I contacted

11      the station and contacted the FBI Bank

12      Robbery Task Force out of Boston.

13 Q.  At some point, did you get a description of

14      the suspect?

15 A.  I spoke to Mr. Salas, the head teller, and

16      he gave me a brief -- he didn't know exactly

17      if it was a white or Spanish male, and I

18      asked him if he had any idea what it might

19      be.  He said "I think it was Spanish."  He

20      gave me a brief description of him, because

21      there had already been another description

22      put out originally by our dispatch center

23      that didn't match.  Originally, it was a

24      white male.

```
 1        one of the long ones that they have on

 2        there.  The pictures are taken like every

 3        few seconds.  So we had to wait like every

 4        five seconds.  Shots that hit all the spots

 5        of the bank.

 6                 MR. KLEHM:  Can you read back the

 7        question?

 8                     (The previous question was read

 9                     back by the court reporter.)

10   Q.   Have you completed your answer?

11   A.   No.

12   Q.   Okay.

13   A.   Yes.  Detective Cronin and I viewed the

14        tapes for quite a while and determined it

15        was a Spanish male.

16   Q.   Okay.

17   A.   That's when Detective Cronin notified the

18        police station, Lieutenant Carney, of the

19        new description.

20   Q.   How long, after you arrived at the scene,

21        did you and Detective Cronin have this

22        discussion where you made the determination

23        that the individual was Hispanic?

24   A.   Probably about 20, 25 minutes.
```

```
 1        answer.
 2   A.   We notified the police station.
 3   Q.   Okay.  I'm sorry.  Who did you tell?
 4   A.   Detective Cronin spoke to Detective Carney.
 5   Q.   Okay.  So as of 20 minutes after you
 6        arrived, you were looking for a Hispanic
 7        male; is that correct?
 8   A.   Yes.
 9   Q.   Within the first 20 minutes of being there,
10        what other descriptions had you received of
11        the suspect?
12   A.   Beforehand, a white male.
13   Q.   Anything else?
14   A.   Medium build, medium height.
15   Q.   What about clothing?
16   A.   They described the clothing with the hat --
17        I said bandana -- I guess you could call it
18        a do-rag.  Baggy clothing.
19   Q.   And what was the last thing?  I'm sorry.
20   A.   Baggy clothing.
21   Q.   Oh, baggy clothing.
22                (Discussion off the record.)
23   Q.   Okay.  After the communication that
24        Detective Cronin had with Lieutenant Carney,
```

1    the area, nor since, and we were just

2    putting all our notes together.

3  Q.  Do you remember anything else from that

4    conversation?

5  A.  No.

6  Q.  Okay.  Did you take notes during that

7    conversation?

8  A.  No.

9  Q.  What did you do next?

10  A.  We were at the station when Detective

11    Heffernan notified me that they a call from

12    Merrimack College security.

13  Q.  What did she tell you?

14  A.  She told me they had the car that she had

15    originally seen near the scene belong to a

16    student at the college and Sergeant Riordan

17    at the time stated to her, she told me, that

18    they had a student that matched the BOLO and

19    the clothing.

20  Q.  Okay.  So at that time, did you believe that

21    you had probable cause to detain Brett

22    Godette?

23  A.  I didn't know Mr. Godette.  No name was

24    mentioned to me at the time.  We went to the

1    college to further investigate, like we

2    would have done with any case.

3  Q.  Did you have probable cause to detain anyone

4    at that point?

5  A.  No.

6  Q.  Did you have reasonable suspicion to detain

7    anyone at that point?

8  A.  After they looked at pictures and we looked

9    at pictures with them.  It's part of our

10    investigation.

11  Q.  But not at that particular point?

12  A.  No.

13  Q.  All right.  So I take it then you proceeded

14    to Merrimack?

15  A.  Yes.

16  Q.  And who did you go with?

17  A.  I drove by myself.  I notified the Chief.

18    The Chief came up there also, because of a

19    weapon being possibly involved.  Sergeant

20    Heffernan and Detective Cronin, I believe,

21    came up together and Detective Salois also

22    went up in his own marked cruiser.

23  Q.  Have you ever been deposed before?

24  A.  Mostly, for motor vehicle accidents, in my

1   Q.   Was Chief Mayrose there?

2   A.   I don't recall.

3   Q.   Okay.  As best you can recall, what was said

4        during that meeting?

5   A.   We showed Detective Rogers and Sergeant

6        Riordan the pictures.  They showed us the

7        two ID's of the two students on campus.

8        They both, Sergeant Riordan and Detective

9        Rogers, thought they looked very much like

10       Mr. Godette, and that's the type of clothing

11       or the clothing that he was wearing, very

12       similar to, that day, that morning they saw

13       him.

14  Q.   Was there any discussion of when those

15       Student ID photographs were taken?

16  A.   No.

17  Q.   Do you remember anything else from that

18       discussion?

19  A.   No.  After that, we set up in three's to

20       look around the campus, to see if we could

21       see Mr. Godette to question him, and they

22       were looking for the car, also, the

23       security.

24  Q.   What was said about the car in that

1  meeting?

2  A.  It was seen, again, near the scene and we'd

3  like to speak to the gentleman in it, and

4  they were looking around campus for it, as

5  we were.  We all had the registration.

6  Q.  And was there discussion, during the

7  meeting, about the comparison between the ID

8  photos and the pictures from the bank?

9  MS. RYAN:  Objection.  You can

10  answer.

11  A.  With Detective Rogers and Sergeant Riordan,

12  who knew them, said it looked much like him,

13  and we saw the similarities on his ID

14  picture, the pictures we had been looking at

15  at the bank.

16  Q.  Who was in your group of three?

17  A.  I was with Chief Stanley, Sergeant Riordan,

18  and myself.

19  Q.  Where did you go?

20  A.  Student Union, cafeteria.  That's what I

21  recall.  We were looking around there.

22  Q.  And your purpose at that time was to look

23  for Brett Godette; is that correct?

24  A.  Right.

```
 1    A.   Yes.

 2    Q.   When did you first start talking about the

 3         class scheduling for Mr. Godette?

 4    A.   When we split into team of three's, the

 5         college took on the responsibility of

 6         getting the schedule and to see where he

 7         might be now and where he had been that day.

 8    Q.   Was there any discussion of waiting until

 9         you found out whether he was in class at the

10         time of the robbery before you approached

11         him?

12    A.   No.

13    Q.   Was there any discussion about the potential

14         impact upon Mr. Godette of detaining him on

15         campus?

16    A.   Our main concern was a weapon on campus and

17         a possible bank suspect on campus or in the

18         community, and we wanted to speak to him and

19         either rule him as a suspect or rule him

20         out.

21    Q.   Was there any concern about the effect on

22         Mr. Godette of detaining him on campus?

23              MS. RYAN:   Objection.   You can

24         answer.
```

North Andover Police Department
566 Main Street
North Andover, Ma. 01845-4099
978-683-3168
**Incident Report**
**NOH**

File No: N/A

Dispatch Incident Number: 2003000005081

Print Date: August 25, 2004
Printed By: esalois

**DEPOSITION EXHIBIT**
Stanley 5
DR 2/27/07

## Incident Information

| | Day of Week | Date | Time | Occurred To | Day of Week | Date | Time | Reported On | Date | Time |
|---|---|---|---|---|---|---|---|---|---|---|
| Occurred On/From | Wed | 03/26/2003 | 11:38:00AM | | Wed | 03/26/2003 | 11:38:00AM | → | 3/26/2003 | 11:38:00AM |

| Reported As | Incident Type - Primary | Arresting Officer |
|---|---|---|
| Robbery | Robbery | |

| Incident Address | Reporting Officer |
|---|---|
| 149 Main Street, North Andover, MA 01845 | |

| Sector | Stat. Area | Sub Stat. Area | Census Tract | Landmark |
|---|---|---|---|---|
| | | | | |

| Business Name | Incident Types – Other |
|---|---|
| SOVEREIGN BANK | Larceny |

## Associated Persons Summary

| Type | Name(Last, First, MI) | Date of Birth | Sex | Home Phone # | Work Phone # |
|---|---|---|---|---|---|
| Vehicle Owner | IANNELLI, STEVEN M | 8/19/1980 | M | N/A | N/A |
| Address: | 93 WEBSTER STREET, EAST BOSTON, MA 02128 | | | | |
| Involved | SALAS, JOSE | 4/3/1983 | M | (978) 682-6220 | (978) 975-3480 |
| Address: | 70 SAUNDERS STREET, LAWRENCE, MA 01841 | | | | |
| Involved | BEAUDOIN, TRACY A | 4/14/1970 | F | (978) 688-7596 | (978) 975-3480 |
| Address: | 64 Saunders Street, North Andover, MA 01845 | | | | |
| Involved | KRAMER, SUZANNE M | 4/12/1970 | F | N/A | N/A |
| Address: | 148 MAIN STREET, Apt #: 207, NORTH ANDOVER, MA 01845 | | | | |
| Witness | STONE, KENNETH | N/A | M | (508) 890-6877 | N/A |
| Address: | 446 MAIN STREET, WORCESTER, MA 01608 | | | | |
| Witness | OCALLAGHAN, EDWARD L | 5/22/1935 | M | N/A | N/A |
| Address: | 291 COLONIAL ROAD, LAWRENCE, MA | | | | |
| Witness | PETRONIO, MARY | N/A | F | N/A | N/A |
| Address: | 35 COMMON STREET, Apt #: A-129, LAWRENCE, MA 01841 | | | | |
| Witness | SHEA, MARYBETH | 7/27/1966 | F | N/A | N/A |
| Address: | 333 Raleigh Tavern Lane, North Andover, MA 01845 | | | | |
| Witness | HRYNYSZYN, STEPHEN | 8/28/1958 | M | N/A | N/A |
| Address: | 27 GLENDALE AVENUE, MELROSE, MA | | | | |

## Associated Businesses Summary

| Type | Name | Primary Phone # | Secondary Phone # |
|---|---|---|---|
| Victim | SOVEREIGN BANK | (978) 681-7370 | N/A |
| Address: | 149 Main Street, North Andover, MA 01845 | | |

## IBR/UCR Offenses

| Offense Number | IBR Type | Chapter | Section | IBR Type Description | Counts |
|---|---|---|---|---|---|
| 1 | 120 | 265 | 17 | Robbery | |

## Arrest Offenses

| Seq # | Chapter | Section | Name(Last, First, MI) | Description of Offense | Counts |
|---|---|---|---|---|---|
| No Arrest Offenses Recorded for Incident #: 2003000004240 | | | | | |

North Andover Police Department

566 Main Street

North Andover, Ma. 01845-4099

978-683-3168

Incident Report

NOH

Case 1:05-cv-11514-LT    Document 81-9    Filed 03/22/2007    Page 2 of 5

File No: N/A

Dispatch Incident Number: 2003000005081

Print Date: August 25, 2004

Printed By: esalois

**Arrestee Seq. # 1**

| Suspect Type | Suspect Name | Alias/Nickname | Occupation | SSN |
|---|---|---|---|---|
| No Arrest Data Available for Incident #: 2003000004240 | | | | |

**Suspect Seq. # 1**

| Suspect Type | Suspect Name | Alias/Nickname | Occupation | SSN |
|---|---|---|---|---|
| No Suspect Data Available for Incident #: 2003000004240 | | | | |

**Victims**

| Victim Name | Victim Type | Sex | Race | Ethnic Origin | Hospital Destination | Transport Description |
|---|---|---|---|---|---|---|
| SOVEREIGN BANK | Financial Instit | N/A | N/A | N/A | N/A | N/A |

**Vehicle Info**

| Vehicle No. | Vehicle Make | Vehicle Model | Vehicle Year | VIN | Primary Color | Secondary Color | Plate No. | State |
|---|---|---|---|---|---|---|---|---|
| 2003000001668 | Mitsubishi | Eclipse/Spyder | 2003 | 4A3AC74H63E024585 | Gray | Gray | 9095ZB | MA |

**Property**

| Property Number | Property Description | | Status | | Serial Number | | Orig. Est. Value |
|---|---|---|---|---|---|---|---|
| 2003000000172 | CASH STOLEN DURING BANK ROBBERY | | Open | | N/A | | $5,554.00 |

| Weapon Type | | Vehicle Ref. | | Drug Type | | Container | | Loss Desc. | Category Desc. |
|---|---|---|---|---|---|---|---|---|---|
| N/A | | N/A | | N/A | | N/A | | Stolen | Stolen |

| Year | Make | | Model | Width | Length | Height | Weight | Caliber | Qty | Unit of Measure | | Color |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| N/A | N/A | | N/A | 0 | 0 | 0 | 0 | 0 | 0.00 | N/A | | N/A |

North Andover Police Department
566 Main Street
North Andover, Ma. 01845-4099
978-683-3168
Incident Report
NOH

File No: N/A
Dispatch Incident Number: 2003000005081

Print Date: August 25, 2004
Printed By: esalois

Case 1:06-cv-10177-JLT    Document 81-9    Filed 03/22/2007    Page 3 of 5

Narratives for Incident Number 2003000004240 ?  <u>Yes</u>

Other Narratives not authorized for print?   <u>None</u>

Narratives this user authorized to print:

Narrative by: Patrolman Paul MacMillan   Division: School Resource Officer

| Seq No: | Date & Time | Narrative Description | Entered by | Status | Reviewed by | Last Edit Date |
|---------|-------------|----------------------|------------|--------|-------------|----------------|
| 1 | 03/26/2003 14:59 | bank robbery | Lieutenant John Carney | Open | Lieutenant John Carney | 01/15/2004 |

Sovereign Bank security reports armed robbery WM suspect entered bank showed note to teller said he had a weapon. Teller saw something black. Later invest indicates Hispanic male suspect in his 20's 5'09" wearing a white hat with a do-rag under it. Gray zip up shirt with dark sleeves. letters "RW" on chest.

In addition, we are looking for ma reg 9095zb, 2003 gray mitsubishi eclipse out of East Boston. This vehicle was seen in the general vicinity of the robbery (Waverly Rd) by one of the officers.

Two males in the front were wearing white BB hats, back seat passenger was wearing a blue BB hat.

_____
Signature - Reporting Officer

_____
Signature - Reviewing Officer

North Andover Police Department

Case 1566 Main Street
North Andover, Ma. 01845-4099
978-683-3168

Incident Report
NOH

File No: N/A

Dispatch Incident Number: 2003000005081

Print Date: August 25, 2004
Printed By: esalois

| Narrative by: Sergeant Diane Heffernan | Division: Patrol Officers |
| --- | --- |

| Seq No:<br>2 | Date & Time<br>03/27/2003 15:47 | Narrative Description<br>Incident Report | Entered by<br>Sergeant Diane Heffernan | Status<br>Open | Reviewed by<br>Lieutenant Paul<br>Gallagher | Last Edit Date<br>01/15/2004 |

March 27, 2003

Re: Armed Robbery - Sovereign Bank
Main Street, North Andover, MA  01845

Involved: Jose Salas - Bank Teller / DOB 04/03/83 / SS# 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 / phone# (978) 682-6220
70 Saunders Street
Lawrence, MA  01841

Report by: Insp. Diane M. Heffernan

On March 26, 2003 at approx. 11:30am, all units responded to Sovereign Bank, Main St., North Andover, for a reported armed robbery that had just occurred. As units responded to the bank, I surveyed the area for possible suspects. I proceeded down Second Street towards Waverly Rd. As I approached this intersection, I observed a Gray Mitsubishi Eclipse, bearing Ma. Reg 9095ZB, heading south on Waverly Rd. Dispatch had just relayed that the suspect was described as a white male, wearing a dark blue baseball cap and a light colored sweater. I could see inside this vehicle, as the windows were down. I observed two white males in the front seat wearing white baseball caps and white shirts. As we approached the intersection of Mass. Ave., and Waverly Road, the signal light changed red. I pulled beside the vehicle and looked inside. At this time I observed another male in the back seat wearing a dark blue baseball cap and a gray colored shirt or sweater. Det. Cronin radioed the station and stated he believed he had the suspect on Main Street. I immediately turned around to head in his direction, while calling in the license plate on the Eclipse. Enroute to Det. Cronin's location, the listing had come back as belonging to Steven Iannelli out of East Boston. While passing Sovereign Bank, I picked up teller Jose Salas, and brought him to the scene where Det. Cronin was questioning a suspect to make an I.D. Mr. Salas did observe the suspect and stated he was not the man who robbed him. I returned Mr. Salas to the bank and went in to interview him. I also radioed the station to put out a BOLO for the Eclipse to stop and question the subjects for possible involvement in the robbery. I also requested dispatch to call East Boston police for information on Mr. Iannelli.

Bank security was responding to Main Street to pull the video tape and produce still photos for us as evidence.

During the interview with Jose Salas he described the following description of the bank robber: He states he was a white male or a light skinned Hispanic, with "dirty hands and dirt on his face", approx. 5'10" tall, medium build, approx. 25 years of age, wearing a white "do-rag" underneath a dark blue baseball cap. He states the brim of the cap was pulled down just above his eyes. The baseball cap had some sort of design on it, as did the shirt he was wearing. He thought the shirt was gray in color. I asked to explain what happened and he stated that he observed this male enter the bank, look around and leave. A short time later, he returned and approached Mr. Salas' window. He handed the teller a note which said, I have a gun - you have 20 seconds - 1st and 2nd draw. The teller looked up and he observed the suspect put his right hand into his pocket and pull out a newspaper, which covered his hand. He states he saw something under the newspaper that was black in color and believed it to be a gun. The suspect also handed the teller a brown paper lunch bag with the note. The note was on white notebook paper. The teller said he had trouble opening the top drawer so he immediately opened the second drawer and put the money in the bag. When I asked him how much money he gave him he said he didn't know, however he remembered he gave him only 20's and five's. The twenties are banded in $500. increments and the fives are banded in $100. increments. He estimated approx. $3,000., but said he had to balance his drawer to determine the correct amount. I asked him is the suspect talked to him and he said only to ask for the note back. He did not appear to have an accent. Mr. Salas explains that the suspect left out the side door and he immediately went over and locked it. He observed the suspect cross Second Street, but went back in the bank at that time.

In the meantime, East Boston Police had called and informed me that they were familiar with the owner of the Eclipse and they have never had trouble with him, nor does he have a criminal history. They were keeping an eye on his residence and would inform me if he returned. They also informed me that the owner's brother does have a criminal history and is a known heroin user. His last known

**North Andover Police Department**
566 Main Street
North Andover, Ma. 01845-4099
978-683-3168
**Incident Report**
**NOH**

Case 1:05-cv-11354-JLT      Document 81-9      Filed 03/22/2007      Page 5 of 5   File No: N/A

Incident Number: 2003000004240

Dispatch Incident Number: 2003000005081

Print Date: August 25, 2004
Printed By: esalois

address was in Saugus. I called Saugus police and had them check that address for the vehicle.

At approx. 2:00pm, we received a call from Merrimack College, North Andover. Lt. Riordon stated he had just received our Teletype and was familiar with that vehicle. He informed us that the owner of the vehicle is a commuter student at the college. He also informed us that the suspected robber matched the description of another student and both he and another Merrimack College detective observed this subject wearing the same clothing today. At this time, myself, Det. Cronin, Lt. Gallagher and Chief Stanley responded to the college. We met with Lt. Riordan who showed us Merrimack College I.D.'s of the owner of the vehicle and the suspect, who he believed to be Brett Gaudette. We viewed the photos and Mr. Gaudette and the suspect did indeed look alike. We split up at this time and looked for Mr. Gaudette throughout the grounds. I went to his dorm room with a campus police officer and knocked on his door. He did not appear to be in his room, so I left the dorm, with campus police and sat outside. Approx. 10 minutes later, the college radioed that Mr. Gaudette was in the lobby of his dorm. I exited the cruiser and met Mr. Gaudette at the door. My police badge was displayed around my neck. I identified myself as a police officer and told him to turn and put his hand on the wall so that I could pat him down for weapons. Mr. Gaudette became extremely agitated, so I placed him in handcuffs for my protection. I explained to him that he was not under arrest and that I was placing the handcuffs on him for my own protection. At this time, other officer's arrived, including Det. Cronin. I explained that we were currently investigating a bank robbery and read Mr. Gaudette his Miranda rights. He stated he understood. After being patted down, I asked if we could search his room. Mr. Gaudette said yes, but then changed his mind. We explained that if he was innocent he wouldn't mind and he agreed. We walked him to his room and once inside uncuffed him. Det. Cronin began questioning Mr. Gaudette while I looked around. I did observe a white "do-rag" on a night table, but did not find the outer clothing the suspect was wearing. Mr. Gaudette denied any involvement in the robbery. When asked where he was at the time of the robbery, he explained that he was taking a test. We had the college confirm this story with his teacher. Since they could not confirm the story at that time, we left Mr. Gaudette's room and explained that if things checked out, he would be all set. All officers left the campus at that time.

I radioed the station and had them remove the BOLO on the vehicle since he was a student at the college and we could not connect any involvement with the Sovereign Bank. I also called East Boston Police and Saugus Police to update them on the situation.

_Signature - Reporting Officer_                                          _Signature - Reviewing Officer_





Exhibit "J"

# MASSACHUSETTS STATE POLICE
## DAILY ADMINISTRATIVE LOG
### State Police Andover
### Wednesday, March 26, 2003

**DEPOSITION EXHIBIT**
Stanley 9
DR 2/27/07

---

**0740 hrs**   **Crash - MV PI**   **0740 hrs**   **Incident Report**   **0800 hrs**   **2003-0A1-0589**   **0A1-TR-03-004507**

2765   Trooper Murphy , Michael   Cruiser: 1229 @ A-1                    METHUEN: 495S: Exact: 47:

Reg: ▒▒▒▒▒▒   Veh: 1993 Nissan        Tow Co: Trombley's Towing   Reason: Crash

**Driver:** ▒▒▒▒▒▒▒▒▒▒▒▒▒▒                                                    KSA1200301656

DOB: ▒▒▒▒▒▒        SSN: ___-__-____   Hospital:                    Injury:   Minor
Address: ▒▒▒▒▒▒▒▒▒▒▒▒▒▒                                            Phone:
Charges:                              Custody Information:

---

**0800 hrs**   **MV Stop**   **0800 hrs**   **Incident Report**   **0830 hrs**   **2003-0A1-0588**   **0A1-TR-03-004506**

1157   Trooper Harbour , Ronald   Cruiser: 0201 @ A-1                    WOBURN: 93S: Closest Reference: 37B:

Reg: ▒▒▒▒▒▒▒   Veh: 2000 TOYOTA       Tow Co: A&s Towing      Reason: Motor Vehicle Violation

**Driver:** ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒                                              CSA1200301655

DOB: ▒▒▒▒▒▒        SSN: ___-__-____   Hospital:                    Injury:   No Injury
Address: ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒                                        Phone:   (___) ___-____
Charges:                              Custody Information:
90-34J UNINSURED MOTOR VEHICLE
90-9-B UNREGISTERED MOTOR VEHICLE

---

**0900 hrs**   **Erratic Operation**   **0939 hrs**   **Incident Report**   **1005 hrs**   **2003-0A1-0590**   **0A1-TR-03-004508**

757   Trooper Materazzo , Stephen   Cruiser: 1252 @ A-1                    ANDOVER: 93N: North Of: 44B:

Reg: ▒▒▒▒▒▒   Veh: 2001 FORD          Tow Co:              Reason:

**Driver:** ▒▒▒▒▒▒▒▒▒▒▒▒▒▒                                                  CSA1200301658

DOB: ▒▒▒▒▒▒        SSN: ▒▒▒▒▒▒   Hospital:                    Injury:
Address: ▒▒▒▒▒▒▒▒▒▒▒▒▒▒                                            Phone:   ▒▒▒▒▒▒▒▒
Charges:                              Custody Information:
94C-34-G DRUG, POSSESS CLASS D

**Witness:** ▒▒▒▒▒▒▒▒▒▒                                                     OSA1189901663

DOB: ▒▒▒▒▒▒        SSN: ___-__-____   Hospital:                    Injury:
Address: ▒▒▒▒▒▒▒▒▒▒▒▒▒▒                                            Phone:   ▒▒▒▒▒▒▒▒
Charges:                              Custody Information:

---

**1155 hrs**   **Internal Activity**   **1155 hrs**   **Log Only**   **1155 hrs**   **0A1-AD-03-00450**

NO ANDOVER PD CALLS ADV THAT THEY HAD A BANK ROBBERY THIER TOWN AND ARE LOOKING FOR THREE W/H/MALES IN 2003 GRAY, MITSUBISHI-SDN,
MA-REG: 9095ZB. PTLS ADV.

---

**1208 hrs**   **Car Fire**   **1215 hrs**   **Assistance Rendered**   **1320 hrs**   **0A1-TR-03-004512**

1157   Trooper Harbour , Ronald   Cruiser: 0201 @ A-1                    ANDOVER: 93S: South Of: 42:

Reg: ▒▒▒▒▒▒   Veh: 1992 Toyota        Tow Co: A&s Towing      Reason: Car Fire

---

000043

Exhibit "K

EXHIBIT
Stanley Q
DP 2/22/07

— Mark Vitigliano
Preda

Jose Salas          ph. 978 692 6220
70 Saunders St          Dob 4-3-83
N. Lawrence
                           SS# 132 66 4017

975 3480

Ht with design
Baseball cap dark ble — forward big + low

Wfm dirt on face
hands dirty
Approx 5'10
   med build

appox 25-26

White do rag sticking out on side          navy blue
                                            emblem +
                                            gray shield

Att bn bag (sandwich bag)          Off
White note book paper          Cardoso

I have a gun          617 343 423
20 seconds          Sgt Friandea
1st + 2nd draw          E Boston

no more
clip          newspaper over right hand
or          black object underneath
dye pack          cox I have that — pointing at note

2-3 am          20's +          Sgt 82 Nault
25+5          5'5          and Sgt
                Straight face          — John C. Ian
                                       — 94C

Exhibit "L"

ORIGINAL

VOLUME:        I
PAGES:      1-177
EXHIBITS:   1-14

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. 05-1354JLT

BRETT S. GODETTE,                              )
    Plaintiff,                              )
                                            )
                                            )
vs.                                            )
                                            )
RICHARD STANLEY, DIANE HEFFERNAN,              )
DANIEL CRONIN, PAUL GALLAGHER, WILLIAM         )
WALLACE, DONALD PATTULLO, CHARLES              )
HESELTINE AND PATRICK KEEFE,                   )
INDIVIDUALLY AND AS POLICE OFFICERS OF         )
THEIR RESPECTIVE MUNICIPALITIES,               )
LIEUTENANT RIORDON, TOWN OF NORTH              )
ANDOVER, TOWN OF ANDOVER, AND                  )
MERRIMACK COLLEGE,                             )
    Defendants.                             )

DEPOSITION OF MICHAEL RIORDAN, a
witness called on behalf of the Plaintiff,
pursuant to the provisions of the
Massachusetts Rules of Civil Procedure,
before Jill Shepherd, Registered Professional
Reporter and Notary Public, in and for the
Commonwealth of Massachusetts, at the law
offices of Krasnoo & Klehm, 23 Main Street,
Andover, Massachusetts, on Thursday,
February 22, 2007, commencing at 10:00 a.m.

```
 1    A.   I can't answer that.

 2    Q.   Why not?

 3    A.   I can't recall.  Well...

 4    Q.   Have you finished your answer?

 5    A.   In the performance of my duties, I always

 6         felt it important to keep the chief and/or my

 7         supervisors aware of anything I was involved

 8         in, as far as campus police work.

 9    Q.   So this was something you thought was

10         important, so you did it on your own; is that

11         correct?

12                   MS. AYER:   Objection.

13                   You can answer the question.

14    Q.   You can answer.

15    A.   I felt it was important, yes.

16    Q.   And you did it on your own?

17                   MS. RYAN:   Objection.

18    A.   No.

19    Q.   Okay.  So at whose direction did you do it?

20    A.   The chief of the department.

21    Q.   Okay.  And so that would be both Chief Cain

22         and Chief Mayrose; is that correct?

23    A.   Yeah.

24    Q.   And when did they each tell you to do these
```

1   Q.  "Close cut," meaning, like a shaved cut?

2   A.  No.

3   Q.  Okay.  More than a shaved cut?

4                MS. AYER:  Objection.

5                Go ahead.  You can answer.

6   A.  No.

7   Q.  Can you describe it any more than you have

8       already?

9   A.  No.

10  Q.  Can you describe his build?

11  A.  About six feet, and about -- I'd say he was

12      lean.

13  Q.  What was his skin tone?

14  A.  Light.  Not really light.  Kind of difficult.

15      Give me some -- medium.  Not dark, not light.

16  Q.  Before March 26, 2003, how many times had you

17      seen Brett Godette?

18  A.  I don't recall.

19  Q.  More than ten?

20  A.  I can't recall.

21  Q.  Well, can you at least give me some idea; was

22      it more than fifty?

23  A.  No.

24  Q.  Was it more than ten?

```
 1        as a Merrimack College student.
 2                  Who was that student?
 3    A.  I don't recall the name.
 4    Q.  Did any pictures come across as part of the
 5        CJIS?
 6    A.  No.
 7                  (Short recess.)
 8    Q.  Before you received the CJIS, did you
 9        receive -- sorry.
10                  Before you received the CJIS, had
11        you seen Brett Godette that day?
12    A.  Yes.
13    Q.  When did you see him?
14    A.  Sometime that morning.
15    Q.  What time?
16    A.  I can't say for sure.
17    Q.  When you say you saw him that morning, what
18        observations did you make about him?
19    A.  At that time?
20    Q.  Yes.
21    A.  Probably, just -- he was coming out of a
22        classroom opposite the detective's office.
23    Q.  What drew your attention to Mr. Godette?
24    A.  The office door was open and class was coming
```

```
 1        Rivers.   That's...
 2   Q.   Now, you said you saw Mr. Godette exiting a
 3        classroom, correct?
 4   A.   Yes.
 5   Q.   Can you name any of the other people that you
 6        saw exiting the classroom at that time?
 7   A.   No.
 8   Q.   Can you name what any of other people exiting
 9        the room, other than Mr. Godette, was wearing
10        at the time?
11   A.   No.
12   Q.   What was Mr. Godette wearing?
13   A.   Athletic apparel, warm-up-type pants, jacket,
14        doo-rag.
15             MR. KLEHM:  Can you read that back.
16        I wasn't writing fast enough.
17                  (Answer read.)
18             MR. KLEHM:   Thanks.
19   Q.   What color warm-up pants was he wearing?
20   A.   I don't recall at this time.
21   Q.   What color jacket?
22   A.   I don't recall.
23   Q.   What kind of jacket?
24   A.   Kind?
```

1  Q.  Yes.

2              MS. RYAN:  Objection.

3  A.  Nylon in nature.

4  Q.  Was it a pullover or zip-up front?

5  A.  Zip-up front.

6  Q.  What's the distance between where you were

7      and where Mr. Godette was as he exited the

8      building?

9  A.  I would say approximately ten to fifteen feet

10     maximum.

11 Q.  Now, were you inside the office at the time?

12 A.  I believe I was right at the entrance.  I was

13     about to exit the office, I believe.

14 Q.  Did you stop to look at Mr. Godette and the

15     others exiting?

16 A.  Made eye contact.

17 Q.  Made eye contact with Mr. Godette?

18 A.  And anybody else that was exiting.

19 Q.  For how many seconds did you look at those

20     people exiting the building?

21 A.  Whatever time it took for them to go from the

22     doorway down the hall.

23 Q.  Doorway down the hall.

24              What do you mean by "doorway down

```
1   Q.   Where did he live the last time you knew him?

2   A.   I think he was living in Lawrence.

3   Q.   Have you ever discussed this case with him?

4   A.   No, sir.

5   Q.   How many people exited that classroom that

6        day?

7   A.   No idea.

8   Q.   Would you -- strike that.

9             Did you stop, as you exited, to look

10       at these people?

11  A.   I don't recall.

12  Q.   Can you estimate the number of seconds that

13       you looked at Brett Godette directly?

14  A.   Whatever time it took to go from the exit of

15       the doorway of the classroom into the

16       hallway.

17  Q.   Can you estimate the number of seconds that

18       you looked at Brett Godette?

19  A.   Fifteen.

20  Q.   Fifteen seconds?

21  A.   (No audible response.)

22  Q.   How many seconds did you spend looking at the

23       whole group?

24  A.   I don't recall.
```

1      MS. AYER:  Objection.

2  A.  No.

3  Q.  What's wrong with what I just said?

4  A.  I didn't focus on him.

5  Q.  Okay.  But did you look at him for fifteen

6      seconds; is that right?

7  A.  The group that was exiting that classroom.

8  Q.  Okay.  All right.  How long did you focus on

9      Brett Godette?

10      MS. AYER:  Objection.

11  A.  I did not focus on Brett Godette.

12  Q.  At all?

13  A.  Define "focus."

14  Q.  How much time did you spend looking directly

15      at Brett Godette or any portion of him?

16  A.  Probably fifteen seconds with the group that

17      was exiting that classroom.

18  Q.  Were you moving during part of or all of that

19      fifteen seconds?

20  A.  I don't believe so.

21  Q.  Were you talking to anyone?

22  A.  Officer Rogers and I were probably in

23      conversation as I was leaving the office.

24  Q.  What were you talking about?

1          Criminal Justice Information System.

2     Q.   Did you have any personal knowledge of the

3          owner of the vehicle?

4     A.   No.

5     Q.   Did you know anything about him at all?

6     A.   Other than that he was a student at Merrimack

7          College; and the vehicle, I believe, was

8          registered to somewhere in the Boston area, I

9          believe.

10    Q.   Did you know whether or not that individual

11         and Mr. Godette were associated with one

12         another in any way?

13    A.   No, I did not.

14    Q.   Did you know the race of that individual?

15    A.   No.

16    Q.   Did you ever have any occasion to speak to

17         that individual at any time?

18    A.   No.

19    Q.   If I mentioned the name Steven M. Ianella,

20         would that refresh your recollection as to

21         the owner of the vehicle?

22    A.   No.

23    Q.   Have you told me everything that you told

24         Lieutenant Wlodyka with regard to your

1           Mr. Godette as well?

2    A.    Yes, sir.

3    Q.    Okay.  What did Mr. Rogers say during that

4          conversation?

5    A.    I can't remember word for word.

6    Q.    What do you mean, in general?

7    A.    I believe he also observed the similarities

8          in the description.

9    Q.    How similar was what you saw Mr. Godette to

10         be wearing to the CJIS, in your mind, as of

11         the time you made the phone call to the North

12         Andover police?

13                   MS. AYER:   Objection.

14                   You can answer the question.

15   A.    Very similar.

16   Q.    Was there any doubt in your mind that a

17         description was of Brett Godette?

18   A.    Yes.

19   Q.    Describe the level of doubt that you had.

20   A.    You define "level."

21   Q.    Well, define the amount of doubt that you

22         had.

23   A.    I don't think I can.

24   Q.    You are going to have to try.

1            MS. AYER:  Objection.

2            You can answer it.

3   A.   None.

4   Q.   You can't describe it?

5   A.   Go ahead.  Rephrase the question.  I'm sorry.

6            THE WITNESS:  I think this thing

7        just got disconnected.  Something over here

8        on the floor [indicating].

9                (Pause.)

10  Q.   I'll ask it this way:  Was there any doubt in

11       your mind that Brett Godette was the person

12       that was described on that CJIS form?

13            MS. RYAN:  Objection.

14            You can answer.

15  A.   Yes.

16  Q.   Okay.  And what was the doubt?

17  A.   One, I wasn't present at the location of the

18       event, I guess.

19  Q.   Anything else?

20  A.   No.

21  Q.   Before you called the North Andover police,

22       did you consider at all the impact of your

23       giving that information to the police?

24            MS. AYER:  Objection.

1    particular male.

2         Do you see that?

3    A.   Yes.

4    Q.   And, first, it says "Hispanic male"; is that

5         correct?

6    A.   Yes.

7    Q.   And, then, "in the 20s"; is that true?

8    A.   Correct.

9    Q.   And the height, 5'9"?

10   A.   Yes.

11   Q.   It refers to a hat.  It looks like it says

12        "white hat," but it's cut off; is that

13        correct?

14   A.   Right.

15   Q.   What color doo-rag did Mr. Godette have on

16        when you saw him that morning?

17   A.   I don't recall the exact color at this point.

18   Q.   Was he wearing a white hat when you saw him?

19   A.   I believe he had a hat on, but I don't recall

20        the color.

21   Q.   What kind of hat?

22   A.   I would assume a baseball cap.  I can't

23        recall for sure.

24   Q.   You are not sure what kind of a hat?

1    A.   No.

2    Q.   Okay.   But you are sure that he was wearing a

3         hat, right?

4    A.   Can't be positive.   I can't recall the exact

5         type of hat.

6    Q.   Now, there's a reference to a gray shirt,

7         zip-up.

8                   Do you see that?

9    A.   Yes.

10   Q.   Was Mr. Godette wearing a gray shirt that

11        day?

12   A.   I believe so.

13   Q.   But you are not sure?

14   A.   Not sure about the color.

15   Q.   So you are not sure whether they were dark

16        sleeves either?

17                  MS. AYER:   Objection.

18                  You can answer the question.

19   A.   No, I don't recall.

20   Q.   Did you see the "RW" on the chest --

21                  MS. AYER:   Objection.

22   Q.   -- on the chest of Mr. Godette, when you saw

23        him?

24   A.   There was a logo.

1   Q.   What was the logo?

2   A.   I don't recall.

3   Q.   Do you remember anything else from when you

4       first saw Mr. Godette that day other than

5       what you have testified to?

6   A.   Anything else?

7   Q.   Any other observations you made of him.

8   A.   No.

9   Q.   Okay.  And is it this description that caused

10      you to call the North Andover police?

11             MS. AYER:  Objection.

12             You can answer it.

13   A.   In conjunction with the motor vehicle.

14       Mainly the motor vehicle.

15   Q.   So it was mainly the motor vehicle?

16   A.   Yes, sir.

17   Q.   Did you, as of the time you called the

18       police, had you looked for the 2003

19       Mitsubishi Eclipse?

20   A.   Simultaneously to the call, the two patrol

21       officers were given the information on the

22       vehicle and to check the campus.

23   Q.   Had you ever called any municipal police

24       department in response to a CJIS form before

```
 1   Q.  Did you ever think to verify that that motor
 2       vehicle was on the campus of Merrimack before
 3       you called the North Andover police?
 4   A.  Simultaneously we were looking for the
 5       vehicle on campus while we notified
 6       North Andover PD.
 7   Q.  Did you ever think to verify that the vehicle
 8       was on campus before you notified the police?
 9                 MS. AYER:  Objection.
10                 You can answer.
11   A.  No.
12   Q.  How much time had elapsed between the time
13       you had seen Mr. Godette and the time that
14       you received this CJIS form?
15   A.  I don't recall.
16   Q.  Was it hours?
17   A.  I don't recall.
18   Q.  Can you give me a quantification of the
19       amount of time?
20   A.  Other than the fact it was prior to the CJIS
21       message?
22   Q.  Well, you started your shift at 8:00,
23       correct?
24   A.  Yes.
```

1    2003?

2          MS. AYER:  Objection.

3          You can answer.

4  A.  Would I agree with you, no.

5  Q.  You wouldn't agree with me?  Okay.

6          Will you agree with me that the

7    alleged robbery was supposed to have taken

8    place at 11:38 on March 26, 2003?

9  A.  According to the message, yes.

10  Q.  So you are not sure whether or not you saw

11    Mr. Godette at 11:30 that morning; is that

12    correct?

13         MS. AYER:  Objection.

14         You can answer.

15  A.  No.

16  Q.  You could have seen Mr. Godette at 11:38 on

17    March 26, 2003 coming out of that classroom;

18    is that correct?

19         MS. AYER:  Objection.

20         You can answer.

21  A.  Yes.

22  Q.  Tell me, as best you can recall, who you

23    spoke with at the North Andover Police

24    Department.

1  Q.  Before you made that call, did you check on
2      Mr. Godette's whereabouts at all?
3  A.  No.
4  Q.  Were you concerned at all that you needed to
5      make sure you had the right person before you
6      reported him?
7           MS. AYER:  Objection.
8  A.  No.
9  Q.  Did you know what was going to happen once
10     you made that report?
11          MS. AYER:  Objection.
12          You can answer.
13 A.  Yes.
14 Q.  Okay.  At the time you made that call, what
15     was your understanding of what was going to
16     happen?
17 A.  North Andover would be taking down the
18     information, obviously, and would probably
19     follow up on that information.
20 Q.  Probably?
21 A.  Would follow up on it.
22 Q.  Because it was a gun, right?
23 A.  Correct.
24 Q.  So you knew that the Merrimack police --

1   A.   I didn't, no.

2   Q.   Oh.  Who did?

3   A.   I don't know who checked his schedule.

4   Q.   So how do you know that someone did?

5   A.   Because during the interrogation, Officer

6        Rogers was making an attempt to contact the

7        professor of that class.

8   Q.   Interrogation of Mr. Godette?

9   A.   Yes.

10  Q.   So when did Officer Rogers obtain

11       Mr. Godette's schedule?

12  A.   I don't know.

13  Q.   Did you tell them to obtain his schedule?

14  A.   No.

15  Q.   Did you, yourself, tell him to -- did you,

16       yourself, ever take any steps towards

17       obtaining Mr. Godette's schedule?

18  A.   Not that I recall.

19  Q.   Why not?

20  A.   I believe I was under the assumption that it

21       was being done.

22  Q.   You were under the assumption it was being

23       done; is that correct?

24  A.   (No audible response.)

1   Q.   You are nodding.  You have to say yes.

2   A.   Yes, I'm sorry.

3   Q.   What was the basis of that assumption?

4   A.   That information was available through our

5        department.

6   Q.   So you didn't take any steps to cause it to

7        be done, but you just assumed that someone

8        was doing it; is that right?

9   A.   I can't recall the exact circumstances.

10  Q.   Well, is there anything else that would help

11       refresh your recollection?

12  A.   I don't know what you are referring to.

13  Q.   Are there any documents?

14  A.   Documents?  Again -- okay.  I assume, yes,

15       they would.

16  Q.   What documents?

17  A.   Something that indicates that member of

18       the -- I mean, the Merrimack department was

19       looking into his class schedule.

20  Q.   Is there such a document?

21  A.   Is there such a document?

22  Q.   Yes.

23  A.   I would say yes.

24  Q.   What is that document?

1   A.   Approximately ten minutes, max.

2   Q.   Did you remain in the office during that ten

3        minutes?

4   A.   I believe so.

5   Q.   Did you do anything other than what you have

6        discussed today during that ten-minute

7        period?

8   A.   Probably just discussed the circumstances

9        with Chief Mayrose.

10  Q.   Okay.  Were you concerned at all, by the way,

11       that you might have the wrong person?

12            MS. AYER:  Objection.

13            You can answer.

14  A.   No.

15  Q.   Okay.  When the North Andover police arrived,

16       when did you first see anyone from the North

17       Andover Police Department?

18  A.   When they came into the detective's office.

19  Q.   Who came in?

20  A.   Officer Cronin, Officer Heffernan,

21       Lieutenant Gallagher and Chief Stanley.

22  Q.   Was there a meeting?

23  A.   An exchange of information, yes.

24  Q.   Who was present -- strike that.

1                    Who else was present at this

2        discussion?

3   A.   Myself, Chief Mayrose, Lieutenant Rogers

4        [sic], I believe.

5   Q.   Anyone else?

6   A.   Not that I can recall.

7   Q.   How long did this discussion last?

8   A.   Short period of time.

9   Q.   Did the officers arrive with their sirens

10       engaged?

11  A.   No, not that I know of.

12  Q.   As best you can recall, what did you say and

13       what did each of them say during this

14       meeting, or discussion?

15  A.   Basically, the general facts of the CJIS

16       message, and the information that I had

17       gathered regarding the plate and the

18       similarities in the description of the

19       individual.

20  Q.   Okay.  What did you tell them about the

21       similarities between the CJIS and the -- and

22       Mr. Godette?

23  A.   The wardrobe, the attire.

24  Q.   Okay.  Did you tell them that it matched

1        Mr. Godette?

2    A.  Similarities.

3    Q.  Did you ever tell any officer of the

4        North Andover Police Department that your --

5        that the CJIS description of the individual

6        matched that of Mr. Godette?

7    A.  I don't believe the word "matched" was used.

8        "Similarities" probably.

9    Q.  Are you -- well, you said "similarities

10       probably"?

11   A.  "Similarities."

12   Q.  Okay.  Is it your testimony that you used the

13       term "similarities" during the course of that

14       meeting?

15   A.  Yes.

16   Q.  Is it also your testimony that you did not

17       use the word "matched"?

18   A.  Yes.

19   Q.  So if someone were to say that you did say

20       that it "matched," that person would not be

21       telling the truth?

22            MS. RYAN:   Objection.

23   A.  No, I wouldn't say that.

24   Q.  Why not?

1    sure that the particular individual,

2    Mr. Godette, was the same on the CJIS?

3  A.  No.

4  Q.  Was the ID of Mr. Godette produced?

5  A.  Yes.

6  Q.  Any further discussion, other than what you

7    have related?

8  A.  The conversation continued.

9  Q.  Okay.  What else was said?

10  A.  The ID and the comparison to the surveillance

11    camera from the bank were looked at.

12  Q.  What was said during that point?

13  A.  I believe the word "similarities" was used.

14  Q.  Who used it?

15  A.  Could have been anybody in that room.

16  Q.  Did you use it?

17  A.  I don't recall if I did or not.  At that

18    point, it was North Andover's investigation.

19  Q.  Did Mr. Cronin and Mr. Heffernan,

20    Mr. Gallagher, Mr. Stanley, Mr. Mayrose and

21    Mr. Rogers use the word "similarities"?

22  A.  I don't know.

23  Q.  Did any of those people use the word "match"?

24  A.  I don't think so.

1    Q.   Okay.  Was there a discussion of the quality

2         of the pictures?

3    A.   The surveillance pictures?

4    Q.   Yes.

5    A.   I don't recall.

6    Q.   Do you recall the quality of those pictures?

7    A.   Somewhat, but...

8    Q.   You thought that that picture was of

9         Brett Godette, right?

10                  MS. AYER:   Objection.

11                  MS. RYAN:   Objection.

12   A.   The picture of the surveillance?

13   Q.   Yes.

14   A.   No.  I didn't have an opinion at that point.

15   Q.   Were you asked for your opinion?

16   A.   No.

17   Q.   Okay.  If you were asked to give your opinion

18        back then, what would your answer have been?

19                  MS. RYAN:   Objection.

20   A.   Similarities based on the wardrobe.

21                  (Exhibit No. 2 marked.)

22   Q.   Sir, I'm showing you what's been marked as

23        Defendant's Exhibit 2.  It consists of two

24        pages, the first of which appears to have two

DEPOSITION
EXHIBIT
Stanley 3
DR 2/27/09

Exhibit "L1"
- i















Exhibit "L1" – ii



TELL 03/26/2003 11:34:59













Exhibit "L2"



**STUDENT** ID
**Iannelli**
**Steven M**
ISSUED: __/__/____
EXPIRES: 05/31/2003
D.O.B.: 08/19/1980



Under 21 Until

3



**STUDENT** ID
**Godette**
**Brett S**
ISSUED: __/__/____
EXPIRES: 05/31/2004
D.O.B.: 03/19/1982



Under 21 Until

6

EXHIBIT "M"

ORIGINAL

VOLUME:  I
PAGES:  1 - 130
EXHIBITS:  1-11

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

BRETT S. GODETTE,                      )
          Plaintiff                    )
                                       )
vs.                                    )
                                       )
                                       )
RICHARD STANLEY, DIANE HEFFERNAN,      )
DANIEL CRONIN, PAUL GALLAGHER,         )
WILLIAM WALLACE, DONALD ATTULO,        )
CHARLES HESELTINE and PATRICK KEEFE,   )
Individually, and as Police Officers   )
of Their Respective Municipalities,    )
LT. RIORDAN, TOWN OF NORTH ANDOVER,    )
TOWN OF ANDOVER, and                   )
MERRIMACK COLLEGE,                     )
          Defendants                   )

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF

RICHARD M. STANLEY

TUESDAY, FEBRUARY 27, 2007

COMMENCING: 10:08 A.M.

```
 1   Q.  Are police officers required to follow the
 2       Policies and Procedures Manual in conducting
 3       their daily business?
 4   A.  They use it as a guide.
 5   Q.  When you say "use it as a guide," does that
 6       mean they don't have to follow it?
 7               MS. RYAN:  Objection.
 8   A.  They follow it, but it's a guide.  They're
 9       lengthy and they're very detailed and it
10       would be very difficult to memorize it, but
11       they use it as a guide, general principles
12       in how to operate a department.
13   Q.  Do you know whether or not the Policies and
14       Procedures Manual requires officers who
15       conduct a field investigation or
16       interrogation to prepare a certain form?
17   A.  I would have to review it to assist in my
18       recollection, but I'm not sure.
19   Q.  Do you know whether or not any such form was
20       prepared with regard to any field
21       investigation or interrogation of Mr.
22       Godette?
23   A.  I do not know.
24               MS. RYAN:  Objection.
```

1    Merrimack College Campus police officer
2    search Brett Godette's room?
3 A.  No.
4 Q.  At any time on March 26, 2003, did you
5    observe any Merrimack College campus police
6    officer search or pat down Mr. Godette
7    himself?
8 A.  No.
9 Q.  At any time on March 26, 2003, did you
10    observe any Merrimack College campus police
11    officer enter Brett Godette's room?
12 A.  No.
13 Q.  During the meeting in the Merrimack College
14    campus security office, do you remember any
15    specific person concluding that Mr. Godette
16    either had similarities to or matched the
17    suspect in the bank photos?
18         MR. KLEHM:  Objection.
19 A.  Any particular person?
20 Q.  Correct.  Was there a particular person that
21    concluded that?
22         MR. KLEHM:  Objection.
23 A.  No.  It was the consensus around the room.
24    There were many people in the room.  I can't

1    tell you who.  The consensus was clear that

2    everyone believed that there were tremendous

3    similarities between the picture and that

4    picture.

5  Q.  So it was more of a collective decision,

6    rather than one particular person; is that

7    fair?

8  A.  I would think so.

9  Q.  Do you recall any particular person

10    concluding that or making a statement like

11    "We need to find him"?

12        MS. RYAN:  Objection.  You can

13    answer.

14  A.  No.

15  Q.  Were the bank photos that were marked at

16    this deposition as Exhibit 3, were those

17    sent to surrounding towns or communities,

18    along with BOLO that day?

19  A.  I don't know.

20  Q.  Other than the Merrimack College Campus

21    Police officers who you previously mentioned

22    as having some role in the incident on

23    March 26, 2003, are there any other

24    Merrimack College Campus police officers

P.O.BOX

149? P.O.BOX

Exhibit "N"

315. TURNPIKE

Brett Gaudette    586?

3/19/52    6:00 AM

094668838

Patio    630 —

30 Furnas Rd    730 PM

E. Brunswick

N.J.    Shower — 8-1100 Cafe

08816    School Cafi.

→ Lightfoot

→ Taylor

→ Beth.    Ath. Room 1st Floor

Gina:

→

6 —

Bus/Cal.  11:00

12:00 Class  Spacious

→ Car — 1:00 PM

Gardner gym 1:30

→ Jarred Johns Room.

1:45 pm

→ Stopped by

D1

MERRIMACK COLLEGE CAMPUS POLICE

Exhibit "O"

TO:  All Department Personnel
FROM:  Bill Mayrose
DATE:  April 11, 2003
RE:  NAPD Armed Robbery Investigation

As you are likely aware, our department recently assisted the North Andover Police Department with their investigation of the armed robbery of a local bank. The investigation led them to our campus and a focus on one of our resident students.

Believing that the student was the armed robbery suspect, a NAPD detective placed the student in handcuffs in the Monican Centre lobby and, after a few minutes of conversation, accompanied him to his room where he was uncuffed and questioned for a period of time. It was during this questioning that the student explained that he was in class when the 11:35am armed robbery occurred.

The student was, understandably, unsettled and embarrassed by the experience of being handcuffed in front of fellow students, particularly due to the fact that he was mistakenly identified as the suspect. After this incident, rumors began circulating around campus that he had been arrested for armed robbery and this caused further frustration and embarrassment to the student and to the college community.

After the incident, I met with Chief Stanley and Lt. Gallagher of the North Andover Police Department. We all agreed that the student was subjected to a situation that could have been avoided with advance information about his 11:00am class. Chief Stanley has offered to apologize to the student and he has also had conversation with President Santagati.

I recognize that things happened very quickly that day and, once NAPD was on campus, they dictated the course and speed of action. With this in mind, it is still appropriate for us to review our role in the incident to see what can be learned. In the spirit of learning, and not criticism, it appears that the focus and course of the investigation would have been changed if the student's class schedule had been checked before searching for him on campus.

Let's use this experience as a learning opportunity. Wherever possible, let's take a little more time to consider all possibilities before calling in a local law enforcement agency. When time allows, the officers involved should consult with me or, in my absence, the next highest ranking officer.



EXHIBIT 1
Cronin
3/13/07

| INITIAL |
|---|
| C2 |
| C1 |
| S1 |
| S2 |
| S3 |
| S4 |
| P1 |
| P? |
| P3 |
| P4 |
| P5 |
| P6 |
| P7 |
| P8 |
| P9 |
| P20 |
| P21 |
| P22 |
| P23 |
| P24 |
| P25 |
| P26 |
| P27 |
| M28 |
| P29 |
| D1 |
| D2 |
| D3 |
| D4 |
| D5 |
| MIC |

Exhibit "P"

ORIGINAL

Exhibit-1

Volume 1, Pages 1-118

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

BRETT S. GODETTE,

        Plaintiff,

VS.                    Civil Action No. 05-11354JLT

RICHARD STANLEY, et al,

        Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

DEPOSITION OF WILLIAM MAYROSE

Wednesday, March 14, 2007, 10:20 a.m.

807 Main Street

Worcester, Massachusetts

- - - - - - - Reporter:  Patricia A. Bucko, RPR - - - - - - -

G & M COURT REPORTING ASSOCIATES

42 Chauncy Street, Suite 1A, Boston, Mass. 02110

617.338.0030   fax 617.426.7225

1    Q.  Do you recall anything from that

2 conversation, in which you received that

3 information?

4    A.  An officer of the North Andover police

5 department came out of Mr. Godette's room, asking if

6 we could check with a professor to see if Mr.

7 Godette was in a specific class at a specific time

8 earlier that day.

9    Q.  So this was when you were up in Mr.

10 Godette's room?

11    A.  I was --

12         MR. SMITH:  Objection.

13    A.  -- outside of Mr. Godette's room.

14    Q.  All right, okay.

15         I just want to make sure I understand

16 it.

17         Was that the first time that you had

18 received any information regarding Mr. Godette's

19 class schedule that day?

20    A.  To the best of my recollection, yes.

21    Q.  Was that the first time that you had had

22 any discussion with anyone, regarding Mr. Godette's

23 schedule that day?

24         MR. SMITH:  Objection.

1      A.  I'm not so sure I had a discussion.

2      Q.  Even outside of Mr. Godette's room?

3      A.  Correct.

4      Q.  So then let me ask you this.  Was that the

5  first time you had received any information

6  regarding Mr. Godette's schedule, that day?

7      A.  Yes, I believe so.

8      Q.  Had you, at any time earlier that day,

9  asked for information regarding his schedule?

10      A.  I don't recall doing so.

11      Q.  The computers that you use in the police

12  department, that you used when you were at

13  Merrimack, did they allow you to obtain various

14  student records?

15      A.  Yes.

16      Q.  You could get a copy of a student ID,

17  correct?

18      A.  Yes.

19      Q.  Could you get a copy of the class schedules

20  from the computers?

21      A.  Yes.

22      Q.  And how does one go about getting copies of

23  class schedules from the computers at the police

24  station?

1      A.   I can't tell you specifically, but as

2   months and years progressed, more people were given

3   the authority for the same reason that I was given,

4   had the authority.

5      Q.   Okay.  But that didn't happen until about

6   two or three years after this incident?

7      A.   I can only speak to when I remember getting

8   the password and the training to get in there.  I

9   cannot say that other people in my department, at

10  the time of the incident, could not get in there.  I

11  do not know at the time, who.

12           I know Karen and Maureen did, only

13  because if I needed information, I would go to them.

14     Q.   So if you needed to find out, back when you

15  were chief, on that date, who had the authority, how

16  would you go about doing it?

17     A.   I think I would simply ask my department

18  members who had the authority to get in; who knew

19  how to run the program.

20     Q.   Could you also make a phone call to the

21  registrar's office if you needed to get a student's

22  class schedule?

23     A.   Yes.

24     Q.   Do you have any personal knowledge as to

1    any of the conversations that you already testified

2    to?

3        A.   Repeat that, please.

4        Q.   Are communications that you set forth in

5    the fourth paragraph of Exhibit 1 --

6        A.   Yes.

7        Q.   -- are they part of any conversations that

8    you already testified to today?

9        A.   Yes.

10       Q.   Which one?

11       A.   The conversation I had with Chief Stanley

12   and either Lieutenant Gallagher or Lieutenant

13   Carney.

14       Q.   This would have been at the North Andover

15   police department?

16       A.   Yes.

17       Q.   As best you can recall, what was said with

18   regard to the subject matters raised in the fourth

19   paragraph of Exhibit 1?

20            MR. SMITH:   Objection.   Asked and

21   answered.

22       Q.   You can answer.

23       A.   Again, it's what I explained earlier, that

24   Chief Stanley had expressed an interest in

1   apologizing to the student directly, and that he

2   felt bad that the student was subjected to what he

3   was subjected to.

4       Q.  Did Chief Stanley use the word "apologize"?

5       A.  I don't know if it was apologize, talk to,

6   explain.  If you are asking me today what I remember

7   from that conversation, I can't tell you that that

8   specific word was used.

9       Q.  Did you have any reason to believe that

10  that wasn't the word used, since you have used it in

11  the fourth paragraph of Exhibit 1?

12              MR. SMITH:  Objection.

13              MS. RYAN:  Objection.

14      Q.  You can answer.

15      A.  I do not.

16      Q.  What do you mean when you say "We all agree

17  that the student was subjected to a situation that

18  could have been avoided with advance information

19  about his 11:00 a.m. class"?

20              MR. SMITH:  Objection.

21      A.  I believe that if we knew for a fact that

22  Mr. Godette was in a particular place at a

23  particular time when the robbery occurred, that the

24  investigation may have taken a different course.

1    don't know how to answer that question.  I really

2    wasn't.

3        Q.   Would you agree with me that African

4    Americans were, when you were working there, a

5    minority on campus?

6        A.   Yes.

7        Q.   And Hispanics as well?

8        A.   Yes.

9        Q.   Did you have any other involvement --

10   whatsoever in -- the incident involving Mr. Godette,

11   as other than what you testified to today?

12            MR. SMITH:   Objection.

13       A.   I don't believe that I do.

14            MR. KLEHM:   Okay, then I have nothing

15   further.

16            (Time ended 12:57 p.m.)

17

18

19

20

21

22

23

24

ORIGINAL EXHIBIT "Q"

VOLUME II
PAGES 64 TO 84
EXHIBITS:  NONE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

BRETT S. GODETTE,                        )
              Plaintiff,                 )
                                         )
     VS                                  )
                                         )
RICHARD STANLEY, DIANE HEFFERNAN,        )
DANIEL CRONIN, PAUL GALLAGHER,           )
WILLIAM WALLACE, DONALD ATTULO,          )
CHARLES HESELTINE and PATRICK KEEFE      )
Individually, and as Police Officers     )
of Their Respective Municipalities,      )
LT. RIORDAN, TOWN OF NORTH ANDOVER,      )
TOWN OF ANDOVER, and MERRIMACK           )
COLLEGE,                                 )
              Defendants.                )

          CONTINUED DEPOSITION OF LIEUTENANT PAUL J.

GALLAGHER, a witness called on behalf of the

Plaintiff, taken pursuant to the Federal Rules of

Civil Procedure, before Lisa Abdo, Certified

Shorthand Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Offices of

Krasnoo Klehm LLP, 23 Main Street, Andover,

Massachusetts, on Tuesday, March 13, 2007,

commencing at 12:55 p.m.

1   went through sentence by sentence pointing out

2   portions that he disagreed with.  I'm starting to

3   think that might be the way to go to start with you

4   as well.  So are you able to go through the memo

5   and tell us whether you agree or disagree with

6   certain portions?

7   A.  Yes.  The first paragraph, I agree.  The

8   second paragraph, I agree.  The third

9   paragraph, I have no idea about other than --

10   I never spoke to Mr. Godette that day.  I

11   don't know what his personal feelings were.

12   The fourth paragraph in which Chief Mayrose

13   states he met with myself and Chief Stanley,

14   I don't have any recollection of that.  I

15   know I spoke to the Chief about speaking to

16   Mr. Godette and explaining the situation,

17   even though we know Detective Cronin had

18   already explained it to him.

19   Q.  Can I interrupt for a second?  When you say "the

20   chief," who are you referring to?

21   A.  Chief Stanley.

22   Q.  So you spoke to Chief Stanley about speaking with

23   Mr. Godette; is that correct?

24   A.  Yes, I did.

*Exhibit "R"*

ORIGINAL

VOLUME II
PAGES 130 TO 170
EXHIBITS:   NONE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

BRETT S. GODETTE,                          )
        Plaintiff,                        )
                                  )
   VS                                      )
                                  )
RICHARD STANLEY, DIANE HEFFERNAN,          )
DANIEL CRONIN, PAUL GALLAGHER,             )
WILLIAM WALLACE, DONALD ATTULO,            )
CHARLES HESELTINE and PATRICK KEEFE        )
Individually, and as Police Officers       )
of Their Respective Municipalities,        )
LT. RIORDAN, TOWN OF NORTH ANDOVER,        )
TOWN OF ANDOVER, and MERRIMACK             )
COLLEGE,                                   )
        Defendants.                       )

CONTINUED DEPOSITION OF CHIEF RICHARD

STANLEY, a witness called on behalf of the

Plaintiff, taken pursuant to the Federal Rules of

Civil Procedure, before Lisa Abdo, Certified

Shorthand Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the Offices of

Krasnoo Klehm LLP, 23 Main Street, Andover,

Massachusetts, on Tuesday, March 13, 2007,

commencing at 12:16 p.m.

1    Q.  Are we talking a couple minutes?

2    A.  Not even.

3    Q.  Who was there?

4    A.  I can't recall.  I know I was talking to him.

5        Usually Lieutenant Gallagher is with me, but

6        I can't recall if the lieutenant was standing

7        right there at the time.

8    Q.  What was said by each of you during that

9        discussion?

10   A.  I don't recall.  All I can do is just give

11       you a general tone of this, you know.

12   Q.  Well, was the discussion that you had with him in

13       the hallway, we'll call it, was that discussion on

14       the subject matters that are set forth in Cronin

15       Exhibit 1?

16           MS. RYAN:  Objection.  You can answer.

17   A.  I don't even -- as I tried to testify to the

18       best of my recollection, I could tell you

19       that this memo brought back some memory to me

20       of having a discussion with him because I see

21       this stuff he put in here about class

22       schedules and all these other things.  And as

23       I testified to you before about my memory of

24       seeing him up in that hallway kind of brings

1    back something about that.  I can't give you

2    specifics.  Believe me, if I could, I would.

3  Q.  So you didn't sit down with Chief Mayrose at any

4    time and talk about this incident?

5  A.  Absolutely not.

6  Q.  Okay.  Did you take any notes when you spoke to

7    him?

8  A.  No.

9  Q.  You said you had two or more meetings with

10    Merrimack regarding Chief Mayrose.  When did those

11    take place?

12  A.  I can't say.  I'm not sure if it's -- I don't

13    know how long he's actually been employed

14    there.  And I'm not sure if it was before

15    this incident, after this incident.  It

16    surely was not directly related to this

17    incident.  Under no circumstances was it

18    related to this incident.  It had to do with

19    rapes taking place on campus that he wasn't

20    reporting.  It had to do with alcohol issues

21    with students where we have intervention

22    programs he wasn't bringing us in on.  It had

23    to do with an absolute wall being put up for

24    further information being given to local law

DEPOSITION
EXHIBIT

Heffernan 1
DR 2/27/07

Exhibit "S"

# NORTH ANDOVER
# POLICE



# DEPARTMENT
# MANUAL

**North Andover Police Department**
**Policies, Rules and Procedures Manual**

**Section A:    DIRECTION**

    Chapter 1 ........................ The Directive System
    Chapter 2 ...............................Direction

**Section B:    ORGANIZATION AND MANAGEMENT**

    Chapter 10 ...................Organizational Structure
    Chapter 11 .......Command Authority/Order of Precedence
    Chapter 12 ...........Job Assignment/Span of Control
    Chapter 13 ...Supervisory Accountability/Staff Meetings
    Chapter 14 ........................Chain of Command
    Chapter 15 ......................Behavioral Standards
    Chapter 16 ........................Fiscal Management
    Chapter 17 ...............................Inspections

**Section C:    AGENCY ROLE AND AUTHORITY**

    Chapter 20 ...............Oath of Office/Appointments
    Chapter 21 .......................Use of Discretion
    Chapter 22 ...........................Missions & Goals
    Chapter 23 ...........Agency Jurisdiction & Mutual Aid
    Chapter 24 ...........Relationships With Other Agencies

**Section D:    PERSONNEL MANAGEMENT**

    Chapter 30 .....................Performance Evaluations
    Chapter 31 ......................Personnel Procedures
    Chapter 32 ...................Discipline & Commendations
    Chapter 33 .Collective Bargaining & Grievance Procedure
    Chapter 34 .......................Career Development
    Chapter 35 ...Classification, Duties & Responsibilities
    Chapter 36 ......Equal Opportunity & Affirmative Action
    Chapter 37 .................... Recruitment of Personnel
    Chapter 38 ...............................Promotion
    Chapter 39 ...................Selection of Personnel

**Section E:    FIELD OPERATIONS**

    Chapter 40 ................................Use of Force
    Chapter 41 ..Sudden Death / Notification of Next of Kin
    Chapter 42 ......................Domestic Violence
    Chapter 43 ...........................Bomb/Bomb Threat

**Section F:    PATROL PROCEDURES**

    Chapter 50 ...............Roll-Call/Firearms Inspection
    Chapter 51 ...............Patrol Types, Shifts & Sectors
    Chapter 52 ...................Field Patrol/Felony Stops
    Chapter 53 .................Police Vehicles & Operation
    Chapter 54 ...........................Pursuit Policy
    Chapter 55 ...........................Special Events

**Section G:    JUVENILE OPERATIONS**

> Chapter 60 ..........................

**Section H:    CRIMINAL INVESTIGATIONS**

> Chapter 70 ..........................

**Section I:    ARREST, PRISONER PROCESSING AND COURT**

> Chapter 80 .........................Prisoner Transport
> Chapter 81 ...........................Holding Facility
> Chapter 82 ..........................Court Procedures
> Chapter 83 ....................................Arrest
> Chapter 84 ............Field Interviews\Interrogations

**Section J:    PROPERTY MANAGEMENT**

> Chapter 90 .....................Agency-Issued Property
> Chapter 91 ......................Agency-Owned Property

**Section K:    INFORMATION MANAGEMENT SYSTEMS**

> Chapter 100 ............Management Information Systems
> Chapter 101 ...........................Communications
> Chapter 102 ..........................Department Forms
> Chapter 103 .....Allocation & Distribution of Personnel

**Section L:    COMMUNITY SERVICES**

> Chapter 110 ...Public Information / Community Relations
> Chapter 111 ...................Social Services Referral
> Chapter 112 .................................
> Chapter 113 ..............................Civil Rights

**Section M:    TRAFFIC**

> Chapter 120 .................................

**Section N:    TRAINING**

> Chapter 130 .................................