UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRETT S. GODETTE, ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 05-11354JLT |
| v. ) | |
| ) | |
| RICHARD STANLEY, *et al*, ) | |
| Defendants. ) | |

## SUPPLEMENTAL AFFIDAVIT OF PAUL J. KLEHM, ESQ.

I, Paul J. Klehm, Esq., under oath, depose and state as follows:

1.      I am counsel to the Plaintiff in the above-referenced matter.

2.      I have caused to be attached hereto true and genuine copies of the following

documents:

A.            Excerpts of Deposition of William Mayrose

B.            Excerpts of Deposition of Michael Riordan

C.            Excerpts of Deposition of Dianne Heffernan

Signed under the pains and penalties of perjury this 3rd day of May, 2007

*/s/ Paul J. Klehm*
Paul J. Klehm

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s)
of record via ECF on May 3, 2007.

*/s/ Paul J. Klehm*
Paul J. Klehm

ORIGINAL

Exhibit-1

Volume 1, Pages 1-118

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

BRETT S. GODETTE,

               Plaintiff,

vs.                  Civil Action No. 05-11354JLT

RICHARD STANLEY, et al,

               Defendants.

------------------------------

DEPOSITION OF WILLIAM MAYROSE

Wednesday, March 14, 2007, 10:20 a.m.

807 Main Street

Worcester, Massachusetts

------- Reporter:  Patricia A. Bucko, RPR -------

G & M COURT REPORTING ASSOCIATES

42 Chauncy Street, Suite 1A, Boston, Mass. 02110

617.338.0030  fax 617.426.7225

1  relating to Brett Godette before this date of the

2  incident?

3      A.  No.

4      Q.  What did you do in response to Lieutenant

5  Wlodyki's statements to you?

6      A.  I went to speak with Lieutenant Riordan.

7      Q.  What, if anything, did you say to

8  Lieutenant Wlodyki when you had that initial

9  conversation with him?

10     A.  I think I asked him where Lieutenant

11 Riordan was.

12     Q.  And how was it that Lieutenant Riordan's

13 name had come up during the conversation?

14     A.  Lieutenant Wlodyki advised me that

15 Lieutenant Riordan had called the North Andover

16 police department.

17     Q.  Did you say Lieutenant Riordan or Sergeant

18 Riordan?

19     A.  Lieutenant.

20     Q.  He was a lieutenant at the time?

21     A.  Yes, I believe so.

22     Q.  Okay, okay.

23         Did Lieutenant Riordan follow the proper

24 policies and procedures in contacting the North

1    Andover police department, before contacting you

2    about this issue?

3        A.   I don't think there were any policies or

4    procedures in place regarding that.

5        Q.   Were you disappointed at all that

6    Lieutenant Riordan had called the North Andover

7    police, before speaking with you?

8        A.   Yes.

9        Q.   Why?

10       A.   When anything of a significant nature is

11   occurring on campus, as the director, I would like

12   to know about it before it happens.

13       Q.   Did Lieutenant Wlodyki tell you where

14   Lieutenant Riordan was?

15       A.   Yes, down in his office.

16       Q.   What did you do next?

17       A.   I went down to see Lieutenant Riordan.

18       Q.   Was anyone else present?

19       A.   I don't recall.

20       Q.   As best you can recall, what did you say to

21   him and what did he say to you?

22              MR. SMITH:   Object to the form of the

23   question.

24              MR. KLEHM:   I'll restate it.

1    registrar, the vice president of student life.

2    Someone other than me who was in charge of student

3    records.

4        Q.  Did you have the authority to access

5    student records?

6        A.  At the time, no.

7        Q.  Did you later acquire that authority?

8        A.  Somewhere I did.

9        Q.  When?

10       A.  I'm going to think two or three years into

11   my tenure there.

12       Q.  What were the circumstances under which you

13   did require that authority?

14       A.  It just made it easier for me rather than

15   me having to ask somebody in the department.

16       Q.  Does that come down to having a password so

17   you could get into a certain database?

18       A.  Yes.

19       Q.  At any time during your tenure, did anyone

20   other than Maureen Cavanaugh and yourself and Karen

21   Fitzpatrick have access to that password to get into

22   that database?

23       A.  Yes.

24       Q.  Who?

1    A.   I can't tell you specifically, but as

2  months and years progressed, more people were given

3  the authority for the same reason that I was given,

4  had the authority.

5    Q.   Okay.  But that didn't happen until about

6  two or three years after this incident?

7    A.   I can only speak to when I remember getting

8  the password and the training to get in there.  I

9  cannot say that other people in my department, at

10  the time of the incident, could not get in there.  I

11  do not know at the time, who.

12          I know Karen and Maureen did, only

13  because if I needed information, I would go to them.

14    Q.   So if you needed to find out, back when you

15  were chief, on that date, who had the authority, how

16  would you go about doing it?

17    A.   I think I would simply ask my department

18  members who had the authority to get in; who knew

19  how to run the program.

20    Q.   Could you also make a phone call to the

21  registrar's office if you needed to get a student's

22  class schedule?

23    A.   Yes.

24    Q.   Do you have any personal knowledge as to

1  had other instances in which you've had to track

2  down a student during the day?

3      A.   I have no specific recollection, but it was

4  kind of a common thing, so eight months or in the

5  eight months or so that I had been there, I would

6  guess.

7      Q.   When you say it was a common thing, could

8  you estimate for me how often per month you would

9  have to locate a student during the day?

10      A.   I can't, because I wouldn't have always had

11  knowledge that that was happening.

12      Q.   Based upon your knowledge in the

13  department, was it happening ten times a month?

14          MR. SMITH:   Objection.

15          MS. RYAN:   Objection.

16      A.   It was in unison.

17          I would say that ten times a month

18  probably is a little high.

19      Q.   Okay.  Did you ever sense that there was a

20  need for more people to be able to access the

21  database of student class schedules?

22      A.   Yes.  I stated earlier, that is why I was

23  trained on it, and other people in the department

24  were given access to it.

1     Q.   Let me broaden it.

2          Did you ever have any contact with any

3  professor regarding Brett Godette?

4     A.   I don't think so.

5     Q.   At some point did you obtain or learn of a

6  call from a professor?

7     A.   Yes.

8     Q.   And what did you learn?

9     A.   I believe that that professor confirmed

10  that Mr. Godette was in that particular class.

11          MR. KLEHM:   Let's go off the record.

12          (Off the record.)

13     Q.   When did you first learn this information?

14          MR. SMITH:   Objection.

15     A.   I'm not sure if it was that night or the

16  next day.

17     Q.   Have you ever had any conversations with

18  Lieutenant Gallagher from the day of the incident

19  forward regarding the incident?

20     A.   If he's the person who was with the chief.

21  Did you say after the incident?

22     Q.   Yes.

23     A.   If he -- and about this incident, you said

24  yes?

1  property.

2      Q.  And what was the result of that meeting?

3          MS. RYAN:   Objection.

4          You can answer.

5      A.  The result of that meeting was a

6  recognition by the District Attorney's office that

7  my department had the independent authority to go

8  investigate criminal acts on the campus, without

9  consultation or assistance of local police

10 departments.

11     Q.  Did that meeting in any way involve Mr.

12 Godette or the investigation on March 26th, 2003?

13     A.  No.

14     Q.  Did you prepare any writings with regard to

15 the incident involving Mr. Godette?

16     A.  Yes.

17     Q.  Okay.  How many?

18     A.  I believe I authored a memo.

19     Q.  Anything else other than the memo?

20     A.  I don't recall that I produced anything.

21     Q.  And when you authored the memo, did you do

22 so in good faith?

23          MR. SMITH:  Objection.

24     A.  Yes.

1    Q.  Did you intend to be accurate in the memo

2  you wrote?

3    A.  Yes.

4         MR. KLEHM:  All right, why don't we get

5  this marked.

6         MR. SMITH:  While that is being marked,

7  can we take a couple of minutes.

8         (Off the record.)

9         (Marked, Exhibit 1, memo dated 4/11/03.)

10   Q.  Chief, we're actually going to back on.

11  Chief, I put in front of you something which at the

12  top says "Merrimack College campus police."  Do you

13  recognize that document which is Exhibit 1 to your

14  deposition?

15   A.  Yes.

16   Q.  What do you recognize it to be?

17   A.  A memo that I issued on it looks like April

18  11th, 2003.

19   Q.  Was this a memo that went into the memo

20  binder?

21   A.  Yes.

22   Q.  Did any of your officers sign off on this

23  memo?

24   A.  I don't have that information here.

1    specifics.  It was very common that any memos that

2    went out, there were questions, reactions, but I

3    don't have a specific recollection of talking about

4    this document after it was put out.

5        Q.  You read it a few moments ago.

6            Is there any portion of this document

7    which you now believe to be inaccurate in any way?

8        A.  I think my reference to checking a

9    student's class schedule, if I had to rewrite this,

10   would be to say, to verify that the student was in a

11   particular place at a particular time, as opposed to

12   simply just checking a schedule.

13       Q.  Anything else that you believe to be

14   inaccurate in Exhibit 1?

15           MS. RYAN:  Objection.

16       A.  No.

17       Q.  In the first paragraph on the, the second

18   sentence of the first paragraph, it reads, "The

19   investigation led them to our campus and a focus on

20   one of our resident students."  Do you see that?

21       A.  Uh-huh.

22       Q.  Is that a "yes"?

23       A.  Yes.

24       Q.  Can you explain what you mean when you said

1     Q.   And when you use the words "we all agreed,"

2   was there an oral agreement?

3              MR. SMITH:   Objection.

4     A.   I don't have a specific recollection of who

5   said what at the meeting.  I, I believe my

6   recollection is that Chief Stanley did most of the

7   communicating with me, and that if I had different

8   information, confirmed different information, things

9   may have played out differently.

10              I can't tell you -- I can't even

11   remember if it was Lieutenant Gallagher or Carney

12   who was there, let alone who said what specific

13   statement.

14     Q.   Do you have any reason, as we sit here

15   today, to deny the contents of the second sentence

16   of Paragraph 4?

17              MR. SMITH:   Objection.

18              MS. RYAN:   Objection.

19     A.   I do not.

20     Q.   If we go down to the fifth paragraph, I

21   want to focus on the last sentence of the fifth

22   paragraph.

23              What causes you to write that "It

24   appears that the focus of the course of the

1    investigation would have been changed if the

2    student's class schedule had been checked before

3    searching for him on campus"?

4        A.  Well, again, in retrospect, I would not

5    have used check, change -- check the student's class

6    schedule as opposed to verifying that the student

7    was in fact in a particular place, but as I just

8    testified that if in fact we could confirm that Mr.

9    Godette was in a particular place at a particular

10   time, other than at the scene of the robbery, that

11   the course of the investigation could have been

12   changed.

13       Q.  Did you do anything, during the course of

14   the investigation, to verify his class schedule, to

15   prevent searching for him before you knew his class

16   schedule?

17       A.  I did not participate in the investigation,

18   per se.

19       Q.  And why didn't you do anything to verify

20   his class schedule?

21       A.  Two reasons.  The incident was a North

22   Andover police investigation, where our department

23   was simply assisting them, and two, Lieutenant

24   Riordan was the detective for the department, and I

1    had full faith in him that I didn't need to

2    micromanage and step in, and really stood at the

3    periphery watching what was going on and not taking

4    over.

5         Q.   With regard to the third paragraph, again,

6    did you make any observations of Mr. Godette,

7    himself, that day?

8              MS. RYAN:   Objection.

9              You can answer.

10        A.   I saw Mr. Godette in the area between the

11   two sets of doors, front of Monican, and I saw him

12   walking down the hall towards his room from a

13   distance behind him.

14        Q.   What did you observe when you saw him?

15        A.   The only thing that stands out in my mind

16   was that he was handcuffed when I first saw him,

17   standing in the area between the two sets of doors

18   at Monican Centre.

19        Q.   Do you know, as you sit here today, what

20   race Mr. Godette is?

21        A.   I do not know what race.  His skin is

22   darker.  I don't know if it's African American,

23   Hispanic, combination.  I just thought it was a

24   darker skinned individual; it could be

Page 1

VOLUME:       I
PAGES:    1-177
EXHIBITS:  1-14

ORIGINAL

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

C.A. 05-1354JLT

BRETT S. GODETTE,                         )
    Plaintiff,                            )
                                          )
vs.                                       )
                                          )
RICHARD STANLEY, DIANE HEFFERNAN,         )
DANIEL CRONIN, PAUL GALLAGHER, WILLIAM    )
WALLACE, DONALD PATTULLO, CHARLES         )
HESELTINE AND PATRICK KEEFE,              )
INDIVIDUALLY AND AS POLICE OFFICERS OF    )
THEIR RESPECTIVE MUNICIPALITIES,          )
LIEUTENANT RIORDON, TOWN OF NORTH         )
ANDOVER, TOWN OF ANDOVER, AND             )
MERRIMACK COLLEGE,                        )
    Defendants.                           )

        DEPOSITION OF MICHAEL RIORDAN, a
witness called on behalf of the Plaintiff,
pursuant to the provisions of the
Massachusetts Rules of Civil Procedure,
before Jill Shepherd, Registered Professional
Reporter and Notary Public, in and for the
Commonwealth of Massachusetts, at the law
offices of Krasnoo & Klehm, 23 Main Street,
Andover, Massachusetts, on Thursday,
February 22, 2007, commencing at 10:00 a.m.

G&M Court Reporters
800-655-3663 - www.gmcourtreporters.com

1    A.   There was a plate listed on the message, and

2         our office was responsible for -- we had in

3         our possession vehicle registrations -- not

4         the actual registration, but the cards -- and

5         I looked at the in-house file for that

6         particular plate and determined that it came

7         back to a Merrimack College student.

8    Q.   Now, the computer that we talked about a

9         little while ago, six or so computers --

10   A.   Yes.

11   Q.   -- are they linked to the college's

12        computers?

13   A.   I would assume so.

14   Q.   Did you have the ability to look at

15        information about particular students from

16        those computers?

17   A.   Yes.

18   Q.   Did you look at their grades?

19   A.   I don't know if grades were available.

20   Q.   What was available?

21   A.   Schedule.

22   Q.   Um-hum.

23   A.   Probably residence, both on campus and home

24        residence.

1   Q.  And when you were going to access a student's

2       schedule or, say, their residence, did you

3       have to enter any passwords, or did you have

4       to do anything before you could get access to

5       those records?

6   A.  I always had the department secretary access

7       it.

8   Q.  Who was that?

9   A.  Maureen Cavanaugh.

10  Q.  Do you know if she's still there?

11  A.  No, she's not.

12  Q.  Do you know where she's working now?

13  A.  No, I don't.

14  Q.  Where did she live back when you worked with

15      her?

16  A.  Haverhill and North Andover.  North Andover

17      first, Haverhill second.

18  Q.  Do you know what street in Haverhill?

19  A.  No.

20  Q.  How old is Ms. Cavanaugh, roughly?

21  A.  Probably sixty.

22  Q.  Have you ever discussed this case with her?

23  A.  No.

24  Q.  You were telling me that the plate came back

1      these pictures depict"?

2   A.   No.

3   Q.   Sir, I'm now going to show you Exhibit 4,

4        which is this photograph [indicating].

5             I slightly misspoke.  I received

6        this photograph yesterday.  I don't know when

7        it was taken.  So do you know what that

8        photograph depicts?

9   A.   No.

10  Q.   Okay.

11            MR. KLEHM:  Can I get that marked?

12       Actually, before we mark it, let's do this --

13  Q.   Once the North Andover police arrived and you

14       had your discussion with them, what happened

15       next?

16  A.   An effort to determine Mr. Godette's

17       whereabouts at that time.

18  Q.   Who made that effort?

19  A.   It was a joint effort.

20  Q.   "Joint," meaning, who?

21  A.   North Andover PD and Merrimack College.

22  Q.   What did the North Andover police do to try

23       to track down Mr. Godette?

24  A.   Again, it was a joint effort at that point in

1    time to see if he was in his dormitory room.

2    I believe Officer Anderson from Merrimack

3    College and Officer Heffernan from

4    North Andover, and I believe Officer Rogers

5    went to the dormitory of residence for

6    Mr. Godette.

7  Q.  What did -- where did you go?

8  A.  Myself, I went with the remaining

9    North Andover representation to the gym.

10  Q.  At this point, had anyone determined what

11    Mr. Godette's schedule was for the day?

12  A.  I don't know.

13  Q.  Was there a discussion of going to any of his

14    classes at that point?

15  A.  I don't know.

16  Q.  Was the North Andover police involved at this

17    point?

18  A.  No, not to my knowledge.

19  Q.  What about the state police?

20  A.  No, not to my knowledge.

21  Q.  Was there a discussion as to how Mr. Godette

22    would be detained, once he was detained,

23    during the course of your discussion with the

24    other officers?

1   A.  No.

2   Q.  Was there a discussion of a gun during the

3       course of your discussion with the other

4       officers?

5   A.  Not that I recall.

6   Q.  As of the time that the North Andover police

7       arrived, who was in control of the

8       investigation?

9            MS. RYAN:  Objection.

10          You can answer.

11   A.  Upon their arrival?

12   Q.  Um-hum.

13   A.  They were.

14   Q.  Is that the standard practice and procedure,

15       that the municipality becomes the lead

16       investigating officer?

17            MS. RYAN:  Objection.

18          You can answer.

19   A.  If the incident occurs in their municipality,

20       yes.

21   Q.  What did you observe when you went to the

22       gym?

23   A.  Mr. Godette was not present.

24   Q.  Did you ask anyone if he was there?

```
 1   A.   I don't believe so.
 2   Q.   Did all of the officers go into the gym?
 3   A.   Myself, Officer Cronin, Chief Stanley and
 4        Lieutenant Gallagher, I believe.
 5   Q.   Were guns drawn?
 6   A.   No.
 7   Q.   Where did you go next?
 8   A.   To the Monican dorm, M-O-N-I-C-A-N, I
 9        believe.  Mr. Godette's residence.
10   Q.   How long did you spend at the gym?
11   A.   Very short period of time.
12   Q.   Okay.  How did you know that Mr. Godette
13        lived in Monican?
14   A.   That information was available through the
15        department and resident life; it was common
16        knowledge.
17   Q.   But how did you obtain that information?
18   A.   Probably just looking up the information.
19   Q.   Did you look up the information?
20   A.   I don't recall.
21   Q.   So did the same set of officers go with you
22        to Monican?
23   A.   Officer Cronin, Chief Stanley, Lieutenant
24        Gallagher, myself, to the best of my
```

1       knowledge, yes.

2   Q.  What happened there?

3   A.  I believe Officer Rogers, who was -- Officer

4       Rogers was inside the dorm at the time, and

5       Officer Heffernan and Officer Anderson were

6       outside the dorm in the Merrimack marked car.

7       A radio transmission was generated by

8       Mr. Rogers that Mr. Godette was approaching

9       the exit through the lobby.

10  Q.  Exit of?

11  A.  Monican dorm.

12  Q.  Do you recall him saying anything else?

13      "Him" being Mr. Rogers.

14  A.  No, I believe it was just a transmission

15      regarding Mr. Godette's action.

16  Q.  Where were you at the time?

17  A.  I believe I was with Officer Cronin, Dan

18      Gallagher and Chief Stanley.  I believe.

19  Q.  In one car?

20  A.  To the best of my knowledge.

21  Q.  Were you parked out front of Monican?

22  A.  I'm not sure.

23  Q.  Who was driving?

24  A.  Not sure.

1    Q.   Okay.   What did you do next?

2    A.   At some point in time, we arrived at Monican.

3         There's a little gap there that I... again,

4         everybody was responding to Officer Roger's

5         radio transmission.  I don't remember exactly

6         how many of us, but I believe it was -- I

7         can't recall all the chain of events at that

8         point.

9    Q.   What next do you recall?

10   A.   Officer Heffernan and Mr. Godette in the

11        foyer of the Monican dorm.

12   Q.   What time was it?

13   A.   I don't recall exactly.

14   Q.   Okay.   Was it morning or afternoon?

15   A.   Afternoon.

16   Q.   Were the students around?

17   A.   Yes.

18   Q.   How many?

19   A.   I don't recall.

20   Q.   Less than fifty?

21   A.   Yes.

22   Q.   Less than twenty?

23   A.   At the Monican dorm in that immediate area?

24   Q.   Yes.

1  A.  I would say yes.

2  Q.  And what officers were with you at the time

3      in the area?

4  A.  Officer Anderson, myself, Chief Mayrose,

5      Officer Cronin and, I believe, Officer

6      Heffernan.

7  Q.  Was Officer Rogers there?

8  A.  I believe he was still in the lobby, but I

9      can't be positive.

10 Q.  Were any North Andover police there yet?

11 A.  No.

12 Q.  What happened next?

13 A.  Mr. Godette was questioned by Officer

14     Heffernan in the foyer of the Monican dorm.

15 Q.  Did you see Officer Heffernan approach

16     Mr. Godette?

17 A.  Her initial contact with him?

18 Q.  Yes.

19 A.  No, I don't believe I did.

20 Q.  When you first saw them, how far apart were

21     they?

22 A.  They were in their immediate contact.

23 Q.  What was Officer Heffernan doing at the time?

24 A.  She was questioning Mr. Godette in the foyer

```
 1   Q.   How many?

 2   A.   Not many.

 3   Q.   Less than twenty?

 4   A.   At that point in time, yeah, I would say

 5        probably less than twenty.

 6   Q.   Did any of the students speak to you?

 7   A.   Not that I recall.

 8   Q.   Did any of the students ask what was going

 9        on?

10   A.   They could have.

11   Q.   Do you have a specific recollection of that?

12   A.   No.

13   Q.   Did you hear Mr. Godette say anything during

14        this whole time while you were downstairs?

15   A.   I don't recall.

16   Q.   How far were you from Mr. Godette during the

17        time that he was with Officer Heffernan

18        before he was brought upstairs?

19   A.   Just outside the door leading into the foyer.

20   Q.   Is there a door, a glass door?

21   A.   No.

22   Q.   You couldn't hear what they were saying

23        because there was a glass door; is that

24        right?
```

1   A.   Right.  I guess so, yeah.

2   Q.   How many feet were you from them?

3   A.   Ten to twelve.

4   Q.   Are there any other officers in the immediate

5        vicinity of Officer Heffernan and

6        Mr. Godette?

7   A.   At some point, Officer Cronin, myself and

8        Officer Anderson and Mayrose were out on the

9        stairwell just outside the door, and I

10       believe Officer Rogers was inside the lobby.

11  Q.   So at some point, Officer Cronin and

12       Officer Rogers went inside; is that right?

13  A.   Inside where?

14  Q.   Inside the area to where Mr. Godette was with

15       Officer Heffernan?

16  A.   Yes.

17  Q.   Just so I have this right, Mr. Godette was

18       inside the Monican at the time he was

19       detained; is that correct?

20  A.   He was in the foyer.

21  Q.   When you say "foyer," was he inside the

22       building or outside of the building?

23  A.   The "foyer" is between the outside of the

24       building and the lobby of the building.  It's

```
 1    Q.   Were you in the foyer at any time before
 2         Mr. Godette was led up to his room?
 3    A.   I don't recall.
 4    Q.   Did you overhear any discussion about whether
 5         or not Mr. Godette consented to having them
 6         go up to his room?
 7    A.   I don't recall.
 8    Q.   Okay.  Did you ever see any officer with a
 9         gun drawn?
10    A.   No.
11    Q.   Throughout the entire incident?
12    A.   Not that I recall.
13    Q.   Did you go upstairs?
14    A.   Yes.
15    Q.   Did all of the officers that you have
16         described go upstairs?
17    A.   Officer Heffernan and Officer Cronin, myself,
18         Officer Anderson, I believe, Chief Mayrose.
19         Did I mention Officer Rogers?
20    Q.   You just did.
21    A.   Okay.  Okay.  Chief Mayrose is the last one I
22         mentioned.
23    Q.   Did you go directly to his room?
24    A.   Did I?
```

ORIGINAL

VOLUME:   I
PAGES:   1 - 134
EXHIBITS:   1-3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

BRETT S. GODETTE,                                        )
      Plaintiff                                        )
                                                                )
vs.                                                               )
                                                                )
                                                                )
RICHARD STANLEY, DIANE HEFFERNAN,       )
DANIEL CRONIN, PAUL GALLAGHER,          )
WILLIAM WALLACE, DONALD ATTULO,         )
CHARLES HESELTINE and PATRICK KEEFE,    )
Individually, and as Police Officers    )
of Their Respective Municipalities,     )
LT. RIORDAN, TOWN OF NORTH ANDOVER,     )
TOWN OF ANDOVER, and                                  )
MERRIMACK COLLEGE,                                      )
      Defendants                                       )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF

DIANE HEFFERNAN

TUESDAY, FEBRUARY 27, 2007

COMMENCING:  1:31 P.M.

1        So does the photo.  He also appears to

2        have -- his mouth looks similar as the

3        photo, the side shot at the bank.  He has

4        dark hair hanging out the side of the hat,

5        below the ear, and so does the ID, if he

6        was to have a cap over his head.  The

7        build looks similar.  He doesn't look

8        extremely heavy here.  Neither does this

9        subject.

10   Q.   Have you completed your answer?

11   A.   Yeah.

12   Q.   You determined Mr. Godette's build back on

13        March 26, 2003; is that correct?

14   A.   Yes.

15   Q.   Okay, and you based that on his student ID?

16   A.   Yes.  I think, by looking at a photo, you

17        can tell whether the person is of weight or

18        not, just by looking at their face and their

19        shoulders.

20   Q.   What did you do next?

21   A.   We split up and went out to look for him.

22   Q.   Who did you go with?

23   A.   I went with Kelly Anderson, who is a

24        Merrimack College campus police officer.

1   A.  No.  At this time, I was in the Merrimack
2       College cruiser.
3   Q.  And was Officer Anderson in uniform?
4   A.  Yes.
5   Q.  All right.  Did you have a firearm with you
6       that day?
7   A.  Yes.
8   Q.  And was there a plan on where you and the
9       other officers would be going that day when
10      you left that meeting?
11  A.  To look for Brett Godette.
12  Q.  Okay.  Did you have a specific idea that you
13      were going to go to his dormitory?
14  A.  Yes.
15  Q.  Had you seen Chief Stanley at the Public
16      Safety office before you left it?
17  A.  I don't recall.
18  Q.  All right, and when you got to the
19      dormitory, what did you do?
20  A.  I went inside with Officer Anderson and a
21      plain clothes detective or officer -- we
22      went inside and went into his room.
23  Q.  Who was that plain clothes officer?
24  A.  I think it was Rogers, but I'm not sure.

1  Q.  What department was he from?

2  A.  Merrimack College.

3  Q.  Oh, okay.  What happened when you went to

4      his room?

5  A.  We knocked on the door and nobody answered.

6  Q.  What did you do next?

7  A.  So then we called his room and nobody

8      answered.

9  Q.  Did you call his room?

10 A.  One of us did.  I don't know which one did.

11     I would have never known his phone number.

12 Q.  What did you do next?

13 A.  We went outside and myself and Officer

14     Anderson from Merrimack College sat outside

15     in her cruiser in front of the dormitory,

16     while the other plain clothes officer from

17     Merrimack College stayed inside the lobby

18     area.

19 Q.  Was Brett Godette supposed to be in a class

20     at that time?

21 A.  I don't believe so.

22 Q.  How long did you wait in the car?

23 A.  Not long.  Ten, 20 minutes.

24 Q.  What happened?

1   A.   The plain clothes Merrimack College officer

2        radioed the other Merrimack College officer

3        that I was with and said that he was coming

4        through the lobby now.

5             MS. RYAN:  Could we take a quick

6        break?

7             (Recess.)

8   Q.   What did you do next?

9   A.   We got out of the cruiser, myself and

10       Officer Anderson, and proceeded up the

11       stairs.

12  Q.   Did you have your firearm produced?

13            MS. RYAN:  Objection.

14  A.   What do you mean by that.

15  Q.   Did you have your firearm in your hand at

16       the time?

17  A.   No.

18  Q.   Were you concerned at all that Mr. Godette

19       would have a firearm?

20  A.   Yes.

21  Q.   Did you have your hand on your firearm?

22  A.   I don't remember exactly if I did or not.

23  Q.   What did you do when you reached Mr.

24       Godette?

1   A.   I don't recall.

2   Q.   Was he wearing a do-rag?

3   A.   I don't believe so.

4   Q.   Was Mr. Godette under arrest at that point?

5   A.   No.

6           MS. RYAN:   Objection.  You can

7        answer.

8   A.   No.

9   Q.   Why did you read him his Miranda rights?

10  A.   Because I was questioning him as to a crime

11       that had occurred.

12  Q.   What was Officer Anderson doing while you

13       were putting the cuffs on Mr. Godette?

14  A.   Just standing there.

15  Q.   Okay.  All right.  Tell me the rest of the

16       conversation you had with Mr. Godette at

17       that point.

18  A.   At that point, I explained to him that "We

19       are in the process of conducting an

20       investigation in regards to a bank robbery

21       that occurred in North Andover."

22  Q.   By the way, as you approached Mr. Godette,

23       he wasn't doing anything suspicious in your

24       mind; was he?

1          room?

2     A.   Yes.

3     Q.   Did you tell him anything else, other than

4          what you've told me?

5     A.   Not that I can recall.  I just said he had

6          strong similarities to the photo of the

7          suspect in the bank robbery, which gave us

8          the probable cause to believe that he could

9          be a suspect.

10    Q.   What happened next?

11    A.   We went up to his room.

12    Q.   Who is "we"?

13    A.   Myself, Detective Cronin, and Brett Godette,

14         and there were other people that followed us

15         up, which would have been the rest of the

16         crew --

17    Q.   Who?

18    A.   -- which would have been Kelly Anderson,

19         Lieutenant Gallagher, the Chief.  Later on,

20         while we were in the room, Andover Police

21         detectives showed up, stood in the hall

22         the whole time.  Chief Mayrose was out

23         there.

24    Q.   When did you first see Chief Stanley that