UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BRETT S. GODETTE ) | |
|     Plaintiff, ) | C.A. No. 05-11354 JLT |
| ) | |
| v. ) | |
| ) | |
| RICHARD STANLEY, DIANE HEFFERNAN, ) | |
| DANIEL CRONIN, and PAUL GALLAGHER, ) | |
| Individually and as Police Officers of ) | |
| their Respective Municipalities, the TOWN OF ) | |
| NORTH ANDOVER, MICHAEL ) | |
| RIORDAN and MERRIMACK COLLEGE ) | |
|     Defendants. ) | |
| ) | |

**MOTION OF DEFENDANTS MERRIMACK COLLEGE AND MICHAEL
RIORDAN FOR LEAVE TO FILE A REPLY TO PLAINTIFF'S OPPOSITION
TO THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

**(EXPEDITED REVIEW REQUESTED AS TRIAL IS SET FOR JUNE 11, 2007)**

Defendants, Merrimack College and Michael Riordan (collectively the "Merrimack College Defendants") respectfully move this Court for leave to file the reply memorandum attached hereto as Exhibit A, as well as a supporting affidavit with exhibits, attached hereto as Exhibit B, in response to the Plaintiff's Opposition to their Cross-Motion for Summary Judgment.

In support of this motion, the Merrimack College Defendants state as follows:

1.    Plaintiff's Opposition attempts to raise new issues relating primarily to legal arguments to which the Merrimack College Defendants have not had the opportunity to address.

2.    Plaintiff's Opposition confuses and misstates the legal issues governing Counts II, V, VI, VIII, IX and X as to which Merrimack College and Riordan are clearly entitled to summary judgment.

3.     The Merrimack College Defendants believe that the issues raised in the Opposition can be substantially simplified and clarified through the filing of a reply memorandum.

4.     The Merrimack College Defendants do not seek permission to re-argue the underlying issues; rather, the Merrimack College Defendants seek an opportunity to respond to issues raised in Plaintiff's Opposition which are confusing, erroneous, or mischaracterized.

5.     Accordingly, the Merrimack College Defendants reasonably request permission to file the attached reply brief, as well as a supporting affidavit with exhibits.

6.     The Merrimack College Defendants request expedited review of the motion in light of the trial scheduled for June 11, 2007.

Respectfully submitted,

MERRIMACK COLLEGE and
MICHAEL RIORDAN

By their Attorneys,

NELSON, KINDER,
MOSSEAU & SATURLEY, P.C.

Dated:  May 7, 2007                    By: /s/ Robert B. Smith_____
                                       Robert B. Smith, BBO#546580
                                       Allison C. Ayer, BBO#660665
                                       Nelson, Kinder, Mosseau & Saturley, P.C.
                                       45 Milk Street, 7th Floor
                                       Boston, MA  02109
                                       Tel.: (617) 778-7500
                                       Fax: (617) 778-7501

## CERTIFICATE OF SERVICE

I, Robert B. Smith, do hereby certify that on this date I electronically filed the foregoing "Motion of Defendants Merrimack College and Michael Riordan for Leave to File a Reply to Plaintiff's Opposition to their Cross-Motion for Summary Judgment" with the Clerk of the District Court using the CM/ECF system, which would then notify the following CM/ECF participants in this case:

James B. Krasnoo, Esq.
Paul Klehm, Esq.
Benjamin Falkner, Esq.
Krasnoo Klehm, LLP
23 Main Street
Second Floor
Andover, MA  01810-3730

Regina Gilgun Ryan, Esq.
Merrick, Louison & Costello, LLP
67 Batterymarch Street
Boston, MA  02110-3206

Dated:  May 7, 2007                    /s/ Robert B. Smith_____

Exhibit A

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRETT S. GODETTE | ) | |
|     Plaintiff, | ) | C.A. No. 05-11354 JLT |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD STANLEY, DIANE HEFFERNAN, | ) | |
| DANIEL CRONIN, and PAUL GALLAGHER, | ) | |
| Individually and as Police Officers of | ) | |
| their Respective Municipalities, the TOWN OF | ) | |
| NORTH ANDOVER, MICHAEL | ) | |
| RIORDAN and MERRIMACK COLLEGE | ) | |
|     Defendants. | ) | |

**DEFENDANTS MERRIMACK COLLEGE AND MICHAEL RIORDAN'S REPLY
MEMORANDUM TO PLAINTIFF'S OPPOSITION TO THEIR CROSS-MOTION FOR
SUMMARY JUDGMENT**

The Defendants, Merrimack College and Michael Riordan ("Riordan") (collectively the "Merrimack College Defendants") reply to the Plaintiff's Opposition to their Cross-Motion for Summary Judgment as to Counts II, V, VI, VIII, IX and X.  In  support of this reply, the Merrimack College Defendants state as follows:

**ARGUMENT**

**I.      Because Plaintiff Consents to its Dismissal, the Merrimack College Defendants are
Entitled to Summary Judgment on Plaintiff's Section 1985 Claim.**

The Court should enter summary judgment in favor of the Merrimack College Defendants as to Count II, plaintiff's claim brought pursuant to 42 U.S.C. § 1985.  Plaintiff failed to oppose the defendants motion for summary judgment as to this count.  Indeed, plaintiff consented to the dismissal of Count II.  <u>See</u> Plaintiff's Opposition to Merrimack College Defendants' Cross-Motion for Summary Judgment, p. 1; <u>see also</u> Plaintiff's Memorandum of

1

Law in Support of his Opposition to Merrimack College Defendants' Cross-Motion for Summary

Judgment, p. 11 at FN. 8.

**II.     Plaintiff's State Civil Rights Claim Fails because Plaintiff Offers No Evidentiary Support that Riordan or any Agent of Merrimack College Used Threats, Force, or Coercion to Violate his Civil Rights.**

  The MCRA was not intended by the legislature to "create 'a vast constitutional tort.'"

DeToledo v. County of Suffolk, et al., 379 F.Supp.2d 138, 146 (D.Mass. 2005)(citing Bally v.

Northeastern University, 403 Mass. 713, 718-19 (1989))(emphasis added).  As conceded by

plaintiff in his opposition, Godette may recover under the Massachusetts Civil Rights Act

("MCRA") only if his rights were violated by "*threats, coercion or intimidation*."

MASS.GEN.LAWS. ch. 12 §§ IIH and 11I (emphasis added).  For purposes of the MCRA:

> 'a threat….involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm…Intimidation involves putting in fear for the purpose of compelling or deterring conduct…[Coercion involves] the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done.'

DeToledo, 379 F.Supp.2d at 146 (citation omitted).

  No Merrimack College officer used threats, force or coercion to deprive the plaintiff of

his civil rights as required for plaintiff to prove a claim under M.G.L. ch. 12 §§ 11H and 11I.  It

is undisputed that no one associated with Merrimack College, including Riordan, had any contact

with the plaintiff on March 26, 2003, whether physical or otherwise.  Several North Andover

Police Department ("NAPD") officers testified that no one associated with Merrimack College

handcuffed, arrested, searched or touched Godette on March 26, 2003.  See Deposition

Transcript ("Dep. Tr.") of Diane Heffernan at 121:21-122:16[1];  Dep. Tr. of Daniel G. Cronin at

---

[1] Copies of excerpts of deposition transcripts of Diane Heffernan, Daniel G. Cronin, Richard M.

2

83:13-85:16; Dep Tr. of Richard M. Stanley at 119:19-121:12; Dep. Tr. of Paul J. Gallagher at 54:24-55:19. They testified that no Merrimack College officer searched Godette's person, his belongings, or his room on March 26, 2003. <u>See</u> <u>id</u>. NAPD officers further testified that no Merrimack College officer questioned or otherwise spoke to Godette on March 26, 2003. <u>See</u> <u>id</u>. Godette admitted that he could not identify a single Merrimack College security officer who searched him, touched him, questioned him or searched his room on March 26, 2003. <u>See</u> Dep. Tr. of Brett S. Godette at 186:16-190:7. Plaintiff has adduced no evidence to the contrary.

It is further undisputed that the NAPD controlled the armed robbery investigation on March 26, 2003 during which plaintiff was detained and questioned. NAPD officer Heffernan made initial contact with the plaintiff. Heffernan requested that he place his hands on the wall and placed him in handcuffs. She also read the plaintiff his Miranda rights and patted down the plaintiff. NAPD officer Heffernan requested to search the plaintiff's room. NAPD officers Heffernan and Cronin escorted the plaintiff to his room and performed the search. NAPD Detectives Heffernan and Cronin also questioned the plaintiff in his dorm room on March 26, 2003. <u>See</u> Affidavit of Paul Klehm at Exhibit C; Affidavit of Paul Klehm at Exhibit H, p. 5; Affidavit of Paul Klehm at Exhibit F, pp. 16-21. Plaintiff has submitted no evidence to the contrary.

Plaintiff's desperate attempt to save his MCRA claim against Merrimack College and Riordan by now asserting that their supposed "recklessness" in failing to check plaintiff's class schedule before calling the NAPD somehow constitutes a violation of his civil rights pursuant to the MCRA defies logic and legal precedent. Because its application is "'explicitly limited'" to

---

Stanley, Paul J. Gallagher, and Brett S. Godette, cited herein are attached as exhibits 1, 2, 3, 4, and 5 respectively, to the Affidavit of Allison C. Ayer, filed simultaneously herewith

only those situations in which alleged deprivation of rights occurs by *threat, intimidation and coercion*, the MCRA "operates 'almost entirely with the realm of intentional behavior.'" DeToledo, 379 F.Supp.2d at 146 (emphasis added).   While The First Circuit recognized that reckless conduct on the part of the defendant may be enough to establish a civil rights claim brought pursuant to *§ 1983*, this Court recognized that no case decided pursuant to MCRA "equat[es] recklessness with intentional conduct." Id.   The Court permitted the MCRA claim to go forward in DeToledo, not as plaintiff's argue pursuant to a recklessness standard, but rather under the "deliberate indifference" standard recognized in § 1983 claims. Id. at 147.[2]

Plaintiff has not alleged a § 1983 claim against Riordan or Merrimack College. Moreover, Merrimack College or Riordan's alleged "recklessness" in failing to check Godette's class schedule to confirm his whereabouts during the robbery before calling the NAPD clearly is not the type of intentional conduct which the MCRA was intended to remedy.   Such omission clearly does not constitute threats, intimidation or coercion, an essential element of a MCRA claim.   It is undisputed that in conjunction with calling the NAPD, Merrimack College indeed sought to contact Godette's professor to verify his whereabouts during the robbery, and that checking Godette's schedule would have merely confirmed that he was *supposed to be* in class.

---

[2] The "deliberate indifference" standard is "a state of mind reflecting conscious disregard or callous indifference to an individual's rights, sufficiently egregious to 'shock the conscience'" DeToldeo, 379 F.Supp.2d at 144.  It has been applied in § 1983 cases where police officers abandoned persons in situations which created grave danger to their physical well being.  See id. (citing Wood v. Ostrander, 879 F.2d 583, 588 (9th Cir. 1989)(officer's "deliberate indifference" and "callous disregard" for the physical safety of a woman whom he left standards in a dangerous neighborhood); White v. Rochford, 592 F.2d 381, 383 (7th Cir. 1979)(officers' callous disregard for the safety of children who were left unattended on the shoulder of a busy freeway after their parents' arrest); Miga v. City of Holyoke, 398 Mass. 343, 351-52 (1986)(offices manifested "deliberate indifference" in leaving an intoxicated, semi-conscious, and suicidal detainee alone despite warnings from other prisoners about her erratic behavior)). Clearly Riordan calling the NAPD with information relevant to their investigation of an armed robbery does not rise to this level as a matter of law.

<u>See</u> Dep. Tr. of Diane Heffernan at 75:4-76:24; 100:1-100:20; Dep. Tr. of Richard M. Stanley at 66:4-68:20; 108:5-109:10.    Considering the lack of contact with plaintiff or control of the investigation, Merrimack College and Riordan's actions also cannot be analogized to the police action taken against Williams in <u>DeToledo</u>.  Plaintiff's state civil rights claim brought against Merrimack College and Riordan pursuant to M.G.L. ch. 12 §§ 11H and 11I, therefore fails, and Merrimack College and Riordan are entitled to summary as to Count V.

### III.    Plaintiff's Common Law Conspiracy Claim Similarly Fails because There Exists No Evidentiary Support that Riordan and/or any other Person Agreed to Commit a Wrongful Act and/or otherwise Committed Tortious Conduct.

In order to succeed on his common law conspiracy claim, Godette must prove a common design or agreement between two or more persons to do a wrongful act, and proof of a tortious act in furtherance of that agreement.  <u>Aetna Cas.Sur.Co. v. P&B Autobody</u>, 43 F.3d 1546, 1563 (1st Cir. 1994).  He has utterly failed to do so here.  To the extent Riordan and the NAPD officers reached any agreement (a dubious proposition), they agreed to fulfill their duties as law enforcement officers to investigate an armed robbery.  Such conduct is clearly not wrongful in any way and plaintiff has submitted no evidence whatsoever to the contrary.    As fully discussed above, Riordan did not arrest, handcuff, touch and/or otherwise make physical contact with the plaintiff.  Riordan did not search plaintiff's room or his person.  At no time on March 26, 2003 did Riordan question or speak to Godette.  <u>See</u> Dep. Tr. of Diane Heffernan at 121:21-122:16; Dep. Tr. of Daniel G. Cronin at 83:13-85:16; Dep Tr. of Richard M. Stanley at 119:19-121:12; Dep. Tr. of Paul J. Gallagher at 54:24-55:19.  Riordan merely contacted Officer Heffernan to provider her with information clearly relevant to the NAPD investigation of a serious crime.  Such actions were entirely proper.  <u>See</u> Dep. Tr. of Richard M. Stanley at 117:22-119:18.  Accordingly, the Merrimack College Defendants are entitled to summary judgment on Count VI,

the common law conspiracy claim.

**IV.    Plaintiff's False Imprisonment and Assault and Battery Claims against Riordan and Merrimack College Also Fail because Plaintiff Has No Factual Support that Riordan and/or any Agent of Merrimack College Used Force or Threats.**

To establish a tort claim for false imprisonment, Godette must establish that Riordan and/or Merrimack College engaged in "an unlawful restraint of [his] freedom of movement by *force or threats.*" Rose v. Town of Concord, et al., 971 F.Supp. 47, 51 (D.Mass. 1997)(emphasis added).  "Assault and battery is the 'intentional and unjustified *use of force* upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.'" Sietins v. Joseph, et al., 239 F.Supp.2d 366, 380 (D.Mass. 2003).

The undisputed facts show plainly that neither Riordan nor any one associated with Merrimack College neither touched, spoke to, or otherwise had contact with the plaintiff on March 26, 2003, and that no one from Merrimack College used threats or force at any time. See Dep. Tr. of Diane Heffernan at 121:21-122:16;  Dep. Tr. of Daniel G. Cronin at 83:13-85:16; Dep Tr. of Richard M. Stanley at 119:19-121:12; Dep. Tr. of Paul J. Gallagher at 54:24-55:19. Accordingly, plaintiff has failed to support his claims for false imprisonment (Count VIII) or assault and battery (Count IX), and Merrimack College and Riordan are entitled to summary judgment on those claims.

**V.    Plaintiff's Negligent Infliction of Emotional Distress Claim Fails because Plaintiff Has No Factual Support that Riordan and/or any Agent of Merrimack College Caused  Physical Injury of Any Kind to Plaintiff.**

It is undisputed that plaintiff did not suffer the type of emotional and/or physical injuries compensable pursuant to a negligent infliction of emotional distress claim.  Plaintiff did not suffer anxiety, depression, posttraumatic stress disorder, nightmares, insomnia, and/or dissociative episodes after March 26, 2003.  See Rodriguez v. Cambridge Housing Authority,

443 Mass. 697, 702 (2005).

Godette attended one brief session with a Merrimack College counselor. See Dep. Tr. of Brett S. Godette at 125:18-127:7, 128:23-129:3, and 132:23-133:15. He did not schedule a second appointment and never sought any other counseling or mental health treatment as a result of the incident. Godette was not prescribed any medication after the incident. Id. Godette's grades were consistent, even after the incident. He graduated with a 2.8 grade point average. Dep. Tr. of Brett S. Godette at 149:12-150:4. His academic performance was not adversely affected by the incident. See id. The incident also did not affect Godette's social life. Godette testified that even before the incident, he did not frequent campus parties or social gatherings. He was reclusive and insular both before and after the incident. See Dep. Tr. of Brett S. Godette at 113:23-115:8. The undisputed facts reveal that plaintiff was virtually unaffected by the incident. He certainly did not suffer the type of emotional distress compensable under Massachusetts law. Moreover, neither Riordan nor any other agent of Merrimack College caused plaintiff any physical injury. See Dep. Tr. of Diane Heffernan at 121:21-122:16; Dep. Tr. of Daniel G. Cronin at 83:13-85:16; Dep Tr. of Richard M. Stanley at 119:19-121:12; Dep. Tr. of Paul J. Gallagher at 54:24-55:19. Accordingly, the Merrimack College Defendants are entitled to summary judgment on Count X.

### Conclusion

For all of these reasons, as well as the reasons asserted in Defendants Merrimack College and Michael Riordan's Response to the North Andover Defendants' Motion for Summary Judgment and their Cross-Motion for Summary Judgment,[3] this Court should grant summary

---

[3] Merrimack College and Riordan further rely on Defendants' Richard Stanley, Diane Heffernan, Daniel Cronin, Paul Gallagher and the Town of North Andover's Motion for Summary Judgment, filed March 1, 2007; Defendants' Richard Stanley, Diane Heffernan, Daniel Cronin,

judgment in favor or Riordan and Merrimack College  on Counts II,  V, VI, VIII, IX, and X.

Respectfully submitted,

MERRIMACK COLLEGE and
MICHAEL RIORDAN

By their Attorneys,

NELSON, KINDER,
MOSSEAU & SATURLEY, P.C.


Dated:  May __, 2007                    By:    /s/ Robert B. Smith
                                               Robert B. Smith, BBO#546580
                                               Allison C. Ayer, BBO#660665
                                               Nelson, Kinder, Mosseau & Saturley, P.C.
                                               45 Milk Street, 7th Floor
                                               Boston, MA  02109
                                               Tel.: (617) 778-7500
                                               Fax: (617) 778-7501

---

Paul Gallagher and the Town of North Andover's L.R. 56.1 Statement of Undisputed Facts, filed
March 1, 2007; and Defendants' Richard Stanley, Diane Heffernan, Daniel Cronin, Paul
Gallagher and the Town of North Andover's Memorandum of Law in Support of Their Motion
for Summary Judgment, filed March 1, 2007 in support of this reply.

## CERTIFICATE OF SERVICE

I, Robert B. Smith, do hereby certify that on this date I electronically filed the foregoing "Defendants Merrimack College and Michael Riordan's Reply Memorandum to Plaintiff's Opposition to their Cross-Motion for Summary Judgment" with the Clerk of the District Court using the CM/ECF system, which would then notify the following CM/ECF participants in this case:

James B. Krasnoo, Esq.
Paul Klehm, Esq.
Benjamin Falkner, Esq.
Krasnoo Klehm, LLP
23 Main Street
Second Floor
Andover, MA  01810-3730

Regina Gilgun Ryan, Esq.
Merrick, Louison & Costello, LLP
67 Batterymarch Street
Boston, MA  02110-3206

Dated:  May ___, 2007                    /s/ Robert B. Smith_____

Exhibit B

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BRETT S. GODETTE | ) | |
| Plaintiff, | ) | C.A. No. 05-11354 JLT |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD STANLEY, DIANE HEFFERNAN, | ) | |
| DANIEL CRONIN, and PAUL GALLAGHER, | ) | |
| Individually and as Police Officers of | ) | |
| their Respective Municipalities, the TOWN OF | ) | |
| NORTH ANDOVER, MICHAEL | ) | |
| RIORDAN and MERRIMACK COLLEGE | ) | |
| Defendants. | ) | |

**AFFIDAVIT OF ALLISON C. AYER IN SUPPORT OF DEFENDANTS
MERRIMACK COLLEGE AND MICHAEL RIORDAN'S REPLY
MEMORANDUM TO PLAINTIFF'S OPPOSITION TO THEIR CROSS-
MOTION FOR SUMMARY JUDGMENT**

I, Allison C. Ayer, do hereby depose and state as follows:

1.     My name is Allison C. Ayer.  I am counsel of record for Merrimack College and Michael Riordan, defendant in the above-captioned proceedings.  This affidavit is based on my personal knowledge.

2.     I have caused to be attached hereto as Exhibit 1 true and accurate copies of excerpts of the deposition transcript of Diane Heffernan taken February 27, 2007.

3.     I have caused to be attached hereto as Exhibit 2 true and accurate copies of excerpts of the deposition transcript of Daniel G. Cronin taken March 13, 2007.

4.     I have caused to be attached hereto as Exhibit 3 true and accurate copies of excerpts of the deposition transcript of Richard M. Stanley taken February 27, 2007.

5.     I have caused to be attached hereto as Exhibit 4 true and accurate copies of excerpts of the deposition transcript of Paul J. Gallagher taken February 27, 2007.

6.    I have caused to be attached hereto as Exhibit 5 true and accurate copies of excerpts of the deposition transcript of Brett S. Godette taken October 19, 2006.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7th DAY OF MAY, 2007.

_Allison C. Ayer_

Allison C. Ayer

## CERTIFICATE OF SERVICE

     I, Robert B. Smith, do hereby certify that on this date I electronically filed the foregoing "Affidavit of Allison C. Ayer in Support of Defendants Merrimack College and Michael Riordan's Reply Memorandum to Plaintiff's Opposition to their Cross-Motion for Summary Judgment" with the Clerk of the District Court using the CM/ECF system, which would then notify the following CM/ECF participants in this case:

James B. Krasnoo, Esq.
Paul Klehm, Esq.
Benjamin Falkner, Esq.
Krasnoo Klehm, LLP
23 Main Street
Second Floor
Andover, MA  01810-3730

Regina Gilgun Ryan, Esq.
Merrick, Louison & Costello, LLP
67 Batterymarch Street
Boston, MA  02110-3206

Dated:  May __, 2007       /s/ Robert B. Smith_____

3

# Exhibit 1

VOLUME:  I
PAGES:  1 - 134
EXHIBITS:  1-3

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
BRETT S. GODETTE,                    )
          Plaintiff                  )
                                     )
vs.                                  )
                                     )
                                     )
RICHARD STANLEY, DIANE HEFFERNAN,    )
DANIEL CRONIN, PAUL GALLAGHER,       )
WILLIAM WALLACE, DONALD ATTULO,      )
CHARLES HESELTINE and PATRICK KEEFE, )
Individually, and as Police Officers )
of Their Respective Municipalities,  )
LT. RIORDAN, TOWN OF NORTH ANDOVER,  )
TOWN OF ANDOVER, and                 )
MERRIMACK COLLEGE,                   )
          Defendants                 )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

DEPOSITION OF

DIANE HEFFERNAN

TUESDAY, FEBRUARY 27, 2007

COMMENCING:  1:31 P.M.

1 Q.  Okay.

2 A.  -- but there was another one, I believe,

3     Rogers.

4 Q.  Okay.  As of the time of that meeting, did

5     you have an understanding as to where Brett

6     Godette was at the time of the robbery?

7 A.  I was told he was in class.

8 Q.  All right.  So as of the time you left that

9     safety office that day, you knew that Brett

10    Godette was scheduled to be in a class as of

11    the time of the robbery; is that true?

12 A.  Yes.

13 Q.  Okay, and what class was that?

14 A.  I don't recall.

15 Q.  All right.  Did you know what the name of

16    his professor was?

17 A.  I don't recall.

18 Q.  Did you or Officer Cronin or anyone else ask

19    what the name of that professor was?

20 A.  Yes.

21 Q.  Okay, and were you told what the name of the

22    professor was?

23 A.  Yes.  I just don't remember.  If I suggested

24    Don Kalinowski, K-a-l-i-n-o-w-s-k-i, would

Page 76

```
 1      that refresh your recollection as to the

 2      name of the professor?

 3 A.   No.

 4 Q.   Okay.  Was any effort made, during that

 5      meeting or after that meeting, to reach that

 6      professor?

 7 A.   We did try to reach the professor, yes.

 8 Q.   Who did?

 9 A.   Campus police.

10 Q.   You didn't, personally?

11 A.   We didn't.  How would we know where he is?

12 Q.   So who tried to reach the professor?

13 A.   I don't know.  Somebody on campus.  I don't

14      know if it was him, the Chief.  I don't

15      know.  It wouldn't have been us.  We would

16      have requested it, but it wouldn't have been

17      us because we don't know where the classes

18      are.

19 Q.   How do you know it was done?

20 A.   Because later on, I was told that they spoke

21      to him.

22 Q.   Okay.  When were you told that they spoke to

23      him?

24 A.   I was told they spoke to him after we left.
```

Page 100

1  Q.  How did it end?

2  A.  It ended that I went out to the hallway and

3      the campus police, one of them had said to

4      me that he could not find the teacher that

5      had Brett Godette at the time of the bank

6      robbery.  However, he did speak to another

7      teacher who did see him in that teacher's

8      class at that time.

9  Q.  All right.  Who told you this?

10 A.  One of the campus police.

11 Q.  Who was it?

12 A.  It wasn't Kelly Anderson, so I don't know.

13     I couldn't tell you if it was the

14     detective.  I couldn't tell you if it was

15     Mayrose.  You know, one of the campus police

16     said that his teacher was currently in a

17     class right now, so he couldn't speak to

18     us.  However, there was another teacher he

19     spoke to, and that other teacher saw Brett

20     Godette in the class at that time.

21 Q.  Okay.  If you don't believe what it is that

22     a suspect is telling you, why do you speak

23     to them?

24             MS. RYAN:  Objection.

```
 1      describe, focus your attention to Brett

 2      Godette?

 3 A.   No.

 4 Q.   Who was in charge of the investigation of

 5      the armed robbery on March 26, 2003?

 6              MS. RYAN:  Objection.

 7 A.   Who was in charge of the investigation?

 8      Lieutenant Gallagher, in charge of the

 9      Detectives Division.  We were doing the

10      investigation, myself and Detective Cronin,

11      with the other officers who were at the

12      scene.  So I'd have to say the initial

13      responding officer would be the one to do

14      the initial report.  The detectives follow

15      up.  There was no lead investigator, if you

16      want to call it.

17 Q.   I guess, what department was in charge of

18      the investigation that day?

19              MS. RYAN:  Objection.  You can

20      answer.

21 A.   North Andover.

22 Q.   During the meeting of the police officers at

23      the Merrimack College security office, did

24      any particular individual state that Brett
```

Page 121

1    Godette and the photographs of the suspect,

2    that there were similarities between those

3    two?

4         MS. RYAN:  Objection.

5 A.  Everyone agreed.

6 Q.  But no particular person --

7         MS. AYER:  Strike that.

8 Q.  Did any particular person make that decision

9    or was it a collective decision of the

10   group?

11 A. It was a collective decision.

12 Q. Who made the decision to release Brett

13   Godette, once you had questioned him and

14   searched his room?

15        MS. RYAN:  Objection.  You can

16   answer.

17 A. Myself and Detective Cronin.

18 Q. And who decided to cancel the description of

19   the license plate in the BOLO?

20 A. I did.

21 Q. Okay.  On March 26, 2003, did anyone from

22   the Merrimack College campus police search

23   Brett Godette, search his person?

24 A. No.

Page 122

1  Q.  On March 26, 2003, did anyone from the

2      Merrimack College campus police handcuff

3      Brett Godette?

4  A.  No.

5  Q.  On March 26, 2003, did anyone from the

6      Merrimack College campus police question

7      Brett Godette?

8  A.  No.

9  Q.  On March 26, 2003, did anyone from the

10     Merrimack College campus police search Brett

11     Godette's room?

12 A.  No.

13 Q.  On March 26, 2003, did anyone from the

14     Merrimack College campus police enter Brett

15     Godette's room at any time?

16 A.  No.

17 Q.  Were the surveillance photos from the

18     bank -- I think they're identified as

19     Stanley Exhibit 3 -- were those disbursed to

20     surrounding towns and communities, along

21     with the BOLO?

22 A.  No.

23 Q.  So at the time you received the phone call

24     from Lieutenant Riordan, he did not yet have

Exhibit 2

VOLUME I
PAGES 1 TO 89
EXHIBITS:  1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No. 05-11354JLT

| | |
|---|---|
| BRETT S. GODETTE, | ) |
|        Plaintiff, | ) |
| | ) |
|   VS | ) |
| | ) |
| RICHARD STANLEY, DIANE HEFFERNAN, | ) |
| DANIEL CRONIN, PAUL GALLAGHER, | ) |
| WILLIAM WALLACE, DONALD ATTULO, | ) |
| CHARLES HESELTINE and PATRICK KEEFE | ) |
| Individually, and as Police Officers | ) |
| of Their Respective Municipalities, | ) |
| LT. RIORDAN, TOWN OF NORTH ANDOVER, | ) |
| TOWN OF ANDOVER, and MERRIMACK | ) |
| COLLEGE, | ) |
|        Defendants. | ) |

DEPOSITION OF DETECTIVE DANIEL G. CRONIN, a

witness called on behalf of the Plaintiff, taken

pursuant to the Federal Rules of Civil Procedure,

before Lisa Abdo, Certified Shorthand Reporter and

Notary Public in and for the Commonwealth of

Massachusetts, at the Offices of Krasnoo Klehm LLP,

23 Main Street, Andover, Massachusetts, on Tuesday,

March 13, 2007, commencing at 10:07 a.m.

1     Godette?

2 A.   No.

3 Q.   From where you questioned Godette, could you see

4      out the dorm room door?

5 A.   Only I could.

6 Q.   Could Mr. Godette?

7           MS. RYAN:   Objection.   You can answer.

8 A.   I don't believe he could.

9 Q.   And why don't you believe that he could?

10 A.  He was facing the windows.

11 Q.  Was his back towards the door?

12 A.  Yes.

13 Q.  On March 26, 2003, did you observe any Merrimack

14     College security officer question Brett Godette?

15 A.  Not while I was present.

16 Q.  Do you have any knowledge of any Merrimack College

17     campus police officer questioning Brett Godette on

18     March 26, 2003?

19 A.  I do not.

20 Q.  On March 26, 2003, did you observe any Merrimack

21     College campus security officer read Brett Godette

22     his Miranda rights?

23 A.  No, I did not.

24 Q.  On March 26, 2003, did you observe any Merrimack

Page 84

1    College campus security officer speak to Brett

2    Godette?

3 A.  Not that I remember.

4 Q.  On March 26, 2003, did you observe any Merrimack

5    College campus security officer handcuff Brett

6    Godette?

7 A.  No, I did not.

8 Q.  On March 26, 2003, did you observe any Merrimack

9    College campus security officer pat down Brett

10    Godette?

11 A.  No, I did not.

12 Q.  On March 26, 2003, did you observe any Merrimack

13    College campus security officer search Brett

14    Godette's person?

15 A.  No, I did not.

16 Q.  On March 26, 2003, did you observe any Merrimack

17    College campus security officer touch Brett Godette

18    in any way?

19 A.  No, I did not.

20 Q.  On March 26, 2003, did you observe any Merrimack

21    College campus security officer search any of Brett

22    Godette's belongings, for example, his bag that you

23    mentioned?

24 A.  No, I did not.

1 Q.  On March 26, 2003, did you observe any Merrimack

2      College campus security officer search Brett

3      Godette's room?

4 A.  No, I did not.

5 Q.  On March 26, 2003, did you observe any Merrimack

6      College campus security officer enter Brett

7      Godette's room?

8 A.  I did not.

9 Q.  Other than the Merrimack College campus security

10     officers that you've mentioned earlier in your

11     deposition, do you have any recollection of any

12     other Merrimack College campus security officer

13     being involved at all in that incident on March 26,

14     2003?

15         MR. KLEHM:  Objection.  Go ahead.

16 A.  None that I remember at this time.

17         MS. AYER:  I'm done.  Thank you.

18         MR. KLEHM:  A couple quick ones.

19             REDIRECT EXAMINATION

20   BY MR. KLEHM:

21 Q.  Would you describe Mr. Godette's skin tone as light

22     Hispanic?

23 A.  Yes.

24 Q.  Did you see any Hispanics or African Americans

Exhibit 3

VOLUME:  I
PAGES:  1 - 130
EXHIBITS:  1-11


UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


Civil Action No. 05-11354JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
BRETT S. GODETTE,                       )
        Plaintiff                       )
                                        )
vs.                                     )
                                        )
                                        )
RICHARD STANLEY, DIANE HEFFERNAN,       )
DANIEL CRONIN, PAUL GALLAGHER,          )
WILLIAM WALLACE, DONALD ATTULO,         )
CHARLES HESELTINE and PATRICK KEEFE,    )
Individually, and as Police Officers    )
of Their Respective Municipalities,     )
LT. RIORDAN, TOWN OF NORTH ANDOVER,     )
TOWN OF ANDOVER, and                    )
MERRIMACK COLLEGE,                      )
        Defendants                      )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



DEPOSITION OF


RICHARD M. STANLEY


TUESDAY, FEBRUARY 27, 2007


COMMENCING: 10:08 A.M.

Page 66

```
 1     he gave us the information that we needed

 2     and we put that information in and looked at

 3     what he had to say and it all checked out.

 4  Q. When did the North Andover Police first

 5     obtain Mr. Godette's class schedule that

 6     day?

 7          MS. RYAN:  Objection.  You can

 8     answer.

 9  A. I don't know.

10  Q. Was it before or after --

11          MR. KLEHM:  Strike that.

12  Q. Was it before or after the police officers

13     left Mr. Godette in his room that day?

14  A. I don't know.  Repeat that question for me,

15     please?

16  Q. Yeah.  Did the North Andover Police learn

17     that Mr. Godette --

18          MR. KLEHM:  Strike that.

19  Q. Did the North Andover Police learn of Mr.

20     Godette's class schedule on March 26, 2003

21     before or after the North Andover Police

22     left Mr. Godette's room on that date?

23          MS. RYAN:  Objection.  You can

24     answer.
```

1 A.   Do you mean, did the North Andover Police

2      verify that Mr. Godette was actually in

3      class that day or that we knew his

4      schedule?

5 Q.   Well, let's start with knowing his

6      schedule.

7                 MS. RYAN:   Objection.

8 A.   Yeah, we knew his schedule.

9 Q.   Okay.  What was the basis of your knowing

10      his schedule?

11 A.   What was the basis?

12 Q.   How did you know his schedule?

13 A.   We received it from someone from the

14      college.

15 Q.   So the college gave you his schedule?  Is

16      that a yes?

17 A.   Yes.  I mean, that would be the only access

18      we could have is somebody from the college

19      gave us the schedule.

20 Q.   When did the college give you his schedule?

21 A.   I have no idea.

22 Q.   Was it in writing?

23 A.   I have no idea.

24 Q.   Who was it that informed you that the

1    college had given you his schedule?

2 A.   I can't recall.

3 Q.   Do you recall, as you sit here today, what

4      the schedule said about where Mr. Godette

5      was supposed to be at the time of this

6      alleged robbery?

7 A.   He -- he had some kind of a class going on

8      at the time that the robbery was taking

9      place.

10 Q.  Okay, and so as of the time that officers

11     were talking to Mr. Godette in his room, the

12     North Andover Police knew of Mr. Godette's

13     class schedule from the college; is that

14     right?

15          MS. RYAN:   Objection.

16 A.  I testified to the fact that I have no idea

17     when we found out, what time we found out

18     the schedule.  All I know is that, at some

19     point in time, we found out that Mr. Godette

20     was in a class and that's when we cleared.

21 Q.  Okay.  So it could have been that the North

22     Andover Police Department learned of Mr.

23     Godette's class schedule from Merrimack

24     after the officers left Mr. Godette in his

1    Allison Ayer, and I represent Merrimack

2    College and Michael Riordan in this

3    lawsuit.

4 A.  Uh-huh.

5 Q.  Would checking Brett Godette's schedule have

6    definitively verified that he was not at the

7    robbery?

8         MR. KLEHM:  Objection.

9 A.  It would be a combination of two things.  A,

10   checking his schedule; and B, verifying with

11   somebody who is reliable that he was

12   actually in class.

13 Q. Okay.

14 A.  So it has to be pretty much two-fold.  It

15   can't just be simply, "Here is his

16   schedule," and take it on face value.  That

17   is a starting point.  It has to be verified

18   by somebody to say "Yes, he was sitting in

19   class at this time."

20 Q.  So if the police had, on March 26, 2003,

21   simply seen his class schedule, that would

22   not have definitively ruled him out as

23   being present at the robbery; is that

24   correct?

1              MR. KLEHM:   Objection.

2 A.   That is correct.

3 Q.   There would have to be an additional step to

4      actually verify that he was indeed in class,

5      in accordance with his class schedule;

6      correct?

7 A.   Correct.

8 Q.   Deposition Exhibit 1, which is that two-page

9      document --

10 A.   Yes.

11 Q.   -- on Page 2, you said you recognized that

12      document; is that correct?

13 A.   Correct.

14 Q.   And this -- I think you testified -- and

15      please correct me if I'm wrong -- this is a

16      BOLO, and that is an acronym for "Be On the

17      Lookout," issued by the North Andover

18      Police?

19 A.   That's correct.

20 Q.   Do you know the source of the information

21      contained in this BOLO?

22 A.   It would be the North Andover Police would

23      take information from witnesses and other

24      measures to put it out.

1           MS. RYAN:   Objection.

2 Q.   -- that you observed that day?

3 A.   I don't know.

4 Q.   Do you remember seeing him there that day?

5 A.   I seem to have a recollection of him up in

6      the hallway, but I don't have a real strong

7      recollection of him being there, taking any

8      kind of active role.

9 Q.   Do you remember seeing him in the campus

10     security office when you initially arrived

11     on campus?

12 A.  I don't recall that.

13 Q.  What about when you arrived at the dormitory

14     and Mr. Godette, who I think you said was

15     detained in the vestibule?

16 A.  No.

17 Q.  You don't recall him being there then?

18 A.  He was not there then.

19 Q.  Okay.  Do you recall seeing Chief Mayrose

20     ever enter Brett Godette's room that day?

21 A.  No.

22 Q.  Was the information that the Merrimack

23     College Campus Police provided to the North

24     Andover Police relevant to their

1    investigation of the bank robbery on

2    March 26, 2003?

3              MR. KLEHM:  Objection.

4 A.  Yes.

5 Q.  Why or how was it relevant?

6 A.  They felt as though -- with the registration

7    number and so forth, they felt as though the

8    car was probably on campus, and they passed

9    on that information to us.

10 Q.  And why was that important?

11 A.  That was potentially a suspect vehicle from

12    the bank robbery.

13 Q.  Did the Merrimack College Campus Police act

14    reasonably in calling the North Andover

15    Police and providing the information about

16    the vehicle that matched the vehicle

17    identified in the BOLO on March 26, 2003?

18              MS. RYAN:  Objection.

19              MR. KLEHM:  Objection.

20 A.  I think they absolutely acted reasonably,

21    and in fact, if they had that information

22    and that were in fact the bank robber and

23    something would have taken place where

24    someone was hurt on campus, and they knew

1    that vehicle was there, I think they

2    absolutely would be in a serious lawsuit

3    regarding failure to protect.  So I think

4    they acted in a reasonable, professional

5    manner by getting the information to us as

6    quickly as possible.

7  Q.  Was it reasonable for them to provide you

8    with information that another Merrimack

9    College student had similarities to the

10    description of the suspect in the BOLO?

11        MR. KLEHM:  Objection.

12        MS. RYAN:  Objection.  You can

13    answer.

14  A.  Was that reasonable?  I believe so, in my

15    opinion.

16  Q.  And again, why?

17  A.  Any information we can get at that point in

18    time would help us.

19  Q.  At any time on March 26, 2003, did you

20    observe any Merrimack College Campus police

21    officer touch Brett Godette?

22  A.  No.

23  Q.  Okay.  At any time on March 26, 2003, did

24    you observe any Merrimack College Campus

Page 120

1    police officer place handcuffs on Brett

2    Godette?

3 A.  No.

4 Q.  At any time on March 26, 2003, did you

5    observe any Merrimack College Campus police

6    officer question Brett Godette?

7 A.  Did I make personal observations of that?

8 Q.  Right.

9 A.  I'd have to say no.

10 Q.  When you say you'd have to say no, what do

11    you mean?

12 A.  I don't know.  There was conversation going

13    on, but I can't be specific.  I know I

14    didn't see anybody handcuff him, but at the

15    same time, I know there was a lot of

16    conversation taking place, but I can't be

17    specific.  I can't give you anything

18    concrete.

19 Q.  So you can specifically identify a Merrimack

20    College campus police officer being the one

21    to converse or pose questions to Brett

22    Godette?

23 A.  No.

24 Q.  On March 26, 2003, did you observe any

1    Merrimack College Campus police officer

2    search Brett Godette's room?

3 A.  No.

4 Q.  At any time on March 26, 2003, did you

5    observe any Merrimack College campus police

6    officer search or pat down Mr. Godette

7    himself?

8 A.  No.

9 Q.  At any time on March 26, 2003, did you

10    observe any Merrimack College campus police

11    officer enter Brett Godette's room?

12 A.  No.

13 Q.  During the meeting in the Merrimack College

14    campus security office, do you remember any

15    specific person concluding that Mr. Godette

16    either had similarities to or matched the

17    suspect in the bank photos?

18         MR. KLEHM:  Objection.

19 A.  Any particular person?

20 Q.  Correct.  Was there a particular person that

21    concluded that?

22         MR. KLEHM:  Objection.

23 A.  No.  It was the consensus around the room.

24    There were many people in the room.  I can't

Exhibit 4

Page 1

VOLUME:  I
PAGES:  1 - 63
EXHIBITS:  1


UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS


Civil Action No. 05-11354JLT

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
BRETT S. GODETTE,                        )
        Plaintiff                        )
                                         )
vs.                                      )
                                         )
                                         )
RICHARD STANLEY, DIANE HEFFERNAN,        )
DANIEL CRONIN, PAUL GALLAGHER,           )
WILLIAM WALLACE, DONALD ATTULO,          )
CHARLES HESELTINE and PATRICK KEEFE,  )
Individually, and as Police Officers )
of Their Respective Municipalities,  )
LT. RIORDAN, TOWN OF NORTH ANDOVER,   )
TOWN OF ANDOVER, and                     )
MERRIMACK COLLEGE,                       )
        Defendants                       )
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*




DEPOSITION OF


PAUL J. GALLAGHER


TUESDAY, FEBRUARY 27, 2007


COMMENCING:  4:11 P.M.

Page 54

1    answer.

2 A.  The observations of the two Merrimack

3    College Public Safety officers.

4 Q.  Was the decision to question Brett Godette

5    that day based on your conclusion that

6    Brett Godette looked like the suspect in the

7    photos?

8 A.  The information we received from the

9    officers and looking at his college ID.

10 Q.  Would you agree with Officer Heffernan's --

11    excuse me -- Sergeant Heffernan's

12    testimony that it was a collective

13    decision to question Brett Godette that

14    day?

15         MS. RYAN:   Objection.   You can

16    answer.

17 A.  Yes.

18 Q.  You would agree with that?

19 A.  Yes.  I wanted to have him spoken to.

20 Q.  Once you arrived on Merrimack College campus

21    on March 26, 2003, who directed the

22    investigation?

23 A.  That would have been me.

24 Q.  On March 26, 2003, did you observe any

1    Merrimack College campus police officer

2    search Brett Godette?

3 A.  No.

4 Q.  On March 26, 2003, did you observe any

5    Merrimack College campus police officer

6    handcuff Brett Godette?

7 A.  No.

8 Q.  On March 26, 2003, did you observe any

9    Merrimack College campus police officer

10    question Brett Godette?

11 A.  No.

12 Q.  On March 26, 2003, did you observe any

13    Merrimack College police officer search

14    Brett Godette's room?

15 A.  No.

16 Q.  On March 26, 2003, did you ever observe any

17    Merrimack College campus police officer

18    enter Brett Godette's room?

19 A.  No.

20 Q.  On March 26, 2003, or at any time since

21    that date, have you received -- and when

22    I say "you," I mean the North Andover Police

23    Department, to the best of your knowledge --

24    received any information regarding a suspect

Exhibit 5

## Page 1

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS
C.A. NO.: 05-11354JLT

*************************************
BRETT S. GODETTE,
          PLAINTIFF

     vs.

RICHARD STANLEY, DIANE HEFFERNAN,
DANIEL CRONIN, PAUL CALLAGHER,
WILLIAM WALLACE, DONALD ATTULLO,
CHARLES HESELTINE and PATRICK KEEFE,
Individually and as Police Officers
of Their Respective Municipalities,
LT. RIORDAN, TOWN OF NORTH ANDVOER,
TOWN OF ANDOVER, and MERRIMACK
COLLEGE,

          DEFENDANTS
*************************************

          DEPOSITION OF BRETT S. GODETTE, a

witness called on behalf of the Defendants,

pursuant to Massachussetts Rules of Civil

Procedure, before Meredith A. Fairbanks, a

Notary Public and Shorthand Reporter in and for

the Commonwealth of Massachusetts, at the

offices of Merrick, Louison & Costello, 67

Batterymarch Street, Boston, Massachusetts

02110, on Thursday, October 19, 2006, commencing

at 9:31 a.m.

## Page 2

1  Appearances:
2
3      Paul J. Klehm
       Krasnoo Klehm, LLP
       23 Main Street
4      Terrace Level, Suite One
       Andover, MA 01810
5      (978)475-9955
       For the Plaintiff;
6
7      Regina M. Ryan
       Merrick, Louison & Costello, LLP
       67 Batterymarch Street
8      Boston, MA 02110
       (617)439-0305
9      For the Defendants.
10
11     Allison C. Ayer
       Nelson, Kinder, Mosseau & Saturley, PC
       99 Middle Street
12     Manchester, NH 03101
       (603)647-1800
13     for the Defendant Merrimack College.
14
15
16
17
18
19
20
21
22
23
24

## Page 3

1          EXAMINATION INDEX
2
   Brett Godette
3    DIRECT BY MS. RYAN . . . . .Page 4
     CROSS BY MR. KLEHM . . . . .Page 151
4    CROSS BY MS. AYER . . . . . .Page 153
5          EXHIBIT INDEX
6
1    Four Individual Statements...Page 139
7
2    Photographs on Four Pages...Page 143
8
3    Diagram...Page 173
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

## Page 4

1          Brett Godette, a witness
2  called on behalf of the Defendant, having been
3  properly identified and sworn under oath,
4  testified as follows:
5               * * *
6          DIRECT EXAMINATION
7  BY MS. RYAN:
8     Q.  Good morning, Mr. Godette.  As I told
9  you, my name is Regina Ryan and I represent the
10 Andover police and the North Andover police and
11 all of the individual police officers from those
12 two departments that have been named in the
13 lawsuit that you have brought and I'm going to
14 be asking you a series of questions today
15 pertaining to your claim and the allegations
16 that you've made against those officers.
17          If at any point during this deposition
18 you want to take a break, I see you have an
19 injury with your crutches here today, I'd be
20 happy to accommodate you in any way.  Okay?
21    A.  I appreciate that.
22    Q.  I'm sorry?
23    A.  I appreciate that.
24    Q.  Okay.  And if I ask you a question,

32 (Pages 125 to 128)

Page 125

1    records had been destroyed and that's the reason
2    why they were not being produced. It was never
3    disclosed to me that you were making those
4    records confidential or --
5        MR. KLEHM: Oh, no. You're
6    misunderstanding. I didn't say anything about
7    -- we never object to the production -- well, I
8    shouldn't say never, but we don't object to the
9    production of records. These happen not to
10   exist. But the contents of the communications
11   between them is governed by the privilege, so
12   you can't get it through him.
13       MS. RYAN: I disagree and we can
14   bring it up with the court, but are you
15   instructing him not to answer?
16       MR. KLEHM: Yes, I am.
17   BY MS. RYAN:
18   Q. So who was the counselor that you met
19   with?
20   A. I don't recall her name.
21   Q. How many times did you meet with her?
22   A. Once.
23   Q. Where did you meet with her?
24   A. In her office.

Page 126

1    Q. At the college or was she from an
2    outside agency?
3    A. At the college.
4    Q. Did she prescribe you any medications?
5    A. No.
6    Q. Did she prescribe you any course of
7    treatment?
8    A. No.
9    Q. Did you schedule a second appointment
10   with her?
11   A. No.
12   Q. Have you sought any other counseling
13   as a result of any of the incidents that serve
14   as the base of your complaint against my
15   clients?
16   A. No.
17   Q. Any medical treatment?
18   A. I would if I had insurance. But no, I
19   haven't.
20   Q. When you were in college you had
21   medical insurance, right?
22   A. Yes.
23   Q. So when you were in college, if you --
24   A. I did? Yes, I did.

Page 127

1    Q. And you never sought any medical
2    treatment as a result of any injuries that you
3    sustained in this correct; is that correct?
4    A. No.
5    Q. You didn't go to the emergency room;
6    is that correct?
7    A. Correct.
8    Q. And now it's your testimony here today
9    that after college you would have sought medical
10   attention for damages you sustained in this case
11   if you had medical insurance?
12   A. Yes. After my mother, you know, we
13   had a very -- we had like a heart-to-heart and
14   my mother knows me best. She always will.
15   Always has. She thinks that I need to seek some
16   medical attention.
17   Q. What medical attention does she think
18   you need to seek?
19   A. She just says, "You need to talk to
20   somebody."
21   Q. And you haven't done that; is that
22   correct?
23   A. No.
24   Q. And since you graduated from college,

Page 128

1    have you ever had medical insurance?
2    A. No. Maybe for a brief period when my
3    mother first signed with Kaiser Permanente,
4    which is a insurance company, but I think I got
5    too old or I was too old to be on it. They said
6    no. Something like that. Because I asked my
7    mother for insurance. She was trying to get me
8    insurance.
9    Q. But you believe you had it for a brief
10   time?
11   A. I may have. I'm not sure.
12   Q. Did you seek any counseling or
13   treatment during that period?
14   A. No.
15   Q. You never had insurance with Nextel?
16   A. No.
17   Q. Did you have the option of having it?
18   A. I'm not sure.
19   Q. What about with Ober Wireless?
20   A. No.
21   Q. Did you have the option of having it?
22   A. No.
23   Q. Were you ever prescribed any
24   medications by anyone as a result of any

DUNN & GOUDREAU

Page 129

1 injuries that you allege you sustained as a
2 result of this incident?
3    A.  No.
4    Q.   And you don't have any copies of the
5 records for the treatment that you had with the
6 counselor on campus; is that correct?
7    A.  Excuse me?
8    Q.   Did you keep a copy of any of the
9 records that you had from the meeting that you
10 had with your counselor on campus?
11        MR. KLEHM:  Objection.  Go ahead.
12    A.  No.  Only records -- I went back to my
13 coach's office and I talked to her like
14 he had asked me to and that was it.
15    Q.   And at any point did you keep a diary
16 of the events that transpired?
17    A.  A diary?  No.  I more or less write
18 poetry.
19    Q.   Did you write any poems about the
20 incident that occurred?
21    A.  I didn't write -- no, I didn't write
22 any poems about the incident that occurred, no.
23    Q.   Do you have medical insurance now?
24    A.  No.

Page 130

1    Q.   I see here today you have an injury to
2 your leg; is that correct?
3    A.  Yes.
4    Q.   Did you seek medical attention for
5 that?
6    A.  Initially, I wasn't going to, but my
7 mother went ahead and paid for whatever the
8 costs were for this.
9    Q.   And what, did you go to the emergency
10 room?
11    A.  A walk-in clinic.
12    Q.   What's your diagnosis?
13    A.  No fracture.  They just did x-rays.
14 But I am going to the hospital on Friday,
15 tomorrow, before I leave just to get it
16 rechecked out because they said I should have it
17 checked out in two weeks again to check the
18 ligaments.
19    Q.   What hospital will you be going to?
20    A.  Probably Lawrence General.
21    Q.   And who is paying for that course of
22 treatment?
23    A.  I've been told just to have them call
24 my attorneys if there's a problem.

Page 131

1    Q.   For this leg?
2    A.  Yes.
3    Q.   And who did you tell that to?
4    A.  Who did I tell what to?
5    Q.   To call your attorneys?
6    A.  Oh, I haven't done it yet.  On Friday,
7 that's what I've been told to do when I go to
8 have it looked at.
9    Q.   But your mother has paid for your
10 medical treatment to date?
11    A.  Thus far.
12        MR. KLEHM:  Can we go off for a
13 minute?  I can explain it really quickly.
14        MS. RYAN:  Don't worry about it.
15 That's okay.
16    Q.   Who are you staying with while you're
17 here for this deposition?
18    A.  I am staying with friends.
19    Q.   Who?
20    A.  Matthew and Nate.  But I'm staying in
21 different places.  I may stay at a different
22 place tonight.  Koran -- I may stay at one of my
23 teammate's places, Koran Rivers.  It's kind of up
24 in the air right now.

Page 132

1    Q.   Where do Matt and Nate live?
2    A.  Lawrence.
3    Q.   How do you know them?
4    A.  I know them through music.  Came to
5 some of my games.  Their cousin was my barber
6 while I was attending Merrimack, so that's how I
7 know them.
8    Q.   Have you had any other medical
9 treatment in the past three years aside from the
10 injury to your leg?
11    A.  Three years.  I'm not quite sure what
12 injuries occurred, but I have had injuries.  I
13 have had surgery.
14    Q.   When was the last time you had
15 surgery?
16    A.  I had surgery on my shoulder.
17    Q.   When was that?
18    A.  That was after my freshman year.
19    Q.   Any medical treatment after you left
20 Merrimack?
21    A.  No.  I mean, really couldn't afford it
22 if I had to.  No, nothing.
23    Q.   Ever had any counseling aside from the
24 one counseling session that you had at Merrimack

Page 133

1  College in your whole life?
2      A.  Have I ever been counseled?  Say that
3  again.
4      Q.  Have you ever sought any treatment
5  with a counselor, being a psychiatrist,
6  psychologist, a social worker, at any point in
7  your life aside from the one you've already
8  testified to here today?
9      A.  No, not that I recall.  Well, when I
10  was at East Brunswick High School, I don't know
11  if it counts, but my guidance counselor used to
12  sit and talk with me about, like, my plans for
13  college and stuff.
14     Q.  Anything else you can think of?
15     A.  That's it.
16     Q.  Now, is it your testimony that you
17  believe that this incident that serves as the
18  basis of the complaint today was racially
19  motivated?
20     A.  I mean, yes.
21     Q.  And what evidence do you have to
22  support your position that this was motivated by
23  race?
24     A.  I mean, just the whole doo-rag

Page 134

1  incident just really didn't rest easy with me.
2  Like, what did that have to do with anything?
3  Like, I wear a doo-rag.  You know, and then the
4  prior things that occurred on campus that I
5  already discussed.
6      Q.  The one incident with the hockey
7  players and the football players?
8      A.  Yes.  And then there was another
9  incident with -- there was other incidents, too,
10  like, that my teammates had.
11     Q.  With the Merrimack police or with an
12  outside police agency?
13     A.  With other students and the police.
14     Q.  Outside police agencies?
15     A.  I'm not really sure what happened in
16  their case, but that would be Light Foot Taylor
17  and those guys.  They had an incident.
18     Q.  What was the incident with Light Foot
19  Taylor?
20     A.  Light Foot Taylor and Kenny Jones,
21  they're current athletes.  That's who I stopped
22  in to see yesterday.  Kenny Jones hurt his
23  back.  Light Foot just had surgery on his leg,
24  so I wanted to, you know, I had to stop by and

Page 135

1  say hello, see how they were doing.  And but
2  those guys were involved in a incident where,
3  from what they tell me, they were called the "N"
4  word by other students.
5      Q.  Did that involve the police?
6      A.  And then when the police came, I
7  believe they were arrested and the other people
8  weren't.
9      Q.  Do you know who they were arrested by?
10     A.  No, I'm not sure.
11     Q.  Do you know when this occurred?
12     A.  No, I'm not sure.
13     Q.  Was it after your incident?
14     A.  Yes.  Was it?  Yes.
15     Q.  And do you know if it's still pending?
16     A.  I'm not sure.
17     Q.  You said that when I asked you why you
18  believe that this incident was racially
19  motivated, you said the doo-rag didn't rest well
20  with you and then you said because of prior
21  incidences including the incident involving
22  Light Foot Tailor and Kenny Jones.
23          Anything else that you're aware of
24  that supports your assertion that this incident

Page 136

1  involving the police was racially motivated?
2      A.  I have nothing that comes to mind.
3  Something may come to mind later.
4      Q.  Is your leg bothering you?
5      A.  Yes.  We can finish.
6      Q.    Do you want to walk around for a few
7  minutes?  Does that help it?
8      A.  Yes, it does.  It's just that the
9  circulation needs to switch.
10         MS. RYAN:  Why don't you walk
11  around for a little bit and then we can come
12  right back in.
13         (A break was taken from
14         12:30 p.m. to 12:34 p.m.)
15  BY MS. RYAN:
16     Q.  Now, I'm just going to -- your counsel
17  has produced the names of some people that he
18  believes might have information that would be
19  relevant to this case, so I'm just going to go
20  through the names and ask you if you know what
21  information these individuals could have that
22  could be relevant to this lawsuit, okay?
23  Patrick Foley.  Who is Patrick Foley?
24     A.  (Witness shakes head.)

38 (Pages 149 to 152)

Page 149

1        Was the last time you spoke to
2   any of them while you were at Merrimack College?
3   A.   Yes.
4   Q.   Had you consumed any drugs or alcohol
5   on March 26, 2003?
6   A.   No.
7   Q.   Were you ever disciplined as a student
8   at Merrimack College?
9   A.   No.
10   Q.   Suspended, put on probation, expelled?
11   A.   No.
12   Q.   And you did graduate?
13   A.   Yes.
14   Q.   And with a major in business?
15   A.   Business. Marketing. Concentration
16   of marketing.
17   Q.   Okay. Were you ever put on like an
18   academic-type probation?
19   A.   No.
20   Q.   And do you remember your GPA when you
21   graduated?
22   A.   I believe it's two-eight.
23   Q.   Were your grades consistent throughout
24   the four years at Merrimack?

Page 150

1   A.   Yes.
2   Q.   And that's like a B student,
3   approximately; is that correct?
4   A.   You can nudge me over, I guess.
5   Q.   Bumped you up a little, right?
6   A.   Yeah.
7   Q.   When you testified earlier about your
8   pants falling down out in front of Monican Hall,
9   do you remember that?
10   A.   Yes.
11   Q.   Your boxers never came down; is that
12   correct?
13   A.   No.
14   Q.   Is that correct?
15   A.   Yes, that's correct. My boxers never
16   came down.
17   Q.   Thank you. Do you have any memory of
18   seeing any Andover police officers on March 26,
19   2003?
20   A.   Again, I couldn't distinguish between
21   Boston police officer and a Andover police
22   officer. I don't know.
23   Q.   And you don't have a memory of seeing
24   any insignia on any individual that identified

Page 151

1   them as an Andover police officer; is that
2   correct?
3   A.   That is correct.
4   Q.   What about North Andover? Do you
5   remember seeing any insignia identifying anyone
6   as a North Andover police officer?
7   A.   Yeah, I didn't see any insignia.
8   Q.   So the police officers that you
9   encountered on March 26, 2003 could have been
10   from any department. You have no identity of
11   any of them; is that correct?
12   A.   Right.
13        MR. KLEHM:  Objection.
14        MS. RYAN:  I have nothing
15   further.
16        MR. KLEHM:  Before you leave,
17   since you're leaving, I had two things I wanted
18   to ask him based on what you said. So since
19   you're going to leave, why don't I just go.
20        MS. RYAN:  I would appreciate
21   that.
22        MR. KLEHM:  It might be three,
23   but okay.
24        CROSS-EXAMINATION

Page 152

1   BY MR. KLEHM:
2   Q.   When the police officers were at your
3   room, did they ask you to go through where you
4   were and when, your whereabouts for the day?
5   A.   Yes.
6   Q.   Can you relate what was said then?
7   A.   Relate what was said then?
8   Q.   What did you say to them, what did
9   they say to you during that conversation?
10   A.   I said the same thing I'd been saying
11   the whole time. I woke up in the morning, went
12   to basketball practice, went to the cafeteria,
13   studied for an exam, took my exam, went to
14   class, came back to my dorm, and went to the
15   gym.
16   Q.   When you got up that morning, what
17   color doo-rag did you have on?
18   A.   I have a blue doo-rag.
19   Q.   And when the police officers brought
20   you up to the room, did you feel like you were
21   being arrested?
22        MS. RYAN:  Objection. You can
23   answer.
24   A.   Yes.

**DUNN & GOUDREAU**

Page 185

1    Q.  Was the single officer with whom you
2  were familiar with and recognized, did he at any
3  time enter that half of the room with you on
4  March 26, 2003?
5    A.  I'm not sure.
6    Q.  I think you just said you did observe
7  the officers who were in there on that half of
8  the room with you?
9    A.  I mean, at that point, I really had my
10  head down like this (indicating). I wasn't
11  watching the whole search. When they asked me
12  questions, I would answer questions, but my head
13  was just, you know, I wasn't really watching the
14  search, watching everything they were touching.
15  I wasn't really.
16    Q.  Do you know how many officers were
17  with you on that side of the room that day when
18  they were doing the search?
19    A.  It was about, I'd say, three to six at
20  different times. I don't know.
21    Q.  Do you recall their genders?
22    A.  Well, there was one female officer and
23  the others were males.
24    Q.  Was the female officer with you on the

Page 186

1  side of the partition searching the room?
2    A.  I'm not sure. She came -- she
3  definitely -- I'm not sure.
4    Q.  Is it fair to say that, to the best of
5  your recollection, that you don't recall any
6  Merrimack College police officer, including the
7  one, and/or the person you identified as
8  familiar with, questioning you at any time that
9  day?
10        MR. KLEHM: Objection. You can
11  answer.
12    A.  Can you state that again?
13    Q.  Sure. I don't think I worded it very
14  well in the first instance, so...
15    A.  Okay.
16    Q.  You have no specific recollection of a
17  Merrimack College police officer questioning you
18  at any time?
19    A.  Verbally.
20    Q.  About any subject on -- let me finish
21  the question -- on March 26, 2003; is that
22  correct?
23    A.  Yes.
24    Q.  And you have no specific recollection

Page 187

1  of the single officer who you said that you were
2  familiar with ever questioning you at any time
3  on March 26, 2003; correct?
4    A.  Correct.
5    Q.  And you don't have any specific
6  recollection of any Merrimack College police
7  officer ever touching you in any way on March
8  26, 2003; correct?
9    A.  Could you state that again?
10    Q.  Sure. You don't have any specific
11  recollection of any Merrimack College police
12  officer touching you in any way, using any force
13  against you, on March 26, 2003?
14    A.  Visually. I didn't see. But then
15  again, I was touched in times where I didn't see
16  who was touching me.
17    Q.  But you don't have a specific
18  recollection. You couldn't say, Yes, that was a
19  Merrimack College police officer who touched me
20  there or touched me that time. You have no
21  specific recollection in that way; is that
22  correct?
23        MR. KLEHM: Objection. You can
24  answer.

Page 188

1    A.  Can you say that again?
2    Q.  You said people touched you that you
3  don't know who they were, but you don't have a
4  specific recollection -- you couldn't identify a
5  specific Merrimack College police officer who
6  specifically touched you at any time during --
7    A.  Right.
8    Q.  -- on March 26, 2003; is that correct?
9        MR. KLEHM: Objection.
10    A.  Correct.
11    Q.  And other than the time when you have
12  a specific recollection of him helping you with
13  your keys when you were in front of your dorm
14  room in Monican Hall on March 26, 2003, you have
15  no other specific recollection of the single
16  officer who you were familiar with touching you
17  at any other time on March 26, 2003; correct?
18    A.  Can you say that again? I'm sorry. I
19  wasn't...
20    Q.  It's okay. Other than -- I think you
21  testified the single officer with whom you were
22  familiar, you have a specific recollection of
23  him helping you with your keys when you were
24  upstairs in your dorm room on March 26, 2003;

48 (Pages 189 to 192)

Page 189

1  is that correct?
2     A.  (Witness shakes head.)
3     Q.  When you opened the door; correct?
4     A.  Correct.
5     Q.  And is it fair to say that you have no
6  other specific recollection of him touching you,
7  him being the single officer with whom you were
8  familiar, at any other time on March 26, 2003
9  other than that?
10    A.  Right.
11    Q.  And is it fair to say that, to the
12 best of your recollection, you do not recall any
13 Merrimack College police officer searching your
14 room on March 26, 2003?
15    A.  Correct.
16    Q.  And is it fair to say that you do not
17 have a specific recollection of seeing the
18 single officer with whom you were familiar with
19 ever searching your room on March 26, 2003;
20 correct?
21    A.  State that again?
22    Q.  Is it fair to say that you don't have
23 any specific recollection of the single officer
24 who you said you were familiar with and

Page 190

1  recognized, is it fair to say that you don't
2  have a specific recollection that he searched
3  your room that day?
4     A.  I never -- I never visually saw him in
5  my room.
6     Q.  So is that "yes?"
7     A.  Yes.
8     Q.  While you were in the entryway, which
9  in Exhibit 3 that we've marked -- do you need to
10 take a break?
11    A.  Mm-mmm.
12    Q.  Are you sure?
13    A.  Yes.
14    Q.  Let me know if you do, okay?
15    A.  No, I'm good.
16    Q.  In the entryway when you were located
17 in the position marked X with the circle around
18 it in the drawing on what's marked Exhibit 3
19 here?
20    A.  Where is 3?
21    Q.  This is Exhibit 3.  I'm sorry.  This X
22 with the circle around it which is the entryway
23 to Monican dorm; is that correct?
24    A.  Yes.

Page 191

1     Q.  Did any student ever enter or exit
2  that entryway while you were in there that day?
3     A.  Yes.  Students were going in and out.
4     Q.  While you were in there?
5     A.  Yes.
6     Q.  Do you have any recollection of who
7  they were?
8     A.  No.  I just saw -- because these are
9  windows (indicating).  There's windows on the
10 doors.
11    Q.  Okay.
12    A.  You know, and I'm being bombarded by
13 questions.  I'm not really -- I'm trying to pay
14 attention to the questions, but I'm seeing
15 students walking by.
16    Q.  So you don't know who they were?
17    A.  No.
18    Q.  You just know there were students?
19    A.  Yes.
20    Q.  The partition that divided your room
21 horizontally, could you see to your half of the
22 room from the doorway to the hallway?
23    A.  I mean, the partition.
24    Q.  Yes?

Page 192

1     A.  Was basically translucent.  Like, you
2  can see through it.  It's not like I was trying
3  to, like, not see him and he couldn't see me.
4  It's just like somewhat of a divide.  Like, he
5  can see through it.  It was just a sheet
6  hanging.  So you can see, like, the t.v. on.  I
7  mean, what do you mean -- I don't know what your
8  perception of seeing is.
9     Q.  Well, I think you said from your
10 position seated at your desk on March 26, 2003,
11 you couldn't see -- you could only see figures?
12    A.  From sitting on my desk looking to the
13 left through the partition, I can see figures,
14 the door.  I can see the door open, the light,
15 but you can't see faces.  You can't see people.
16    Q.  So would it be fair to say that the
17 same is true looking the opposite
18 direction; i.e., looking into the room from the
19 door into your half of the room?
20    A.  I mean, I didn't get that view, so I
21 don't --
22    Q.  You --
23    A.  I don't know.  I don't know what the
24 light was.

## Page 113

1  sitting down, chatting?  I want to talk to
2  you."  Something like that.
3     Q.  So where did you have lunch, in the
4  cafeteria?
5     A.  Yes.  The Merrimack cafeteria.
6     Q.  Did you know him to be the president
7  before he approached you?
8     A.  Oh, yes.  Of course.
9     Q.  And can you describe the conversation
10  that you had with him?
11     A.  He stated, you know, "I'm sorry about
12  what happened.  Whoever is at fault for this
13  will be disciplined.  Whatever we can do to help
14  you.  We had, you know, we had nothing to do
15  with the situation.  It was an outside
16  operation."
17             Pretty much that was the gist of the
18  conversation.  It wasn't long.  I was very -- I
19  was -- at that time, I was just anti-social in
20  general, but, then again, this is the president
21  of the college you play for, so I was, you know,
22  showing respect.
23     Q.  So when you were at Merrimack, would
24  you describe yourself as being anti-social?

## Page 114

1     A.  Yes.  I stayed in my room pretty much
2  my whole four years.  I didn't really go out on
3  campus at all, really.  Very, very, very
4  rarely.  And then in my -- in my senior year of
5  college, I basically lived off-campus.
6     Q.  Who did you live with off-campus?
7     A.  My girlfriend at the time.
8     Q.  Who was that?
9     A.  Jennifer Magnanimi.
10     Q.  And so you wouldn't make it a practice
11  to go to parties on campus?
12     A.  No.
13     Q.  And would you socialize with your
14  teammates?
15     A.  Oh, yes.  I would socialize -- I would
16  socialize with my teammates and that's pretty
17  much it.
18     Q.  And why was that?
19     A.  Honestly, I felt those are the only
20  people there I would trust to hang out with
21  and...
22     Q.  Why did you feel they were the only
23  ones you could trust?
24     A.  Honestly, because I understood the

## Page 115

1  fact that I -- when I signed to go to Merrimack,
2  you know, I was going to be one of very few
3  minorities and, I mean, I come from an area --
4  I've been involved in situations in the past
5  where, you know, things like this have occurred
6  to me.  So I more keep to my -- I'm a
7  keep-to-myself person.  You know, I try to avoid
8  trouble.
9     Q.  So were you unhappy when you were at
10  Merrimack?
11        MR. KLEHM:  Objection.  Do you
12  want to say when?
13     Q.  At any time were you unhappy --
14        Strike that.  You just testified
15  that you understood you were going to be one of
16  very few minorities at Merrimack; is that true?
17     A.  Yes.  But I was -- I wasn't raised to
18  view color.  My brother is half white.  I don't
19  know my father but a name.  I'm -- but I'm
20  aware.  I'm aware of my surroundings always.
21     Q.  What do you mean by that?
22     A.  I mean, while at Merrimack, I'd seen
23  things happen to other students of color.
24  That's all.

## Page 116

1     Q.  What have you seen?
2     A.  There was an incident with two
3  football players and the hockey team and the two
4  football players eventually got expelled.
5     Q.  Were the football players minorities?
6     A.  Yes.
7     Q.  And were the hockey players?
8     A.  I don't believe they ever had a
9  minority hockey player.  I'm not sure.
10     Q.  So the ones that were involved weren't
11  minorities; is that correct?
12     A.  Huh?
13     Q.  The ones that were involved in an
14  incident between football players and hockey
15  players were not minorities, the hockey players?
16     A.  I wasn't present.  Like I said, I
17  stayed in my room.  But I was friends with the
18  two football players.
19     Q.  Did you think it was racially
20  motivated?
21     A.  Going off of what they stated, yes.
22     Q.  Any other incidences that you believe
23  were racially motivated with regard to students
24  at Merrimack College?