UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

)
BRETT S. GODETTE,           )
    Plaintiff,            )
                          )       Civil Action No. 05-11354JLT
v.                          )
                          )
RICHARD STANLEY, *et. al.*, )
    Defendants.           )

**PLAINTIFF BRETT S. GODETTE'S MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS MERRIMACK COLLEGE AND MICHAEL RIORDAN'S MOTION FOR SUMMARY JUDGMENT AS TO ALL REMAINING COUNTS [DOC. NO. 102]**

Plaintiff Brett S. Godette hereby submits the within memorandum of law in support of his opposition to the motion of Defendants Merrimack College and Michael Riordan for summary judgment as to all remaining counts [Doc. No. 102].

**Facts**

Godette relies upon, and incorporates herein by reference, the facts set forth in his previous filings in opposition to Defendants' various motions for summary judgment, including, without limitation, the facts set forth in Plaintiff's Memorandum of Law In Support of Plaintiff's Opposition To Defendants Richard Stanley, Diane Heffernan, Daniel Cronin, Paul Gallagher and Town of North Andover's Motion For Summary Judgment (hereinafter, "North Andover Opposition Memorandum") [*See* Doc. No. 80] and the facts set forth in Plaintiff Brett S. Godette's Memorandum Of Law In Opposition To Motion Of Defendants Merrimack College And Michael Riordan For Partial Summary Judgment On Counts II, V, VI, VIII, IX And X Only [Doc. No. 77] [*See* Doc. No. 90]. Godette further relies upon the Diversity materials produced

by Defendants and the Merrimack College Non-Discrimination Policy. (*See* **Exhibits A** through **E** of Further Supplemental Affidavit of Paul J. Klehm, Esq.).[1]

## Standard of Review

The party moving for summary judgment must meet the initial burden of demonstrating the absence of a genuine issue of material fact, upon which a reasonable jury could find for the nonmovant. Fed. R. Civ. P. 56(c). All facts must be viewed in the light most favorable to the nonmovant, giving the nonmovant "the benefit of all reasonable inferences that can be drawn from these facts." *Lockhart v. Cedar Rapids Comm. Sch. Dist.*, 963 F. Supp. 805, 814 (N.D. Iowa 1997) (citation omitted). "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, *Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 181 (1st Cir. 1989), would permit a rational fact finder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds*, 896 F.2d 5, 7 (1st Cir. 1990).

## Argument

**A.  Where Riordan and the Merrimack College Breached Their Respective Duties to Godette to Exercise Reasonable Care to Avoid Physical Harm to Godette, Summary Judgment in Favor of Defendants on Count XI (Negligence) Is Not Warranted.**

In order to prevail on his negligence claim, Godette must show (1) that Riordan and/or Merrimack College owed Godette a duty, (2) that Riordan and/or Merrimack College breached this duty, (3) that Godette suffered damages, and (4) that Godette's damages were causally related to Riordan's and/or Merrimack College's breach of duty. *Jupin v. Kask*, 447 Mass. 141, 146 (2006). Defendants argue, in essence, that Riordan and Merrimack College owed no legal duty to Godette. ([Doc. No. 103], at pp. 3-8). Defendants *do not* argue, in the alternative, that

---

[1] Godette notes that Defendants erroneously state in their memorandum that "Plaintiff admitted that he was indeed wearing clothing similar to the suspect's." ([Doc. No. 103], at p. 6 n.2). Godette categorically denies that his clothing was similar to that worn by the suspected bank robber and notes that Defendants' citations do not support the assertion that Godette admitted same. (*See, e.g.*, [Doc. No. 79], Responses Nos. 2, 4, 5, 6, 11 and 12).

they did not breach a duty to Godette if such a duty exists, nor do they argue that Godette did not suffer damages causally related to any such breach. ([Doc. No. 103], at pp. 3-8).

The existence of a duty is a question of law. *Jupin*, 447 Mass. at 146, citing *Remy v. MacDonald*, 440 Mass. 675, 677 (2004). Under Massachusetts law, "[C]ourts will find a duty where, in general, reasonable persons would recognize it and agree that it exists." *Jupin*, at 146, quoting *Luoni v. Berube*, 431 Mass. 729, 735 (2000).

> **1.     Merrimack College and Riordan owed a duty to Godette to exercise reasonable care before calling the North Andover police to accuse Godette of robbing the bank.**

Generally, every actor must exercise reasonable care to avoid physical harm to others. *Jupin*, at 147. Nonetheless, the risk of harm to another must be reasonably foreseeable to the actor. *Id.* Thus, with certain exceptions, Massachusetts recognizes the rule that "a defendant owes a duty of care to **all persons who are foreseeably endangered** by his conduct, with respect to **all risks which make the conduct unreasonably dangerous**." *Id.* (emphasis added), quoting *Tarasoff v. Regents of the Univ. of Cal.*, 17 Cal.3d 425, 434-435 (1976); *see also Pool v. City of Oakland*, 42 Cal.3d 1051, 1062-1063 (1986) (store negligent for summoning police upon suspicion that customer attempted to buy groceries with forged $100 bill)[2]. Only where "the imposition of a precautionary duty is deemed to be either inadvisable or unworkable" will a court fail to recognize a duty of reasonable care. *Jupin*, 447 Mass. at 147-148. The Court must determine whether a duty exists in the context of "existing social values, customs and considerations of policy." *Luoni v. Berube*, 431 Mass. 729, 730 (2000).

---

[2] Pool had cashed a paycheck and received from Wells Fargo, among other bills, a valid $100 bill upon which the motto "In God We Trust" did not appear. *Id.*, at 1056. Pool tendered the bill to pay for his groceries at Safeway store, which happened to have been receiving an inordinate amount of counterfeit $100 bills. *Id.* Although at least one series of valid bills had been printed without the motto, the store treated the bill as a possible counterfeit and called the Oakland police. *Id.*, at 1057. Police arrived and arrested Pool. *Id.* Shortly after Pool arrived at the police station, officers verified, via a Treasury Department telephone service, the validity of Pool's bill. *Id.*, at 1058. The entire verification process took six minutes. *Id.*

In *Jupin*, an historically violent and mentally instable young man, Jason Rivers, shot and killed a Westminster police officer. *Jupin*, 447 Mass. at 142. Rivers, who lived in the home of Kask, the defendant, had obtained a firearm from a large collection of firearms in the basement of the home. *Id.* Kask had allowed Rivers access to her entire home, including the area where the firearms collection was stored. *Id.*

The central issue before the *Jupin* court was whether Kask owed to the police officer a duty of reasonable care in the security and storage of the firearms collection. *Id.*, at 143. The court held that because it was reasonably foreseeable that Rivers would steal a firearm and kill someone with the weapon, Kask owed a duty of reasonable care to the officer. *Id.*, at 147-148. Likewise, the court held that there was no public policy justification for refusing to impose a duty. *Jupin*, at 148. Weighing the public policy behind imposing a duty, the court found that the potential harm of failing to take reasonable steps to secure firearms was great and that the costs of imposing the duty were *relatively* modest. *Id.*, at 151-152. In order to have satisfied her duty, the court noted, Kask may only have had to build a locked gun cabinet. *Jupin,* at 148. Moreover, the *Jupin* court found that the recognition of a duty would not open the door to liability for almost all actions or omissions by the defendant. *Id.*, at 153; *compare Remy*, 440 Mass. at 678 ("Recognizing a pregnant woman's legal duty of care in negligence to her unborn child would present an almost unlimited number of circumstances that would likely give rise to litigation"). The court concluded that there would be a significant social benefit to recognizing a duty of reasonable care in the storage of firearms. *Jupin*, 447 Mass. at 153.

Defendants do not argue that the harm suffered by Godette was not reasonably foreseeable as a result of the conduct of Riordan and other Merrimack College police officers. (*See* [Doc. No. 103], at pp. 3-8). Here, it was clearly reasonably foreseeable that if Riordan

4

called the North Andover police department to report that he believed Godette to be the bank robber, then the North Andover police would arrest Godette and treat him roughly, even if Godette was actually innocent.  *See Jupin*, 447 Mass. at 148-149 (third party's actions, even if criminal, reasonably foreseeable); *Pool*, 42 Cal.3d at 1064 ("[A]ccusing an innocent customer of felonious conduct and calling in the police could foreseeably lead to a police investigation, escalation of the conflict, and arrest ...").  In fact, at his deposition, Riordan testified that he *expected* just that (*See* [Doc. No. 79], at p. 7 (Riordan "knew that the North Andover police would probably follow up on the information because there was a gun involved in the alleged crime")).  *Cf. Jupin*, 447 Mass. at 149 (Kask's "testimony leaves the unmistakable impression that she foresaw the risk…").

Defendants argue that public policy "dictates the conclusion that Merrimack College and Riordan had no duty to delay calling the NAPD." ([Doc. No. 103], at p. 7).  Nonetheless, courts in other jurisdictions have recognized that a negligence action may be based upon the failure of the defendant to "exercise due care in reporting suspicions of felonious conduct to the police." *Pool*, 42 Cal.3d at 1062-1063 n.12, 1065 (collecting cases at n.12; store negligent for summoning police upon suspicion that customer attempted to buy groceries with forged $100 bill).  Godette's counsel is unaware of any Massachusetts case holding, and Defendants cite no authority in support of the view, that it violates public policy to impose a duty upon Merrimack College and Riordan to exercise reasonable care before identifying one of its own students as a bank robber to the local police.  To the extent that this Court is inclined to decide, based upon public policy considerations, that no such duty should be imposed, the Court would be issuing a new rule of state law in the absence of controlling precedent of the Supreme Judicial Court of Massachusetts ("SJC").  Godette therefore respectfully requests that this Court certify the

5

question of law to the SJC pursuant to SJC Rule 1:03, Uniform Certification of Questions of Law (United States District Court may certify question of law to SJC if "there are involved in the proceeding before it questions of law of [Massachusetts] which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court there is no controlling precedent in the decisions of [the SJC]").

      Weighing in favor of imposing a duty upon Merrimack College and Riordan is the high risk of harm to Godette from the false identification. Despite having virtually no evidence that Godette was involved in the bank robbery, besides his suspicion that Godette, an African-American, matched the description of a bank robber described as Hispanic, Riordan telephoned North Andover police and told them that Godette was the bank robber. Riordan failed to spend even a few minutes to inquire into Godette's whereabouts at the time of the robbery either before calling the police or before the police arrived at the Merrimack College police station for a meeting. *Cf. Pool*, *supra*, n.2. Riordan and other Merrimack College officers later met with North Andover police and led them on a campus-wide search for Godette. As a result of Riordan's information, North Andover police officers pushed Godette violently against a wall, in front of a crowd of onlookers. Godette was physically assaulted. Godette experienced extreme humiliation and embarrassment as the officers led him in handcuffs past several onlookers through the dormitory to his dormitory room. Moreover, it is reasonably foreseeable that unnecessary police confrontation, particularly with an alleged armed bank robber, can result in extremely dangerous conditions and tragic consequences. *See Anderson v. Russell*, 247 F.3d 125 (4th Cir. 2001) (man listening to music through headphones mistakenly shot by police when police confronted him with guns, told him to put his hands up, and man reached for walkman to turn down volume). It is also reasonably foreseeable that, once notified by Riordan, the North

6

Andover police were going to act swiftly and with great force in order to detain a suspected bank robber.

Defendants unfairly argue that "in a **post-Virginia Tech society** … an armed student poses a serious and real danger to the physical safety of the student body." ([Doc. No. 103], at p. 8 (emphasis added)). Godette was never armed nor linked in any way to the bank robbery. ([Doc. No. 79], at p.9). Moreover, Riordan's negligent investigation and accusation of Godette left the real armed bank robber potentially to roam freely about the Merrimack College campus. Furthermore, the reference to Virginia Tech is inflammatory and irrelevant to the case at bar. Not only did the instant events occur in 2003, long before the Virginia Tech tragedy, but also an armed student poses the same potential risk today that he or she did before the Virginia Tech tragedy.

In contrast to the great harm suffered by Godette as a result of Riordan's and Merrimack College's negligent conduct, the costs of imposing a duty upon Riordan and Merrimack College to take reasonable steps to insure that they are not wrongfully accusing someone of a crime are modest, *see Jupin*, 447 Mass. at 152, especially where Merrimack College and Riordan could easily have eliminated Godette as a suspect. Mayrose admitted that he could call the registrar's office if he needed a student's schedule. ([Doc. No. 90], at p.2). *Cf. Pool*, *supra*, 42 Cal.3d at 1058 (six minute verification process via telephone call to Treasury Department to determine that $100 bill was not counterfeit); *compare Bash v. Clark University*, 22 Mass. L. Rptr. 84, 2006 WL 4114297 (Mass. Super.) (university cannot prevent illegal drug use by students "except *possibly* by posting guards in each dorm room on a 24-hour, 365-day per year basis") (emphasis in original), quoting *Crow v. State of California*, 222 Cal. App. 3d 192, 209 (1990). Riordan testified that he had access to class schedules on the department computers through the

department secretary Maureen Cavanaugh. ([Doc. No. 90], at p.2). Mayrose sensed that there was a need for more people to be able to access the database of student class schedules, and "that is why I was trained on it, and other people in the department were given access to it." ([Doc. No. 90], at p.2). Mayrose believes that "the professor confirmed that Mr. Godette was in that particular class." ([Doc. No. 90], at p.2). Tellingly, as then Chief of the Merrimack College police, William Mayrose, admitted in writing that "[Godette] was subjected to a situation that could have been avoided with advance information about his 11:00 am class." ([Doc. No. 90], at p.2). Nonetheless, despite the ease with which Riordan and other Merrimack College police officers could have determined Godette's whereabouts at the time of the bank robbery, *see Pool*, *supra*, Riordan simply acted upon his unverified suspicions and summoned the North Andover police, and both Riordan and other Merrimack College officers helped the North Andover police track down and arrest Godette.

Where the harm to Godette was reasonably foreseeable, and where the risk of harm is high in comparison with the modest cost of imposing a duty upon college officials to take reasonable steps to insure that they are not wrongfully accusing their own student of a crime, Merrimack College and Riordan were under the duty to act as the reasonably prudent person. As such, they should have checked Godette's schedule and consulted with Godette's professor before calling the North Andover police and accusing Godette of the bank robbery. Moreover, they could reasonably be expected to have taken those steps at any time prior to Godette's arrest.

    **2.**    **Merrimack College and Riordan owed a duty to Godette to protect him from the harmful conduct of third parties; here, North Andover police officers.**

Massachusetts recognizes an affirmative duty upon colleges, even in the absence of any other actions by the college, to protect their students from the harmful conduct of third parties. *Mullins v. Pine Manor College*, 389 Mass. 47 (1983) (college liable for failing to take reasonable

steps to prevent criminal act, rape, by a third party); *see also Furek v. University of Delaware*, 594 A.2d 506, 522 (Del. 1991) ("The university is not an insurer of the safety of its students nor a policeman of student morality, nonetheless, it has a duty to regulate and supervise foreseeable dangerous activities occurring on its property"). This duty extends to Godette, as to any other student. Here, as in *Mullins*, Godette suffered physical and emotional harm on the Merrimack College campus at the hands of a third party. By inviting the police onto campus for the express purpose of having Godette harmed, however, Merrimack College and Riordan went even further than the situation presented in *Mullins*. Merrimack, through Riordan, created the situation leading to Godette's wrongful arrest and failed to regulate and/or supervise dangerous activity on its campus, to wit, the arrest of a suspected armed felon. *See, e.g., Anderson*, *supra*, 247 F.3d at 130 (shooting of unarmed suspect); *Pool*, *supra*, 42 Cal.3d at 1064. In short, Merrimack College and Riordan failed to protect Godette from foreseeable harm, even though a simple phone call or a review of Godette's class schedule on a computer, coupled with a phone call, could have avoided the entire situation, thereby protecting *all* Merrimack College students. (*See, e.g.*, [Doc. No. 81, Exhibit O], the "Mayrose Memorandum"). One must remember that, in Mayrose's memorandum, Mayrose admitted that Merrimack should have handled the situation differently.[3]

      Finally, Defendants argue, without citation, that, as a matter of law, they cannot be liable for Godette's damages because this Court found Godette's arrest to be lawful. ([Doc. No. 103], at 8). Defendants argument mischaracterizes the law of negligence. While unlawful conduct may provide evidence of negligence, the absence of a violation of Godette's civil rights does not

---

[3] Mayrose wrote, in his memorandum: "[I]t appears that the focus and course of the investigation would have been changed if the student's class schedule had been checked before searching for him on campus….Wherever possible, let's take a little more time to consider all possibilities before calling in a local law enforcement agency." ([Doc. No. 81, Exhibit O; Doc. No. 90], at pp. 2-3).

9

as a matter of law absolve Merrimack College and Riordan of liability for their negligent conduct.

Therefore, Godette respectfully requests that this Court deny summary judgment as to Godette's negligence claim against Riordan and Merrimack College. In the alternative, Godette respectfully requests that this Court certify to the Supreme Judicial Court of Massachusetts the question of whether Merrimack College and Riordan owed a duty to exercise reasonable care before reporting suspicions of felonious conduct to the police.

> **B.    Defendants' Motion for Summary Judgment on Count XIII (Breach of Contract) Must Be Denied Where There Are Genuine Issues of Material Fact Pertaining to Whether Merrimack Breached Its Contract With Godette By, Among Other Things, Discriminating Against Him on the Basis of His Race and Failing to Protect Him.**

In Count XIII of the Complaint, Godette alleges a breach of contract claim against Merrimack College. In that Count, Godette alleges that Godette and Merrimack entered into a contract under which Merrimack would provide a collegiate education to Godette for good and valuable consideration. (Complaint, ¶129). Godette alleges that Merrimack breached its contract with him by, among other things, (a) discriminating against Godette on the basis of his race, (b) by failing to protect and maintain Godette's privacy and confidentiality, (c) by assisting in causing his arrest and (d) by failing to afford Godette due process. (Complaint, ¶131).

In order to bring a breach of claim under Massachusetts law, "a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage." *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 825 F.Supp. 370, 380 (D.Mass.1993). Courts have found that the basic legal relationship between students and colleges is contractual in nature. *Thornton v. Harvard University*, 2 F.Supp.2d 89, 93 (D.Mass. 1998); *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir.1998); *Russell v. Salve Regina College*,

938 F.2d 315, 316 (1st Cir.1991). "The proper standard for interpreting the contractual terms is that of 'reasonable expectation--what meaning the party making the manifestation, the university, should reasonably expect the other party to give it.' " *Mangla*, 135 F.3d at 83 (quoting *Giles v. Howard Univ.*, 428 F.Supp. 603, 605 (D.D.C.1977). "Under Massachusetts law, the promise, offer, or commitment that forms the basis of a valid contract can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials. *Guckenberger v. Boston University*, 974 F.Supp. 106, 149 (D.Mass.,1997). In the case at bar, Merrimack failed to produce any of those documents through automatic disclosure[4].

Merrimack did, however, produce various documents pertaining to the protection of diversity on campus. (See **Exhibits A through D** to Supplemental Affidavit of Paul J. Klehm). Godette has moved *in limine* to exclude those documents at trial, but he includes them here only for purposes of demonstrating the existence of a diversity/non-discrimination policy on campus. Moreover, according to its website (which constitutes promotional materials), Merrimack's Non-Discrimination Policy provides as follows:

> Merrimack College fully supports a policy of non-discrimination. No person will, on the basis of race, color, religion, sex, national or ethnic origin, age, handicap, or disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination in any of the activities conducted by the College.

(See **Exhibit E**). Through that language, Merrimack committed itself to a policy of non-discrimination with regard to Godette and all other members of its community.

During Godette's tenure at Merrimack College, few African-American or Hispanic students and faculty were on the Merrimack College campus, and the majority of students during his tenure at the school were Caucasian. (Aff. Godette, ¶1, Exhibit A to Affidavit of Paul J.

---

[4] The Court did not permit the parties to engage in formal written discovery without leave of Court. [Doc. No. 40]. As a result, Godette did not have the opportunity to obtain student handbooks through normal discovery means. Godette is filing herewith a Rule 56(f) affidavit.

Klehm, Esq. [Doc. No. 81](hereinafter, "Aff. Klehm"); see Dep. Godette, p. 115, ln. 2-3, Exhibit B to Aff. Klehm; see Deposition of William Mayrose, p. 115, ln. 3-8, Exhibit P to Aff. Klehm). Even though the bank robber was initially described as white and later as Hispanic, Godette, an African-American, was ultimately arrested by the North Andover police, after Riordan singled out Godette. Godette believes and asserts that his arrest was racially motivated. (Aff. Godette, ¶40, Exhibit A to Aff. Klehm, Dep. Godette, p. 133, ln. 16-20, Exhibit B to Aff. Klehm).

The case of *Goodman v. President and Trustees of Bowdoin College,* 135 F.Supp.2d 40 (D. Me. 2001) is instructive. In that case, a student who was expelled for fighting brought various claims, including, without limitation, a breach of contract based upon racial discrimination, against Bowdoin College. The Court examined language contained in the Bowdoin student handbook and found that the college had not contractually committed itself to refrain from racial discrimination[5]. "[N]owhere in this provision does Bowdoin assume any responsibility for refraining from discrimination itself or set forth any consequences of discriminatory actions on its part." *Id.* at 56. Merrimack's Non-Discrimination Policy, on its face, clearly commits Merrimack to refrain from discriminatory actions. As a result, for Merrimack to single out Godette on the basis of his race and to cause him to be arrested in public on suspicion of a very serious crime such as a bank robbery constitutes a breach of contract. It bears repeating that Merrimack could have avoided the wrongful arrest by simply checking on

---

[5]
> Respect for the rights of all and for the differences among us is essential to the Bowdoin community. Discrimination ... of others because of race, religious affiliation, gender, age, sexual orientation, physical characteristics, or other characteristics has no place in an intellectual community. * * * Such practices violate both the ideals of the College and its Social Code and are subject to appropriate disciplinary sanctions. When such incidents violate the statues of the State of Maine, criminal prosecution may be pursued.

*Id.* at 56.

Godette's whereabouts.  A jury may find that Merrimack's failure to do so is further evidence of discrimination against Godette on the basis of his race.

Even in the absence of racial discrimination, Merrimack's failure to check on Godette's whereabouts constitutes a breach of contract.  It is an implied term of the contract between Godette and Merrimack that the Merrimack police services will conduct fair investigations and avoid causing wrongful arrests.  Here, Riordan could have checked the computers for Godette's schedule or he could have contacted the Registrar's Office for his schedule before calling the North Andover Police or, at the very least, during the interim between the time he called the police and the time that the North Andover police arrived at his office.  After all, several hours had elapsed since the robbery, and there had been no reports on campus or anywhere else close by of any shootings or gun brandishings.  Merrimack continues to argue that it needed to act as quickly as possible in order to protect the students, but, especially given the passage of time and the flimsy nature of the identification, their argument affords no justification for Merrimack to act with such recklessness.  Moreover, Merrimack ignores the very real risk that Godette could have been seriously harmed, or even killed, by the police officers during the course of the felony arrest.  Merrimack failed to take steps to insure Godette's safety, thereby breaching its contract with Godette.

Defendants seek to trivialize Godette's breach of contract claim by framing it as  claim that "Merrimack College contracted with Plaintiff to withhold from local law enforcement information relevant to their armed robbery investigation (or any other investigation for that matter)."  Merrimack has mischaracterized Godette's breach of contract claim.  That statement assumes that the information that Riordan had about Godette was relevant.  Taking the evidence in the light most favorable to Godette for purposes of summary judgment, as this Court must, it

is clear that Riordan lacked relevant information about Godette with regard to the armed robbery investigation.

Additionally, the mere fact that this Court has found that the conduct of the North Andover police does not violate Godette's civil rights (which Godette disputes) does not exonerate Merrimack. In determining whether there is probable cause to arrest for purposes of a civil rights claim, the Court examines the evidence available to the police at the time that they make the arrest – an issue which was discussed at the previous summary judgment hearing in this case. One of the breaches of contract here concerns the failure of Merrimack and Riordan to confirm Godette's whereabouts before reporting him to the police as a bank robber. We need not reach the issue of probable cause in order to find that Merrimack breached its contract with Godette.

Through its breaches of the contract, Merrimack caused Godette's private life on the college campus to become suddenly public and humiliating. At the very least, there are genuine issues of material facts pertaining to whether Merrimack breached its contract with Godette by, among other things, discriminating against him on the basis of his race and failing to protect him. A trial on these issues is warranted.

    **C.    Where There Are Genuine Issues of Material Fact As to Whether Merrimack Acted in Good Faith With Regard to Godette, Merrimack's Motion for Summary Judgment on Count XIV (Breach of Covenant of Good Faith and Fair Dealing) Must Be Denied.**

In every Massachusetts contract, there exists an implied covenant of good faith and fair dealing. See *Maddaloni v. Western Mass. Bus Lines, Inc.*, 12 Mass.App.Ct. 236, 242, 422 N.E.2d 1379, 1383 (1981), *aff'd*, 386 Mass. 877, 438 N.E.2d 351 (1982). Under that covenant, "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract,…." *Druker v. Roland Wm. Jutras Associates,*

14

*Inc.*, 370 Mass. 383, 385, 348 N.E.2d 763, 765 (1976); See also, *Restatement, 2d, Contracts,* § 205.

      We have established above the existence of a contract between Godette and Merrimack. In discriminating against him on the basis of his race, and in causing him to be arrested because of Merrimack's and Riordan's failure to verify Godette's whereabouts, Merrimack and Riordan precipitated a chain of explosive events which caused great harm to Godette and endured until Merrimack much later performed the simple task of confirming that Godette had been in class – a task which Merrimack could have, and should have, performed much earlier.  In so doing, Merrimack prevented Godette from obtaining a Merrimack education free from unwarranted intrusions on his private life and free from unnecessary emotional distress, and Merrimack thereby breached the implied covenant of good faith and fair dealing.  See *Powers v. MJB Acquisition Corp.,* 993 F.Supp. 861, 865 (D.Wyo.,1998)(alleged failure to accommodate student's disability could constitute breach of implied covenant of good faith and fair dealing, and, therefore, was question for jury, especially where special relationship between school and student).

      When conducting this analysis, one must remember that Merrimack College, as an institution of learning, is not entitled to any special deference under the facts of this case. "Courts have long recognized that matters of academic judgment are generally better left to the educational institutions than to the judiciary and have accorded great deference where such matters are at issue." *Mangla*, 135 F.3d at 84 (no breach of implied covenant where student not admitted to particular college).  This case involves the wrongful arrest of one of Merrimack's students, not a review of a matter of academic judgment.

As a result, Godette respectfully requests that this Court deny summary judgment as to Godette's breach of covenant of good faith and fair dealing claim against Riordan and Merrimack College.

### **Conclusion**

Godette respectfully requests that this Court deny the motion for summary judgment filed by Defendants Merrimack College and Michael Riordan on all counts. In the alternative, Godette respectfully requests that this Court report a question to the Supreme Judicial Court of Massachusetts on the question of whether a college and its police officer owed a duty to exercise reasonable care before reporting suspicions of felonious conduct to the local municipal police department. Additionally, Godette seeks leave to obtain copies of any and all writings between Merrimack and Godette, along with any and all Merrimack student handbooks in effect from 2000 to and including 2004, pursuant to Rule 56(f).

        Plaintiff
        Brett S. Godette
        By his Attorneys,

*/s/ Paul J. Klehm*
James B. Krasnoo (BBO#279300)
*james@krasnooklehm.com*
Paul J. Klehm (BBO#561605)
*pklehm@krasnooklehm.com*
Benjamin L. Falkner (BBO#667951)
*bfalkner@krasnooklehm.com*
Krasnoo | Klehm LLP
23 Main Street, Suite 6
Andover, MA 01810
(978) 475-9955

Dated: June 1, 2007

**CERTIFICATE OF SERVICE**

    I hereby certify that a true copy of the above document was served upon the attorney(s) of record via ECF on June 1, 2007.

                              */s/ Paul J. Klehm*
                              Paul J. Klehm