UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|   |   |
|---|---|
| BRETT S. GODETTE, ) | |
|     Plaintiff, ) | |
| ) | Civil Action No. 05-11354JLT |
| v. ) | |
| ) | |
| RICHARD STANLEY, *et. al.*, ) | |
|     Defendants. ) | |

**PLAINTIFF BRETT S. GODETTE'S OPPOSITION TO MOTION *IN LIMINE* OF MERRIMACK COLLEGE AND MICHAEL RIORDAN TO EXCLUDE FORMER MERRIMACK POLICE CHIEF WILLIAM MAYROSE'S MEMORANDUM AND ANY TESTIMONY CONCERNING ITS CONTENTS**

Plaintiff Brett S. Godette (hereinafter, "Godette") hereby opposes the motion *in limine* of Defendants Merrimack College and Michael Riordan (hereinafter, collectively, "Merrimack") to exclude a memorandum authored by then Merrimack Police Chief William Mayrose on April 11, 2003 (hereinafter, the "Memorandum"), a copy of which is attached hereto as **Exhibit A**, and any testimony relating thereto, where:

    (1) the Memorandum contains admissions of a party-opponent pursuant to Fed.R.Evid. 801(d)(2),

    (2) the Memorandum does not constitute a subsequent remedial measure pursuant to Fed.R.Evid. 407,

    (3) the Memorandum constitutes a business record pursuant to Fed.R.Evid. 803(6) where, among other things, the Chief testified that he prepared such memoranda in the ordinary course of business, and

    (4) to the extent that this Court finds the Memorandum to include hearsay, Godette notes that the Memorandum is offered to show, among other things, the feasibility of determining Godette's whereabouts before having him arrested.

In the alternative, to the extent necessary, Godette respectfully requests that this Court permit the introduction of the Memorandum, and testimony relating thereto, at trial after making necessary redactions from the Memorandum. Godette relies upon the reasons set forth below:

1.      On the morning of March 26, 2003, there was a bank robbery in North Andover, Massachusetts. While the victim initially described the robber as Caucasian, the North Andover police determined, apparently based upon surveillance photographs, that the robber was Hispanic. The North Andover police disseminated a description of the robber to the Merrimack College Police Department, as well as to other places. Lt. Michael Riordan of the Merrimack College Police made an erroneous determination that Godette, an African-American Merrimack student whom Riordan had seen earlier that day, was the bank robber. Without first determining Godette's whereabouts at the time of the robbery (by obtaining his schedule on a computer or from the registrar's office and by contacting Godette's professor) and despite the passage of approximately three hours from the time of the robbery, Riordan called the North Andover Police regarding Godette. Riordan did not check Godette's whereabouts between the time of calling the police and the time of their arrival, nor did he or his department take any steps to confirm Godette's whereabouts before various police departments converged upon Godette in a public area of the college and arrested him.

2.      In the Memorandum, which Merrimack did not produce until approximately March 19, 2007, then chief William Mayrose discussed the incident and Merrimack police's role in the incident. Chief Mayrose testified that he wrote his memorandum dated April 11, 2003 in good faith, intending it to be accurate. (Dep. Mayrose, at p. 90, ln. 21 to p. 91, ln. 3 [Doc. No. 92]; *see* Exhibit O to Affidavit of Paul J. Klehm [Doc. No. 81]; see also Exhibit A to Merrimack's Motion *in Limine* [Doc. No.112]). In the Memorandum, Mayrose wrote, among other things,

> The student was, understandably, unsettled and embarrassed by the experience of being handcuffed in front of fellow students, particularly due to the fact that he was mistakenly identified as the suspect. After this incident, rumors began circulating around campus that he had been arrested for armed robbery and this

2

> caused further frustration and embarrassment to the student and to the college community.
>
> After the incident, I met with Chief Stanley and Lt. Gallagher of the North Andover Police Department. We all agreed that the student was subjected to a situation that could have been avoided with advance information about his 11:00am class. Chief Stanley has offered to apologize to the student and he has also had conversation with President Santigati.
>
> I recognize that things happened very quickly that day and, once NAPD was on campus, they dictated the course and speed of action. With this in mind, it is still appropriate for us to review our role in the incident to see what can be learned. In the spirit of learning, and not criticism, it appears that the focus and course of the investigation would have been changed if the student's class schedule had been checked before searching for him on campus….
>
> Wherever possible, let's take a little more time to consider all possibilities before calling in a local law enforcement agency. When time allows, the officers involved should consult with me or, in my absence, the next highest ranking officer.

*Id*[1]; See **Exhibit A**.

      3.      Merrimack argues that the Memorandum constitutes a subsequent remedial measure and that, therefore, the Memorandum must be excluded pursuant to Fed.R.Evid. 407. That rule provides:

> When, after an injury or harm allegedly caused by an event, measures are taken that, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence, culpable conduct, a defect in a product, a defect in a product's design, or a need for a warning or instruction. This rule does not require the exclusion of evidence of subsequent measures when offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment.

---

[1] At his deposition, when asked if any portion of the document was inaccurate, Mayrose testified, "I think my reference to checking a student's class schedule, if I had to rewrite this, would be to say, to verify that the student was in a particular place at a particular time, as opposed to simply just checking a schedule." (Dep. Mayrose, at p. 96, ln. 6-12; [Doc. No. 92]). He did not believe any other portion of the memorandum to be inaccurate. (*Id*. at p. 96, ln. 13-16; see p. 102, ln. 14-19; [Doc. No. 92]).

4.      Merrimack cites to a number of cases in which the Court excluded certain memoranda as subsequent remedial measures. One cannot extrapolate from that argument, though, that the Memorandum, which includes analysis and conclusions regarding the wrongful arrest, must be precluded. In *Prentiss & Carlisle Co., Inc. v. Koehring-Waterous of Timberjack, Inc.*, 972 F.2d 6, 9-10 (1st Cir. 1992), the First Circuit found that a manufacturer's post-incident memorandum was admissible where Rule 407 prohibits evidence of subsequent remedial measures taken, not evidence of a party's analysis of its own product after an incident. See also *Hochen v. Bobst Group, Inc.,* 193 F.R.D. 22, 25 (D. Mass. 2000)(Relying upon *Prentiss*, Court found post-accident report, testimony regarding report, and findings of persons who worked on press admissible where Rule 407 only barred evidence regarding subsequent remedial repairs made by technicians).

5.      In Paragraph 9 of its motion, Merrimack argues that "evidence of post-incident policy changes, internal investigations, disciplinary proceedings, and admissions of errors in judgment, violations of policy, or intentions to take disciplinary action…" constitute subsequent remedial measures, citing to *Gilanian v. City of Boston*, 431 F.Supp.2d 172, 177 (D.Mass 2006) and *Specht v. Jensen*, 863 F.2d 700, 701 (10th Cir. 1988). There are two problems with Merrimack's argument. First, in *Gilanian*, the Court determined that, since the policy change was the result of a higher authority (and not in response to an incident giving rise to a lawsuit), Rule 407 did not apply. *Gilanian*, 431 F.Supp.2d at 178. Secondly, and more importantly, there is a split in the case law "concerning whether the conclusions of a post-accident investigation are admissible under Rule 407." *Villalba v. Consol. Freightways Corp. of Delaware*, 2000 WL 1154073 (N.D.Ill. Aug 14, 2000)(citing *Specht* and *Prentiss*). Notwithstanding the District Court decision in *Gilanian*, the First Circuit follows *Prentiss,* and, therefore, the only type of evidence

that constitutes subsequent remedial measures are the actual policy changes (remedial measures taken) as a result of the incident.

6. We now apply the learning in *Prentiss* to the Memorandum. Under *Prentiss*, the portions of the Memorandum which discuss the incident, and Mayrose's analysis and conclusions drawn from the incident, are all admissible. The remaining question is whether any portion of the Memorandum constitutes a change in policy. The language in the Memorandum appears more conversational ("Let's use this experience as a learning opportunity"), rather than as a formal statement of policy or of subsequent remedial repairs made. Thus, it cannot be fairly said that the language of the Memorandum constitutes a change in policy.

7. To the extent that this Court does determine that any portion of the Memorandum constitutes a statement of policy, Godette respectfully requests that this Court redact any such statement of policy and then admit the remaining portion of the Memorandum.

8. Merrimack next argues that the Memorandum constitutes hearsay under Fed.R.Evid. 801(a)-(c) and Fed.R.Evid. 805. In fact, Chief Mayrose's report constitutes an admission by a party-opponent pursuant to Fed.R.Evid. 801(d)(2). It is his own statement, and he has manifested (at his deposition) his belief in the truth of the Memorandum. Additionally, the circumstances of this case demonstrate that Mayrose was authorized to make the statement on behalf of Merrimack. While his designation as Chief of the Merrimack Police demonstrates that he was management level, one does not need to be management level in order to have one's statement as an employee constitute an admission against a company. See *Union Mut. Life Ins. Co. v. Chrysler Corp.*, 793 F.2d 1, 8 (1st Cir. 1986). Moreover, under Fed.R.Evid. 801(d)(2)(D), Godette is not even required to demonstrate that Mayrose has first-hand knowledge pertaining to

the statements he makes. See *Advisory Committee's Note* to Fed.R.Evid. 801(d)(2), 28 U.S.C., App'x, Rules of Evid. 716, 717 (1982).

9. The Memorandum, which was written only 16 days after the event, also constitutes a business record pursuant to Fed.R.Evid. 803(6). At his deposition, Mayrose testified that he prepared memoranda in the regular course of his business. (Excerpt of Deposition of William Mayrose (hereinafter, "Dep. Mayrose"), attached hereto as **Exhibit B**, p. 36, ln. 19-22). Mayrose expected officers to review the memoranda every shift that they worked, and, further, to initial the memorandum signifying that they had read same. (Dep. Mayrose, p. 35, ln. 7-24). Mayrose testified that he sought to be as accurate as possible in the memoranda. (Dep. Mayrose, p. 36, ln. 23 to p. 37, ln. 2). The Memorandum thus meets the requirements of the business records exception to the hearsay rule.

10. Merrimack alleges that certain information from independent sources constitutes inadmissible hearsay. First, the Memorandum constitutes an admission, and thus the entire document is admissible. Secondly, Mayrose wrote the Memorandum in the normal course of his business. In *Cameron v. Otto Bock Orthopedic Industry, Inc.*, 43 F.3d 14, 16 (1st Cir. 1994), upon which Merrimack relies, the Court excluded information from prosthetists in a report, because "the prosthetists' patients are not part of Otto Bock's business." Here, however, Mayrose appears to have received his information from college and municipal police sources, sources from whom, it is clear, a college police chief receives information on a regular basis.

11. To the extent that this Court finds that the Memorandum constitutes hearsay, Godette notes that, in that event, he would not be offering the Memorandum for the truth of the matter asserted. Instead, he would be offering it to show, among other things, the feasibility with which the incident could have been avoided if the Merrimack police had simply confirmed

Godette's whereabouts at the time of the robbery before contacting the police, or at least before the police and Merrimack police went to search for Godette on campus.

12. Godette respectfully requests that this Court deny Merrimack's motion *in limine* to exclude the Memorandum. In the alternative, to the extent necessary, Godette respectfully requests that this Court permit the introduction of the Memorandum at trial after making necessary redactions from the Memorandum.

**WHEREFORE**, for the above reasons, Godette respectfully requests that this Court DENY Merrimack's motion *in limine* to exclude the Memorandum, and testimony relating thereto. In the alternative, to the extent necessary, Godette respectfully requests that this Court permit the introduction of the Memorandum, and testimony relating thereto, at trial after making necessary redactions from the Memorandum.

right

Plaintiff
Brett S. Godette
By his Attorneys,

*/s/ Paul J. Klehm*
James B. Krasnoo (BBO#279300)
*james@krasnooklehm.com*
Paul J. Klehm (BBO#561605)
*pklehm@krasnooklehm.com*
Benjamin L. Falkner (BBO#667951)
*bfalkner@krasnooklehm.com*
Krasnoo | Klehm LLP
23 Main Street, Suite 6
Andover, MA 01810
(978) 475-9955

Dated: June 4, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the above document was served upon the attorney(s) of record via ECF on June 4, 2007.

*/s/ Paul J. Klehm*
Paul J. Klehm

**MERRIMACK COLLEGE CAMPUS POLICE**

Exhibit "A"

TO: All Department Personnel
FROM: Bill Mayrose
DATE: April 11, 2003
RE: NAPD Armed Robbery Investigation

As you are likely aware, our department recently assisted the North Andover Police Department with their investigation of the armed robbery of a local bank. The investigation led them to our campus and a focus on one of our resident students.

Believing that the student was the armed robbery suspect, a NAPD detective placed the student in handcuffs in the Monican Centre lobby and, after a few minutes of conversation, accompanied him to his room where he was uncuffed and questioned for a period of time. It was during this questioning that the student explained that he was in class when the 11:35am armed robbery occurred.

The student was, understandably, unsettled and embarrassed by the experience of being handcuffed in front of fellow students, particularly due to the fact that he was mistakenly identified as the suspect. After this incident, rumors began circulating around campus that he had been arrested for armed robbery and this caused further frustration and embarrassment to the student and to the college community.

After the incident, I met with Chief Stanley and Lt. Gallagher of the North Andover Police Department. We all agreed that the student was subjected to a situation that could have been avoided with advance information about his 11:00am class. Chief Stanley has offered to apologize to the student and he has also had conversation with President Santagati.

I recognize that things happened very quickly that day and, once NAPD was on campus, they dictated the course and speed of action. With this in mind, it is still appropriate for us to review our role in the incident to see what can be learned. In the spirit of learning, and not criticism, it appears that the focus and course of the investigation would have been changed if the student's class schedule had been checked before searching for him on campus.

Let's use this experience as a learning opportunity. Wherever possible, let's take a little more time to consider all possibilities before calling in a local law enforcement agency. When time allows, the officers involved should consult with me or, in my absence, the next highest ranking officer.


EXHIBIT 1
Cronin
3/13/07

Exhibit-1

**ORIGINAL**

Volume 1, Pages 1-118

UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

BRETT S. GODETTE,

       Plaintiff,

vs.                 Civil Action No. 05-11354JLT

RICHARD STANLEY, et al,

       Defendants.

---------------------------------

DEPOSITION OF WILLIAM MAYROSE

Wednesday, March 14, 2007, 10:20 a.m.

807 Main Street

Worcester, Massachusetts

------- Reporter: Patricia A. Bucko, RPR -------

G & M COURT REPORTING ASSOCIATES

42 Chauncy Street, Suite 1A, Boston, Mass. 02110

617.338.0030   fax 617.426.7225

1   Q.  Could you think of any as you sit here
2  today?
3   A.  No, not -- no, not oral policies that were
4  not in the policy and procedures book, no.
5   Q.  Now, you also mentioned a memo book.  Could
6  you tell me what that was?
7   A.  It was a looseleaf type binder where memos
8  would be inserted, and officers -- all the
9  department members were required to read the memos
10  at their first shift that they came on duty, and to
11  initial that they had read the memo.
12   Q.  What sorts of things would end up in a
13  memo?
14   A.  Anything from sharing information about
15  coming events, to clarifications and policies, to
16  addressing issues that were not addressed in the
17  larger policies and procedures book.  Quite a
18  variety of information.
19   Q.  How often were officers expected to review
20  the memo book?
21   A.  Every shift they worked.
22   Q.  So each shift, they were supposed to come
23  in and look at the memo book before they went out?
24   A.  Yes.

1   Q.  So was it then required that officers read
2   all of the current memos each shift before they went
3   out on their rounds?
4   A.  Yes.
5   Q.  And they would put their initials on the
6   memo themselves?
7   A.  Yes.
8   Q.  These memos, who would draft the memos?
9   A.  Primarily me, but other supervisors could
10  also put memos on it.
11  Q.  And was there any policy and procedure,
12  either written or otherwise, with regard to what
13  would determine when to write a memo?
14  A.  No.
15  Q.  And am I right, then, that the purpose of
16  drafting the memos was to convey certain information
17  to your officers?
18  A.  Yes.
19  Q.  And these memos would be something that
20  would be prepared in the regular course of your
21  business?
22  A.  Yes.
23  Q.  And you, when you draft these memos, would
24  seek to be as accurate as possible in your contents,

```
 1  correct?
 2      A.  Yes.
 3      Q.  And were there times when you later
 4  realized that a memo contained an error or two and
 5  you needed to correct it?
 6      A.  Yes.
 7      Q.  What would you do?
 8      A.  The error could have been addressed in a
 9  subsequent memo or in an e-mail to the department.
10      Q.  Did you ever send out any e-mails to
11  anyone, whether they were within the department or
12  without of the department, in regard to either Brett
13  Godette or the incident which brings you here today?
14      A.  I don't think so.
15      Q.  When you worked at Merrimack College, what
16  was your normal shift?
17          MS. RYAN:  Objection.
18          You can answer, sorry.
19      A.  I usually arrived between 8:00 and 8:30 in
20  the morning; left anywhere between 6:00 and 7:00 at
21  night, Monday through Friday, exclusive of holidays.
22      Q.  Do you recall what your shift was on the
23  date of the incident which brings you here today?
24      A.  I worked the day shift.  I couldn't tell
```